# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

BRUCE HENRY,
*Plaintiff-Appellee,*
v.

RON ABERNATHY, et al.,
*Defendants-Appellants.*

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:21-cv-00797-RAH-JTA

## BRIEF OF APPELLANTS ATTORNEY GENERAL STEVE MARSHALL AND DISTRICT ATTORNEY HAYS WEBB

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr.
  *Solicitor General*

James W. Davis
  *Deputy Attorney General*

Benjamin M. Seiss
Richard D. Mink
Charles A. McKay
  *Assistant Attorneys General*

Dylan Mauldin
  *Assistant Solicitor General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

March 26, 2024

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1(a)(3) to 26.1-2(b), the undersigned counsel certifies that that the following listed persons and parties may have an interest in the outcome of this case:

1. Abernathy, Ron (Defendant-Appellant, Sheriff, Tuscaloosa County);

2. Adams, Magistrate Judge Jerusha T. (U. S. District Court, Middle District of Alabama);

3. Agricola, Jr., Algert S. (Attorney for Henry);

4. Agricola, Barbara H. (Attorney for Henry);

5. Agricola Law LLC (Attorneys for Henry);

6. Albea, Stuart D. (Attorney for Abernathy);

7. Davis, James W. (Attorney for Hayes and Marshall);

8. Dubbeling, Paul M. (Attorney for Henry);

9. LaCour Jr., Edmund G. (Attorney for Hayes and Marshall);

10. Harris, Andrew Reid (Terminated in lower court 7/27/2023);

11. Henry, Bruce (Plaintiff-Appellee);

12. Huffaker, Jr., Hon. Judge R. Austin (U. S. District Court, Middle District of Alabama);

13. Marshall, Steve (Defendant-Appellant, Alabama Attorney General);

14. Mauldin, Dylan (Attorney for Hayes and Marshall);

15. McKay, Charles A. (Attorney for Hayes and Marshall);

16. Mink, Richard D. (Attorney for Hayes and Marshall);

17. P.M. Dubbeling, PLLC (Attorney for Henry);

18. Seiss, Benjamin M. (Attorney for Hayes and Marshall);

19. Webb, Hayes (Defendant-Appellant).

Undersigned counsel further certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour, Jr.
 *Solicitor General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

**Counsel for Appellants Attorney General Marshall and District Attorney Webb**

## STATEMENT REGARDING ORAL ARGUMENT

The Court indicated in its March 15, 2024 order that the case will be set for oral argument upon completion of briefing.

# TABLE OF CONTENTS

Certificate of Interested Persons ..........................................................................C-1

Statement Regarding Oral Argument ....................................................... i

Table of Authorities ................................................................................. iv

Introduction ...............................................................................................1

Statement of Jurisdiction...........................................................................5

Statement of the Issues..............................................................................5

Statement of the Case................................................................................6

    A.   Alabama Regulates Sex Offenders...........................................6

    B.   Known Sex Offenders Pose a Unique Threat to Child Safety .................8

    C.   Bruce Henry Committed a Child Pornography Offense Involving Children and Later Had a Child ..............................................10

    D.   Henry Sues and Is Denied a Preliminary Injunction................................12

    E.   No Reliable Method Exists to Identify Child Sex Offenders Who Can Safely Reside With Specific Children......................................16

    F.   District Court Declares §15-20A-11(d)(4) Facially Unconstitutional.....16

Summary of the Argument........................................................................18

Standard of Review...................................................................................20

Argument...................................................................................................20

    I.   No One Convicted Of Sex Offenses Involving Children Has A Substantive Due Process Right To Reside With Or Have Overnight Access To Children. ......................................................20

A. No Binding Precedent Recognizes The Right of Child Sex Offenders to Reside With or Have Overnight Access to Their Children ........................................................................... 23

B. There Is an Enduring Historical Tradition of Denying Child Custody to Cruel Parents Who Feloniously Abuse Children ........... 28

C. Section 11(d)(4) Satisfies Any Level Of Scrutiny Because Sex Offenders Who Target Children Cannot Safely Reside With Any Children .......................................................... 40

II. At Least Some People Convicted Of Some Sex Offenses Involving Children Have No Substantive Due Process Right To Reside With Or Have Overnight Access to Children ........................................................ 42

A. Section 11(d)(4) Does Not Implicate Substantive Due Process Rights When Applied to Sex Offenders Who Wish to Live or Stay Overnight With Children With Whom They Have No Parental Relationship. ....................................................... 44

B. Even if Every Sex Crime Covered by Section 11(d)(4) Does Not Adequately Predict Future Dangerousness for Children, Some Surely Do. .............................................................. 47

III. The District Court Exceeded Its Authority And Abused Its Discretion When It Entered a Universal Injunction Barring Enforcement Of §15-20A-11(d)(4). ................................................................................. 50

Conclusion ..................................................................................................... 51

Certificate of Compliance ............................................................................. 53

Certificate of Service .................................................................................... 54

# Table of Authorities

**Cases**

*Allen v. State,*
 449 Md. 988 (Md. Ct. App. 2016) ........................................................37

*Alley v. U.S. Dep't of Health & Hum. Servs.,*
 590 F.3d 1195 (11th Cir. 2009) ...........................................................50

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott,*
 717 F.3d 851 (11th Cir. 2013) ................................................... 18, 44

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.,*
 522 F.3d 1200 (11th Cir. 2008) ...........................................................20

*Baird v. Baird,*
 21 N.J. Eq. 384 (N.J. 1869) .................................................................34

*Bendiburg v. Dempsey,*
 909 F.2d 463 (11th Cir. 1990) .............................................................21

*Boggs v. Boggs,*
 49 Iowa 190 (1878) ..............................................................................32

*Bucklew v. Precythe,*
 139 S. Ct. 1112 (2019) .........................................................................43

*C.M. v. State,*
 889 So.2d 57 (Ala. Crim. App. 2004) ..................................................49

*Cagle v. Bruner,*
 112 F.3d 1510 (11th Cir. 1997) ...........................................................20

*California v. Texas,*
 593 U.S. 659 (2021) .............................................................................50

*Chapsky v. Wood,*
 26 Kan. 650 (1881) ..............................................................................31

*Cocke v. Hannum*,
  10 George 423 (Miss. 1860) ......................................................... 32, 36

*Commonwealth v. Lapointe*,
  759 N.E.2d 294 (Mass. 2001) ............................................................37

*DA Mortg., Inc. v. City of Miami Beach*,
  486 F.3d 1254 (11th Cir. 2007) ........................................................43

*Doe v. Moore*,
  410 F.3d 1337 (11th Cir. 2005) ................................................. 21, 40

*Doe v. Rausch*,
  648 F. Supp. 3d 925 (W.D. Tenn. 2023) ........................................46

*Dumain v. Gwynne*,
  10 Allen 270 (Mass. 1865) ...............................................................32

*Echols v. Lawton*,
  913 F.3d 1313 (11th Cir. 2019) ......................................................20

*Eknes-Tucker v. Governor of Alabama*,
  80 F.4th 1205 (11th Cir. 2023) ................................................. 27, 40

*Ex parte Bronstein*,
  434 So. 2d 780 (Ala. 1983) ..............................................................46

*Ex parte Crouse*,
  4 Whart. 9 (Penn. 1839) ..................................................................33

*Ex parte Sullivan*,
  407 So. 2d 559 (Ala. 1981) ..............................................................29

*F.C.C. v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) .........................................................................40

*Farnham v. Pierce*,
  6 N.E. 830 (Mass. 1886) ..................................................................34

*Fla. Right to Life, Inc., v. Lamar*,
    273 F.3d 1318 (11th Cir. 2001) ..........................................................45

*Georgia v. President of the United States*,
    46 F.4th 12833 (11th Cir. 2022) ........................................................51

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................. 50, 51

*Harris v. Mexican Specialty Foods, Inc.*,
    564 F.3d 1301 (11th Cir. 2009) ..........................................................43

*Herring v. Alabama*,
    100 So. 3d 616 (Ala. Crim. App. 2011)..............................................42

*In re C.R.C.*,
    450 P.3d 1169 (Utah Ct. App. 2019) ..................................................36

*In re Cuneen*,
    17 How. Pr. 516 (N.Y. Sup. Ct. 1859)................................................32

*In re S.B.G.*,
    981 N.W.2d 224 (Minn. Ct. App. 2022)..............................................36

*In re Welfare of Child of M.Z.*,
    No. 27-JV-17-5407, 2019 WL 2167826 (Minn. Ct. App. 2019).........36

*Jensen v. Jensen*,
    170 N.W. 735 (Wis. 1919)........................................................ 33, 37

*K.E.W v. T.W.E*,
    990 So. 2d 375 (Ala. Civ. App. 2007).................................. 22, 29, 38

*Kennedy v. Louisiana*,
    554 U.S. 407 (2008)................................................................. 38, 49

*L.M.L. v. Alabama*,
    2022 WL 1721575 (Ala. Crim. App. 2022) .......................................38

*Lassiter v. Dep't Soc. Servs. of Durham Cnty.*,
    452 U.S. 18 (1981).............................................................26

*Lehr v. Robertson*,
    463 U.S. 248 (1983)............................. 25, 27, 34, 46

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
    358 F.3d 804 (11th Cir. 2004) ...........................20

*Lovell v. House of the Good Shepherd*,
    9 Wash. 419 (1894)............................................32

*M.L.B. v. S.L.J.*,
    519 U.S. 102 (1996)...........................................26

*Matter of Pima Cnty., Juvenile Action Nos. S-826 and J-59015*,
    643 P.2d 736 (Ariz. Ct. App. 1982)....................33

*McKune v. Lile*,
    536 U.S. 24 (2002)...............................................8

*Mercein v. People ex rel. Barry*,
    25 Wend. 64 (N.Y. 1840) ..................................33

*Michael H. v. Gerald D.*,
    491 U.S. 110 (1989)........................ 24, 25, 27-29, 39

*Miner v. Miner*,
    11 Ill. 43 (1849) ................................................32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).................................................29

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ...........................40

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)...............................................8

*Parham v. J.R.*,
    442 U.S. 584 (1979)........................................................................29

*People ex rel. Ordronaux v. Chegaray*,
    18 Wend. 637 (N.Y. Sup. Ct. 1836) ........................................ 30, 31

*Prince v. Massachusetts*,
    321 U.S. 158 (1944)........................................................................21

*Rivera v. Minnich*,
    483 U.S. 574 (1987)........................................................................26

*Santosky v. Kramer*,
    455 U.S. 745 (1982)........................................................................26

*Stanley v. Illinois*,
    405 U.S. 645 (1972)........................................................................24

*State ex rel. Juvenile Dpt. Of Lane Cnty., Brammer*,
    133 Or. App. 544 (Ore. Ct. App. 1995)...........................................37

*State v. Richardson*,
    40 N.H. 272 (1860) ........................................................................34

*Striplin v. Ware*,
    36 Ala. 87, 90 (1860) .....................................................................29

*T.D. v. Patton*,
    868 F.3d 1209 (10th Cir. 2017) ......................................................40

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................45

*Trawick v. Trawick*,
    173 So. 2d 341 (La. Ct. App. 1965).................................................32

*Troxel v. Granville*,
    530 U.S. 57 (2000).......................................................... 23, 24, 27

*United States v.Goldberg*,
   491 F.3d 6682 (7th Cir. 2007) ..........................................39

*United States v. Hansen,*
   599 U.S. 762 (2023)...........................................................43

*United States v. Hoey*,
   508 F.3d 687 (5th Cir. 2007) ..............................................39

*United States v. Irey*,
   612 F.3d 1160 (11th Cir. 2010) ............................... 8, 22, 37

*United States v. Loy*,
   237 F.3d 251 (3d Cir. 2001) ...............................................36

*United States v. Myers*,
   426 F.3d 117 (2d Cir. 2005) ...............................................46

*United States v. Pugh*,
   515 F.3d 1179 (11th Cir. 2008) ..........................................22

*United States v. Salerno,*
   481 U.S. 739 (1987)................................................ 15, 43, 50

*United States v. Sarras*,
   575 F.3d 1191 (11th Cir. 2009) ..........................................21

*United States v. Widmer*,
   785 F.3d 200 (6th Cir. 2015) ..............................................42

*Washington v. Glucksberg*,
   521 U.S. 702 (1997)...................................................... 21, 27

*Williams v. Att'y Gen. of Ala.*,
   378 F.3d 1232 (11th Cir. 2004) .................................. 21, 24, 27

**Statutes**

4 U.S.C. §112(a) ...................................................................12

18 U.S.C. §2G2.2 ...............................................................39

18 U.S.C. §2251 ...............................................................39

18 U.S.C. §2252A(a)(5)(B) ................................................ 11, 38

18 U.S.C. §2252A(b)(2) .................................................... 39, 49

28 U.S.C. §1291 .................................................................5

28 U.S.C. §1331 .................................................................5

42 U.S.C. §1983 .................................................................5

ALA. CODE §13A-6-61(a)(1) ..............................................49

ALA. CODE §13A-6-61(a)(3) ..........................................38, 49

ALA. CODE §13A-6-125 ......................................................38

ALA. CODE §15-20A-2(1) .....................................................6

ALA. CODE §15-20A-2(5) .................................................6, 40

ALA. CODE §15-20A-4(2) .....................................................8

ALA. CODE §15-20A-4(14) ...................................................8

ALA. CODE §15-20A-4(20) ...................................................8

ALA. CODE §15-20A-4(27) ...............................................8, 47

ALA. CODE §15-20A-11(d) ................................ 2, 4, 5, 7, 40, 45

ALA. CODE §15-20A-11(d)(4)..........................2, 4-6, 12, 13, 15-19,
................................................................37, 42, 44, 45-47, 49-51

ALA. CODE §§15-20A-11(d)(1)-(5) .........................................8

Ala. Code §15-20A-23 ........................................................7

x

ALA. CODE §30-3-151 ........................................................25

ALA. CODE §30-3-151(2)-(5) ...........................................26

ALA. CODE §398 (1958) ...................................................49

IND. CODE §31-35-3-4 (1997) ........................................35

MINN. STAT. §243.166, subdiv. 1b(a)(2)(vii) (2023) ...............35

MINN. STAT. §260C.503, subdiv. 2(a)(6) (2023) ...................35

MISS. CODE §93-15-121(h)(i) (2017) ..............................35

MO. ANN. STAT. §210.117(1) (2017) ............................36

WIS. STAT. §48.415(9m)(a)-(am) (2018) ......................35

WIS. STAT. §948.051 (2018) .........................................35

## Rules

Fed. R. Civ. P. 23 .........................................................50

## Acts

Alabama Sex Offender Registration and Community
    Notification Act ........................................... 6, 7, 17, 44, 47

## Other Authorities

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND
    438 (1769)................................................................30

2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 203
    (10th ed. Boston, Little, Brown & Co. 1860) ............................ 31, 37

2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE AS ADMINISTERED
    IN ENGLAND AND AMERICA
    §1341 (2d ed. 1839) ........................................................................30

ACTS AND RESOLVES PASSED BY THE GENERAL COURT OF MASSACHUSETTS
    266 (1866)......................................................................................34

Adam Walsh Child Protection and Safety Act of 2006,
    Pub. L. No. 109–248, §501(2)(D), 120 Stat. 587, 624 (2006) ..........................39

Black's Law Dictionary 223 (7th ed. 1999) ...........................................................43

Interstate Commission for Adult Offender Supervision (ICAOS), (ICAOS Rules),
    https://interstatecompact.org/generate-pdf/icaos-rules (2024)................... 12, 26

JAMES SCHOULER, LAW OF THE DOMESTIC RELATIONS,
    243 (Boston, Little, Brown & Co. 1905)............................................................31

JOHN LOCKE, TWO TREATISES OF GOVERNMENT
    §58 (1690)......................................................................................30

Philip M. Genty, *Procedural Due Process Rights of Incarcerated Parents in
    Termination of Parental Rights Proceedings: A Fifty State Analysis*,
    30 J. FAM. L. 757 (1991) ..................................................................35

UNITED STATES DEP'T OF JUST., *SORNA Substantial Implementation Review State
    of Alabama*, Office of Justice Programs (July 14, 2011),
    https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/alabama.pdf
    .........................................................................................................7

WALTER C. TIFFANY, HANDBOOK ON THE LAW OF PERSONS AND DOMESTIC
    RELATIONS 346 (Roger W. Cooley 3d ed. 1921)...............................................31

This case is about whether *all* convicted sex offenders—no matter the severity of their crimes against children—are constitutionally entitled to reside and spend the night with their minor children. The district court thought a "mere conviction" for child sex trafficking was not enough to deny the trafficker overnight access to other children. Doc. 150 at 13. The court then entered a universal injunction preventing Alabama from enforcing its prohibition on those convicted of a sex offense involving a child from living with minor relatives. That injunction prohibits the State from applying its law against any parents—no matter how egregious the offense—and also against grandparents, stepparents, siblings, and stepsiblings. That breathtaking result ignores our Nation's long history of protecting children from adults who have committed cruel and abusive crimes. The decision is unsupported by the Constitution and should be reversed.

Like all States, Alabama recognizes that persons who willfully victimize children pose a unique threat to public safety, and the State regulates known sex offenders accordingly. Sex crimes against child victims are underreported and difficult to detect. They often also predict future sex offenses. After offending once, offenders like Plaintiff Bruce Henry are five times more likely to be arrested or convicted for another sex offense than other felons. Undisputed evidence below showed that at least half of child pornography offenders commit hands-on contact

offenses against children, and there is no reliable method to determine which ones will molest a child, but we know that number is higher than those caught.

It follows then that limiting child sex offenders' private access to children is necessary to prevent additional grievous harm. To that end, Alabama forbids any sex offender from living with children unless the sex offender is closely related to the child. ALA. CODE §15-20A-11(d). And the exception for related minors does not apply if the offender was convicted of a sex offense involving a child under the age of 12 or a child pornography offense. *Id.* §15-20A-11(d)(4). The Legislature determined that those convicted of sexually abusing children are unfit to reside and visit overnight with children, including their own.

Henry was convicted of possessing child pornography. He admittedly masturbated while viewing child pornography. And because these images were "incredibly difficult to come by," Doc. 86-2 at 49:14–50:11, he collected them, saving over 300 horrific images including pictures and videos involving bestiality and rape of prepubescent children, Doc. 86-19 at 6. His own experts admitted that his criminal conduct indicates a sexual interest in children. And his sexual interest in children did not end with his jail sentence. While on supervised release, Henry has violated the terms of release to access pornography involving younger-looking teens and photographs of children in sexual positions.

He and his wife now have a son, with whom Henry may not reside or conduct overnight visits because of his child pornography conviction. Henry brought this case arguing that this prohibition is unconstitutional for a few reasons, but the district court latched onto one. That the prohibition is unconstitutional on its face because it violates the substantive due process right of parents. Why? Because the statute sweeps in less serious sex offenders. Never mind that the statute "is justified" as to some sex offenders. Doc. 150 at 13. Never mind that it applies to "the worst of the worst." *Id.* Or that at least half of "low risk" child pornography offenders— supposedly the best of the best—commit contact offenses. Indeed, the district court *denied* Henry's motion for a preliminary injunction because the court was not convinced Henry could safely live with his child. *See* Doc. 62 at 29. Even so, to the district court, "the mere fact of conviction" for horrendous crimes against children was not enough to deny *any* offender continued access to children. Doc. 150 at 13. That was error on several fronts.

*First*, the full panoply of parental rights have never been extended to those convicted of indisputably cruel and abusive conduct toward children. Rather, there is a long tradition of parental rights being terminated for such abuse. It matters not that a Legislature (rather than a judge) relied on "the mere fact of conviction" (rather than an assessment of competing expert witnesses). Legislatures have long tied the exercise of different rights (life, liberty, the franchise, the right to bear arms, etc.) to

certain criminal convictions. The history of States taking such steps to protect children and the fit here between the conviction and the goal both show that the Legislature was acting within the bounds of the Constitution.

*Second*, and relatedly, the law satisfies strict scrutiny. Sex offenders are dangerous and prone to victimize. They often prey on children at home, and their crimes often go undetected. And with the stakes so high, there is no sufficiently reliable way to separate the likely reoffenders from those who can safely sleep down the hall from a child. The "mere fact of conviction" is a narrowly tailored way to advance the State's compelling interest in protecting children.

*Third*, the district court's decision to facially enjoin §15-20A-11(d)(4) was also in error. Even if the district court's hypothetical 19-year-old who sexts his 16-year-old girlfriend had a winning as-applied claim, the law could still be applied constitutionally to many other sex offenders. For example, 11(d)(4) applies to sex offenders other than parents, including stepparents, grandparents, siblings, and stepsiblings, but they have no parental rights offended by the statute. And even among parents, surely the "mere fact of conviction" for sex trafficking or raping a child is grounds enough to deny the person a ready opportunity to do so again.

*Finally*, this case is no class action. Henry is the sole plaintiff and his injury is redressed by issuing an injunction limited solely to him. Henry lacked standing to obtain relief on behalf of any other sex offenders. The district court therefore

exceeded its authority and abused its discretion by issuing a statewide injunction against enforcement of the law.

## STATEMENT OF JURISDICTION

Appellee Bruce Henry sued Appellants in district court seeking relief under 42 U.S.C. §1983. Doc. 1. The district court exercised jurisdiction under 28 U.S.C. §1331. Doc. 62 at 2. The district court granted Henry summary judgment on January 10, 2024, Docs. 150 and 151, and Defendants Marshall and Webb timely filed their notices of appeal on January 10, 2024. Doc. 152. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Sex offenses against children are devastating to victims, yet are hard to detect. Like all other States and the federal government, Alabama regulates sex offenses and convicted sex offenders. As part of that framework, through Ala. Code §15-20A-11(d), Alabama generally forbids sex offenders from residing with or having overnight access to children. The statute has an exception that allows sex offenders to live with their children, stepchildren, grandchildren, siblings, and stepsiblings. But that exception does not apply if the sex offender is convicted of a sex offense involving a child under the age of twelve or a child pornography offense. *See id.* §15-20A-11(d)(4), Thus, Alabama bars people convicted of sex crimes against children or child pornography offenses from living with or otherwise staying

overnight with minors. The district court declared the prohibition facially unconstitutional. The *first* issue presented is whether the prohibition can be applied constitutionally to at least one sex offender.

2. Plaintiff Bruce Henry was convicted of possessing child pornography and now wishes to live with his child and reside with him overnight. He did not represent a class of sex offenders, just himself. The *second* issue presented is whether the district court exceeded its Article III authority and/or abused its discretion when it issued a universal injunction barring any application of §15-20A-11(d)(4), including to child rapists and convicted sex offenders who are not parents of the child with whom they want to live.

## STATEMENT OF THE CASE

### A. Alabama Regulates Sex Offenders

Alabama enacted the Alabama Sex Offender Registration and Community Notification Act (ASORCNA) in 2011 to comprehensively regulate sex offenders. The Legislature found that "the increasing number [of sex offenders] coupled with the danger of recidivism place society at risk." ALA. CODE §15-20A-2(1). "Employment and residence restrictions, together with monitoring and tracking" were necessary to advance the State's "primary governmental interest of protecting vulnerable populations, particularly children." *Id.* §15-20A-2(5). "[D]ue to the nature of their offenses," those who commit sex crimes "have a reduced expectation

of privacy." *Id*. After reviewing ASORCNA, the United States Department of Justice concluded that Alabama had "substantially implemented" the Federal Sex Offender Registration and Notification Act.[1]

Under ASORCNA, a registered adult sex offender may "reside" or conduct "overnight visits" with a minor only if the offender is "the parent, grandparent, stepparent, sibling, or stepsibling of the minor." ALA. CODE §15-20A-11(d).[2] There are, however, five circumstances in which an adult sex offender cannot live with any minor, no matter their relation:

(1) Parental rights of the adult sex offender have been or are in the process of being terminated as provided by law.

(2) The adult sex offender has been convicted of any sex offense in which any of the minor children, grandchildren, stepchildren, siblings, or stepsiblings of the adult sex offender was the victim.

(3) The adult sex offender has been convicted of any sex offense in which a minor was the victim and the minor resided or lived with the adult sex offender at the time of the offense.

(4) The adult sex offender has been convicted of any sex offense involving a child, regardless of whether the adult sex offender was related to or shared a residence with the child victim.

(5) The adult sex offender has been convicted of any sex offense involving forcible compulsion in which the victim was a minor.

---

[1] UNITED STATES DEP'T OF JUST., *SORNA Substantial Implementation Review State of Alabama*, Office of Justice Programs (July 14, 2011), https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/alabama.pdf.
[2] ASORCNA allows for case-by-case exceptions for certain disabled or terminally ill sex offenders. *See* ALA. CODE §15-20A-23.

*Id*. §§15-20A-11(d)(1)-(5).

A "sex offense involving a child" refers to either a sexual crime against a child under 12 years old or an offense involving child pornography. *Id*. §15-20A-4(27); *see id*. §15-20A-4(2) (defining child as a "person who has not attained the age of 12"). A sex offender's residence is "determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place." *Id*. §15-20A-4(20). An "overnight visit" is "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m." *Id*. §15-20A-4(14).

## B. Known Sex Offenders Pose a Unique Threat to Child Safety

"Sex offenders are a serious threat." *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion). "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Id*. at 33. And "the victims of sexual assault are most often juveniles." *Id*. at 32. Given "the grave harm that sexual abuse of children inflicts on its victims," *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc), "it is legitimate and entirely reasonable for States to try to stop abuse from occurring before it happens," *Packingham v. North Carolina*, 582 U.S. 98, 113 (2017) (Alito, J., concurring).

Department of Justice statistics reflect that 93% of all officially recorded sexual abuse is committed by someone known to the victim before the crime, and

60% of such offenses occur "in the victim's home or the home of someone they know." Doc. 86-18 at 151 (Dr. Hersh Deposition). At least 20% of sex offenders abuse both biologically related and non-related victims. Doc. 86-11 at 24 (Dr. DeLisi).

For a variety of reasons, the sexual abuse of children often evades detection. Doc. 86-11 at 22. Sexual abuse is more "sensitive, intrusive, and intimate" than other crimes. *Id*. Victims experience emotions "spanning embarrassment, guilt, shame, anger, depression, and self-derogation[,]" which "inhibit the likelihood of reporting the victimization." *Id*. Because of undetected sexual crime, official statistics (re-arrest and re-conviction rates) do not reflect the true incidence of sexual recidivism by sex offenders. *Id*. at 20–24. Depending on the inputs used to account for undetected recidivistic events, sexual recidivism estimates can be between two and ten times greater than re-arrest and re-conviction rates. *Id*. at 19.

The emergence of child pornography offending in the late 1990s created a new domain of victimization. Doc. 86-18 at 85:3–5. Overall, "there is not a lot of research out there" on child pornography offenders. Doc. 86-17 at 283:14–16 (Dr. Helmus deposition). An exceptionally small percentage of the general population exhibits a sexual interest in children. Doc. 86-11 at 13-14. At the same time, possession of child pornography is a valid and reliable indicator of pedophilia, *id*. at 6; Doc. 86-8 at 7, and sexual interest in children marks elevated risk to sexually

abuse a child, Docs. 86-8 at 8, 86-17 at 12:6-19, 57 at 48. While pornography consumption is correlated with sexual aggression generally, child pornography consumption is the only type associated with and predictive of the sexual abuse of children. Doc. 86-11 at 14–15. Child pornography offenders who have physically abused a child have had more access to children than those with no known contact offenses. *Id*. at 14–15.

According to Henry's own expert, with child pornography offenders, one "can assume that roughly half have committed a contact sex offense against a child." Doc. 86-8 at 20. Other research indicates that "[t]he majority of child porn offenders have undetected contact victims, undetected sex crime offenses, and continue to offend with use of child porn/child erotica even while in sex offender treatment." Doc. 86-11 at 25.

**C. Bruce Henry Committed a Child Pornography Offense Involving Children and Later Had a Child.**

Henry does not know when he first "actively started looking for child pornography," Doc. 86-2 at 49:23–50:1, but at the time of his arrest in 2011, he possessed two videos and 348 images of child sexual exploitation material. Doc. 86-19 at 6. In one video, an adult male received oral sex from a prepubescent girl before digitally raping the child. *Id*. The other video shows a prepubescent child engaging in sex acts with a dog. *Id*.

Henry's images depicted sexual, sometimes sadomasochistic, abuse of prepubescent and adolescent girls. *Id*. In an interview following his arrest, Henry explained that his consumption of child pornography was focused on "girls between the ages of six and ten." *Id*. Henry further explained at his deposition that he saved, rather than simply viewed, these images because "they were incredibly difficult to come by"; in other words, they weren't easy for him "to find." Doc. 86-2 at 49:14–50:11.

In 2013, Henry pled guilty to one count of possession of child pornography under 18 U.S.C. §2252A(a)(5)(B). Doc. 86-20. Five years later, he was released from prison, beginning his term of supervised release. Doc. 86-21 at 1. As a condition of his release, Henry was prohibited from accessing the internet without prior approval from his probation officer. *Id*. at 4. A year after his release, during a polygraph examination, Henry admitted to violating the terms of his supervised release by accessing online pornography. *Id*. at 3. Based on the videos' "titles," Henry had searched for pornography involving "young or teenage females." *Id*. In another polygraph exam administered roughly one month later, Henry admitted to "seeking out" pictures of "teen girls" and "children in sexual positions." *Id*.

Henry and his wife married in November 2019. Doc. 86-3 at 67:13-15. The next month, he accessed pornography using his wife's phone while she took a shower. Doc. 86-2 at 76:11-78:4. As a result of Henry's repeated noncompliance, a

federal judge extended Henry's supervised release from 60 months to 96 months. Doc. 86-22.[3] Sometime after Henry viewed pornography on his wife's phone, Henry used a computer in the house to view pornography in violation of his internet usage agreement with Probation. Doc. 86-2 at 42-44; Doc. 92:1-95:8. In 2021, Henry's wife gave birth to their son. Doc. 86-3 at 13:7-13.

### D. Henry Sues and Is Denied a Preliminary Injunction.

Later in 2021, Henry brought three claims against Sheriff Abernathy, District Attorney Webb, and Alabama Attorney General Marshall (collectively referred to as "Appellants"). Doc. 1 ¶¶12–23. He alleged that §15-20A-11(d)(4) violated his intimate association rights under the First Amendment, as well as his Equal Protection and substantive Due Process rights under the Fourteenth Amendment, by preventing him from residing or conducting overnight visits with his child. Doc. 1 at ¶¶76-78, 90-92, 110-112. He sought a declaratory judgment that the statute "is overbroad in violation of the First and Fourteenth Amendments of the United States Constitution both on its face and as applied to Mr. Henry" and "denies to persons convicted of 'an offense involving child pornography' and to Mr. Henry individually

---

[3] Because of Henry's repeated non-compliance with his supervision plan, Henry lacks the option to relocate to another jurisdiction. Doc. 101-2 at 1; *see* 4 U.S.C. §112(a) (providing authorization for states to enter compacts related to "prevention of crime"); Interstate Commission for Adult Offender Supervision (ICAOS), ICAOS Rules, https://interstatecompact.org/generate-pdf/icaos-rules (2024) (providing rules for transfer of federal supervisees).

the equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution." Doc. 1 at 20.

Appellants moved to dismiss Henry's facial challenges and his Equal Protection Claim, arguing that §15-20A-11(d)(4) is not unconstitutional in all of its applications and that Henry failed to plausibly allege "differential treatment between similarly situated classes of people." Doc. 20 at 4. Defendants asserted that "this lawsuit should be appropriately limited to Henry's as-applied challenges." Doc. 29 at 11.

Later, before the court ruled on the motion to dismiss, Henry moved for a preliminary injunction to prevent Defendants from enforcing §15-20A-11(d)(4) against him. Doc. 30 at 1. He argued that "§15-20A-11(d)(4), on its face, severely restricts Mr. Henry's First and Fourteenth Amendment rights of familial association to the serious detriment not only of him but of his infant child as well." Doc. 30-4 at 4. Henry asserted that those like him with only child pornography convictions were less likely to recidivate than other sex offenders and that Alabama could use "scientifically validated risk assessment tools" to determine "*which* offenders" are likely to commit a future contact offense. *Id.* at 3. In his view, "a conviction alone is not enough information to assess the risk of an individual." Doc. 57 at 8:25–9:5.

At the preliminary injunction hearing, Henry offered three experts to opine about the risk posed by sex offenders as a class, child pornography offenders as a

subset within that class, and Henry as an individual. *See* Doc. 30-1 (Burkhart report); Doc. 30-2 (Hersh report); Doc. 30-3 (Wells report). In their summary and final reports, the clinical psychologists opined that "evidence-based risk assessments" allow professionals to determine "to a reasonable degree of scientific certainty" whether a particular sex offender can safely reside with a particular child. Doc. 86-4 at 10; *see* Doc. 86-9 at 9 ("[A] professional can estimate an offender's risk to a child and describe what circumstances, if any, the offender might safely be allowed to have contact with the child.").

Dr. Burkhart asserted that Alabama routinely conducted risk assessments on sex offenders and thus Alabama could "tailor its legal prohibitions to the actual risk posed by an individual." Doc. 86-4 at 10. Mr. Wells, a licensed counselor, offered his "professional opinion" "based on the individualized risk assessment and testing [he] conducted on [Henry]," that Henry consumed child pornography as the result of his addictive personality, not pedophilia, and "does not represent a meaningful risk of committing future acts of harm against minors," Doc. 86-7 at 3, 7–9.

Defendants offered an expert criminologist to rebut the testimony about the risks posed by child sex offenders, generally, and Henry, specifically. And Defendants responded that the residency restriction is subject to rational basis review in any event, which it satisfied. Doc. 35 at 17; Doc. 57 at 16:8-19 (preliminary injunction hearing). The district court denied Defendants' motion to dismiss and

Henry's motion for a preliminary injunction. Docs. 61 & 62. Regarding Henry's facial claims, the district court accepted Henry's argument "that *Salerno*'s 'no set of circumstances' language does not set forth a '*test* for facial challenges' but rather describes 'the *result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.'" Doc. 61 at 11 (emphasis in original) (quoting Doc. 27 at 6). The court explained that it could not "determine whether a law is unconstitutional in all of its applications without applying the relevant constitutional test to the challenged law—be it strict scrutiny, rational basis, or another test." Doc. 61 at 13. The court concluded it was unnecessary to determine whether "§15-20A-11(d)(4) is unconstitutional in all of its applications without regard to the relevant constitutional test applicable to *Henry's* First and Fourteenth Amendment claims." *Id.* at 19 (emphasis added).[4]

The district court emphasized that Henry had sought "a preliminary injunction on his *as-applied* First Amendment and Fourteenth Amendment claims." Doc. 62 at 25 (emphasis in original). The court assumed without deciding that the residency restriction must satisfy strict scrutiny. Nonetheless, Henry failed to show a

---

[4] The court further found that Henry had stated a viable Equal Protection claim by alleging that "sex offenders convicted of child pornography offenses who are not allowed to live with their children are similarly situated to other sex offenders who are allowed to live with their children." *Id.* at 31.

substantial likelihood of success on the merits because the court feared that Henry could be "a risk to his child." Doc. 62 at 29.

### E. No Reliable Method Exists to Identify Child Sex Offenders Who Can Safely Reside With Specific Children.

After the preliminary hearing, Defendants retained an additional expert in actuarial risk assessment tools while Henry retained a rebuttal witness. The six experts, Bruce Henry, and his wife were deposed. The State of Alabama—as Dr. Burkhart later admitted—does not routinely conduct individualized risk assessments on adult sex offenders. Doc. 86-15 at 149:9-17; 156:11-22. The three "evidence-based tools" used by Dr. Burkhart and Wells to assess Henry's recidivism risk all lack empirical support and predictive validity for child pornography offenders like Henry. Doc. 82-16 (Dr. Scurich Report). In Wells's risk assessment, he attributed Henry's consumption of child pornography to a traumatic event that never occurred. Doc. 86-16 at 89:14-90:6; *but cf.* Doc. 86-19 at 10. And he administered one assessment indicating that Henry—after his release from prison—had a sexual interest in children. Doc. 86-16 at 102:20-104:1 (A portion of this section is redacted in the filed document). Wells dismissed the results of that test as irrelevant to Henry's present risk. *Id.* at 85:10-86:23; 285:5-13.

### F. District Court Declares §15-20A-11(d)(4) Facially Unconstitutional.

After discovery closed, Defendants and Henry filed cross-motions for summary judgment. Docs. 94, 100, 102. The court granted Henry's motion with

respect to only his *facial* substantive due process challenge, denying Henry's First Amendment and Equal Protection claims as moot. Doc. 150 at 18. On the facial claim, the court described the right burdened by 11(d)(4) as *Henry's* right to "care, custody and control" of his child. Doc. 150 at 7-8. Reasoning from generalized conceptions of parental rights, the court concluded that 11(d)(4) "burdens" the "fundamental right[s]" of Henry and every "other parent" falling within 11(d)(4). *Id.* at 8-11. On this view, 11(d)(4) triggered strict scrutiny every time it was applied to a parent. *See id.* at 11.

Moving to strict scrutiny, the court took issue with 11(d)(4)'s breadth. *Id.* at 13. For some offenders, the court agreed that "the facts resulting in a conviction" "merit the statute's lifetime restriction." *Id.* But 11(d)(4) looks to the "conviction" alone despite "varying elements" of included crimes. *Id.* Though recognizing that 11(d)(4) applies to the "worst of the worst offenders," like child traffickers and rapists, the court was disturbed that the statute would also sweep in certain conduct by a 19-year-old and 16-year-old in a relationship. *Id.* Without "some mechanism" for "relief" from the ban, 11(d)(4) failed strict scrutiny. *Id.* at 15. The court thus declared 11(d)(4) facially unconstitutional and permanently enjoined the state from enforcing it. *Id.* at 18. Section 11(d)(4)—despite applying not only to parents, but also to grandparents, stepparents, siblings, and stepsiblings—was "stricken as unconstitutional and severed from" ASORCNA. *Id*. at 2.

Appellants timely filed a notice of appeal and moved to stay the court's injunction pending appeal. Doc. 156 at 9. The district court granted the stay. Doc. 164.

This appeal turns on whether a law that bars convicted child sex offenders from living and visiting overnight with minor relatives can ever be applied consistent with substantive due process. Under "the proper standard for evaluating a facial challenge," *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013), the answer is clearly yes. The district court held otherwise only because it failed to consider all "set[s] of circumstances" in which 11(d)(4) could be applied. This error alone requires reversal.

The district court enjoined any application of Alabama's law based on the parental right to care, custody, and control of his child. But parental rights can be curtailed, or even terminated, upon a showing that a parent is a threat to his child. And there is a long tradition of States determining that convictions for cruel and abusive conduct toward children conclusively rebuts the presumption that a parent is fit to raise his child. Alabama acted squarely within that tradition when it determined that it is too risky to allow anyone who has been convicted of abusing children to once again have access to children in their home. The law offends no deeply rooted right. And because sex offenses against children are notoriously hard

18

to detect and sex offenders are particularly likely to abuse again, the statute satisfies strict scrutiny. A conviction for such a severe crime guarantees a tight enough fit to advance the State's undoubtedly compelling interest in protecting children.

Only considering the general custody rights of presumptively fit parents, the district court overlooked that 11(d)(4) applies to persons convicted of a *sex offense involving a child* who are *not* parents. Henry never even attempted to shoulder his burden of showing that all child sex offenders (including rapists and traffickers) have a fundamental right to "cohabitate with [their] relatives." Doc. 1 ¶82. The court, moreover, substituted a hypothetical offense that did not involve children for the actual offense in this case that did. From there, the court reasoned that if the hypothetical offender would be entitled to a custody hearing so are all child sex offenders. As a result, the district court enjoined the State from enforcing 11(d)(4) in its entirety without finding that a single parent in Alabama with a qualifying child sex crime conviction can safely reside with his children. Because 11(d)(4) may be applied constitutionally to at least *some* sex offenders, this Court must reverse.

For similar reasons, the court's injunction goes too far. Henry had no standing to seek relief for anyone but himself, and the district court had no authority to grant relief to sex offenders who were not before the court. The court's universal injunction should be reversed.

Summary judgment should be granted "only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Cagle v. Bruner*, 112 F.3d 1510, 1514 (11th Cir. 1997). "This Court reviews de novo a district court's decision to grant or deny summary judgment." *Id*. This Court reviews "the scope of the injunction for abuse of discretion." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).

<div align="center">ARGUMENT</div>

## I. No One Convicted Of Sex Offenses Involving Children Has A Substantive Due Process Right To Reside With Or Have Overnight Access To Children.

"Supreme Court precedent" recognizes that parents generally have the right to make certain "decisions concerning the care, custody, and control of their children." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 812 (11th Cir. 2004) (cleaned up). The right has been rooted in the Due Process Clause and is thus unenumerated, because, "on its face," "the Due Process Clause guarantees no substantive rights, but only (as it says) process." *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (cleaned up). "For that reason, the Supreme Court has been reluctant to expand the concept of substantive due process." *Id*. Courts must "exercise the utmost care whenever [they] are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of" the judiciary. *Doe v. Moore*, 410 F.3d

1337, 1343 (11th Cir. 2005) (cleaned up). Courts "analyze a substantive due process claim by first crafting a careful description of the asserted right." *Id.* (cleaned up). "[A] careful description of the fundamental interest at issue" allows courts to "narrowly frame the specific facts" so that they "do not stray into broader constitutional vistas than are called for by the facts of the case at hand." *Id.* at 1344. Once the right has been carefully defined, courts analyze whether the claimed right is "(1) 'objectively, deeply rooted in this Nation's history and tradition' and (2) 'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed.'" *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1242 (11th Cir. 2004) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

Even in cases recognizing parental rights, the Supreme Court has made clear that "rights of parenthood" are "not beyond regulation in the public interest" or in matters "affecting the child's welfare." *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944). "Parental autonomy may be limited when parental decisions jeopardize the health or safety of a child, and the state can intercede on the child's behalf." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990).

Children's health and safety are threatened when they are placed around adults with a demonstrated propensity to sexually abuse children. "Child sex crimes are among the most egregious and despicable of societal and criminal offenses." *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009). "[C]hild sex offenders have

appalling rates of recidivism and their crimes are under-reported." *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008). In light of these facts, "[i]t would violate Alabama's stated public policy to award custody of a minor to a parent who resides with or shares a living accommodation with a registered criminal sex offender convicted of crimes against children, regardless of the opinion of experts, lay persons, and [trial courts] that the registered sex offender does not pose a threat to the child." *K.E.W v. T.W.E*, 990 So. 2d 375, 381 (Ala. Civ. App. 2007). For anyone who had access to "helpless little girls and subjected them to pain and degradation," *Irey*, 612 F.3d at 1168, Alabama "created a rule without exception for the protection of the children of this state." *K.E.W.,* 990 So.2d at 381. The State has made the predictive judgment that the risks to children are just too high.

The Constitution allows States to do precisely that. While a parent's right to "care, custody, and control" of his child is "fundamental," Doc. 150 at 11, the contours of that right are informed by history and tradition, which consider whether the parent is presumptively fit. And there is an enduring history of denying custody to parents who have engaged in abusive or cruel conduct.

Nor does it make a difference in this context whether it is a judge or legislature making the prediction about whether a parent presents a danger to children. Many States have determined that certain crimes are cruel enough that any person convicted of them can no longer be entrusted with the care of a child. Judges may

be capable of making these determinations on an individualized basis, but that does not mean legislatures must abandon the field. As long as there is an adequate fit between the conviction and the consequence, the Constitution is satisfied.

For similar reasons, the State's cohabitation ban survives any level of scrutiny. The evidence adduced below showed the high recidivism and low detection rates associated with sexual abuse of children. The district court suggested that some sort of individualized hearing could work to protect the rights of the offender who has harmed children before but won't do it again, even when given the chance. But the risks are too high and the available predictors too uncertain to back up that assumption. Indeed, the district court denied Henry's motion for a preliminary injunction because the court was not adequately assured that Henry would not be "a risk to his child." Doc. 62 at 29. The State's policy is narrowly tailored to justify its compelling interest in not giving convicted child sex offenders a ready opportunity to offend again.

### A. No Binding Precedent Recognizes The Right of Child Sex Offenders to Reside With or Have Overnight Access to Their Children.

Precedent recognizing parental rights extends those rights only to presumptively fit parents. In *Troxel v. Granville*, the plurality recognized that "a fit custodial parent" has the "fundamental right to make decisions concerning the care, custody, and control of her two daughters." 530 U.S. 57, 72 (2000) . The two decisive concurrences likewise emphasized how Washington's visitation statute was infirm

because it afforded no deference to the parenting decisions of *fit* parents against claims by nonparents. *See id*. at 80 (Thomas, J., concurring) (state lacked a "legitimate governmental interest … in second-guessing a fit parent's decision regarding visitation with third parties"); *id*. at 79 (Souter, J., concurring) (state law "authorizing courts to grant visitation rights to any person at any time[] is unconstitutional").

Previously, *Stanley v. Illinois* held that Illinois could not, without notice or a hearing, categorically deprive all fathers of children born out of wedlock of their parental rights. 405 U.S. 645, 649 (1972) ("Is a presumption that distinguishes and burdens all unwed fathers constitutionally repugnant?"). The Court rejected a scheme that treated "the unwed father's claim of parental qualification" as "irrelevant." *Id.* at 650. The decision "call[ed] into question … the adequacy of the 'fit' between the classification and the policy that the classification serves." *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989) (plurality op.) (discussing *Stanley* and other "irrebuttable presumption" decisions).

Taken together, *Troxel* and *Stanley* indicate that the Constitution protects the parental rights of "fit parents," *Troxel*, 530 U.S. at 68, and state law may not conclude that "all unmarried fathers" are unfit or "unsuitable" for every one of the responsibilities of parenthood. *Stanley*, 405 U.S. at 654; *cf. Williams,* 378 F.3d at 1236 ("Although many of the Court's 'privacy' decisions have implicated sexual

matters, the Court has never indicated that the mere fact that an activity is sexual and private entitles it to protection as a fundamental right.") (internal citations omitted). Thus, the Supreme Court declined to extend *any* fundamental parental rights to some "adulterous natural father[s]" who conceive children with married women. *Michael H.*, 491 U.S. at 120 (plurality op.). Similarly, "the Federal Constitution will not automatically compel a state to listen to [a biological father's] opinion of where the child's best interests lie" when he "fails" to take "responsibility for the child's future." *Lehr v. Robertson*, 463 U.S. 248,262 (1983); *see id.* at 262 n.18 (noting "differences" between "constitutional protection" of natural father "who has played a substantial role in rearing his child" as opposed to "a mere biological parent"). If this Nation's history and tradition confer *no* parental rights on "adulterous natural fathers" and lesser protection to the interests of absentee fathers, it is error to *assume* that fathers who have sexually abused children have a fundamental right to physical custody of their children that would trigger strict scrutiny.

Moreover, 11(d)(4) does not extinguish all "parental prerogatives" of persons convicted of child sexual abuse. *Michael H.*, 491 U.S. at 126. The Legislature instead limited the physical custody rights of such parents: they may not reside or spend the night with any children. This distinction matters because the parental right to "custody" refers generally to legal and physical custody, which are distinct parental prerogatives. ALA. CODE §30-3-151 (defining different forms of custody). Parents

25

with "legal custody" but no "physical custody" have full "rights and responsibilities for major decisions concerning the child, including, but not limited to, the education of the child, health care, and religious training," as well as "rights of visitation." *Id*. §30-3-151(2)-(5).

By contrast, "[t]ermination [of parental rights] denies the natural parent[] physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child." *Santosky v. Kramer*, 455 U.S. 745, 749 (1982) (footnote omitted). It "destroy[s] permanently all legal recognition of the parental relationship." *Rivera v. Minnich*, 483 U.S. 574, 580 (1987). Though stringent and permanent, the cohabitation restriction does not implicate "the State's authority to sever permanently a parent-child bond." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996). Rather than attempting "to end" the parent-child relationships of child sex offenders, the cohabitation restriction merely "infringe[s] upon" the interest in physical custody for the *safety* of children. *Lassiter v. Dep't Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981). Henry retains the right to decide to move his family (including his son) to another state that permits him to be a primary residential parent.[5]

---

[5] Again, to be eligible to transfer supervision to a different state, federal offenders must be in "substantial compliance with a valid plan of supervision." ICAOS R. 3.101(c). For ineligible supervisees, the "sending state" has discretion to "request transfer of supervision" to "promote public safety," and the "receiving state shall have discretion to accept or reject the transfer of supervision." *Id*. 3.101-2.

"[T]here is no binding authority that indicates that the general right to 'make decisions concerning the care, custody, and control of [one's] children' includes the right" to physical custody of one's children *after* being convicted of serious felonies against children. *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1221 (11th Cir. 2023). Henry failed to show how his asserted right is "encompassed within the reach of the Supreme Court's existing fundamental-right precedents," which address the rights of fit parents never convicted of any form of child abuse. *Williams*, 378 F.3d at 1239 (citing *Glucksberg*, 521 U.S. at 720-21). The "extension of" physical custody rights to fathers convicted of serious crimes against children necessitates a "careful description of the asserted right" and an examination of "this Nation's history and tradition." *Id*. at 1239.[6] Even the loosest description of the right asserted by Henry necessarily includes his "qualifying conviction." Doc. 150 at 11. Just as *Lehr, Michael H.*, and *Troxel*, respectively described the fundamental right at issue as that of a "mere biological parent," an "adulterous natural father," and a "fit custodial parent," the right in this case is that of a parent convicted of child sexual abuse—not parents in general.

A person's "status"—as an absent, adulterous, or criminally predatory father—affects whether that person has a fundamental parental right to primary

---

[6] Ironically, Henry asserts that he is entitled to the fundamental rights of a "lawful parent," Doc. 27 at 3, when his commission of a *crime* against *children* distinguishes him from parents with a fundamental right to physical custody of their children.

physical custody of a child. Henry needed to show "that [our society] has traditionally accorded *such a father*" the right to unfettered physical custody of his child. *Michael H.*, 491 U.S. at 126 (emphasis added). Yet, Henry did not point to "any particular, identifiable tradition" protecting the physical custody rights of parents found to have criminally exploited children. *Id*. at 127 n.6 (opinion of Scalia, J.).

Neither the Supreme Court nor the Eleventh Circuit has held that the fundamental right of physical custody enjoyed by presumptively fit parents extends to persons convicted of serious sexual crimes against children. Without binding precedent establishing a fundamental right for persons in Henry's circumstances, Henry bears the burden to establish that the custody rights of feloniously cruel parents are "so deeply embedded within our traditions as to be a fundamental right." *Id*. at 125. Henry and the district court ignored this burden, and "the lack of [historical] evidence alone might defeat [Henry's] case." *Id*. Even so, the historical record shows that American society has "traditionally denied" legal and physical custody rights to parents who criminally abuse children. *Id.* at 126.

## B. There Is an Enduring Historical Tradition of Denying Child Custody to Cruel Parents Who Feloniously Abuse Children.

A well-established and enduring tradition "refutes any possible contention" that an unenumerated right is fundamental. *Michael H., 491 U.S. at 127 n.6 (opinion of Scalia, J.). "[H]istorically [the law] has recognized that natural bonds of affection

28

lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Still, "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id*. In Alabama, the presumption that a natural parent is a fit custodian is "overcome by clear and convincing evidence that the father is unsuited or unfit to assume the place of a father in providing a *safe* and comfortable home, proper environment, parental affection, care, training and education." *Ex parte Sullivan*, 407 So. 2d 559, 563 (Ala. 1981) (emphasis added).

The Alabama Legislature has specified sexual victimization of children as "gross misconduct," *Striplin v. Ware*, 36 Ala. 87, 90 (1860), that conclusively establishes a parent is unfit for physical custody of any child. *K.E.W. v. T.W.E.*, 990 So.2d 375, 381 (Ala. Civ. App. 2007). This judgment falls squarely within the western tradition of denying physical custody to fathers found to have acted with extreme cruelty toward children. *See Michael H.*, 491 U.S. at 127 n.6 (opinion of Scalia, J.) (explaining that the proper level of generality is "the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified"); *cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022) (requiring "a well-established and representative historical analogue, not a historical twin.").

Blackstone emphasized a father's "natural duty" to protect his children. 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 438 (1769). Generally, a parent's natural protective instinct worked "so strongly as to need rather a check than a spur." *Id*. The law showed "indulgence" to "the workings of parental affection." *Id*. "The power, then, that parents have over their children arises from that duty which is incumbent on them, to take care of their offspring during the imperfect state of childhood." JOHN LOCKE, TWO TREATISES OF GOVERNMENT §58 (1690). Joseph Story elaborated on the "natural presumption" underlying a parent's legal right to custody of his children:

> [I]n general parents are entrusted with the custody of the persons and the education of their children; yet this is done upon the natural presumption, that the children will be properly taken care of … and that they will be treated with kindness and affection.

2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE AS ADMINISTERED IN ENGLAND AND AMERICA §1341 (2d ed. 1839).

"Whenever this presumption is removed" by a finding that the father "acts in a manner injurious to the morals or interests of his children; in every such case, the Court of Chancery *will* interfere, and deprive him of the custody of his children." *Id*. §1341. "[L]ike other rights," a father's "right to the custody of his infant children" could "be forfeited by misconduct." *People ex rel. Ordronaux v. Chegaray*, 18 Wend. 637, 643 (N.Y. Sup. Ct. 1836). Leading up to the Fourteenth Amendment, parental rights would be curtailed with a sufficient showing of parental misconduct.

Courts exercised discretion in assessing misconduct so long "as the legislature ha[d] not declared on what grounds the court shall proceed." *Id*. at 644.

When the Fourteenth Amendment was ratified, "[t]he father's right [to custody of his legitimate children was] superior to that of the mother, *unless it appears that the child would be exposed to cruelty* or gross corruption." 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 203 (10th ed. Boston, Little, Brown & Co. 1860) (emphasis added). Specifically, in actions to determine physical custody of a child, the court would deny custody "to the father" if "he had abused the right to the custody of his child, or there be an apprehension of cruelty, or some exhibition of profligacy, or want of ability to provide for his children." *Id.* at 228.

After ratification of the Fourteenth Amendment, the law continued to acknowledge that a father's "paramount right" to custody of his child could "be forfeited by his misconduct." JAMES SCHOULER, LAW OF THE DOMESTIC RELATIONS, 243 (Boston, Little, Brown & Co. 1905). Various categories of misconduct extinguished the parental right of custody: "If a father … is a drunkard, or a criminal, or cruel, or shiftless, or otherwise unfit, the interests of the child should outweigh his parental right of custody." WALTER C. TIFFANY, HANDBOOK ON THE LAW OF PERSONS AND DOMESTIC RELATIONS 346 (Roger W. Cooley 3d ed. 1921) (first edition published in 1896) (footnotes omitted); *see also Chapsky v. Wood*, 26 Kan. 650, 653 (1881) (father's custodial right does not persist "no matter how bad,

immoral, or unworthy he may be"). Children are not delivered into the physical custody of a father when to do so would be "manifestly to their detriment and discomfort." *In re Cuneen*, 17 How. Pr. 516 (N.Y. Sup. Ct. 1859); *see also Boggs v. Boggs*, 49 Iowa 190, 192 (1878) (physical cruelty toward daughter was sufficient to show that the father was "an unsuitable person to be intrusted with the government of children"); *see also Cocke v. Hannum*, 10 George 423, 441 (Miss. 1860) (denying father's request for custody); *Miner v. Miner*, 11 Ill. 43, 49 (1849).

The American tradition shows that serious felonies justify State intervention into a parent's physical custody of his or her child. *Dumain v. Gwynne*, 10 Allen 270, 272-73 (Mass. 1865) (questioning whether burglary conviction permanently forfeits father's "right to the custody of his children"). General moral failings do not affect a parent's custodial rights, but "conviction of certain felonies presumably do indicate moral unfitness of a parent to look after and direct the welfare and future of a small child." *Trawick v. Trawick*, 173 So. 2d 341, 343 (La. Ct. App. 1965). The person's conduct must be "sufficiently extravagant and singular and wrong to meet the condemnation of all decent and law-abiding people, without regard to religious belief or social standing, before a parent should be deprived of the comfort or custody of a child." *Lovell v. House of the Good Shepherd*, 9 Wash. 419, 422 (1894).

Thus, it was historically recognized that a "class" of wrongdoing may "stamp" a parent "as an unfit person to bring up her child." *Jensen v. Jensen*, 170 N.W. 735,

736 (Wis. 1919). For instance, "crimes such as child molestation, … rape and armed robbery, … and the murder of one's own child" demonstrate "parental unfitness." *Matter of Pima Cnty., Juvenile Action Nos. S-826 and J-59015*, 643 P.2d 736, 738 (Ariz. Ct. App. 1982) (collecting cases). By committing these offenses, "[t]he person becomes unfit under [the state statute] because of the commission of the crime regardless of whether he is a parent at that time." *Id*. Against this historical backdrop, the Alabama Legislature designated a uniquely cruel class of crimes directed at children as establishing custodial unfitness.

While courts exercised discretion to curtail the physical custody rights of criminally "cruel" fathers, the legislature was expected to provide certain rules limiting—not expanding—courts' discretion. "The right of parental control is a natural, but not an unalienable one. It is not excepted by the declaration of rights out of the subjects of ordinary legislation; and it consequently remains subject to the ordinary legislative power[.]" *Ex parte Crouse*, 4 Whart. 9, 11 (Penn. 1839).

To lose his right to physical custody, a father "must be chargeable with such grossly immoral conduct, as shows him plainly disqualified for the proper discharge of parental duties." *Mercein v. People ex rel. Barry*, 25 Wend. 64, 73 (N.Y. 1840). Though "there has been controversy in respect to the exercise of the discretion of the court when called upon to change the custody of an infant," "clear and satisfactory proofs" of unfitness were sufficient to deny physical custody. *State v. Richardson*,

40 N.H. 272, 274–75 (1860). Courts were careful not to exercise "arbitrary" "discretion," withholding custody only when faced with a "positive disqualification of the father." *Id.* at 275.

"Rules governing … child custody are generally specified in statutory enactments that vary from State to State." *Lehr*, 463 U.S. at 256. The discretion of family courts was, "as far as practicable, to be regulated by settled rules and admitted principles." *Baird v. Baird*, 21 N.J. Eq. 384, 388 (N.J. 1869).

Various 19th century state statutes protected children from parents who posed a threat to their own children. In 1866, the General Court of Massachusetts passed an act that authorized cities and towns within the Commonwealth to:

> make all needful provisions and arrangements concerning children under sixteen years of age, who, by reason of the neglect, crime, drunkenness or other vices of parents … are suffered to be growing up without salutary parental control and education, or in circumstances exposing them to lead idle and dissolute lives.

ACTS AND RESOLVES PASSED BY THE GENERAL COURT OF MASSACHUSETTS 266 (1866) ("An Act Concerning the Care and Education of Neglected Children"). The law went unchallenged, and its successor statute was upheld as constitutional two decades later. *See Farnham v. Pierce*, 6 N.E. 830, 831 (Mass. 1886) (reviewing the constitutionality of "An act to prevent and punish wrongs to children.").

By 1991, many States considered termination of parental rights—in their entirety—appropriate "when parents have been convicted of particularly serious

offenses." Philip M. Genty, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis*, 30 J. FAM. L. 757, 782 (1991). For instance, "Illinois, Indiana, Iowa, Louisiana, Maine, New York, Oklahoma, and Tennessee all ha[d] statutes that permit[ted] termination of rights on the basis of crimes in which a child was the victim." *Id*. at 782-86 (footnotes omitted). In Indiana, conviction for certain crimes, including murder, involuntary manslaughter, or rape, can be grounds for termination of parental rights. IND. CODE §31-35-3-4 (1997). The Mississippi code similarly enumerates various felony offenses "against any child" that are grounds for termination of a person's parental rights. MISS. CODE §93-15-121(h)(i) (2017).

Many States continue to recognize that commission of cruel felonies targeting children demonstrate unfitness to have *any* parental rights. Under Wisconsin law, the commission of a felony against one's child or sex trafficking "involving any child" is sufficient grounds for termination of parental rights. WIS. STAT. §48.415(9m)(a)-(am) (2018); *see id*. §948.051 (2018) (defining "trafficking of a child" offense). In Minnesota, if a "parent has committed an offense that requires registration as a predatory offender," then upon learning that the offender has had a child, the governing "social services agency must ask the county attorney to immediately file a termination of parental rights petition." MINN. STAT. §260C.503, subdiv. 2(a)(6) (2023); *see id*. §243.166, subdiv. 1b(a)(2)(vii) (2023) (including

"possessing pornographic work involving a minor" as a predatory offense).[7]

Missouri provides that a child, once taken into the custody of the state, "shall not be reunited with a parent or placed in a home in which the parent or any person residing in the home has been found guilty of any of [21 sex offenses] when a child was the victim[.]" MO. ANN. STAT. §210.117(1) (2017).[8]

There is a long-established tradition of State intervention to protect children from unfit parents and concluding certain "cruel" criminal conduct renders a parent unfit for physical custody. Within this tradition, "convicted pedophiles may"—like other egregious child abusers—"lose custody of their children or have restrictions placed on their parental rights." *United States v. Loy*, 237 F.3d 251, 269 (3d Cir. 2001). Commission of child sex offenses creates uniquely "well-founded apprehensions" of the offenders "acting with extreme cruelty" and establishes that children left in their physical custody "would be in danger of contamination." *Cocke*, 39 Miss. at 441. Most states recognize that the abuse of children, generally, bears on

---

[7] Under Minnesota law, possession of child pornography is a predatory sexual offense. *See In re Welfare of Child of M.Z.*, No. 27-JV-17-5407, 2019 WL 2167826 *4 (Minn. Ct. App. 2019) ("Appellant was convicted of … possession of child pornography in violation .., requiring that appellant register as a predatory offender—that satisfies a statutory basis for termination …."); *see also In re S.B.G.*, 981 N.W.2d 224, 226 (Minn. Ct. App. 2022) ("S.B.G.'s parental rights to a child were terminated because he is required to register as a predatory offender.").

[8] Other states provide that committing sex crimes against any child creates a presumption of general parental unfitness. In Utah, "possessing child pornography is prima facie evidence of unfitness." *In re C.R.C.*, 450 P.3d 1169, 1176 (Utah Ct. App. 2019).

a parent's fitness to have physical custody of their own children. *See*, *e.g.*, *State ex rel. Juvenile Dpt. Of Lane Cnty., Brammer*, 133 Or. App. 544 (Ore. Ct. App. 1995) ("[A] child may be removed from an abusive environment if there is evidence of abuse of *any* child.") (emphasis in original); *Allen v. State*, 449 Md. 98, 118 (Md. Ct. App. 2016) (describing family code's "default position that a parent who has abused or neglected *a* child shall be denied unsupervised contact with his or her own child") (cleaned up); *Commonwealth v. Lapointe*, 759 N.E.2d 294, 298 (Mass. 2001) (upholding a probation condition preventing defendant convicted of child sex offense from living with his minor children). After a judicial determination that a parent committed egregious sex offenses against children, the offender falls within the historical tradition of parents who may lose their parental rights. A conviction for a serious sex crime against a child establishes a unique willingness and proclivity to violate children for one's "own perverse pleasure." *Irey*, 612 F.3d at 1199. Children physically entrusted to such parents "would be exposed to cruelty or gross corruption" of the vilest sort. 2 Kent, Commentaries On American Law 203. Thus, serious sex crimes against children *do* "stamp" a parent "as an unfit person to bring up her child." *Jensen*, 170 N.W. at 736. And because this is a facial challenge, it is enough that at least one crime covered by 11(d)(4) is sufficient on its own to establish that a parent is unfit to live with their child.

For example, a person commits first degree rape in Alabama if "[b]eing 16 years old or older," the offender "engages in sexual intercourse with another person who is less than 12 years old." ALA. CODE §13A-6-61(a)(3). The State may "prosecut[e] a person for first-degree rape and first-degree sodomy based on the age of the victim," or based on "evidence of forcible compulsion." *L.M.L. v. Alabama*, 2022 WL 1721575, at *6 (Ala. Crim. App. 2022). A child sex trafficker similarly facilitates the transportation "of a child for the purposes of engaging in an unlawful sex act with a child … for his or her benefit or for the benefit of another." ALA. CODE §13A-6-125. "The immaturity and vulnerability of a child, both physically and psychologically, adds a devastating dimension to rape that is not present when an adult is raped." *Kennedy v. Louisiana*, 554 U.S. 407, 2677–78 (Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting). Rather than permit any person who raped, sodomized, or trafficked children 11 years old and younger to have "protracted time with [their] child in a private setting," the Legislature chose not to "expose the child to the risk of recidivism" in the household. *K.E.W.*, 990 So. 2d at 382.

So too for an offender convicted of "knowingly possess[ing], or knowingly access[ing] with intent to view … material that contains an image of child pornography" transported in interstate commerce. 18 U.S.C. §2252A(a)(5)(B). And especially so for a child pornography offender who receives enhanced penalties for

any offense that "involve[s] a prepubescent minor or a minor who had not attained 12 years of age," *id.* §2252A(b)(2), or traffics exploitation material involving sadistic or masochistic images, *see United States v. Hoey*, 508 F.3d 687 (5th Cir. 2007) (discussing sentence enhancement for 18 U.S.C. §2G2.2). For child pornography offenses like Henry's, "[y]oung children were raped in order to enable the production of the pornography." *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007). "Every instance of viewing images of child pornography represents … a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109–248, §501(2)(D), 120 Stat. 587, 623 (2006) (codified at 18 U.S.C. §2251 note). Participation in this vile abuse, even through digital means, establishes a perverse appetite to victimize children.

Legislatures make predictive judgments all the time, from determining mandatory minimum (and maximum) sentences for certain crimes to attaching other consequences—including for the right to vote or bear arms—to certain convictions. Courts may assess "the adequacy of the 'fit' between the classification and the policy that the classification serves," *Michael H.*, 491 U.S. at 121 (plurality op.), but substantive due process does not demand that these questions always be placed in the hands of judges or an administrative board. Indeed, when the stakes are so high for children and the classification the State is using is so tailored, there is no reason to think a judge's "individualized" predictive judgment will necessarily be more

accurate than the Legislature's. *See, e.g.*, *T.D. v. Patton*, 868 F.3d 1209, 1217 (10th Cir. 2017) (therapist recommending to court that child be placed with father who then sexually abused child).

### C. Section 11(d)(4) Satisfies Any Level Of Scrutiny Because Sex Offenders Who Target Children Cannot Safely Reside With Any Children.

The residency restriction satisfies any level of scrutiny. "It is well established that states have a compelling interest in 'safeguarding the physical and psychological wellbeing of … minor[s].'" *Eknes-Tucker*, 80 F.4th at 1225 (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020)). "A statute is considered constitutional under the rational basis test when 'there is any reasonably conceivable state of facts that could provide a rational basis for' it." *Moore,* 410 F.3d at 1346 (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). It is more than "reasonably conceivable" that restricting access to children for known child sex offenders advances the State's "primary governmental interest of protecting vulnerable populations, particularly children." ALA. CODE §15-20A-2(5).

Strict scrutiny is also satisfied. Possession of child pornography is indicative of pedophilia, Doc. 86-11 at 6, which in turn is a robust risk factor for sexual abuse of children, Doc. 57 at 62:13–15; *see also* Doc. 86-17 at 344:23–345:3. While anonymous clinical surveys reveal that only .6% of the general population ever

indicate a sexual interest in children, Doc. 86-11 at 13–14, *every* child pornography offender has victimized children to satiate that deviant desire.

With a mean follow-up time of only 4.8 years, official statistics show that 4.6% of child pornography offenders in the United States are arrested or charged with a new sex offense. *Id*. at 18. An additional 19% of child pornography offenders violate a term of their probation in that same time period. *Id*. As demonstrated by Henry's pursuit of younger-oriented pornography on supervised release, probation violations often involve sexual misconduct, not simply technical mishaps. When inputs to quantify undetected sexual crime are considered, the prevalence of actual sexual recidivism balloons to be two-to-ten times higher than official estimates indicate. *Id*. at 19. So, within only five years of release, an estimated 9.2% to 46% of child pornography offenders will commit another sex crime.

Those numbers are bolstered by the fact that at least half of child pornography offenders have committed a *contact* offense against a child, Doc. 86-8 at 20 (Helmus Report), and estimates range "up to 85%" for contact offenses, Doc. 86-15 at 51:21–23 (Burkhart Deposition). Further, though data specific to child pornography offenders is limited, a review of 47 studies involving 35,572 sex offenders established that one in five sex offenders abuse both related and non-related victims. Doc. 86-11 at 24–25.

Given the disturbing reality of child pornography offending, the Sixth Circuit upheld a no-contact restriction between a child pornography offender and his own daughter, finding it was "tailored for the *precise* purpose of protecting [the offender's] daughter." *United States v. Widmer*, 785 F.3d 200, 208 (6th Cir. 2015).

Preventing persons "who have demonstrated an obvious preference for young children under the age of 12" from living with all children is "narrowly tailored to protect children … from those sex offenders who pose the highest risk to them." *Herring v. Alabama*, 100 So. 3d 616, 626 (Ala. Crim. App. 2011). The statute is thus narrowly tailored to protect children who might otherwise be left in the physical custody of sexual predators. Section 15-20A-11(d)(4) focuses on a narrow group— persons known to have committed a sex offense involving a child—to target a particular evil—child sexual abuse behind closed doors. The cohabitation restriction prevents dangerous offenders from having unfettered access to minor relatives without terminating a parent's relationship with his child. This satisfies strict scrutiny.

## II. At Least Some People Convicted Of Some Sex Offenses Involving Children Have No Substantive Due Process Right To Reside With Or Have Overnight Access to Children.

Declaring the catchall cohabitation restriction facially unconstitutional, the district court barred its enforcement in its entirety—purporting to strike the statute from the code. Doc. 150 at 2, 16. To grant such sweeping relief, the district court

needed to find that "*no set of circumstances exists* under which the [statute] would be valid." *United States v. Hansen,* 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)). Instead, the district court focused on a hypothetical offender whose offense involved an adolescent—not a child—and overlooked other applications, including the one in *this* case. The statute applies not just to the hypothetical 19-year-old and his high school girlfriend, but also to "the worst of the worst offenders." Doc. 150 at 13. And the statute applies not just to parents who wish to reside with their children—who at least might have a parental rights claim—but also to grandparents, stepparents, siblings, and stepsiblings, who undoubtedly do not. This error alone warrants reversal.

"A facial challenge asserts that a law '*always* operates unconstitutionally.'" *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (quoting Black's Law Dictionary 223 (7th ed. 1999)). Although "classifying a lawsuit as facial or as-applied" does not change the substantive rule of law, it "affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (internal quotation marks omitted).

When mounting a facial challenge to a statute, "the plaintiff bears the burden of proving that the law could never be applied in a constitutional manner." *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007). To

prevail in his facial challenge, Henry thus needed to show that §15-20A-11(d)(4) could never be applied constitutionally. On its face, 11(d)(4) prevents persons convicted of raping and trafficking children from thereafter living with minor relatives, including stepchildren and stepsiblings. Henry never even attempted to meet his burden of showing the cohabitation restriction is unconstitutional in *all* sets of circumstances.

### A. Section 11(d)(4) Does Not Implicate Substantive Due Process Rights When Applied to Sex Offenders Who Wish to Live or Stay Overnight With Children With Whom They Have No Parental Relationship.

As an initial matter, Henry *attempted* to show only that the cohabitation restriction is unconstitutional *as applied* to biological parents possessing an established relationship with their children. In his words, "the issue in this case is under what circumstances [Alabama] can prevent parents from living with their own children." Doc. 27 at 10 n.4. Denying "that the strict 'no set of circumstances' test is the proper standard for evaluating a facial challenge," *American Federation of State, County and Municipal Employees Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013), the district court invalidated a general provision of ASORCNA based solely on the standard of review "applicable to *Henry*'s First and Fourteenth Amendment claims." Doc. 61 at 19 (emphasis added). The district court failed to recognize that unless the statute applies only to biological parents in Henry's "set of

circumstances," there could be more than *one* "relevant constitutional" standard of review.

The district court explicitly narrowed the "set of circumstances" implicated by 11(d)(4) to those involving natural parents in an otherwise intact family unit. *See* Doc. 150 at 5 (describing 11(d)(4) as prohibiting "a qualifying parent from being present in the family home where his minor child resides"). After narrowing 11(d)(4) to apply exclusively to parents in Henry's circumstances, the court then found it facially invalid. *But see Fla. Right to Life, Inc., v. Lamar*, 273 F.3d 1318, 1326 (11th Cir. 2001) (Federal courts "must be particularly reluctant to rewrite the terms of a state statute.") (cleaned up).

The court failed to address that the challenged restriction also applies to any "grandparent, stepparent, sibling, or stepsibling," ALA. CODE §15-20A-11(d), who is an "adult sex offender" "convicted of any sex offense involving a child." *Id.* §15-20A-11(d)(4). Henry lacks standing to challenge 11(d)(4)'s application to anyone aside from parents. As a parent wishing to live with his child, he has demonstrated no "personal stake" in the law's application to stepparents, grandparents, siblings, or stepsiblings. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The constitutionality of 11(d)(4) as applied to those offenders is thus an "abstract dispute[]" that the district court lacked authority to decide. *Id.*

Even setting aside jurisdiction, grandparents, stepparents, siblings, and stepsiblings do not possess the fundamental rights of fit parents. *Ex parte Bronstein*, 434 So. 2d 780, 782 (Ala. 1983) ("Under common law principles, grandparents lacked any legal right to visitation and communication with their grandchildren if such visitation was forbidden by the parents."); *Doe v. Rausch*, 648 F. Supp. 3d 925, 950-51 (W.D. Tenn. 2023) (rejecting substantive due process challenge to law preventing sex offenders from living with their stepchildren). As a result, 11(d)(4) doesn't even arguably run afoul of the Constitution when it bars those offenders from residing or visiting overnight with minor stepchildren, grandchildren, siblings, or stepsiblings.

The statute may also be constitutionally applied to *any* biological parents who failed to take steps to develop a relationship with their child. *Lehr*, 463 U.S. at 261 (explaining that "the mere existence of a biological link" between a parent and child does not merit the same due process protections as a "developed" relationship); *see United States v. Myers*, 426 F.3d 117, 128 (2d Cir. 2005) (remanding for district court to determine whether sex offender's "relationship with his son [was] sufficiently established to merit constitutional protection"). And some parents lack any cognizable relationship with their offspring based on criminal conduct that resulted in the conception of the child. *See* Doc. 131 at 3-6 (listing statutes that terminate parental rights when child is conceived as result of sexual assault).

Because §15-20A-11(d)(4) may be constitutionally applied to numerous sex offenders with various biological and nonbiological family connections to minors, it is facially constitutional.

## B. Even if Every Sex Crime Covered by Section 11(d)(4) Does Not Adequately Predict Future Dangerousness for Children, Some Surely Do.

Much of the proof adduced below involved whether Henry's conviction for child pornography was evidence enough that Henry was a risk to his child. And after considering substantial evidence, the district court denied Henry a preliminary injunction based on that risk and later granted the State a stay pending appeal. But even if Henry could assuage the court's concerns about the risks posed by child pornographers, the statute applies to violent contact offenders too. Under ASORCNA, a "sex offense involving a child" includes any sex offense against a child under 12 years old or an offense "involving child pornography." ALA. CODE §15-20A-4(27). The district court was correct that 11(d)(4) applies "equally to, for example, a 19-year-old male college freshman convicted for downloading sexually explicit content of his 16-year-old high school girlfriend, to the worst of offenders— like one who trafficked and raped children." Doc. 150 at 13. When assessing the facial constitutionality of 11(d)(4), the court must assess the custodial rights of offender parents "who trafficked and raped children," not simply the hypothetical 19-year-old and his 16-year-old girlfriend.

Henry himself contemplated that "evidence" might reveal "discreet groups of individuals to whom the statute can be constitutionally applied," in which case the court could "tailor its relief appropriately." Doc. 27 at 10. The evidence Henry presented focused on the purportedly *de minimis* risk posed by people convicted only of child pornography offenses. Doc. 100 at 22 (risk posed by child porn offenders); *id*. at 33–35 (risk posed by Henry). At the preliminary injunction hearing, Henry conceded that there may be a "small group of crimes which are themselves so indicative of future dangerousness in and of themselves, that the State could constitutionally abrogate rights." Doc. 57 at 14:22–25.[9] Henry then objected to the State's expert testimony because, in his view, the studies underlying it could not "fairly be described as focused on child pornography offenders." *Id*. at 217:7–8.

The district court reduced the valid sweep of the law to nil while assuming "some sex offenses involving a minor, such as the child sex trafficker or serial offender, merit the statute's lifetime restriction." Doc. 150 at 13. But if the elements of any "sex offense involving a minor" "justif[y]" a lifetime restriction on a parent's

---

[9] Henry further argued that the "statute includes a lot of people for whom the crime in itself certainly doesn't indicate meaningful, substantial danger"—with Henry being "one of those people." *Id*. at 15:1–3. This is quite the opposite of asserting that no child sex offenders' convictions alone can adequately "indicate meaningful, substantial danger."

physical custody of minors, then the statute may be applied constitutionally in a "set of circumstances" and is necessarily facially constitutional.[10]

It was error to gauge the facial constitutionality of 11(d)(4) by its application to the *least* dangerous offender rather than the *most* dangerous. Rape of a child was widely punishable by death throughout much of American history—including in Alabama.[11] Possession of child pornography is a newer offense for which the death penalty has not been applied. Even so, the child pornography offender (like Henry) who collects images of prepubescent children being raped commits a different, more serious offense than the district court's hypothetical offender who possesses images of his 16-year-old girlfriend. *See* 18 U.S.C. §2252A(b)(2) (providing enhanced penalties for a child pornography offender whose "offense involved a prepubescent minor or a minor who had not attained 12 years of age"). Even assuming that the statute is unconstitutional *as applied* to the hypothetical 19-year-old who sexted a

---

[10] At first blush, one may assume 11(d)(5) independently reaches child rapists because it covers any sex offense involving "forcible compulsion" against a child. A person commits first degree rape under ALA. CODE §13A-6-61(a)(3) if he is at least 16 years old and has "sexual intercourse" with a child "less than 12 years old." But first degree rape under §13A-6-61(a)(1) is sexual penetration through "forcible compulsion." To prove forcible compulsion, the State must present evidence of resistance by the victim, whereas rape of a child under the age of 12 understandably requires no similar showing. *C.M. v. State*, 889 So. 2d 57, 66–67 (Ala. Crim. App. 2004). Thus, (d)(4) is the main provision barring child rapists from residing with their children, stepchildren, etc.

[11] "In 1925, 18 States, the District of Columbia, and the Federal Government had statutes that authorized the death penalty for the rape of a child or an adult." *Kennedy v. Louisiana*, 554 U.S. 407, 422 (2008); ALA. CODE §398 (1958) (repealed 1973).

16-year-old, that particular application does not nullify the "justified" applications to persons like Henry—much less offenders who raped or trafficked children.

In essence, the district court turned the *Salerno* standard on its head: declaring a statute facially unconstitutional based on one hypothetical application in the least defensible of circumstances while refusing to consider the *actual* application of the statute. This Court should reverse.

## III. The District Court Exceeded Its Authority And Abused Its Discretion When It Entered a Universal Injunction Barring Enforcement Of §15-20A-11(d)(4).

Even if the challenged law is unconstitutional as applied to Henry, the district court abused its discretion when it entered a universal injunction. *Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1205 (11th Cir. 2009) ("It is well-settled that a district court abuses its discretion when it drafts an injunction that is unnecessarily broad in scope."). With its universal injunction, the district court went beyond its authority to adjudicate an Article III "case or controversy" and treated Henry's case like a class action without the strictures of Federal Rule of Civil Procedure 23.

Courts decide disputes between parties instead of exercising "general authority to conduct oversight" of State officials. *California v. Texas*, 593 U.S. 659, 673 (2021). To maintain that balance, a court's "remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford,* 138 S. Ct. 1916, 1934 (2018), and

should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022). "[A]ny remedial benefit extended to others is typically collateral." *Id.* at 1304. Thus, when "it is possible to provide complete relief to the plaintiffs with an injunction limited in scope to the plaintiffs alone," courts should not "extend relief to nonparties." *Id.* (quotation omitted). But that is precisely what the district court's injunction will do if upheld. For his substantive due process claim, Henry's only alleged injury is his inability to cohabitate and have overnight visits with his son. Doc. 1 ¶¶ 52, 53. An injunction prohibiting Defendants from enforcing §15-20A-11(d)(4) against him—and him alone—would "redress" that "particular injury," *Gill*, 138 S. Ct. at 1934, making a statewide remedy "[un]necessary" to give him "complete relief." *Georgia*, 46 F.4th at 1303 (quotations omitted). Relief to non-parents was especially unnecessary and improper given Henry's lack of a "personal stake" in 11(d)(4)'s application to those offenders.

## CONCLUSION

The Court should reverse the grant of summary judgment in favor of Henry and remand with direction to enter summary judgment in favor of Appellants on Henry's facial challenge. At a minimum, this Court should remand and direct the district court to limit its injunction to Henry alone.

Respectfully submitted,

Steve Marshall
  *Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*

James W. Davis
  *Deputy Attorney General*

Benjamin M. Seiss
Richard D. Mink
Charles A. McKay
  *Assistant Attorneys General*

 Dylan Mauldin
  *Assistant Solicitor General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
***Counsel for Appellants Attorney General
Marshall and District Attorney Webb***

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) as it contains 12,556 words, excluding those parts exempted by FED. R. APP. P. 32(f).

I further certify that this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and the type style requirements of FED. R. APP. P. 32(a)(6), as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

<div style="margin-left:40%">

*s/* Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
 *Solicitor General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

***Counsel for Appellants Attorney General
Marshall and District Attorney Webb***

</div>

**CERTIFICATE OF SERVICE**

I certify that, on March 26, 2024, I electronically filed this document using

the Court's CM/ECF system, which will serve all counsel of record.

<div align="right">

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Appellants Attorney*
*General Marshall and District*
*Attorney Webb*

</div>