[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10139

_____

BRUCE HENRY,

Plaintiff-Appellee,

*versus*

SHERIFF OF TUSCALOOSA COUNTY, ALABAMA,
in his official capacity,
DISTRICT ATTORNEY OF TUSCALOOSA COUNTY,
ALABAMA,
in his official capacity,
ATTORNEY GENERAL OF THE STATE OF ALABAMA,
in his official capacity,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:21-cv-00797-RAH-JTA

_____

Before ROSENBAUM, ABUDU, and WILSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

Alabama Code § 15-20A-11(d)(4) prohibits "adult sex of-fender[s]" who have been convicted of a sex offense involving a child from "resid[ing] or conduct[ing] an overnight visit with a mi-nor," including their own child. No exceptions. Plaintiff-Appellee Bruce Henry, who pled guilty to one count of possessing child por-nography in 2013, challenges Section 15-20A-11(d)(4) facially and as applied to him.

Henry has completed his term of imprisonment, married, and fathered a son. But Section 15-20A-11(d)(4) doesn't allow Henry to live with his son. Henry asserts that Section 15-20A-11(d)(4) violates his First Amendment right of intimate association and the Fourteenth Amendment's guarantees of equal protection of the laws and due process of law. In particular, he argues that Section 15-20A-11(d)(4) interferes with "perhaps the oldest of the fundamental liberty interests" that the Fourteenth Amendment se-cures, the "fundamental right of parents to make decisions con-cerning the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion), which

includes the right to "establish a home and bring up children," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

We agree. To be sure, Alabama has a compelling reason for its law: to protect children. And certainly some sex offenders should never have the chance to be near children, including their own.

But Alabama has not narrowly tailored its law to achieve its goal. The law offers no escape hatch whatsoever. So a person who's been convicted of a qualifying offense has no chance to avoid the law's prohibition by proving that they wouldn't be dangerous to their child. Rather, in every case without fail, Alabama's law prohibits sex offenders who've been convicted of a qualifying offense from residing with their child, even if the individual can prove they present no risk to their child. As a result, it deprives some individuals convicted of qualifying offenses of their fundamental right to establish a home and bring up their own children, in violation of the Fourteenth Amendment. And it deprives some children in Alabama of the presence of a parent who may be fit to lovingly care for and raise them.

To understand the vast breadth of Section 15-20A-11(d)(4), consider, for instance, a college freshman convicted of downloading sexually explicit photos their high-school partner sent them. Under Alabama's law, that person will necessarily *never* be able to reside with their child, even if that college freshman does not become a parent until decades after graduating and even if that college freshman never engages in any other sex offense. The

Fourteenth Amendment doesn't allow for the automatic removal of a parent's fundamental right to establish a home and raise their child in every circumstance that Section 15-20A-11(d)(4) imposes that penalty.

So after careful consideration, and with the benefit of oral argument, we affirm the district court's holding that Section 15-20A-11(d)(4) impermissibly burdens Henry's fundamental rights to "establish a home and bring up children." *Id.* at 399.

But there's an easy fix for Alabama to defeat as-applied challenges like Henry's: Alabama can amend its statute to provide parents with a meaningful chance to show that they are fit despite their conviction. *See also infra* note 10 (addressing other possible less restrictive alternatives). Indeed, as far as we can tell, that's what every other state that strips unfit parents—including those who are sex offenders—of the right to live with their children does.

Still, we can't say that the Section is unconstitutional in all its applications. For example, the Section applies to non-parental relatives, such as stepparents and stepsiblings, who may not enjoy the same fundamental rights of cohabitation as a parent does with their own child. And here, Henry—a parent—is the only party to this lawsuit challenging the facial and as-applied constitutionality of the Section. So we do not need to pass on that complex constitutional question to redress Henry's injury. We therefore conclude that the district court abused its discretion in facially enjoining Section 15-20A-11(d)(4). For that reason, we vacate the district court's

injunction and remand the case for further proceedings consistent with this opinion.

## I.     BACKGROUND

### A. Factual and Statutory Background

In 2013, Henry pled guilty to one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). He had never been convicted of a sexual offense before. At the time of his arrest in 2011, he possessed two videos and 348 photos of prepubescent and adolescent girls, which he downloaded from the internet.[1] Henry's collection focused on "girls between the ages of six and ten" and included depictions of sadomasochism and bestiality.

The district court sentenced Henry to 70 months of prison and 60 months of supervised release with special conditions. He served five years of his sentence before his release in March 2018. After release, Henry completed a qualified Sex Offender Treatment Program, as well as individual and group counseling. Henry continues to attend weekly Sex Addicts Anonymous meetings. And he maintains a steady job, attends church, and volunteers.

Two special conditions of Henry's supervised release are of note. First, Henry must participate in the United States Probation Office's computer restriction-and-monitoring program. That

---

[1] That amount is significant. Still, it's less than one-tenth of the median amount found in child-pornography offenders' possession. In fiscal year 2019, for instance, non-production child-pornography offenders possessed a median of 4,265 illegal images, according to the U.S. Sentencing Commission.

program prohibits Henry from possessing or using certain electronic devices that may communicate with other electronic devices without the Probation Office's prior approval.  And second, Henry may not have "any unsupervised, one-to-one contact with any children under the age of 18 *other than his own children.*"

Despite these restrictions, while on supervised release, Henry in two instances accessed pornography.  In July of 2019, Henry admitted during a polygraphed interview that he used an Amazon Firestick to view pornography.  A forensic examination revealed no saved images, but Henry had viewed images with "titles indicating that they were of young or teenage females."  And Henry admitted in a follow-up polygraph test that he actively sought out images of teen girls and children posed in sexual positions.

Also, in December 2019, Henry used his wife's unlocked phone to search for pornographic images.  He disclosed the incident to his sexual-offender-treatment provider but failed to inform his probation officer during the officer's home visit in January 2020.  Instead, the probation officer learned about the incident from Henry's supervision report for that month.

Citing these violations, Henry's probation officer filed a petition to revoke Henry's supervised release.  A federal judge declined.  Instead, the district court extended Henry's term of supervised release from 60 to 96 months (through March 2026).

Henry is now married and has a three-year-old son.  But because of the Alabama Sex Offender Registration and Community

Notification Act ("ASORCNA"), Henry cannot live or reside overnight with him (and by extension, his wife).

As we've noted, ASORCNA prohibits any sex offender from "resid[ing] or conduct[ing] an overnight visit with a minor" unless the sex offender "is the parent, grandparent, stepparent, sibling, or stepsibling of the minor." ALA. CODE § 15-20A-11(d). But those exemptions are substantially less inclusive than they appear on first glance. That's so because Section 15-20A-11(d)'s exception itself has five exceptions.

As relevant here, a sex offender may not reside or conduct an overnight visit with a minor, even if they are the minor's parent, if "[t]he adult sex offender has been convicted of any sex offense involving a child, regardless of whether the adult sex offender was related to or shared a residence with the child victim."[2] *Id.* § 15-20A-11(d)(4). This subsection applies to Henry because a "sex offense involving a child" includes "offense[s] involving child pornography." *Id.* § 15-20A-4(27); *see also id.* § 15-20A-4(2) (defining "child" as a "person who has not attained the age of 12").

_____

[2] None of the statute's other four exceptions apply to Henry. Alabama has not terminated (and is not currently terminating) Henry's parental rights, ALA. CODE § 15-20A-11(d)(1); Henry hasn't been convicted of a sexual offense involving his child or a minor with whom he resided, *id.* § 15-20A-11(d)(2), (3); and he has not been convicted of a sexual offense involving the forcible compulsion of a minor, *id.* § 15-20A-11(d)(5).

The statute's definitions of "reside" and "conduct an overnight visit" effectively prevent Henry from living with his son.

Under Alabama law, a sex offender resides at a place if they are "habitually or systematically present at" it.  *Id*. § 15-20A-4(20). We determine that, in turn, "by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place."  *Id*.  As a baseline, an offender resides at a place if he "spend[s] more than four hours a day" there "on three or more consecutive days" or "more than four hours a day" there "on 10 or more aggregate days during a calendar month."  *Id*.

As for an "overnight visit," that occurs whenever an offender is in the same place as a minor for any part of the period "between the hours of 10:30 p.m. and 6:00 a.m."  *Id*. § 15-20A-4(14) (explaining "[a]ny presence" causes an overnight visit).

So to summarize, Section 15-20A-11(d) prevents Henry from being present in the same home as his son (1) at any time between the hours of 10:30 p.m. and 6:00 a.m.; (2) for more than four hours a day on three consecutive days; (3) for more than four hours a day on ten or more days during a calendar month; or (4) in any other circumstance where he is habitually and systematically present at his son's home.

And those restrictions are permanent.  Alabama law affords no offramp to Henry or anyone else:  the statute contains no mechanism for offenders to challenge its restrictions on residing or staying overnight with minors, even their own children.  By contrast,

ASORCNA offers a limited exception for sex offenders who are "terminally ill or permanently immobile" or suffering from a "debilitating medical condition." *Id.* § 15-20A-23(a). Those offenders may petition for relief from the requirement of living more 2,000 feet away from a school, childcare, or camp facility. *Id.*

At bottom, the Section prevents sexual offenders whose offense involved a minor from living with their children until the restrictions expire when their children turn eighteen. *See id.* § 15-20A-4(13).

## B. *Procedural History*

In November 2021, Henry sued Defendants-Appellants Ron Abernathy, the Sheriff of Tuscaloosa County; Hays Webb, the District Attorney of Tuscaloosa County; and Steve Marshall, the Attorney General of Alabama (collectively, "Defendants," "Alabama," or "the State"), in their official capacities under 42 U.S.C. § 1983. He claimed that Section 15-20A-11(d)(4) violates his First Amendment right to intimate association and Fourteenth Amendment rights to equal protection and due process. Henry sought a declaratory judgment that Section 15-20A-11(d)(4) is overbroad and unconstitutional both facially and as applied, and he requested that the district court enter an injunction against Defendants to prevent the law's enforcement.

The district court denied Henry's motion for a preliminary injunction. But it partially granted Henry's motion for summary judgment, finding Section 15-20A-11(d) facially unconstitutional. Based on that conclusion, the court enjoined Alabama from

enforcing the statute in its current form.  We recount both district-court decisions.

1.  <u>The district court denied Henry's motion for a preliminary injunction.</u>

In March 2022, Henry moved for a preliminary injunction, requesting that the district court permit him to conduct overnight visits with his son and reside with his wife and son for the pendency of his lawsuit.  He argued that Section "15-20A-11(d)(4), on its face, severely restricts [his] First and Fourteenth Amendment rights of familial association to the serious detriment not only of him but of his infant child as well."  After holding an evidentiary hearing, the district court denied Henry's motion.

Henry relied principally on the testimony of three witnesses: Dr. Keith Hersh, Dr. Barry Burkhart, and Jerome Wells.

Dr. Hersh is a psychologist who specializes in treatment of and recidivism among sex offenders.  And Dr. Burkhart is a clinical psychologist with expertise in recidivism of sex offenders, sex offenders' psychology, and the psychological and development effects of absent parents on early childhood development.

Drs. Hersh and Burkhart testified that child-pornography offenders have a low recidivism rate generally (around 1–4% over a 3–5-year period); that they pose a low risk of committing a contact sex offense specifically (around 1–2% over a 5–9 year period); and that relevant factors, like time, treatment, and a parent-child relationship, further decrease the likelihood of recidivism.  Even so, on cross-examination, Alabama elicited testimony that sexual interest

in children is a robust indicator of risk of committing a contact of-
fense and that the number of images a person possesses, as well as
a person's noncompliance with terms of supervised release, in-
crease that person's risk of committing a future contact offense.

But ultimately, both Drs. Hersh and Burkhart opined that
evaluating an offender's risk of recidivism, particularly their risk of
harming their own child, requires an individualized assessment.
And both testified that Henry posed a low risk of harming his son.
Dr. Burkhart added that, given the detriment of an absent father to
a developing child, he would recommend that Henry live at home
with his son full time.

Wells is a counselor for those who have committed sexual
offenses. The court admitted him as an expert in risk-assessment
tools used for sexual offenders and the treatment of sexual offend-
ers.

Wells treated Henry and met with him around 150 to 200
times. He recounted Henry's treatment programs and the results
of three risk-assessment tools that indicated Henry was a low risk
to his son. But Wells acknowledged on cross-examination that he
could not recall Henry's August 2019 admission that Henry sought
out images of girls in sexual positions; that he did not address that
admission during Henry's course of counseling; and that one of his
exams did not account for Henry's admission. Nor could Wells re-
call that Henry's supervised release had been extended. Still, Wells
concluded that, in his professional opinion, Henry is a low risk of

being a contact or hands-on offender and that Henry would not sexually assault his son.

For its part, Alabama called Dr. Matthew DeLisi to testify in response to Henry's experts. Dr. DeLisi is a professor at Iowa State University who is a generalist researcher in criminology and criminal justice. The district court admitted him as an expert in criminology—specifically, the risk factors for crime.

Dr. DeLisi opined that sexual offenders are more likely to commit contact offenses than non-sexual offenders, and he cited research showing that many child-pornography offenders display an interest in pedophilia. He cited studies suggesting 12–55% of child-pornography offenders commit a contact offense. But DeLisi neither evaluated Henry nor opined on his individual risk of recidivism or the risk that Henry might harm his son.

After the hearing, the district court denied Henry's motion for a preliminary injunction. The court concluded that Henry failed to show a substantial likelihood of success on the merits and that the equities did not weigh in his favor. As to the merits, the district court emphasized that the volume of Henry's child-pornography collection was "troubling" and that key witnesses—namely, Henry, his wife, and his probation officer—did not testify at the preliminary-injunction hearing. Because Henry's motion would "disrupt the status quo," the court explained, Henry bore the burden of showing that he would not pose a risk to his son if the court permitted Henry to live with him. And in this preliminary posture, Henry's experts did not sufficiently abate the court's two concerns.

As to the balance of the harms, the district court concluded they weighed in Alabama's favor: the risk that Henry would recidivate and thereby harm his child outweighed the risk that Henry would be unconstitutionally deprived of his ability to live with his child and that his son would not have a father at home during his formative years. The court stressed in conclusion that its denial of Henry's motion for a preliminary injunction was "an effort to 'avoid the error that is most costly in the circumstances'" before it could address the complex factual and constitutional issues "at a more mature stage of the litigation process."

   **2.** The district court partially granted Henry's motion for summary judgment and issued an injunction facially enjoining enforcement of Section 15-20A-11(d)(4).

On March 31, 2023, the parties filed cross-motions for summary judgment. The district court partially granted Henry's motion, and it denied Defendants' in full. The court concluded that Section 15-20A-11(d)(4) implicated Henry's substantive due-process right to the "care, custody and control" of his child.[3] As a result, the court reasoned that the Section could stand only if it

_____

[3] The district court also noted that, while the summary-judgment motions were pending, Alabama enacted House Bill 6. The law "recognized that parents have a fundamental right to direct the upbringing of their children" and that "[t]he liberty protected by the due process clause includes the fundamental right of parents to direct the education, upbringing, care, and control of their children." H.B. 6, Ala. 2023 Reg. Sess. (Ala. 2023). The law requires that infringements on parental rights clear strict scrutiny, the most demanding standard of judicial review. *See id.*

survived strict scrutiny.  But because the court found that the law was not narrowly tailored to further Alabama's compelling interest of protecting the health and safety of minors, the court determined the law was unconstitutional.

As the district court saw things, the law is both over- and underinclusive.  Concerning the law's overinclusiveness, the court characterized Section 15-20A-11(d)(4)'s "overbreadth" as "breathtaking."  The law, it said, sweeps in "the worst of the worst offenders" along with consensual teen sexual relationships without any "mechanism" for "relief."  And at the underinclusiveness end of the spectrum, the court reasoned, Section 15-20A-11(d) "allows every qualifying adult sex offender daily unsupervised access to minors for four hours at a time in any one place on two consecutive days and nine aggregate days per month, as long as such access occurs between the hours of 6:00 a.m. and 10:30 p.m."

The district court also highlighted the Section's novelty, both across the United States and in Alabama.  The parties and the district court were "unaware of any statute enacted by another state substantially similar to [Section] 15-20A-11(d)(4)."  And "except for ASORCNA, Alabama has never statutorily limited parents' contact or ability to live with their children based upon the single fact of conviction."

For those reasons, the court concluded that Section 15-20A-11(d)(4) facially violates parents' fundamental rights, as the Fourteenth Amendment's Due Process Clause secures them.  The district court partially granted Henry's requests for declaratory and

injunctive relief. It declared Section 15-20A-11(d)(4) facially uncon-stitutional, and it enjoined Defendants from enforcing the law in its current form. The district court denied as moot Henry's re-maining claims, including those under the Fourteenth Amend-ment's Equal Protection Clause.

⋆    ⋆    ⋆

After the district court entered judgment, Alabama timely appealed. Alabama then moved to stay the permanent injunction pending appeal. Henry opposed a stay. But the district court granted Alabama's stay motion. Then, in this Court, Henry filed an unopposed motion to expedite the appeal. We granted that mo-tion and now consider the appeal.

## II.    STANDARDS OF REVIEW

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). An issue of fact is genuine if a reasonable trier of fact could return judgment for the non-moving party. *An-derson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material if it "might affect the outcome of the suit under the gov-erning law" and is not "irrelevant or unnecessary." *Id.*

On appeal, we review de novo a district court's grant of summary judgment, construing all evidence in the light most fa-vorable to the non-moving party. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). And we review both a district court's decision to grant an injunction, as well as the scope of that injunction, for

16                    Opinion of the Court                    24-10139

abuse of discretion. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).

## III.    DISCUSSION

Alabama raises three arguments on appeal.

First, it argues that Section 15-20A-11(d)(4) is constitutional as applied to Henry because individuals convicted of a sex offense do not have a fundamental right to reside with their child. And it asserts that even if Henry does have such a right, the law survives strict scrutiny because it is narrowly tailored to advance Alabama's compelling interest in protecting children.

Second, the State argues that Section 15-20A-11(d)(4) is facially constitutional because it covers at least some crimes for which the fact of a conviction is narrowly tailored to advance its compelling interest in protecting children and because it covers at least some relatives who do not have the same fundamental rights of cohabitation as do parents. Alabama contends that cases at the intersection of those two edges—namely, stepsiblings or stepparents who have raped or trafficked children—fall within the statute's plainly legitimate sweep.

Third, and relatedly, Alabama asserts that, at a minimum, the district court erred in entering a "universal" injunction that extends to plaintiffs other than Henry, who are not party to this lawsuit.

We address each argument in turn. But to preview, we reject Alabama's first claim and hold that Section 15-20A-11(d)(4) is

unconstitutional as applied to Henry. The Constitution guarantees parents the right to live with their children. Henry did not necessarily forfeit that right when he committed a sexual offense, yet Section 15-20A-11(d)(4) automatically deprives him of that right. So the law must pass strict scrutiny. But Section 15-20A-11(d)(4) is not narrowly tailored to advance the State's extremely compelling interest in protecting children. Rather, it's overinclusive—applying to some crimes that bear little relationship to a parent's fitness or the likelihood that they will harm their child—and underinclusive—permitting apparently dangerous child predators to spend substantial amounts of unsupervised time with children. Plus, Alabama failed to rebut the effectiveness of Henry's proffered less restrictive alternatives: the State did not show that an opportunity for individualized relief would undermine its statutory scheme.

As to Alabama's second argument, we agree that the Section is not facially invalid. At least in this posture, Henry has not shown that Section 15-20A-11(d)(4) is unconstitutional in all its applications. For instance, as Alabama points out, stepsiblings and stepparents may not have the same constitutional rights to cohabitation as do parents and children. The issue received limited briefing, so we conclude, at least for this appeal and without conclusively passing on the merits of that question, that Henry has not met the lofty burden that the facial-challenge standard imposes.

And finally, because we vacate the district court's injunction, we do not address Alabama's argument that the district court abused its discretion in entering a universal injunction.

A.  *Section 15-20A-11(d)(4) violates parents' fundamental rights to establish a home and live with their children.*

The Due Process Clause of the Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Its guarantee is both procedural and substantive. *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). And when, as here, a plaintiff asserts a violation of their substantive-due-process rights, we generally employ a two-step framework to resolve the claim.

At the first step, we determine whether a right is "fundamental." *Id.* at 710. Rights are fundamental if they are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720–21 (cleaned up). We require litigants to propose a "'careful description' of the asserted fundamental liberty interest." *Id.* at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). We do that so we can better focus our analysis of our "Nation's history, legal traditions, and practices," which reveal whether a right is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty. *Id.*

At the second step, we scrutinize the government action either strictly or loosely depending on whether we determine the asserted right is fundamental. If the right is fundamental, the government action that burdens the right is presumptively wrongful, and the government bears the burden to show that its action is "narrowly tailored to serve a compelling state interest." *Flores*, 507

U.S. at 302. We call this level of review strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004).

By contrast, if the asserted right is not fundamental, then the government action is presumptively lawful, and we reject the plaintiff's claim so long as the government action is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. We call this rational-basis review. Rational-basis review is much like a sieve because most government action passes through it unscathed. Indeed, we sustain the government's action if "there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488 (1955).

In applying this framework to Henry's claim, we conclude first, that the right of a parent to live with their child is both deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty. In fact, binding Supreme Court precedent has already said so. And second, we hold that Section 15-20A-11(d)(4) does not pass strict scrutiny because it is not narrowly tailored to advance Alabama's compelling state interest. The simple fact of a conviction for any one of a number of crimes that the statute covers does not necessarily and conclusively prove that a parent, including Henry, is forever either unfit or an imminent danger to their child.

**1.** <u>Section 15-20A-11(d)(4) burdens Henry's fundamental right
    to establish a home with his son.</u>

Our analysis proceeds in three parts.  First, we recount our
Nation's history of familial cohabitation and our precedent respect-
ing that.  Binding case law properly captures that a person's right
to live with their family is deeply rooted in our Nation's history,
legal traditions, and practices.  Second, we explain how Section 15-
20A-11(d)(4) deprives Henry of that fundamental liberty interest.
And third, we address Alabama's counterarguments.  Although
parents generally have a right to live with their children and Section
15-20A-11(d)(4) would substantially burden that right, the State ar-
gues the statute is constitutional because Henry completely lacks a
constitutional right to live with his children.  Child-pornography
offenders, Alabama asserts, categorically lose their parental rights
at the moment of conviction.  In the third subsection, we explain
why that approach to fundamental rights does not comport with
the Constitution's text or Supreme Court precedent.

        *i.*       *A parent's right to live with their child is deeply rooted in*
                *this Nation's history and tradition.*

As we've noted, the Supreme Court has already concluded
that parents have the constitutional right to live with their children.
*See Meyer*, 262 U.S. at 399.  Indeed, that right is part and parcel of
"perhaps the oldest of the fundamental liberty interests" that the
Fourteenth Amendment secures, the right to raise one's children.
*Troxel*, 530 U.S. at 65–66; *see Obergefell v. Hodges*, 576 U.S. 644, 667–
68, (2015) (explaining the rights to marry, establish a home, and

bring up children make up a "unified whole" that is a "central part of the liberty protected by the Due Process Clause" (citation omitted)).

The right to live with one's family is one of the first to find judicial recognition in the United States Reports. And that right's privileges have been at the center of the American way of life since our Republic's inception. At the Founding, the family was a dominant and primarily "private institution." MICHAEL GROSSBERG, GOVERNING THE HEARTH 6 (1985). Although cultures throughout history had established familial arrangements "based on political, religious, and financial concerns," *Obergefell*, 576 U.S. at 659, the American family reflected the Revolutionary ideals of individual liberty, *see id.* at 659–60; GROSSBERG, *supra*, at 6. "[I]n the republican household[,] parents and children became bound together by a new egalitarianism and by affection." GROSSBERG, *supra*, at 8.

Our "nation's households . . . were seen by almost all Americans as crucial to national well-being." *Id.* at 6. For it was the home's "domestic intimacy" that served "as a counterweight to marketplace competition" that would come to characterize Antebellum life. *Id.*; *see* SUSAN L. BROWN, FAMILIES IN AMERICA 14–15 (2017). As Alexis de Tocqueville recounted after his travels throughout the United States, "when the American retires from the turmoil of public life to the bosom of his family, he finds in it the image of order and of peace." 1 ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 332 (Henry Reeve, transl., 4th ed. 1841);

*see also id.* ("There is certainly no country in the world where the tie of marriage is so much respected as in America . . . .").

In turn, our Founders recognized through constitutional guarantees "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."[4] *Silverman v. United States*, 365 U.S. 505, 511 (1961) (discussing the Fourth Amendment); *see Lawrence v. Texas*, 539 U.S. 558, 562 (2003) ("Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home.").

But our Founders' reverence for the home did not stem solely from its role as an intimate refuge from the public sphere. "The home [also] derives its pre-eminence as the seat of family life," a seat where parents raise their children and pass to them our

---

[4] Throughout our fundamental-rights jurisprudence, the Court has emphasized the home and treated invasions of it as highly suspect. *See, e.g., Stanley v. Georgia*, 394 U.S. 557, 565 (1969) ("Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home."); *Payton v. New York*, 445 U.S. 573, 598 (1980) (relying on the common law's "unequivocal endorsement of the tenet that 'a man's house is his castle'" to conclude the Fourth Amendment prevents warrantless home arrests); *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008) (describing the Second Amendment's "core protection" as the "use arms in defense of hearth and home"); *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) ("Explaining that the need for defense of self, family, and property is most acute in the home, we found that" the Second Amendment "right applies to handguns because they are the most preferred firearm in the nation to keep and use for protection of one's home and family." (cleaned up)).

traditions and values. *Poe v. Ullman*, 367 U.S. 497, 551–52 (1961) (Harlan, J., dissenting).

At common law, parents were charged with "giving" their children "an *education*" that would prepare them for a successful life. 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 645 (William Carey Jones ed., S.F., Bancroft-Whitney Co. 1915). That did not change after the Revolution. American parents shouldered the "primary responsibility" of educating the next generation. GROSSBERG, *supra*, at 8. Indeed, the Founders "understood parents to have a right and duty to govern their children's growth." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 828 (2011) (Thomas, J., dissenting). And that remains true to this day: "parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968).

In short, "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 844 (1977) (cleaned up).

Census data concretely show how Americans lived out these sentiments about the home. They reflect the long-held and uninterrupted practice of the American family living together under one roof. "In the mid-nineteenth century, about 70 percent of persons aged 65 or older lived with their children or children-in-law."

Steven Ruggles, *Multigenerational Families in Nineteenth-Century America*, 18 CONTINUITY & CHANGE 139, 141 (2003); *see id.* at 142–43 ("Thus, 80 per cent of the aged population either resided with children or in an adjacent dwelling."); *see also* Matt A. Nelson, *The Decline of Patrilineal Kin Propinquity in the United States 1790–1940*, 41 DEMOGRAPHIC RSCH. 501, 526 (2020) ("In 1850, 52% of 65-year-old persons lived near someone with the same surname compared to 44% of 20-year-old persons.").  And that figure only increases when we consider that some elderly Americans didn't have children to live with: in 1850, over 80 percent of elderly Americans who could live with their children or children-in-law did so.  Ruggles, *supra*, at 145, 151.  These high rates of familial cohabitation persisted largely because "children never moved out" of their parents' home.  *Id.* at 152–53.

In other words, at the Founding and through Reconstruction, Americans lived most of their lives with their families.  Parents lived with their minor children as they grew into adulthood.  Then, if those children turned into parents themselves, they raised the family's next generation under the same roof.  And "as near as we can measure, the practice was essentially universal."  *Id.* at 143.

So it's unsurprising that the Supreme Court has repeatedly recognized the constitutional right to live with one's family.  After all, our Constitution secures those fundamental rights that "have, at all times, been enjoyed by the citizens of the several states which compose this Union."  *Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1825) (No. 3,230) (Washington, Circuit Justice); *see Glucksberg*,

521 U.S. at 710 ("We begin, as we do in all due process cases, by examining our Nation's history, legal traditions, and practices."); *Robertson v. Baldwin*, 165 U.S. 275, 282 (1897) (explaining the Thirteenth Amendment did not "disturb the right of parents and guardians to the custody of their minor children or wards" because Americans "adopted [it] with reference to a state of affairs which had existed in certain states of the Union since the foundation of the government").

Indeed, since the Founding, our courts have respected the rights of parents to live with their children. *See, e.g.*, *Kirkpatrick v. Lockhart*, 4 S.C.L. (2 Brev.) 276, 277–79 (S.C. Const. App. 1809) (permitting recovery in tort from a person who knowingly took a minor away from a parent); *United States v. Anderson*, 24 F. Cas. 813 (C.C.D. Tenn. 1812) (No. 14,449) (granting writ of habeas corpus to return a child in military service to their parent); *Commonwealth v. Downes*, 41 Mass. 227, 232 (1836) (same); *see also* Frances M. Clarke & Rebecca Jo Plant, *No Minor Matter: Underage Soldiers, Parents, and the Nationalization of Habeas Corpus in Civil War America*, 35 L. & Hist. Rev. 881, 892–95 (2017) (explaining parents' widespread use of the writ of habeas corpus to regain custody of their children was "rooted in common law traditions that imbued parents with substantial authority over their children until they reached the age of majority").

As for the Supreme Court's express recognition that the Fourteenth Amendment protects the fundamental right to live with one's family, that itself traces back more than a hundred years

to *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925).

In *Meyer*, the Supreme Court invalidated a Nebraska law barring the teaching of certain foreign languages. 262 U.S. at 400–03. The Court explained that the Due Process Clause's guarantee of "liberty" secures more than "mere[] freedom from bodily restraint." *Id*. at 399. It protects "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men," including the right "to engage in any of the common occupations of life, to acquire useful knowledge, to marry," and, as relevant here, to *"establish a home and bring up children." Id*. at 399 (emphasis added). And by barring children from learning certain languages, the Court explained, the law violated the children's right to acquire such useful knowledge and "the right of parents to . . . instruct their children" in languages long thought "helpful and desirable." *Id*. at 400.

Then, in *Pierce*, the Court expanded on its conclusion that parents have a fundamental right to establish a home and bring up children. There, the Court considered a challenge to Oregon's Compulsory Education Act of 1922, which required parents to send their children to public school. *Pierce*, 268 U.S. at 530–31. Relying on *Meyer*, the Court concluded that Oregon's statute "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id*. at 534–35. As a result, the State could not require parents to

send their children to public school; parents had a right to educate them privately.

We've explained that *"Meyer* and *Pierce* ushered in a line of Supreme Court decisions that recognized, and further defined the contours of, parents' liberty interest to control the upbringing of their children." Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1222 (11th Cir. 2023); *see, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944) (upholding a child-labor law against a challenge that it violated parents' rights to raise their children); *Stanley v. Illinois*, 405 U.S. 645, 646–59 (1972) (holding unconstitutional a law that designated children of unwed parents as wards of the state upon a mother's death because fathers have protected "interest[s] in retaining custody of [their] children"); *Wisconsin v. Yoder*, 406 U.S. 205, 213–234 (1972) (striking down a Wisconsin law that compelled school attendance beyond the eighth grade because it interfered with "the traditional interest of parents with respect to the religious upbringing of their children"); *Parham v. J. R.*, 442 U.S. 584, 604 (1979) (explaining the Constitution "permit[s] the parents to retain a substantial, if not the dominant, role in [their children's medical] decision[s], absent a finding of neglect or abuse"); *Santosky v. Kramer*, 455 U.S. 745, 769 (1982) (requiring that the state prove by clear and convincing evidence that parental rights should be terminated); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (declining to require the state to appoint counsel for parents at a termination proceeding, although explaining that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one"); *Troxel*, 530 U.S.

at 60–75 (declaring unconstitutional a visitation statute because the law interfered with parents' fundamental right "to make decisions concerning the care, custody, and control of their children" and instructed courts to disregard "the traditional presumption that a fit parent will act in the best interest of his or her child").

Relying on this line of precedent, and other cases establishing the "private realm of family life," *Prince*, 321 U.S. at 166, the Supreme Court in *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (plurality opinion), reaffirmed that family members have the fundamental right to live with one another. There, the plaintiffs challenged East Cleveland's housing ordinance that limited occupancy of a dwelling to members of a single family. *Id*. at 495–96. The Supreme Court invalidated the ordinance as an unjustified intrusion into family life. *Id*. at 506.

As *Moore* explained, "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition," for "[i]t is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Id*. at 503–04. *Moore* further recognized that the right of "parents and children" and extended family members, like grandparents, to "shar[e] a household" lies at the core of the American family. *Id*. at 504. And East Cleveland had no authority to deprive its citizens of that privilege.

The Court based its conclusion not only on its understanding of Americans' "practice[]" of living with their families (although that would have been sufficient), *see Glucksberg*, 521 U.S. at

710 (citing *Moore*, 431 U.S. at 503); *cf.* Ruggles, *supra*, at 141, 145, 151; Nelson, *supra*, at 526, but also on the Court's firmly rooted precedent establishing the rights of parents (and sometimes extended family members) to raise children, *see Moore*, 431 U.S. at 505 & n.15.  The Court recognized that parents may not be able to "direct the upbringing . . . of [their] children," *Pierce*, 268 U.S. at 534, without the corresponding ability to live and "establish a home" with them, *Meyer*, 262 U.S. at 399.  Those rights, though independently worthy of constitutional protection, are interrelated and well established.  *See Obergefell,* 576 U.S at 667–68; GROSSBERG, *supra*, at 8.

Since *Moore*, the Supreme Court has repeatedly reaffirmed the right of parents to live with their children.[5]  In *Roberts v. United States Jaycees*, for instance, the Court said that the Bill of Rights affords "certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State."

---

[5] The Court has entertained many challenges to statutes on the ground that they "intrude on choices concerning family living arrangements."  *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (cleaned up).  And to be sure, it has rejected some of them because only statutory classifications that "'directly and substantially' interfere with family living arrangements" burden the fundamental right.  *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 386–387 & n.12); *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers*, 485 U.S. 360, 365 (1988); *Bowen*, 483 U.S. at 601–02.  But as we explain in the body of this opinion, Section 15-20A-11(d)(4) "directly and substantially" interferes with Henry's living arrangements, *Lyng*, 477 U.S. at 638, by severely limiting the amount of time he can spend in the same home as his son and by precluding him from living with his own son.

468 U.S. 609, 618 (1984).  The Court continued, explaining that "[f]amily relationships . . . involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life."  *Id.* at 619–20.  As a result, the Court confirmed, the Constitution secures parents' rights to "rais[e] and educat[e]" their children and to "co-habitat[e]" with them.  *Id.* at 619.

We have also consistently acknowledged family members' fundamental right to cohabitate, including a parent's right to live with their children.  *See, e.g.*, *Picou v. Gillum*, 874 F.2d 1519, 1521 (11th Cir. 1989) (recognizing that the Constitution protects "the structure of the family unit"); *Elliott v. City of Athens*, 960 F.2d 975, 981 (11th Cir. 1992) ("*Moore* and *Belle Terre*, read together, indicate that a feasible method of controlling density is to place occupancy limitations on unrelated persons but not on related persons."), *abrogated on other grounds by City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995); *Parks v. City of Warner Robins*, 43 F.3d 609, 614 n.3 (11th Cir. 1995) (citing case law establishing that government may not "directly and substantially interfere with family living arrangements" (cleaned up)); *Ross v. Clayton County*, 173 F.3d 1305, 1311 (11th Cir. 1999) (explaining "that the First Amendment right of free association encompasses 'cohabitation with one's relatives'" (quoting *U.S. Jaycees*, 468 U.S. at 619)); *Eknes-Tucker*, 80 F.4th at 1221–22 (recognizing "that the 'liberty' guaranteed by the Due Process Clause includes the right "to . . . *establish a home and bring up children*" (emphasis in original) (quoting *Meyer*, 262 U.S. at 399)); *cf.*

*Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1285 (11th Cir. 2001) (rejecting a claim that a zero-tolerance policy for federal housing directly and substantially interfered with family living arrangements); *Konikov v. Orange County*, 410 F.3d 1317, 1326 (11th Cir. 2005) (acknowledging "the fundamental right to freedom of personal choice in marriage and family life" (citing *Moore*, 431 U.S. at 499)); *Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir. 1984) ("A state violates the fourteenth amendment when it seeks to interfere with the social relationship of two or more people.").

So have our sister circuits. *See, e.g.*, *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982) ("A fundamental right is even more clearly involved here because the rental policy infringes the choice of parents to live with their children rather than the choice of more distant relations."); *Franz v. United States*, 707 F.2d 582, 595 (D.C. Cir. 1983) (explaining the Fourteenth Amendment protects "cohabitation with members of one's extended family"); *Doe v. City of Butler*, 892 F.2d 315, 321 (3d Cir. 1989) ("Zoning restrictions cannot be applied to hinder those in a familial relationship from living together."); *Hameetman v. City of Chicago*, 776 F.2d 636, 642 (7th Cir. 1985) ("A state or city that forces a man to live apart from his family deprives him of a form of liberty protected by the due process clause, and therefore violates the Fourteenth Amendment if due process is denied."); *cf. Johnson v. City of Cincinnati*, 310 F.3d 484, 501, 506 (6th Cir. 2002) (striking down a Cincinnati ordinance that limited a grandparent's access to the neighborhood where her grandchild lived as violative of the "fundamental right to

participate in child-rearing," including the "right to 'establish a home and bring up children'" (quoting *Meyer*, 262 U.S. at 398)).

Not only that, but Alabama courts have also recognized a parent's fundamental right to live with their children. *See Alabama v. C.M.*, 746 So. 2d 410, 415 n.7 (Ala. Crim. App. 1999) (acknowledging the "right to live with relatives"). In fact, in rejecting a challenge to ASORCNA's precursor, Alabama's Court of Criminal Appeals recognized that the statute "directly infringe[d]" the plaintiff-sex-offender's fundamental rights by prohibiting him "from choosing to reside with his children." *Herring v. State*, 100 So. 3d 616, 624 (Ala. Crim. App. 2011). And so the court applied "the strict-scrutiny test to determine whether th[e] [relevant] sections violate[d] Herring's due-process and equal-protection rights." *Id*. at 625. Although, as we explain later, we disagree with *Herring*'s result and conclude that Section 15-20A-11(d)(4) can't survive strict scrutiny, *Herring* shows Alabama's recognition that statutes that restrict a parent's ability to live with their child burden a fundamental right that the Fourteenth Amendment protects.

In sum, precedent instructs that the government may not interfere with how a parent raises their minor child, target the custody of one's minor child, *Robertson v. Hecksel*, 420 F.3d 1254, 1259–60 (11th Cir. 2005), or restrict a parent's ability to live with their child, *see, e.g.*, *Meyer*, 431 U.S. at 399; *Moore*, 431 U.S. at 499; *Bowen*, 483 U.S. at 602, without a compelling state interest that the state action is narrowly tailored to further, *Flores*, 507 U.S. at 302. So we

turn next to whether Section 15-20A-11(d)(4) inappropriately burdens a parent's fundamental right to live with and raise their child.

ii.     *Section 15-20A-11(d)(4) directly and substantially infringes Henry's ability to live with his son.*

In this section, we consider whether Section 15-20A-11(d)(4) substantially burdens Henry's constitutional rights, which would require us to apply strict scrutiny in our review of it. We conclude that it does. Although we show our work below, we note that the parties don't dispute that Section 15-20A-11(d)(4) substantially burdens a parent's right to live with their child. After all, the statute's plain text criminalizes that conduct. But a body of law addresses the extent to which state action may burden people's living arrangements without inviting stringent constitutional review. So we summarize it below, in showing our work and explaining why we conclude that we must apply strict scrutiny to Section 15-20A-11(d)(4).

Although the Fourteenth Amendment secures individuals' rights to live with their family members, not all state action affecting their ability to do so requires heightened constitutional scrutiny. After all, who someone lives with or where someone lives are important financial decisions. And many government programs or policies could have effects on the costs of such decisions. But we afford the government a great deal of latitude in crafting social and economic policy. *See Lee Optical*, 348 U.S. at 488. So only those laws that "'directly and substantially' interfere with family living arrangements" warrant careful judicial review. *Castillo*, 477 U.S. at

638 (quoting *Zablocki*, 434 U.S. at 387). As the Court has summarized, "that some families may decide to modify their living arrangements in order to avoid the effect of" a given law "does not transform" that law "into an act whose design and direct effect are to intrude on choices concerning family living arrangements." *Bowen*, 483 U.S. at 601–02 (cleaned up).

So in assessing claims that state action interferes with a family's living arrangements, courts generally have not applied heightened scrutiny to those regulations that have an "incidental and unintended effect" on the family, *Hameetman*, 776 F.2d at 643, or that "affect[] or encourage[] decisions on family matters," *Doe v. Miller*, 405 F.3d 700, 710 (8th Cir. 2005) (quoting *Gorrie v. Bowen*, 809 F.2d 508, 523 (8th Cir. 1987)). When that's the case, the rational-basis test controls.

Conditions on benefits typify the incidental or nudging effect government may permissibly have on familial arrangements. For example, the Supreme Court took no issue with the "allotment of food stamps" based on the statute's definition of a "household" because the definition did not "prevent any group of persons from dining together" or substantially increase the chance that "relatives would choose to live apart." *Castillo*, 477 U.S. at 638; *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers*, 485 U.S. at 365 (holding that an amendment preventing individuals on strike from receiving food stamps did not directly and substantially impact familial living arrangements). Nor, the Supreme Court has concluded, did the consideration of a household's collective

income as a condition of eligibility for federal aid violate Americans' right to cohabitate. *Bowen*, 483 U.S. at 601–02. And a housing authority did not violate the Constitution when it evicted a person under a policy that prevented any member of a tenant's household from engaging in drug-related criminal activity at or near the public housing. *Burton*, 271 F.3d at 1285.

Courts have also been less likely to apply strict scrutiny if the challenged state action primarily affects *where* someone lives without directly altering *whom* someone lives with. For instance, in *Hameetman v. City of Chicago*, the Seventh Circuit found no constitutional infirmity in Chicago's requirement that firefighters live within the City's limits. 776 F.2d at 642–43. As the court explained, the requirement was "not a regulation of the composition or location of the family." *Id.* at 643. Instead, any impact on Hameetman's family was "indirect," a consequence of his family's unique circumstances and preference for suburban life. *Id.* Although in some cases an indirect impact on family living arrangements "would be so cruel and arbitrary . . . as to be deemed a denial of due process of law," the Seventh Circuit concluded that the one before it was not so "extreme." *Id.*; *see id.* (explaining also that Hameetman did not request an accommodation from the City and that he failed to show why his family could not live in Chicago).

On similar logic, the Eighth Circuit upheld restrictions preventing an adult convicted of sex offenses involving minors from residing within 2,000 feet of a school or child-care facility. *Doe v. Miller*, 405 F.3d 700, 704–05 (8th Cir. 2005); *see also Doe v. Moore*, 410

F.3d 1337, 1344 & n.5 (11th Cir. 2005) (acknowledging *Miller* in a decision rejecting a substantive-due-process challenge to the publication of sex offenders' personal information); *McGuire v. Marshall*, 50 F.4th 986, 1024–25 (11th Cir. 2022) (concluding Alabama's law restricting certain sex offenders from residing near a school or child-care facility was not an ex-post-facto law).

The court upheld the statute because it did "not operate directly on the family relationship." *Miller*, 405 F.3d at 710. As the court explained, "[a]lthough the law restricts where a residence may be located, nothing in the statute limits *who may live with* the Does in their residences." *Id.* (emphasis added); *cf. McGuire*, 50 F.4th at 1009 (explaining similar residency restrictions were not an ex-post-facto law, in part, because offenders may still "go into exclusion zones to . . . visit friends or family"). To be sure, the statute limited some from living with family, like parents who already resided within a prohibited area. *Miller*, 405 F.3d at 711. But on the whole, the statute did not infringe upon offenders' liberties "in a fashion" so direct and pervasive that it "require[d] heightened scrutiny." *Id.*; *cf. Johnson*, 310 F.3d at 503 (concluding an ordinance that "broadly excludes individuals from Over the Rhine without regard to their reason for travel in the neighborhood" violated Johnson's right to raise a grandchild).

As *Hameetman* and *Miller* expressly state, they upheld laws that stand in contrast to those that facially restrict *who*, or sometimes *how many*, may inhabit a dwelling. *Cf. City of Santa Barbara v. Adamson*, 27 Cal. 3d 123, 133 (1980) ("In general, zoning ordinances

are much less suspect when they focus on the use than when they command inquiry into who are the users." (emphasis omitted)).  So for instance, in *Moore*, the Supreme Court explained that East Cleveland's ordinance directly infringed Moore's fundamental rights because "[o]n its face it selects certain categories of relatives who may live together and declares that others may not."  431 U.S. at 498–99.  That rendered "the usual judicial deference to the legislature . . . inappropriate."  *Id.* at 499.

Here, there's no reasonable dispute—indeed, the parties do not dispute—that Section 15-20A-11(d)(4) falls into the *Moore* camp—that is, the category of laws whose "design and direct effect are to intrude on choices concerning family living arrangements." *Bowen*, 483 U.S. at 601–02 (cleaned up).  By its plain terms, Alabama's statutory scheme stops Henry from "resid[ing]" with his child.  ALA. CODE § 15-20A-11(d).  Its restrictions do "not merely 'inconvenience'" Henry "in exercising his fundamental right as a parent"; they "directly infringe on that right by removing his freedom of choice regarding family matters."  *Herring*, 100 So. 3d at 624; *see R.E.H. v. C.T.*, 327 So. 3d 248, 253 (Ala. Civ. App. 2020) ("This state-imposed separation of offenders and children necessarily renders the father unable to assume physical custody of the child . . . .").  Just as East Cleveland made "a crime of a grandmother's choice to live with her grandson," *Moore*, 431 U.S. at 499, Alabama makes a crime, punishable up to ten years in jail, ALA. CODE §§ 13A-5-6(a)(3), 15-20A-11(i), of Henry's cho[ice] to reside with his" son, *Herring*, 100 So. 3d at 624.  In short, Section 15-20A-11(d)(4) "'directly and substantially' interfere[s] with" Henry's

"family living arrangements." *Castillo*, 477 U.S. at 638 (quoting *Zablocki*, 434 U.S. at 387).

As a result, we must carefully review its statutory scheme to ensure it is narrowly tailored to advance a compelling governmental interest. *Flores*, 507 U.S. at 302.

> iii.     *Alabama's arguments for why the Fourteenth Amendment does not secure Henry's right to live with his son find little support in the Constitution's text or our precedent.*

But before we consider the tailoring of Alabama's statutory scheme, we take a moment to address Alabama's arguments that strict scrutiny does not apply here, even though Section 15-20A-11(d)(4) is the type of law that falls into the *Moore* camp and would otherwise be subject to strict scrutiny. As Alabama sees it, Henry's past conviction entirely removes this case from *Moore* and other parental-rights decisions. Alabama argues that we do not need to strictly scrutinize Section 15-20A-11(d)(4) because Henry, as a convicted sex offender, lacks the constitutional right to direct the upbringing of his child. In the State's view, Henry's claimed right "break[s] new ground" under substantive due process, so it requires a new "careful description of the asserted right," *Flores*, 507 U.S. at 302 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992))—one that includes in its definition the fact of Henry's conviction.

In support of its position, Alabama asserts that Henry hasn't identified a binding case or a historical tradition affording sex offenders parental rights. In Alabama's view, under the Supreme

Court precedent, only "fit parents" have such rights, *Troxel*, 530 U.S. at 68, so even "the loosest description of the asserted right necessary includes" Henry's "qualifying conviction." And without a tradition of affording sex offenders parental rights, the State concludes, Henry's substantive-due-process claim fails, for Section 15-20A-11(d)(4) is rationally related to its legitimate governmental interest in securing children.

We disagree with Alabama's evaluation of Henry's substantive-due-process claim.[6] Broadly, Alabama conflates the identification of the right at issue with the tailoring analysis. Whether a right exists is a different question from whether the state may constitutionally restrict the exercise of that right. And the Constitution's text as well as the Court's fundamental-rights precedents confirm this point. "The traditional restrictions" on a constitutional right "go to show the scope of the right, not its lack of fundamental character." *McDonald v. City of Chicago*, 561 U.S. 742, 802 (2010) (Scalia, J., concurring). In other words, Henry's status as a sex offender may give Alabama a compelling reason to limit his

---

[6] Alabama also misidentifies the relevant rights that Henry asserts. Henry claims that Section 15-20A-11(d)(4) unconstitutionally prevents him from living with his child, not just, as Alabama seems to suggest, that it undermines Henry's parental right to exercise physical custody over his son. Although those rights overlap, they are constitutionally distinct. And the right to live with family is one that has long been "carefully described" and repeatedly affirmed by precedent, none of which suggests the right to live with family is definitionally qualified by a prior conviction.

constitutional rights, but it does not eliminate those rights whole-sale.

Three points illustrate this general problem in Alabama's argument. We discuss them as follows. First, we establish that the Constitution's text does not support Alabama's contention that Henry's prior conviction automatically deprives him of a well-established fundamental right. Second, we explain why the fundamental-rights case law does not enable Alabama to avoid strict scrutiny solely because of Henry's conviction. Third, we show how the parental-rights cases support our reading of the Constitution's text and the general principles our fundamental-rights jurisprudence has set forth.

***The Constitution's Text***. We begin with the relevant provision: the Fourteenth Amendment's Due Process Clause. That Clause prevents state and local governments from "depriv[ing] any *person* of . . . liberty . . . without due process of law." U.S. CONST. amend. XIV, § 1 (emphasis added). For three reasons, the best reading of that language requires the conclusion that Henry's conviction bears on the state's justification for depriving him of his fundamental rights, not whether he has them in the first place.

First, the clause's structure does not support Alabama's argument. The main clue comes from the provision's object: "any person." It's by now beyond debate that that phrase is broad. The Supreme Court has repeatedly confirmed that the use of "any person" makes the Due Process Clause's reach "universal . . . in application." *Plyler v. Doe*, 457 U.S. 202, 212 (1982) (emphasis omitted)

(quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). So the Clause covers Henry. After all, he is a "person," and his conviction does not change that fact. As a result, the Constitution's plain terms guarantee him certain liberties. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (explaining "dangerous felons" "are indisputably part of 'the people'" who the Second Amendment protects); *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (same). That means that the right to "establish a home and bring up children," *Meyer*, 262 U.S. at 399—a liberty within the meaning of the Due Process Clause—is a right guaranteed to all "person[s]," including Henry. And the only remaining question is whether restricting a "person['s]" (in this case, Henry's) liberties comports with due process of law.

Second, Alabama's reading of the Due Process Clause—or any other rights-securing provision—does not make much sense in application. "It is one thing to say that" certain liberties "fall outside the scope" of the Fourteenth Amendment, but it "is another thing to say that certain *people* fall outside the Amendment's scope." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). To suggest the latter, as Alabama does, would imply that "a person could be in one day and out the next: the moment he was convicted of a [sex] crime . . . , his rights would be stripped as a self-executing consequence of his new status." *Id.* To put it mildly, that is "an unusual way of thinking about rights." *Id.*

And it is not one that the Constitution adopts. The Fourteenth Amendment anticipates that state action will deprive

individuals of their constitutional rights and that state action will determine the scope of the deprivation. *Id.* In this respect, the Fourteenth Amendment provides that "[n]o *State shall make or enforce* any law which shall abridge the privileges or immunities of citizens of the United States; nor . . . *deprive* any person of life, liberty, or property, without due process of law; nor *deny*" them "the equal protection of the laws." U.S. CONST. amend. XIV, § 1 (emphasis added).

"Felon voting rights are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting); *accord Jones v. Governor of Fla.*, 975 F.3d 1016, 1028–29 (11th Cir. 2020) (en banc). So too with the right to keep and bear arms. We've explained that "dangerous felons" are part of "the people" the Second Amendment protects but that they "may be prohibited from possessing firearms without offending" the preexisting right the Second Amendment secures. *Jimenez-Shilon*, 34 F.4th at 1046. In both instances, "a person convicted of a qualifying crime does not automatically lose his right[s] . . . but instead becomes *eligible* to lose" them, *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting), in appropriate circumstances.

Third, Alabama's view of the Constitution leads to some perverse results. If Alabama were right that a possible reason for *regulating* fundamental rights precluded stringent judicial review, nothing would stop Alabama from disregarding the usual limitations on states' power to infringe constitutional rights. That's so

because, as we've noted, rational-basis review applies when the right involved is not "fundamental." And under rational-basis review, courts generally don't strike down legislation—regardless of how poorly tailored restrictions are or how much of a historical outlier they may be. *See Beach Commc'ns, Inc.*, 508 U.S. at 313–15. But that is not how courts usually assess fundamental-rights claims; a valid *reason* for limiting rights does not justify *every means* of limiting rights. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("*Why and how* the regulation burdens the right are central to this inquiry." (emphasis added)); *Flores*, 507 U.S. at 302 (permitting state action that is "narrowly tailored to serve a compelling state interest"). Yet Alabama seeks to turn a potential justification for targeted regulation of persons' fundamental rights into a regulatory blank check. The Constitution does not allow states to evade judicial review in that way when fundamental rights are at issue.

When we consider these three points together, the text of the Due Process Clause dispatches Alabama's argument: the Constitution secures fundamental rights for all persons, but the government may deprive individuals of those fundamental rights under only very limited circumstances. *See Flores*, 507 U.S. at 301–02 ("[O]ur . . . cases . . . interpret[] the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."). So whether Henry's conviction is a

44                    Opinion of the Court                    24-10139

"qualifying" one that renders him "eligible" to be deprived of his rights, *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting), raises a question of tailoring, *see Flores*, 507 U.S. at 301–02, or history, *see Kerry v. Din*, 576 U.S. 86, 95 (2015) (plurality opinion).

    ***Fundamental-Rights Precedent.***  Our fundamental-rights jurisprudence confirms the conclusion we draw from the text of the Due Process Clause: Henry's conviction bears on the State's justification for restricting his constitutional rights, not on the existence or definition of Henry's constitutional rights in the first place.

    In fact, the Supreme Court has squarely rejected Alabama's position—which would wholesale deprive certain "person[s]" of fundamental rights—as "inconsistent with the approach" it "has used in discussing" well-established fundamental rights, "including marriage and intimacy." *Obergefell*, 576 U.S. at 671.  Rights are not "defined by *who* exercised them in the past." *Id.* (emphasis added). Indeed, "*Loving* did not ask about a 'right to interracial marriage'; *Turner* did not ask about a 'right of inmates to marry'; and *Zablocki* did not ask about a 'right of fathers with unpaid child support duties to marry.'" *Id.*  When governments have attempted to deprive certain groups of people of their fundamental rights, the Court has "inquired about the right . . . in its comprehensive sense, asking if there was a sufficient justification for excluding the relevant class from the right." *Id.*  So the question in cases like Henry's is whether the state has a sufficient justification for and appropriate means of denying the right to certain individuals.  And it's not, as Alabama

attempts to frame the dispute, whether Henry has the right in the first place.

To be sure, in some cases, the Supreme Court has found the status of the person "who[m]" the government is regulating important to its careful description of the fundamental right. But it has normally done so because that fact informs what right the plaintiff is asserting. *Cf. id.*

The Supreme Court's recent substantive-due-process case, *Department of State v. Muñoz*, offers an example. 602 U.S. 899 (2024). Muñoz filed suit after the United States prevented her husband, a noncitizen, from entering the country. She argued that the decision undermined her right to marriage and the right to live with her family. *Id.* at 903–07, 910. The Court rejected Muñoz's claim and, as relevant here, her framing of the dispute. As the Court saw things, Muñoz claimed "something distinct: the right to *reside with her noncitizen spouse in the United States*." *Id.* at 910. Because Muñoz's husband, a noncitizen, did not have the right to reside in the United States, her claim "involve[d] more than marriage and more than spousal cohabitation." *Id.* In turn, the Court concluded that Muñoz failed to show "that the right to bring a noncitizen spouse to the United States is deeply rooted in this Nation's history and tradition." *Id.* at 911 (cleaned up).

But Henry's case is unlike *Muñoz*. Muñoz's husband's status as a noncitizen required her to establish something "more than spousal cohabitation"—the right to have her husband enter and

reside in the United States. *Id.* at 910. By contrast, it's hard to see, and Alabama does not explain, how Henry's status as a sex offender requires him to assert "something distinct" from or something "more than . . . cohabitation" with his family. *Id.* Rather, living with his family is the core relief Henry seeks through his complaint. So precedent detailing how to carefully describe fundamental-rights claims does not suggest Henry's status as a felon is material to whether the Fourteenth Amendment guarantees him the fundamental right to live with his family in the first place.

Decisions from cases on more analogous facts prove the point. Consider prisoners' attempts to enforce their fundamental rights. As the Court has repeatedly explained, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987).

Convicted individuals, even when they are serving their sentences, retain, for instance, the right to petition the government for redress, *Johnson v. Avery*, 393 U.S. 483, 486 (1969), the right to be free of racial discrimination, *Lee v. Washington*, 390 U.S. 333, 333–34 (1968), the right to the freedom of speech, *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989), the right to the free exercise of religion, *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987), and the right to marry, *Turner*, 582 U.S. at 95–96. Each is undoubtedly a "'liberty' interest within the meaning of the Fourteenth Amendment," and each does not fade away upon conviction "even though" a right

may be "qualified of necessity by the circumstance of imprisonment." *Martinez*, 416 U.S. at 418.

And if prisoners retain their constitutional rights, so too do those who have served their terms of incarceration and are rejoining society. *Cf. Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014) (concluding "registered sex offenders who have completed their terms of probation and parole enjoy the full protection of the First Amendment" (cleaned up)).

Our sister circuits have uniformly recognized that principle in cases directly analogous to Henry's. When district courts impose special conditions of supervised release that interfere with a felon's, including a sex offender's, ability to raise or live with their child, the courts of appeals have acknowledged that such restrictions interfere with "a fundamental liberty interest." *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. 2014) (quoting *United States v. Edgin*, 92 F.3d 1044, 1049 (10th Cir. 1996)); *United States v. Del Valle-Cruz*, 785 F.3d 48, 56–57, 64 (1st Cir. 2015); *United States v. Myers*, 426 F.3d 117, 125–26, 130 (2d Cir. 2005) (Sotomayor, J.); *United States v. Voelker*, 489 F.3d 139, 154–55 (3d Cir. 2007); *United States v. Worley*, 685 F.3d 404, 408 (4th Cir. 2012); *United States v. Widmer*, 785 F.3d 200, 208 (6th Cir. 2015); *United States v. Quinn*, 698 F.3d 651, 652 (7th Cir. 2012) (Easterbrook, C.J.); *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006); *United States v. Wolf Child*, 699 F.3d 1082, 1092–93 (9th Cir. 2012).

As a result, many courts review the challenged conditions to ensure they "interfere with the right of familial association . . . only in compelling circumstances" through means that are "'especially fine-tuned' to achieve the statutory purposes of sentencing." *Bear*, 769 F.3d at 1229 (first quoting *United States v. Smith*, 606 F.3d 1270, 1284 (10th Cir. 2010); and then quoting *Edgin*, 92 F.3d at 1049); *accord Quinn*, 698 F.3d at 652 ("Putting the parent-child relationship under governmental supervision for long periods (under this judgment, until the son turns 18) requires strong justification."); *Widmer*, 785 F.3d at 208 ("Special conditions of supervised release that implicate parental rights are considered more intrusive and require explicit consideration by the sentencing court."); *United States v. Cabrera-Rivera*, 893 F.3d 14, 33 (1st Cir. 2018) ("Because impairment of a defendant's relationship with his child involves a very significant deprivation of liberty, it requires a greater justification." (cleaned up)).[7] So even after a person has been convicted of a sex

---

[7] We have not articulated a special standard of review for conditions of supervised release that infringe individuals' constitutional rights. All special conditions of supervised release must be "reasonably related to the statutory sentencing factors," involve "no greater deprivation of liberty than is reasonably necessary for the purposes set forth in" 18 U.S.C. § 3553(a), and remain "consistent with any pertinent policy statements issued by the Sentencing Commission." *United States v. Etienne*, 102 F.4th 1139, 1146 (11th Cir. 2024). So we generally consider claims that a condition violates a constitutional right as an argument that the condition "is more restrictive than necessary." *Id.* We have "affirmed restrictive conditions of supervised release that burden constitutional rights so long as the conditions are tempered by reasonable exceptions." *Id.* at 1446–47. In other words, we generally don't impose "*absolute* bar[s]" on individuals' exercise of their constitutional rights, *id.* at 1147, and we attempt to ensure that restrictions on such rights are "narrowly prescribed," *id.* at 1149.

offense, including those involving child pornography, courts universally view those individuals as still enjoying their fundamental rights, including their rights to live with and contact family, subject to limits based on appropriate tailoring.

Our precedent comports with this principle. In *Doe v. Moore*, we rejected a substantive-due-process challenge to Florida's registration and notification scheme and DNA-collection statute. 410 F.3d at 1344–45. We did so for two reasons. First, we concluded the plaintiffs had no liberty interest in preventing "a state's publication of truthful information that is already available to the public."[8] *Id.* at 1345. No history or tradition supported such a proposition.

And second, as relevant here, we confirmed the challenged provision did not "fall under a fundamental right classification." *Id.* That was so, we explained, because the law didn't "restrict

---

*See, e.g.*, *United States v. Zinn*, 321 F.3d 1084, 1093 (11th Cir. 2003) (upholding a restriction on access to the internet in a child-pornography prosecution because the supervisee could still use the internet for valid purposes with his probation officer's permission); *United States v. Coglianese*, 34 F.4th 1002, 1010–11 (11th Cir. 2022) (same).

[8] To be sure, in *Doe v. Moore*, our careful description of the asserted right included the plaintiffs' convictions. *See* 410 F.3d at 1344 (defining the right as "the right of a person, convicted of 'sexual offenses,' to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website"); *see also United States v. Ambert*, 561 F.3d 1202, 1209 (11th Cir. 2009). But, as we explain above, that definition had no impact on how we ultimately resolved the claim, nor did it lead us to discount the importance of a sex offender's familial rights.

plaintiffs' freedom of action with respect to their families," nor did it otherwise "intrude upon the aspect of the right to privacy that protects an individual's independence in making certain types of important decisions." *Id.* (quoting *Paul P. v. Verniero*, 170 F.3d 396, 405 (3d Cir. 1999)); *see id.* at 1345 n.6 (recognizing "limitations on state regulatory power in areas regarding 'marriage, procreation, contraception, family relationships, and child rearing and education'" (quoting *Paul v. Davis*, 424 U.S. 693, 713 (1976))).

The dispositive factor wasn't that sex offenders lacked familial rights.  To the contrary, we emphasized that these rights, which we described as "privacy interests," were important to our decision. *See id.* at 1344 n.4.  But we upheld the challenged provision because Florida's laws had only "indirect effects" "on the offender's relationship with his family," and those effects just "did not rise to the infringement of a fundamental right."  *Id.* at 1344–45; *see id.* at 1344 n.5 (citing *Miller*, 405 F.3d at 710–11, which upheld a location-based residency restriction on sex offenders because it did not limit who may live with the offenders in their residences).  But as we've explained, that's not the case here.  Section 15-20A-11(d)(4) criminalizes conduct at the core of "family relationships," *id.* at 1345 n.6 (citation omitted)—namely a person's ability to live with and raise their own child.

So Supreme Court precedent, case law from our sister circuits, and our own decisions point to and compel the conclusion that Henry enjoys the right to live with his child.

*Parental-Rights Precedent.* Despite the Constitution's text and the general principles that guide our inquiry into fundamental-rights claims, Alabama argues the Supreme Court's parental-rights cases require that Henry prove our society has "traditionally accorded *such a father*" (that is, a father with a child-pornography conviction) the rights he asserts. *Michael H. v. Gerald D.*, 491 U.S. 110, 126 (1989) (plurality opinion) (emphasis added). Alabama also cites *Stanley*, 405 U.S. at 649, *Lehr v. Robertson*, 463 U.S. 248 (1983), and *Troxel*, 530 U.S. at 69, in support of its position.

But Alabama overreads *Michael H.* and misinterprets the other cases on which it relies. Rather than support Alabama's position, *Michael H.*, *Stanley*, *Lehr*, and *Troxel* confirm that Henry has a right to live with his son, at least and until the State limits that right through a means consistent with due process. We discuss *Michael H.* first and then address the remaining cases on which Alabama relies.

In *Michael H.*, Michael, a putative father, sought parental and visitation rights for his purported natural child. That child was born into a woman's marriage with another man and had been accepted and raised as the legitimate child of that marriage. 491 U.S. at 113, 127. California law presumed a child born of wedlock, like the one in *Micheal H.*, was the natural child of the married couple, and it disallowed collateral attacks on the legal status of that family. *Id.* So Michael argued the statutory scheme was unconstitutional. But the Court rejected the challenge. *Id.* at 116–17, 130.

Contrary to Alabama's assertion, the Court did not do so be-
cause states may generally deny the parental rights of "an adulter-
ous natural father." *Id.* at 130. Rather, a plurality rejected Mi-
chael's claim because "California law, like nature itself, ma[d]e[] no
provision for dual fatherhood." *Id.* at 118. Michael's claim that the
Constitution ought to protect his parental rights was necessarily a
claim that the Constitution had to "*deny* protection to [the] marital
father." *Id.* at 130. And in the situation of competing claims to
parental rights, Michael could offer no evidence showing that states
traditionally preferred his parental-rights claim over those of a mar-
ried father who "wishes to embrace the child." *Id.* at 127. To the
contrary, "our traditions ha[d] protected the marital family . . .
against the sort of claim Michael assert[ed]." *Id.* at 124. The "pre-
sumption of legitimacy," to which California adhered and which
Michael challenged, "was a fundamental principle at common law."
*Id.*

So Alabama's reliance on *Michael H.* is misplaced.[9] The
Court was not concerned with Michael's status as an adulterous

---

[9] The *Michael H.* coalition fractured sharply. Only four Justices joined Justice
Scalia's plurality opinion. *See Michael H.*, 491 U.S. at 113. And two of those
Justices disagreed with the analytical approach Justice Scalia took. *See id.* at
132 (O'Connor, J., concurring in part) (explaining the "relevant traditions pro-
tecting asserted rights" "might not be" articulated at "'the most specific level'
available" (citation omitted)); *cf. Obergefell*, 576 U.S. at 671. So at its narrow-
est—where it is firmly binding, *see Marks v. United States*, 430 U.S. 188, 193
(1977)—*Michael H.* is a narrow-tailoring case. Justice Stevens affirmed because
California afforded Michael a sufficient opportunity to establish paternity and
that his parentage would be in the child's best interest. *Michael H.*, 491 U.S. at

natural father for its own sake but because that status required Michael to prove something "distinct" and "more than" a right to paternity, *Muñoz*, 602 U.S. at 910—that the Constitution grants natural fathers parental rights at the expense of marital fathers, *see Michael H.*, 491 U.S. at 127, 130. But Alabama again fails to show how Henry's status as a sex offender requires that he claim a "distinct" right or something "more than . . . cohabitation." *Muñoz*, 602 U.S. at 910.

Tradition and history also doomed Michael's claim. Michael's claim ran headlong into the common law's "presumption of legitimacy" that had protected "the marital family . . . against the sort of claim Michael assert[ed]." *Michael H.*, 491 U.S. at 124. So whatever rights Michael generally had as a natural father were historically circumscribed by "a tradition denying the specific application of" them. *Din*, 576 U.S. at 95; *see Muñoz*, 602 U.S. at 911–12. In other words, California prevailed because it adhered to traditional *restrictions* on parental rights, not necessarily because Michael lacked parental rights in the first place. *See Michael H.*, 491 U.S. at 127 n.6 (explaining "a more specific tradition . . . unqualifiedly denies protection to" the "natural father of a child adulterously conceived"); *see also id.* at 127 n.6, 129 n.7 (acknowledging that in the absence of a "more specific tradition," courts may have

---

135–36 (Stevens, J., concurring in the judgment). Still, for purposes of this opinion, we accept the plurality opinion's logic as controlling. But even then, the plurality opinion does not support Alabama's argument that Henry lacks a fundamental right to live with his son.

to "reason from[] the traditions regarding natural fathers in general").

So at most, *Michael H.* stands for the unremarkable proposition that states may limit a person's exercise of a fundamental right if the state's action accords with our Nation's history and tradition. *See Rahimi*, 602 U.S. at 691 (explaining "if a challenged regulation fits within [our regulatory] tradition, it is lawful"). But that's not the case here. On *Michael H.*'s own terms, Henry is indisputably a member of a "unitary family" that Americans have "historic[ally] respect[ed]." *Id.* at 123. And as we will discuss, Alabama has not shown a history and tradition of extinguishing familial rights merely because of the fact of conviction.

The remaining cases on which Alabama relies affirmatively undermine its claim that Michael lacks a constitutional right to live with his child. *Stanley*, *Lehr*, and *Troxel* make clear that broad, statutory classifications abrogating parental rights are presumptively improper.

True, in *Stanley*, the Court framed the relevant question as whether "a presumption that distinguishes and burdens all unwed fathers [is] constitutionally repugnant." 405 U.S. at 649. But it immediately concluded that "as a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him." *Id.*

Then, in *Lehr*, another case involving an unwed parent, the Supreme Court applied *Stanley*. New York "adopted a special

statutory scheme to protect the unmarried father's interest in assuming a responsible role in the future of his child." 463 U.S. at 263. But the absentee father failed to avail himself of the scheme's protections, so the Court rejected his bid to establish his parental rights through a constitutional claim. *Id.* at 263–65.

And in *Troxel*, the Court described the plaintiff as a "fit custodial parent" because "no court . . . found[] that Granville was an unfit parent." 530 U.S. at 68. In turn, the "presumption that fit parents act in the best interests of their children" attached. *Id.*

In each of these three cases, the Court presumed the putative parent had a constitutional right unless an adequate state procedure terminated those rights for appropriate reasons. In other words, the Fourteenth Amendment prevented the state from depriving the parents of the right to the care, custody, and control of their child unless and until the state afforded them due process.

None of the cases Alabama marshals establishes that a prior child-pornography conviction eliminates Henry's fundamental rights as a matter of law. To the contrary, Supreme Court precedent generally requires an individualized finding to terminate parental rights: when state law "forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child." *Stanley*, 405 U.S. at 657. In sum, state regulation of parental rights based on status alone is constitutionally suspect.

\*        \*        \*

Henry has a fundamental right to live with his family, including his son.  Alabama Code § 15-20A-11(d)(4) directly and substantially interferes with that right by making it a crime for Henry to reside with him.  So we must closely examine Alabama's law to ensure it passes constitutional muster.

2. <u>Section 15-20A-11(d)(4) does not pass constitutional review because it is neither narrowly tailored to further Alabama's compelling governmental interest nor consistent with our Nation's history and tradition of regulating familial cohabitation.</u>

The next step in our analysis asks whether, even if Section 15-20A-11(d)(4) infringes Henry's fundamental right to live with his son, it does so unconstitutionally.  Alabama argues that the law survives constitutional review because it passes strict scrutiny and comports with this Nation's history and tradition of regulating parental rights.

We disagree.  Alabama certainly has a compelling interest in protecting its youth from sexual abuse.  But the challenged provision is not narrowly tailored to further that interest.  And our Nation's history and tradition of regulating parental rights confirms that conclusion: we have given parents the chance to show that physical custody of their children is in the children's best interest.  Alabama's law offers no such opportunity for anyone convicted of a qualifying "sex offense" under any circumstances.  Because

Alabama's law fails strict scrutiny and departs from our traditions, we conclude that it is unconstitutional.

We begin with strict scrutiny and then address Alabama's historical arguments.

      i.       *Section 15-20A-11(d)(4) is not narrowly tailored to further Alabama's compelling governmental interests.*

To satisfy strict scrutiny, the government bears the burden to prove that it has "narrowly tailored" its state action "to serve a compelling state interest." *Flores*, 507 U.S. at 302. Alabama has surely shown it has a "compelling interest." Indeed, it "is indisputable 'that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)).

But "it is not enough for the [State] to identify a compelling interest." *Id.* "To survive strict scrutiny," Alabama "must prove" that Section 15-20A-11(d)(4) furthers "that compelling interest and" is "narrowly tailored to that end." *Id.* (cleaned up). Tailoring is especially important in cases like this one, where familial rights are involved. That's so because the State has no compelling interest in removing children from parents who are in fact competent to love and care for them. *See Stanley*, 405 U.S. at 652 ("[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents."); *Santosky*, 455 U.S. at 760 ("[U]ntil the State proves parental unfitness, the child and his parents share a

vital interest in preventing erroneous termination of their natural relationship.").

Three factors guide our determination on whether state action is sufficiently tailored: overinclusiveness, underinclusiveness, and the opportunity to enact less restrictive alternatives. *See Ent. Merchs. Ass'n*, 564 U.S. at 805 (explaining that compelling interests "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive"); *Muñoz*, 602 U.S. at 919 (acknowledging that a burden on a fundamental right "trigger[s]" the government's "obligation to demonstrate" that its action "is the least restrictive means of serving" its compelling "interest").

*Overinclusiveness.* A law is overinclusive when it regulates too much conduct. In other words, the law applies to individuals whom the government does not have a compelling interest in regulating. Overinclusive cases present the greatest constitutional concern because the government abridges constitutional rights without justification. *See Zablocki*, 434 U.S. at 390 (concluding a statute forbidding marriage without a court order was "substantially overinclusive" because it possibly prevented individuals, through marriage to wealthy spouses, from "improving their ability to satisfy" the prior familial support obligations that Wisconsin claimed to enact the statute to secure); *cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("[T]he record does not reveal any rational basis for believing that the Featherston home would pose any special threat to the city's legitimate interests."). After all,

the government may not "burn the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

Still, narrow tailoring does not require "perfect tailoring." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015).

At bottom, when we account for these considerations, state action is not narrowly tailored if it advances the state's compelling interest in only "some" cases. *Stanley*, 405 U.S. at 654; *Ent. Merchs. Ass'n*, 564 U.S. at 804.

***Underinclusiveness.*** On the flip side, a law is underinclusive if it leaves unregulated similar conduct that also threatens the compelling interest that the state action purports to advance. *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015). We assess a state action's underinclusiveness because a "woefully underinclusive" act may undermine our belief that the government truly wishes to advance its asserted interest. *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see City of Ladue v. Gilleo*, 512 U.S. 43, 52–53 (1994) (explaining underinclusiveness "diminish[es] the credibility of the government's rationale" for regulating fundamental rights).

Underinclusiveness doesn't raise the same constitutional concerns as does overinclusiveness. And some underinclusive situations may arise, as here, where no reasonable person would doubt that the government is genuine in its efforts to advance its asserted interest. Plus, the government "need not address all aspects of a problem in one fell swoop." *Williams-Yulee*, 575 U.S. at 449. But even so, the state bears the burden of identifying "good reason[s]"

for "singl[ing] out" the conduct it did regulate. *TikTok Inc. v. Garland*, 145 S. Ct. 57, 70 (2025). And to the extent the government leaves unregulated some conduct that may undermine its asserted interest, that fact may hamper the government's ability to disprove the viability of proffered less restrictive alternatives.

*Less Restrictive Alternatives.* That brings us to the next factor. State action infringing fundamental rights fails strict scrutiny "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. ACLU*, 521 U.S. 844, 874 (1997). Put simply, "the government cannot" advance a compelling interest "by means that 'broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Lynch v. Baxley*, 744 F.2d 1452, 1459 (11th Cir. 1984) (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

This does not mean that states must affirmatively proffer and then rebut less restrictive alternatives. *United States v. Grady*, 18 F.4th 1275, 1286 n.12 (11th Cir. 2021) (discussing least-restrictive alternatives under the Religious Freedom and Restoration Act); *see also Knight v. Thompson*, 797 F.3d 934, 946 (11th Cir. 2015) (acknowledging that, at least under the Religious Land Use and Institutionalized Persons Act, we split on this issue with the First and Third Circuits, which require that governments show they considered and rejected less restrictive alternatives). But if a plaintiff "present[s]" the government "with a plausible, less restrictive alternative," it is "for the Government . . . to prove the alternative to be

ineffective." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 823 (2000); *Grady*, 18 F.4th at 1286.

Section 15-20A-11(d)(4) flunks each of these three tests—overinclusiveness, underinclusiveness, and less restrictive alternatives—so it fails strict scrutiny.

***Overinclusiveness.*** The statute is vastly overinclusive. Defendants assert that their "interest in protecting children is advanced by preventing 'sexual recidivism,' which is the *commission* of another sex crime . . . ." Appellants' Reply Br. at 16. But a conviction that satisfies Section 15-20A-11(d)(4)'s criteria does not alone predict with substantial precision an offender's likelihood of harming their own child. Nor does such a conviction offer, as Alabama law and our Constitution usually require, "clear and convincing evidence" that the regulated individual "is unsuited or unfit to assume the place of a [parent] in providing a safe and comfortable home . . . ." *Ex parte Sullivan*, 407 So. 2d 559, 563 (Ala. 1981) (quoting *Chandler v. Whatley*, 238 Ala. 206, 209 (1939)); *see Santosky*, 455 U.S. at 769 (requiring the clear-and-convincing standard of proof to terminate parental rights).

At its broadest, Section 15-20A-11(d)(4) covers some crimes that sustain little to no rational inference that a parent is likely to harm their child. For instance, as we've mentioned, Section 15-20A-11(d)(4) would bar from residing with their child a 19-year-old college freshman convicted of downloading sexually explicit content that their 16-year-old high-school sweetheart sent them. And

because Section 15-20A-11(d)(4) operates forever without exception, that categorical bar would remain even if the 19-year-old college freshman later fathered a child at the age of fifty or sixty and after living several decades of a law-abiding life. Alabama offers no justification for treating that person exactly like one who just last week trafficked or raped children.

And for at least some of the core conduct Section 15-20A-11(d)(4) targets, the sole fact of a conviction is not sufficiently tailored to advance Alabama's interests in protecting children. The parties hotly contest whether a qualifying conviction, specifically a child-pornography conviction, may adequately stand in for the danger that a parent poses to a child. They do so primarily through expert testimony on the recidivism rates for sex offenders generally and child-pornography offenders specifically. *Cf. United States v. Kebodeaux*, 570 U.S. 387, 396 (2013) (acknowledging that, generally, there is "conflicting evidence" on sex offenders' recidivism rates). We briefly recount that evidentiary debate, and we credit the evidence Alabama marshaled. But even applying our summary-judgment standard of review, Alabama has not shown the Section is narrowly tailored.

Alabama relies mostly on three figures to argue that child-pornography offenders recidivate at a high rate and therefore pose a continuing danger to their own children. First, Alabama suggests that within five years of release, an estimated 9.2% to 46% of child-pornography offenders will commit another sex offense. It reaches that estimate by multiplying a five-year sex-offense recidivism rate

for child-pornography offenders (4.6%) by its experts' claim that actual recidivism rates are undercounted at a multiple of two to ten times the reported figures. Second, the State asserts that fifty percent—and up to eighty-five percent—of child-pornography offenders have previously committed a contact offense against a child (meaning an offense involving the sexual molestation of a child). And third, Alabama argues that, for those who have committed a contact offense and have recidivated, about a quarter did so even after ten years of living free in their community. So the risk an offender poses, the State posits, does not decrease over time.

Henry disputes the relevance and the accuracy of some of these figures. He counters that Alabama fails to differentiate between child-pornography offenders who have committed a contact offense in the past and those who have not. And Henry's expert proffered that less than two percent of—that is, fewer than one in fifty—offenders who have only viewed or possessed child pornography, like Henry, commit a future contact offense.

Henry also contests the extrapolations the State makes from its estimates of unreported recidivism. Alabama's unreported-crime-multiplier, Henry's expert claims, relies on unreported crimes committed by those who have not yet been caught, not recidivism rates of those who have been convicted of an offense, like Henry; estimates of unreported crime do not make estimates of unreported recidivism. Henry's expert also argues that the risk of sexual recidivism halves every five years an individual is living in the community as a law-abiding citizen. And after around ten to

fifteen years, Henry adds, most individuals who have committed a sex offense are no more likely to commit a new sex offense than are individuals with a non-sexual criminal history. Though, for low-risk sex offenders, Henry's expert points out that it may take only five years to pose a risk that is statistically indistinguishable from other non-sexual offenders.

Of course, we do not wade into these factual disputes at the summary-judgment stage; we must draw all reasonable inferences in favor of the non-movant (here, Alabama). *Marbury*, 936 F.3d at 1232. But even under the summary-judgment standard, Alabama has not carried its burden. That is so for two reasons.

First, none of the figures Alabama proffers show that Henry's qualifying conviction necessarily makes him and others like him, without more, a danger to their children. The law doesn't distinguish between offenders like Henry, who haven't committed a previous contact offense and appear statistically unlikely to commit one in the future, and offenders who have committed a previous contact offense and who may be more likely to commit another in the future. In other words, Alabama defends Section 15-20A-11(d)(4) by relying on material distinctions the law itself does not make and which do not even apply to offenders in Henry's shoes. That is a concession of overinclusiveness.

To be sure, the premise of Alabama's position is that many sexual offenses go unreported, so broad legislative categories are necessary to prevent likely *contact* offenders from recidivating with

their own child. But as applied to Section 15-20A-11(d)(4), that logic just uses a child-pornography conviction as a proxy for offenders who have previously committed a *contact* offense, even when they haven't. Then Section 15-20A-11(d)(4) uses the first proxy as a second proxy for the dispositive conclusion that the regulated offender poses a threat to their own child. *See Stanley*, 405 U.S. at 657 (holding, in parental-rights cases, "the determinative issues" are "competency and care"). But this logic—twice removed from Henry's non-contact situation—falls apart as soon as we look at the record: noticeably absent from it is direct evidence that child-pornography-only offenders like Henry pose a danger to their children. In this respect, Section 15-20A-11(d)(4) sweeps with too broad a brush.

Second, even if we disregard that error, the overinclusiveness problems persist. The most relevant statistic the State proffered was its first: that 9.2% to 46% of child-pornography offenders will commit another sex offense.

That figure raises several concerns. For starters, it includes a substantial range because it depends on estimates of the amount of unreported recidivism. That range of uncertainty—a span of about 37 percentage points—is so large that it makes the estimate of recidivism meaningless.

Plus, even crediting the highest recidivism rate in that range, as we must in this posture, still at least half the parents the law prevents from residing with their children will not pose a danger to

them.  Indeed, our sister circuits have determined that a conviction for viewing child-pornography images, without more, does not establish that an offender is a danger to their own child.  *See, e.g.*, *Davis*, 452 F.3d at 995 (finding "plain error" where a district court barred a child-pornography offender from having unsupervised contact with his own daughter where there was "no evidence that he has abused a child"); *Bear*, 769 F.3d at 1229 (vacating conditions limiting Bear's ability to reside with his children because, despite his prior sex offenses, the record did not show "a danger to his own three children"); *Del Valle-Cruz*, 785 F.3d at 64 (same); *Worley*, 685 F.3d at 408–09 (same).  Of course, any new contact offense is a tragedy.  But so is depriving a child of a caring, competent, loving parent who presents no danger to the child.  And although narrow tailoring does not require "perfect tailoring," *Williams-Yulee*, 575 U.S. at 454, it demands more than a coin flip.

     Other courts have held as much, declaring unconstitutional statutes that terminate parental rights based solely on the fact of a conviction, for the reason that they ignored individualized evidence relevant to a parent's fitness.  *See In re Amanda D.*, 811 N.E.2d 1237, 1242 (Ill. App. 2004) ("We conclude that a conviction of aggravated battery to a child is not an adequate proxy for unfitness" because it "fails to take into account several things relevant to the ultimate fitness determination."), *aff'd sub nom. In re D.W.*, 827 N.E.2d 466 (Ill. 2005).

     In short, the State cannot justify abridging fundamental rights by advancing its compelling state interests in "some" cases.

*See Stanley*, 405 U.S. at 654 ("But all unmarried fathers are not in this category; some are wholly suited to have custody of their children."); *Ent. Merchs. Ass'n*, 564 U.S. at 804 ("[S]ome of the legislation's effect may indeed be in support of what some parents of the restricted children actually want . . . . [But] [t]his is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires."). And that's especially so when, as we discuss later, Alabama has other tools at its disposal to ensure the safety of its children. Section 15-20A-11(d)(4) is fatally overinclusive.

*Underinclusiveness*. At the same time, Section 15-20A-11(d)(4) is puzzlingly underinclusive. The statute does not prohibit a covered offender from unsupervised visitation with "his or her child at the residence of the criminal sex offender where the child does not also reside." *S.A.N. v. S.E.N.*, 995 So. 2d 175, 178 (Ala. Civ. App. 2008). In other words, it "allows every qualifying adult sex offender daily unsupervised access to minors for four hours at a time in any one place on two consecutive days and nine aggregate days per month, as long as such access occurs between the hours of 6:00 a.m. and 10:30 p.m." *Henry v. Abernathy*, 711 F. Supp. 3d 1300, 1305 (M.D. Ala. 2024).

So while Alabama burdens many who may in fact be fit to love and care for their children, at the same time, it may allow those who are in fact a danger to minors to enjoy unsupervised access to their next potential victims. That is not the sort of narrow tailoring strict scrutiny looks favorably upon.

To be clear, we don't doubt that Section 15-20A-11(d)(4) reflects Alabama's genuine efforts to secure the safety and wellbeing of its children. We believe the State is sincere in exercising its *parens patriae* authority to the benefit of its citizenry. The legislature could have afforded even dangerous offenders the visitation rights we've just discussed to allow their children the benefit of a relationship with their parent, subject to a judicial determination that visitation is not in the child's best interest. *See S.A.N.*, 995 So. 2d at 178–79. But under strict scrutiny, where we must consider a law's effectiveness in light of less restrictive alternatives, a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on [fundamental rights], when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (internal quotation marks omitted) (quoting *Republican Party of Minn.*, 536 U.S. at 780).

***Less Restrictive Alternatives***. Besides Section 15-20A-11(d)(4)'s over- and underinclusiveness, Alabama could employ less restrictive alternatives to accomplish its goals. Henry focuses primarily on the alternative that Alabama could provide the opportunity for judicial review and individualized relief.[10]

---

[10] Besides this alternative, Henry suggests several other ways Alabama could more narrowly tailor its statute: by including fewer qualifying offenses, by time-limiting its law, by providing criteria for reinstatement into the home (such as completion of a treatment program), or by allowing residence under certain conditions (such as the presence of a separate, qualified caregiver or ongoing supervision by the Alabama Department of Human Resources). We don't further address these proposed alternatives because we agree with

Currently, Alabama's statutory scheme prevents covered offenders from living with their children "regardless of the opinion of experts, lay persons, and the trial court that the registered sex offender does not pose a threat to the child." *K.E.W. v. T.W.E.*, 990 So. 2d 375, 381 (Ala. Civ. App. 2007). So if Henry filed suit to prove his fitness as a parent, ASCORNA would foreclose the claim and forbid the judge from considering any evidence on the matter. But Henry has developed evidence that a person's likelihood of recidivism declines substantially when we account for certain factors and that an individualized review can offer the most accurate assessment of the danger a particular person may pose to their child. Plus, generally, "parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody." *Stanley*, 405 U.S. at 658; *cf. Doe v. Kearney*, 329 F.3d 1286, 1295 (11th Cir. 2003) ("[A] state may not remove a child from parental custody without judicial authorization unless there is probable cause to believe the child is threatened with imminent harm."). So Henry has proffered a plausible less restrictive alternative. *See ACLU*, 521 U.S. at 874.

───────────────

Henry that his primary proposed alternative is a plausible one. We also don't assess the constitutionality of a more narrowly tailored scheme that adopts Henry's additional suggestions, even if it does not provide the opportunity for individualized review. We don't resolve such a hypothetical, in part, because this case does not require us to decide whether individualized review is a viable less restrictive alternative *as compared to* any other, more narrowly tailored scheme Alabama could enact.

Alabama disputes the viability of individualized hearings.[11]
It contends that no expert tool can establish with a reasonable

---

[11] Alabama also briefly expresses in its reply brief some doubt that we may properly consider Henry's primary alternative, calling it "a sort of substantive-due-process right to more process." We don't find that suggestion persuasive for two reasons. First, Defendants raise it for the first time in their reply brief—and even then, make only a passing reference to it. But we don't consider issues raised for the first time in a reply brief or matters mentioned only in passing. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Second, and in any case, Henry's claim is not one of procedural due process. Henry does not make the usual procedural-due-process points. He does not contest the "constitutional adequacy of [state] procedures," *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), like when a person challenges the acceptability of post-deprivation hearings, *id*. at 349; the applicable standard of proof, *Santosky*, 455 U.S. at 769–70; or the lack of appointed counsel, *Lassiter*, 452 U.S. at 31–32. Instead, Henry's claim sounds in substantive due process. He raises the opportunity for individualized relief only to show that that there is not an "adequa[te] . . . 'fit' between the classification and the policy that the classification serves"—the fit is inadequate, Henry claims, because there is more tailored way to advance the State's policy. *Michael H.*, 491 U.S. at 121; *see Flores*, 507 U.S. at 308 (confirming the plaintiffs merely "recast[ed]" a "'substantive due process' argument" in "'procedural due process' terms" by claiming individualized proceedings "would better serve" the plaintiffs' interests). That the less restrictive alternative is more procedure is immaterial. The Court has recognized that certain procedural rules may satisfy substantive due process by furthering a compelling state interest. *See, e.g., Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 280–85 (1990) (concluding Missouri could require clear-and-convincing evidence of a patient's intent before discontinuing nutrition and hydration because such a requirement permissibly furthers the state's interest in safeguarding the patient's wishes and preserving life); *United States v. Salerno*, 481 U.S. 739, 750–51 (1987) (holding the Bail Reform Act's restriction of physical liberty was justified by the "careful delineation of the circumstances" in and the procedures by which one could be detained before trial, furthering the government's interest in abating "an identified and

degree of scientific accuracy whether an offender poses a risk to their child.  And Alabama argues that individualized determinations could never advance its compelling interest as effectively as its current statutory scheme because some future offenders may slip through the cracks of any individualized process.  But Alabama has failed to introduce evidence that satisfies its burden of proving that the mere availability of individualized relief will make its statutory scheme less effective.  *See Playboy Ent. Grp.*, 529 U.S. at 823; *Grady*, 18 F.4th at 1286.  That's so for three reasons.

First, Alabama too narrowly defines the end to which it must narrowly tailor its law.  Alabama must advance "the physical and psychological well-being" of *all* its children.  *Otto*, 981 F.3d at 868 (citation omitted).  As we've explained, "the State registers no gain towards its declared goals when it separates children from the custody of fit parents."  *Stanley*, 405 U.S. at 652.  So if Henry, or any other parent, "is a fit" one, then Alabama "spites its own articulated goals when it needlessly separates him from his family."  *Id*. at 652–53.

---

articulable threat to an individual or the community").  At bottom, claims that a statute is unconstitutional as applied to a plaintiff—because the plaintiff "is not likely to be currently dangerous"—"'must ultimately be analyzed' in terms of substantive, not procedural, due process," at least if, as is the case here, dangerousness is not already "relevant under the statutory scheme."  *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7–8 (2003) (quoting *Michael H.*, 491 U.S. at 121).

In turn, the most effective means of pursuing Alabama's stated goal is the one that maximizes the number of children who can remain with fit parents while minimizing the number of children who may be placed with unfit ones. On this rubric, permitting some form of individualized relief comports more effectively with advancing the State's interests than does a categorical rule. *See id.* at 655 ("Given the opportunity to make his case, Stanley may have been seen to be deserving of custody of his offspring. Had this been so, the State's statutory policy would have been furthered by leaving custody in him.").

Second, Alabama fails to show how the opportunity for individualized adjudications will make its statutory scheme less effective, given the law's underinclusiveness that we've already pointed out. As we've noted, Section 15-20A-11(d)(4) permits even the worst covered offenders periods of unsupervised access to their children. We've taken those visitation rights as an attempt to balance the competing interests at stake in this difficult area of family law. But even when we view Section 15-20A-11(d)(4) in this light, Alabama has not adduced evidence showing that employing a scheme that permits some individualized determinations that a parent is fit to reside with their child would undermine its interests.

For starters, Alabama has not offered evidence on how likely its trial courts are to err in making individualized determinations. Nor has it shown that the number of future offenders who may slip through the cracks of an alternative scheme with individualized relief would be far greater (or even any greater) than the number of

those who escape ASCORNA's current reach.  And that seems especially unlikely if the alternative scheme eliminates ASCORNA's current underinclusivity and is narrowly tailored to cover those who either decline their opportunity for individualized relief, *see Lehr*, 463 U.S. at 264–65, or, after petitioning for relief, are adjudicated to be dangerous, *see Stanley*, 405 U.S. at 654–55.

After all, to police the statute's current underinclusiveness, the "legislature obviously relie[s] heavily on the understanding that trial courts" will "restrict the visitation rights of a parent who poses a danger of sexually abusing a child."  *S.A.N.*, 995 So. 2d at 179.  So the State can't reasonably contend that individualized adjudications are so often wrong that they seriously threaten ASORCNA's effectiveness; it already relies on them.  Without more evidence, we can't conclude that a genuine dispute of material fact exists on whether Henry's proffered alternatives are less effective.

Third, and relatedly, to the best of our knowledge, every other state in the country gives offenders the chance to prove that they do not pose a danger to their child or that it is in the child's best interest to live with them.  Indeed, in the district-court proceedings, both the parties and the district court were "unaware of any statute enacted by another state substantially similar to § 15-20A-11(d)(4)."  *Henry*, 711 F. Supp. 3d at 1305.

That fact is important to our analysis of less restrictive alternatives.  If Section 15-20A-11(d)(4) is an outlier, we can more easily conclude that Henry successfully proffered a viable less restrictive

alternative.   *See Ullman*, 367 U.S. at 554 (Harlan, J., dissenting) ("[C]onclusive, in my view, is the utter novelty of this enactment."); *cf. Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) ("It is instructive that no case or holding of this Court has approved of a statute as broad in its reach.").   The Supreme Court has confirmed that other states' practices may show that a given measure has "already proven effective" in advancing the State's interests.   *TikTok*, 145 S. Ct. at 71; *see McCullen v. Coakley*, 573 U.S. 464, 490–494 (2014) (concluding a state law burdened more speech than necessary where it had not considered less restrictive measures successfully adopted by other jurisdictions).

And on appeal, Alabama points to no other state that has used a law like ASCORNA.   In fact, each comparison law that Alabama points to includes the very opportunity for individualized relief that the State denies its citizens.

We start with the examples Alabama cites in reply: Arizona, Minnesota, and Wisconsin.

In Arizona, "proof of conviction" of a crime that "supports a rational inference of unfitness" will "create[] a rebuttable presumption that the father is unfit to parent children." *Matter of Pima Cnty., Juv. Action Nos. S-826 & J-59015*, 643 P.2d 736, 738 (Ariz. Ct. App. 1982).   But importantly—and unlike with Section 15-20A-11(d)(4)—"the parent may rebut the assessment of unfitness based on a past act by showing actual fitness at the time of the hearing." *Matter of Juv. No. J-2255*, 613 P.2d 304, 307 (Ariz. Ct. App. 1980).

So too for Minnesota. There, a previous conviction for a sex offense satisfies a statutory basis for terminating a person's parental rights. *See Matter of Welfare of Child of S.B.G.*, 981 N.W.2d 224, 226 (Minn. Ct. App. 2022), *aff'd*, 991 N.W.2d 874 (Minn. 2023). But again—and unlike in Alabama—a court "may not order the termination of parental rights without determining that the termination is in the child's best interests." *Id.* at 232; *see Matter of Welfare of Child of M. Z.*, 2019 WL 2167826, at *4 (Minn. Ct. App. May 20, 2019) ("A juvenile court may terminate the parental rights of a parent when at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best interests.").

The same goes for Wisconsin. Although convictions of sexual offenses may satisfy statutory grounds for parental-rights termination, *see* WISC. STAT. § 48.415(5), (9m)(a)-(am), "the court need not terminate the parent's rights" if the evidence does not warrant such an order, *In re Jayton S.*, 629 N.W.2d 768, 776 (Wisc. 2001); *see also In re M.D.*, 2019 WI App 21, ¶¶ 3–9, 36–39 (reversing an order terminating the parental rights of an individual convicted of possessing child pornography because the trial court did not conduct a hearing to determine the child's best interests).

So Alabama's own examples show that states account for a parent's prior conviction, either by making it a statutory basis for termination or by using it as a basis for a presumption of unfitness. But in either case, parents have the chance to show that they are fit

in fact or that their continuing custody would be in their child's best interest.

        And that's not just the case in Arizona, Minnesota, and Wisconsin.  As far as we can tell, it's also the case in every other state that Alabama claims to allow the termination of parental rights based on a conviction.  *See, e.g.*, MISS. CODE § 93-15-121(h)(i) (prior conviction "may be grounds for termination of the parent's parental rights if reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome"); *In re D.F.*, 777 N.E.2d 930, 940 (Ill. 2002) ("If the court makes such a finding [of unfitness], it will then consider whether it is in the best interests of the child that parental rights be terminated."); *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) ("In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence."); *In re T.M.P.*, 126 So. 3d 741, 756 (La. App. 4 Cir. 2013) ("Although the State need only establish one statutory ground, the trial court must also find that termination is in the child's best interests."); *In re P.L.O.*, 131 S.W.3d 782, 788 (Mo. 2004) ("[T]he trial court must find by clear, cogent, and convincing evidence that one or more grounds for termination exists," and "the trial court must find that termination is in the best interests of the children."); *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) ("Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests."); *In re Child. of Christopher S.*, 203 A.3d 808, 811 (Me. 2019) ("Once a court determines that a parent is unfit, it

must determine whether termination of the parental rights is in the child's best interest."); *In re Christopher T.*, 101 A.D.2d 997, 997 (N.Y. App. Div. 1984) ("[T]ermination of parental rights is not warranted, and certainly not mandated, if such is not in the child's best interests, even though the statutory requirements for termination have been established."), *aff'd sub nom. In re Joyce T.*, 478 N.E.2d 1306 (N.Y. 1985); *In re Adoption of L.D.S.*, 155 P.3d 1, 8 (Ok. 2006), *as supplemented on reh'g* (Mar. 6, 2007) ("Parents must be provided the opportunity to fully and finally litigate . . . *before* . . . the child is permanently removed from the family."); *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004) ("[A] finding of unfitness does not necessarily require that the parent's rights be terminated.  Not all parental misconduct is irredeemable." (internal citation omitted)).

Not only that, but the very cases Alabama cites undermine the proposition that a mere fact of conviction conclusively resolves whether the state may separate a parent from their child.  Instead, those cases considered the totality of the circumstances and individual findings of the danger, if any, that a parent posed to their children.  *See, e.g.*, *Trawick v. Trawick*, 173 So. 2d 341, 343 (La. Ct. App. 1965) (explaining the "conviction of certain felonies presumably do indicate moral unfitness of a parent to look after and direct the welfare and future of a small child, but . . . it is more important for us to determine if the act . . . will be of such a handicap as to so seriously jeopardize the future of the child as to warrant the court in separating it from her mother"); *Commonwealth v. Lapointe*, 759 N.E.2d 294, 299–300 (Mass. 2001) (concluding a probation

condition that prevented a sex offender from living with his child
did not violate the offender's constitutional rights because "the
judge has retained jurisdiction to revisit all the conditions" and to
issue "appropriate future orders based on changed circum-
stances"); *State ex rel. Juv. Dep't of Lane Cnty. v. Brammer*, 892 P.2d
720, 722 (Or. Ct. App. 1995) (affirming that, under "totality of the
circumstances," the lower court did not err in finding "a reasonable
likelihood of harm to the welfare of" the at-issue children); *Allen v.
State*, 141 A.3d 194, 206 (Md. 2016) (explaining "a party to a child
custody hearing that has previously abused a child shall be denied
custody unless the court specifically finds that there is no likelihood
of further child abuse or neglect by the party" (cleaned up)); *In re
C.R.C.*, 450 P.3d 1169, 1176 (Utah Ct. App. 2019) (concluding "pos-
sessing child pornography is prima facie evidence of unfitness" but
terminating parental rights because the father "failed to demon-
strate to the court why he should be considered a fit parent and
why it was not in Child's best interest to terminate his rights").

Put simply, as far as we can tell, in every other state, parents
may present evidence that they are not a danger to their child. Sec-
tion 15-20A-11(d)(4)'s "utter novelty" highlights its constitutional
infirmity. *Ullman*, 367 U.S. at 554 (Harlan, J., dissenting). Indeed,
the availability of judicial review in every other state suggests that
measure has "already proven effective" in advancing the State's as-
serted interests. *TikTok*, 145 S. Ct. at 71. As a result, Alabama has
not met its burden under strict scrutiny of rebutting Henry's

proffered less restrictive alternative. *See Playboy Ent. Grp.*, 529 U.S. at 823.

Because Section 15-20A-11(d)(4) is both overinclusive and underinclusive, and because less restrictive alternatives are plausibly at least just as effective, the law fails strict scrutiny. *See In re Amanda D.*, 811 N.E.2d at 1238, 1241–48 (holding unconstitutional a statute that terminated parental rights based solely on the fact that the parent "was previously convicted of aggravated battery of a child").

ii.    *Section 15-20A-11(d)(4) departs from our Nation's history and tradition of regulating parental rights.*

Alternatively, Alabama argues that there's a well-established and enduring tradition of limiting the parental rights of those guilty of gross misconduct. Whatever rights Henry may have had as a parent generally, the State suggests, a "tradition" exists that denies "the specific application of" those rights based on his conviction. *Din*, 576 U.S. at 95; *see Muñoz*, 602 U.S. at 911–12.

But even assuming that a historical tradition of relevantly similar regulation can support the constitutionality of Section 15-20A-11(d)(4) even though the law fails strict scrutiny, we disagree that the tradition Alabama marshals is sufficiently analogous to sustain Section 15-20A-11(d)(4) and its current statutory scheme.

When the Supreme Court has relied primarily on history to sustain the constitutionality of a law that severely burdens a

fundamental right, it has required that "the challenged regulation" be "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. That means we have looked to the laws of earlier eras to see whether they burdened the fundamental right at issue in a relevantly similar way. "Why and how the regulation burdens the right are central to this inquiry." *Id.* By understanding why our predecessors enacted a law or followed an existing legal regime, as well as how they furthered their goals, we discern the scope of the rights our predecessors meant to enshrine in our fundamental law when they voted for the Fourteenth Amendment. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022) ("[W]e must ask what the *Fourteenth Amendment* means by the term 'liberty.'"). So by asking whether a modern law is "'relevantly similar' to laws that our tradition is understood to permit," we apply "faithfully the balance struck by the [Reconstruction] generation to modern circumstances." *Rahimi*, 602 U.S. at 692 (citation omitted).

Of course, "a challenged regulation [need] not precisely match its historical precursors." *Rahimi*, 602 U.S. at 692. "The insight" we take from an analogue "is not the authoritative status of the" analogue itself, "but the apparent rule at play given that such an [analogue] is expected to follow from it." *Id.* at 740 (Barrett, J., concurring) (quoting Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375, 386 (2013)). In other words, "[h]istorical regulations reveal a principle, not a mold." *Id.* Our goal, then, is to "pull[] principle from [that] precedent." *Id.* And

we must do so at "just the right level of generality" so that we are continuing to respect the Fourteenth Amendment, *see id.*, while not "trap[ping] [the] law . . . in amber," *id.* at 691 (Roberts, C.J., majority). Put differently, we must ask ourselves whether we are "endorsing outliers that our ancestors would never have accepted." *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 30 (2022) (citation omitted).

In this case, the evidence suggests Section 15-20A-11(d)(4) is such an "outlier[]." To be sure, governments throughout our history have removed children from parents and homes when a danger to the children's health or safety existed. But historically, courts have afforded parents individualized relief, including the chance to show that they were not a danger to their children and that their custody over their children was in the children's best interests. Yet Section 15-20A-11(d)(4) denies parents like Henry that opportunity. It operates as substantive law, foreclosing on the merits any claim that a parent who falls within its reach is in fact fit or competent, "regardless of the opinion of experts, lay persons, and the trial court that the registered sex offender does not pose a threat to the child." *K.E.W.,* 990 So. 2d at 381. In that way, it restricts parents' rights to live with their children based on simply a fact of conviction. And by doing so, Alabama departs from our Nation's history and tradition.

We support this conclusion in the next two sub-sections. First, we recount the history of custody—the bundle of parents' rights over children that allowed parents to live with their

children—from its common-law origins through the legal regime at the adoption of the Fourteenth Amendment.  Court cases, as well as a wave of state legislation about children's welfare, establish the principles that governed parent's rights, including their custodial rights.  Then, we apply the history-and-tradition legal framework to the lessons we've learned from our history.  In doing so, we conclude that Section 15-20A-11(d)(4) departs from our Nation's history and tradition.

> a.  Although historically states could remove children from parents who posed a danger to them, parents enjoyed the right to petition courts for relief and to show that they were no longer a danger to their children.

Because substantive due process derives from the Fourteenth Amendment, which Americans adopted in 1868, the relevant period for our analysis of regulations of substantive-due-process rights is the Reconstruction Era.[12]  *See Dobbs*, 597 U.S. at 240;

---

[12] To the extent we rely on evidence from after the Reconstruction Era, we do so because it is part of a continuing tradition and because we believe it is consistent with the public understanding of the rights Americans intended to secure through the Fourteenth Amendment.  *See Bruen*, 597 U.S. at 35–37; *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 445 (2024) (Kagan, J., concurring) (explaining a "continuing tradition" may have great weight in constitutional interpretation).  We also note that Alabama proffered much of the post-ratification evidence on which we rely as representative of our Nation's regulatory tradition.  *Cf. Bruen*, 597 U.S. at 25 n.6 (explaining courts are "entitled to decide a case based on the historical record compiled by the parties").

*Eknes-Tucker*, 80 F.4th at 1221.  Even so, a review of the common-law background is helpful.

"The fundamental principle of the common law is that the father has the paramount right to the custody and control of his minor children."  JAMES SCHOULER, A TREATISE ON THE LAW OF DOMESTIC RELATIONS, *333 (Bos., Little, Brown & Co. 2d. ed. 1874).  Or as Blackstone put it, children were subject to the "empire of the father."  1 BLACKSTONE, *supra*, at 648.  Traditional legal systems "assured fathers of absolute dominion over children and property."  J. Herbie DiFonzo, *From the Rule of One to Shared Parenting: Custody Presumptions in Law and Policy*, 52 FAM. CT. REV. 214, 214 (2014).  So a "father had the supreme right to the guardianship of his infant heirs" as a "by-product of the laws of inheritance and land ownership."  Sarah Abramowicz, Note, *English Child Custody Law, 1660-1839: The Origins of Judicial Intervention in Paternal Custody*, 99 COLUM. L. REV. 1344, 1366 (1999).

But over the course of the eighteenth and nineteenth centuries, the unassailable version of paternal rights softened.

In England, after the Tenures Abolition Act of 1660 empowered fathers to appoint guardians to their children by will, the Court of Chancery "took on itself the task of supervising testamentary guardians" to "ensure that after a father died, his children would be brought up as he would have wanted them to be."  *Id.* at 1391.  If appointed guardians breached the trust in which fathers placed their children, the court could intervene for the benefit of the children.  *See, e.g., Beaufort v. Berty* (1721) 24 Eng. Rep. 579, 579;

1 P. Wms. 703, 704; *Eyre v. Shaftsbury* (1722) 24 Eng. Rep. 659, 660;
2 P. Wms. 103, 104; *Morgan v. Dillon* (1724) 88 Eng. Rep. 361, 365–
66; 9 Mod. 135, 142–43.

　　But with that precedent set, it was only a matter of time be-
fore the new "tradition of judicial involvement in child custody"
would be "turned against fathers themselves." Abramowicz, *supra*,
at 1391; *see Rex v. Delaval* (1763) 97 Eng. Rep. 913, 913–16; 3 Burr.
1434, 1434–40 (implying that if a father were involved with arrang-
ing eighteen-year-old daughter's "prostitution," he should not re-
tain custody). And eventually, the Court of Chancery in England
confirmed its authority to remove a child from their parent. *See,
e.g.*, *Shelley v. Westbrooke* (1817) 37 Eng. Rep. 850, 851; Jacob 266, 267
*Wellesley v. Beaufort* (1827) 38 Eng. Rep. 236, 243–45, 247; 2 Russ. 1,
19–24, 30 (suggesting interference with parental rights was "long
settled by judicial practice" to be "the law of the land"). Still, the
common law continued to ensure a father "the custody of his mi-
nor child" in recognition of his "absolute right." WALTER C.
TIFFANY, HANDBOOK ON THE LAW OF PERSONS AND DOMESTIC
RELATIONS 267 (Roger W. Cooley ed., St. Paul, West Pub. Co. 2d ed.
1909); SCHOULER, *supra*, at *337–38 (confirming the "English
rule . . . that the father is entitled to the sole custody of his infant
child; controllable, in general, by the court only in case of very
gross misconduct, injurious to the child"). But it made exceptions
"in the cases of the most flagrant unfitness." TIFFANY, *supra*, at 267.

　　During the same period, American courts followed suit.
Drawing on English legal developments, Justice Story remarked

that the power "to remove infant children from the custody of their parents" was "of extreme delicacy" but a "jurisdiction which" was "indispensable" to our Nation's courts. 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 1342 (Melville M. Bigelow ed., Bos., Little, Brown & Co. 13th ed. 1886). That jurisdiction was indispensable, in part, because the "primary object of the American" family-law system was "to secure the welfare of the child." SCHOULER, *supra*, at *339.

So parental rights became synonymous with "the traditional presumption that the parents [will] act in the best interests of their child," *Parham*, 442 U.S. at 604, and will fulfill "their duties" to protect and care for them, 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW *203 (O. W. Holmes, Jr. ed., Bos., Little, Brown & Co. 12th ed. 1873). As a result, "the courts of law, as well as those of equity, while acknowledging the general rule that" parents are "entitled to the child's custody, modif[ied] the rule to a greater or less extent by adopting the equitable principle that this right must yield to considerations affecting the well-being of the child." TIFFANY, *supra*, at 268. This meant that parents were "generally entitled to the custody of" their children but could lose that custody when the "interests of the children *strongly* require[d] it." KENT, *supra*, at *205 (emphasis added).

Through the Antebellum period, a general structure of family law emerged. *See* TIFFANY, *supra*, at 268 ("[T]he great weight of authority establishes the following propositions.").

First, courts did not "act arbitrarily, and disregard the rights of the father," for the "right of the father [wa]s generally held to be a paramount right, if he [wa]s a fit person." *Id.*; *see Brinster v. Compton*, 68 Ala. 299, 302 (1880) (explaining the court's jurisdiction was to be "exercised for the benefit of the infant primarily, but not arbitrarily in disregard of the father's natural right to be preferred").

Courts recognized that "parents are the natural guardians and prima facie are entitled to the custody of their minor children." *Foulke v. People ex rel. Foulke*, 36 P. 640, 643 (Col. App. 1894) (citing *State ex rel. Mayne v. Baldwin*, 5 N.J. Eq. 454, 455 (Ch. 1846)). So if the parent was "a fit and proper person, he ha[d] a legal right to that custody, and the court [was] bound to give it to him." *Foster v. Alston*, 7 Miss. (6 Howard) 406, 472 (1842); *accord Miner v. Miner*, 11 Ill. 43, 49 (1849); *Armstrong v. Stone*, 50 Va. (9 Gratt.) 102, 106 (1852); *State ex rel. Sharpe v. Banks*, 25 Ind. 495, 500 (1865); *Johnson v. Terry*, 34 Conn. 259, 263 (1867); *Baird v. Baird*, 21 N.J. Eq. 384, 388 (1869); *Henson v. Walts*, 40 Ind. 170, 172 (1872); *Rust v. Vanvacter*, 9 W. Va. 600, 612–15 (1876); *Lovell v. House of the Good Shepherd*, 9 Wash. 419, 422–23 (1894).

As especially relevant here, though, courts required "a clear and strong case of unfitness" to intervene. *Commonwealth v. Briggs*, 33 Mass. (16 Pick.) 203, 205 (1834); *see Striplin v. Ware*, 36 Ala. 87, 90 (1860) ("[T]he parental authority will not be interfered with, except in case of gross misconduct . . . ."); *accord Miller v. Wallace*, 76 Ga. 479, 487 (1886). In short, "no court [was] at liberty to disregard" parents' "right to the custody" of their children "in the absence of

any positive disqualification . . . for the proper discharge of [their] parental duties." *State ex rel. Herrick v. Richardson*, 40 N.H. 272, 275 (1860).

Second, in determining whether a parent was unfit, courts considered pertinent facts "with reference rather to the interests of the child than the moral delinquency of the parent." SCHOULER, *supra*, at *336; *see* STORY, *supra*, § 1341 (explaining courts will interfere where a parent "acts in a manner injurious *to the morals or interests of his children*" (emphasis added)). The Massachusetts high court, for instance, declared that it would interfere if the parent was "wholly unable to provide for the safety and wants of the child." *Briggs*, 33 Mass. (16 Pick.) at 205; *see Foster*, 7 Miss. (6 Howard) at 457 (concluding the mother should be preferred "unless there be something in the conduct or character of the mother to operate against the *interest* of the child").

Under this standard, courts showed no reservation in removing children from homes when parents were guilty of "gross ill treatment or cruelty towards" children. STORY, *supra*, § 1341; *see, e.g.*, *In re Cuneen*, 17 How. Pr. 516, 516–17 (N.Y. Sup. Ct. 1859) (denying custody to a father with a "suspicious and splenetic temper" that led to "many of the instances of tyrannical and abusive conduct"); *Boggs v. Boggs*, 49 Iowa 190, 192 (1878) (finding unfit a father who confessed "to bad treatment" and "the striking of [a] little girl upon the head with a hoe"). Nor did they wait for mistreatment to occur; courts could act if it "appear[ed]" that the child would be exposed to cruelty." KENT, *supra*, at *194 n.(c). "[I]f a father

wrong[ed] his wife," for instance, "it [wa]s readily presumed that he w[ould] wrong his children likewise." SCHOULER, *supra*, at *340.

Still, as these examples show, the focus remained on the actual or likely welfare of the children. So in Alabama, the Supreme Court refused to disturb a mother's custody over her children in the absence of evidence showing she was "either physically or mentally, incapable of taking proper care of [her] children" or that the children were "in danger of being personally abused." *Striplin*, 36 Ala. at 90–91. And it did so even though the mother's new husband was of "somewhat exceptionable" morals. *Id*. at 91 If the facts showed that the children were likely to be safe and cared for by their parents, the parents' misdeeds or shortcomings did not justify state intervention. *See, e.g.*, *id*.; *Lovell*, 9 Wash. at 423.

Third and relatedly, in applying these values to determine custody, all "the circumstances" were "fully considered by the court," and "[m]uch [was] left to the peculiar surroundings of each case." SCHOULER, *supra*, at *339–40. The "American rule [was] not . . . one of fixed and determined principles." *Id*. Rather, the totality of the circumstances controlled. *See United States v. Green*, 26 F. Cas. 30, 31 (C.C.D.R.I. 1824) (No. 15,256) (Story, Circuit Justice) (confirming, in matters of custody, courts "will look into all the circumstances"); *Briggs*, 33 Mass. (16 Pick.) at 205 (explaining "all the circumstances are to be taken into consideration"); *Banks*, 25 Ind. at 500 ("'The court should judge upon the circumstances of the particular case, and give direction accordingly."); *Baird*, 21 N.J. Eq. at 388 (noting "the circumstances of each case must, of

necessity, become important elements entering into the grounds of decision"); *Verser v. Ford*, 37 Ark. 27, 29 (1881) (concluding "[n]o rigid rules to regulate the practice have or can be formulated" and that courts "must exercise [their] judgment upon the peculiar circumstances of the case"). Indeed, some courts disregarded "inflexible" statutory rules that determined custody "without any reference to the best interests of the children" or "the circumstances" and "particular necessities of the case." *Sturtevant v. State*, 19 N.W. 617, 618 (Neb. 1884).

Our predecessors' holistic approach meant even certain "violation[s] of laws" did "not necessarily demonstrate depravity of heart or moral unfitness to bring up a child." *Jensen v. Jensen*, 170 N.W. 735, 736 (Wis. 1919) (rejecting that a mother's infraction "necessarily stamp[ed] her as an unfit person to bring up her child"). So even if, earlier, a mother "was not a competent person to maintain control of [a] child," courts would consider whether those "difficulties . . . have now passed away" such that "the necessity of separating the mother and child has ceased to exist." *Lovell*, 9 Wash. at 423; *see In re Kelley*, 152 Mass. 432, 435 (1890) ("A parent who has neglected his child may become competent, and may desire to furnish a better home . . . to his child . . . , and the good of the child may require that it should be restored to its parent."); *Striplin*, 36 Ala. at 91 (rejecting as a grounds for removing children from their mother prior "domestic disturbance[s] between the husband and wife" because "the domestic peace has been restored, and the parties are living together in harmony").

If the parents could "convince[]" the court that they would "treat[] the[] children with kindness," the court would award them custody. *Striplin*, 36 Ala. at 91; *see Jensen*, 170 N.W. at 736 (declining to rescind custody from a mother "in the face of proof showing that the child is being well taken care"). So even a prior loss of custody did not necessarily "preclude" parents from "applying to obtain the custody" of their children; "the Courts [were] always open to [parents] for a renewed application" to show their custody would be in the best interest of their children. *Verser*, 37 Ark. at 31–32.

These principles developed primarily through decisions of the courts. SCHOULER, *supra*, at *339. But Antebellum and Reconstruction legislatures also played a role in securing children's welfare.

Most prominently, states throughout the Antebellum period established reformatories for children who committed crimes, were beyond the control of their parents, were found vagrant, or were in the custody of an unfit parent. *See, e.g.*, *Ex Parte Crouse*, 4 Whart. 9 (Pa. 1839); *see also* LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS 101–09 (Baltimore, Harold B. Scrimger 3d ed. 1899) (providing an overview of this wave of state legislation). Courts generally upheld these laws and allowed the state to commit children to the institutions they created as a proper exercise of the state's *parens patriae* authority. In this way, courts saw the laws as ensuring the "care of neglected children" by

"supply[ing] to them the parental custody which they" did not have. *Farnham v. Pierce*, 141 Mass. 203, 204 (1886).

Still, these legislative efforts were not without constitutional difficulties. Principally, courts took issue with the "ease with which" the parent's "right to the care, custody and assistance of his child" was "disrupted under the laws in question." *People ex rel. O'Connell v. Turner*, 55 Ill. 280, 284 (1870). "Before any abridgment of the [parent's] right," courts held, "gross misconduct or almost total unfitness on the part of the parent, should be clearly proved." *Id.* at 284–85; *see State ex rel. Bethell v. Kilvington*, 45 S.W. 433, 435 (Tenn. 1898) ("Ordinarily, the parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law."); *Mill v. Brown*, 88 P. 609, 613 (Utah 1907) ("Before the state can be substituted to the right of the parent it must affirmatively be made to appear that the parent has forfeited his natural and legal right to the custody and control of the child . . . ."); *accord Ex parte Becknell*, 119 Cal. 496, 498 (1897), *overruled on other grounds by In re Daedler*, 194 Cal. 320, 327–28, 331–32 (1924) (overruling *Becknell* to the extent it established a jury-trial right for juvenile offenses and rejecting a parental-rights challenge because the relevant statute required a court to find "that the welfare of such person requires that his custody be taken from said parent or guardian"), *disapproved of by In re Javier A.*, 159 Cal. App. 3d 913, 950–56 (Ct. App. 1984) (discussing *Becknell*'s, *Daedler*'s, and their progeny's treatment of juvenile jury-trial rights).

When laws failed to clear this hurdle, courts declared them unconstitutional.  So courts set aside laws that demanded only "slight evidence" or offered "an informal" if non-existent "mode of procedure" that made them "conflict with the natural right of the parent." *Turner*, 55 Ill. at 284; *see id*. at 288 ("The constitution is the highest law; . . . and as the laws under which the detention is had, are in conflict with its provisions, we must so declare."); *see also State ex rel. Cunningham v. Ray*, 63 N.H. 406, 412 (1885) (declaring unconstitutional a statute that committed a minor on only a complaint).

Most often,[13] though, courts saved the statutes' constitutionality by realigning them with parent's rights.  *See McLean County v.*

---

[13] We are aware of one treatise that has suggested "there is no constitutional limitation to the power of the State to interfere with the parental control of minors."  CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES 561 (St. Louis, F. H. Thomas L. Book Co. 1886).  That treatise reached that conclusion by conceptualizing parental control as a "duty" delegated by the legislature to the parent.  *Id*. at 560.  Under that reasoning, the legislature may, in its "discretion," "determine under what circumstances, if at all, a parent may be entrusted with the rearing of his child." *Id*.  In other words, that treatise rejected the notion that parents had a "natural right" in the custody of their child because, as the treatise recognized, if parents had such rights, guarantees of due process attached.  And that meant that "any interference with the parental control must be justified . . . because of the evil character of the parents; and like all other similar cases of restraint upon natural right, the commitment of the child to the care of the State authorities must rest upon a judicial decree, after a fair trial, in which the parents have the right to appear and defend themselves against the charge of being unfit to retain the custody of the child." *Id*.  With the utmost respect, we think Professor Tiedeman got this one wrong.  For one, precedent rejects his position, and

*Humphreys*, 104 Ill. 378, 384 (1882) (acknowledging that while there was "no ground for declaring the act unconstitutional," "the constitution clothes the judiciary with ample authority to correct any abuses that may arise under the act").  They did so by permitting individualized proceedings to determine whether the parents were fit to have their children returned to their custody.

In some cases, courts required individualized findings of unfitness "before a child c[ould] be made a ward of the state" and separated from their parents.  *Mill*, 88 P. at 614; *see, e.g.*, *id.* at 614–15 (returning child to parent's custody until the child "shall be legally adjudicated to be a ward of the state in accordance with the views herein expressed"); *Ex parte Becknell*, 119 Cal. at 498 (discharging minor because there was no finding that the parent was "unfit or

---

tribunals have guaranteed the very protections he suggested parents did not have.  From the time of the Fourteenth Amendment to today, courts have held that, "[o]rdinarily, the parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law."  *Kilvington*, 45 S.W. at 435; *see Meyer*, 262 U.S. at 399 (considering the right to "establish a home and bring up children" one "long recognized at common law").  For another, the dicta the treatise cites in support of its unyielding proposition comes from a case that did not involve parental rights.  Rather, it concerned the prosecution of a person who sold liquor to a minor under the age of twenty-one and who presented as a defense that the minor's father authorized the sale.  *See State v. Clottu*, 33 Ind. 409, 409 (1870).  But as we show above, when confronted with actual infringements of a *parent's* rights, courts have enforced well-defined limits on the state's police power.  Were the opposite true, the legislature could enact laws to remove all children from their parents at birth (or any other age) for the benefit of nearly any stated interest, with the state's decision subject to only rational-basis review.  We think the incorrectness of that position speaks for itself.

unwilling or unable to perform their parental duties"). Sometimes, the "statute" itself conformed to that "constitutional principle" and "guard[ed] the interests and rights of parents by requiring that their children shall not be taken from them without a hearing, upon due notice, in the courts of the state." *Van Walters v. Bd. of Child.'s Guardian of Marion Cnty.*, 32 N.E. 568, 569 (Ind. 1892); *see, e.g.*, *In re Ferrier*, 103 Ill. 367, 372 (1882) (requiring "the court [to] find[] that the parent is not a fit person to have the custody of the infant"); *People ex rel. Van Heck v. N.Y. Cath. Protectory*, 4 N.E. 177, 179 (N.Y. 1886) (granting parents the "opportunity to be heard, and to show the real facts"); *Ex parte Peterson*, 187 N.W. 226, 227 (Minn. 1922) (affording notice and a jury trial); *In re Daedler*, 194 Cal. at 331 (requiring finding that loss of custody is in child's best interest).

But if the relevant law didn't guarantee that trial courts or other judicial officers would make such a finding, courts of review avoided any constitutional infirmity by noting that, in the instant case, the parents took "part in the proceedings" that resulted in their loss of custody, *see State ex rel. Olson v. Brown*, 52 N.W. 935, 937 (Minn. 1892); *In re Turner*, 145 P. 871, 872–73 (Kan. 1915), or that an adequate finding had in fact been made, *see People ex rel. Tobano v. Governors of House of Refuge*, 18 How. Pr. 409, 409–11 (N.Y. Sup. Ct. 1859) (child was a vagrant); *Ex parte Ah Peen*, 51 Cal. 280, 281 (1876) (parent abandoned child); *Bryant v. Brown*, 118 So. 184, 191 (Miss. 1928) (child convicted of a crime).

In other cases, courts allowed parents to assert their rights in court after the removal of their children to allow them the chance

to regain custody. Courts rejected the premise that the institution-alization statutes were "intended to foreclose the right of a parent, when competent, to resume the custody and care of his child." *Mil-waukee Indus. Sch. v. Milwaukee Cnty. Sup'rs*, 40 Wis. 328, 339 (1876). So any time a state confined a child, the statute did not "bind the parent or guardian" or "preclude[]" them "from asserting any right to the custody and care of the child, which he may be afterwards able to establish." *Id.*; *see Mill*, 88 P. at 614 ("The parent is not bound by the judgment against the child, and may at any time institute proper proceedings to obtain custody of him.").

Rather, "[t]he right of the parent [was] sufficiently guarded by permitting the parent on habeas corpus proceedings to inquire into the propriety or necessity of the detention, and to have the custody restored upon a proper showing that he or she is compe-tent, and a proper person, to have charge of the child." *Kilvington*, 45 S.W. at 435; *see Farnham*, 141 Mass. at 205 (explaining a parent has "a right to show that the cause stated for the commitment does not now exist; that he is competent and fit to have the care of his child; and that the welfare of the child will permit of her removal from her present custody"); *accord Cincinnati House of Refuge v. Ryan*, 37 Ohio St. 197, 204 (1881); *In re Kelley*, 152 Mass. at 435–36; *Ex parte Sharp*, 96 P. 563, 565–66 (Idaho 1908); *In re Alley*, 182 N.W. 360, 362–63 (Wisc. 1921).

Thus, it was black-letter law that "the courts may . . . inquire into the existence of a sufficient cause for detention" of a minor "even though a statute should expressly prohibit such inquiry."

HOCHHEIMER, *supra*, at 105; *see, e.g.*, *Cannon v. Stuart*, 8 Del. (3 Houst.) 223, 225 (1866) (releasing minor to parent by "writ of *habeas corpus* under the constitution, which is paramount to that, or any other statute of the legislature"); *Prescott v. State*, 19 Ohio St. 184, 189 (1869) (doubting that the legislature could "restrict the power of the court, invested by the constitution with jurisdiction in *habeas corpus*, from inquiring fully into the cause of the detention of a" minor taken from his parents); *accord Dumain v. Gwynne*, 92 Mass. (10 Allen) 270, 274–75 (1865).

Dumain v. Gwynne* offers an example of these Reconstruction Era principles. There, a "father had disqualified himself from taking proper care of his children in their early infancy by his intemperate habits," and he later "committed the crime of burglary, for which offence he was sentenced to the state prison for the term of three years." 92 Mass. (10 Allen) at 272–73. As a result, the father forfeited the custody of his children. *Id.* at 273. Soon after the father went to prison, the wife bequeathed custody of the children to a temporary home that Massachusetts established. *Id.* at 273–74. And that home later placed the children with a family who adopted them. *Id.* Then "four months before" the father's prison term expired, he left prison, discharged "for his good behavior." *Id.* at 274.

Upon returning to society, he rekindled his relationship with his wife, pursued a trade as a blacksmith, established a good character, and became "able to support [his] children comfortably." *Id.*

So with the desire to obtain custody of them, he filed a writ of *habeas corpus*.

The adoptive families resisted. *Id.* But the Massachusetts high court did not hold that "the rights of either parent in respect to the children [were] absolutely lost." *Id.* Instead, the tribunal explained that the trial judge had the "power upon this process to inquire fully into the matter," to determine "the liberty and welfare of the children," and "to satisfy himself whether the children are improperly restrained, and whether their comfort and education are properly attended to." *Id.* at 275. All "reasonable and proper sources of evidence" could factor into the judge's determination. *Id.*

So the court remanded the case to determine whether the best interest of the children weighed in favor of returning custody to their natural parents. *Id.* Upon remand, the trial court, after considering "the evidence," determined the children "were members of a good family in this commonwealth," "treated kindly and affectionately," and likely to be given "an education much better than their parents could give them." *Id.* at 275–76. So although the father had the opportunity to present his case, he failed to regain custody. *Id.* at 276.

We discern from this history the following principle: government can remove children from parents who pose a danger to them, but parents enjoy the right to petition courts for relief, to prove that they are no longer a danger to their children, and to

show that returning the children to their custody is in the children's best interest.

> b. Alabama departs from our history and tradition by denying Henry the opportunity to prove, based on the totality of the circumstances, that he is a fit parent who can best care for his child.

Section 15-20A-11(d)(4) departs from our history and tradition of regulating parental rights because it does not impose "a comparable burden" to those of its predecessors. *Bruen*, 597 U.S. at 29. To be sure, Alabama enacted the Section to ensure the safety of its children, just as states had done throughout our Nation's history. So Section 15-20A-11(d)(4) shares the same "why" with state action of the past, *Rahimi*, 602 U.S. at 692: to ensure children are not in the custody of parents who are "wholly unable to provide for the[ir] safety and wants," *Briggs*, 33 Mass. (16 Pick.) at 205. But although Section 15-20A-11(d)(4) regulates the right of parents to live with their children "for a permissible reason," the law is not "compatible with the right" because it regulates that right "to an extent beyond what was done at" Reconstruction. *Rahimi*, 602 U.S. at 692.

Alabama's statutory scheme turns an inquiry traditionally predicated on individual findings after a parent presented any relevant evidence into the non-individualized, automatic removal of a parent's fundamental right to reside with their child. Section 15-20A-11(d)(4) prevents a parent from living with their child based solely on the fact of a prior conviction, "regardless of the opinion

of experts, lay persons, and the trial court that the registered sex offender does not pose a threat to the child." *K.E.W.*, 990 So. 2d at 381. So even if Henry petitioned Alabama courts for relief, Section 15-20A-11(d)(4) would, as a matter of substantive law, prevent the trial court from hearing any evidence on the matter of Henry's fitness; such evidence would be legally irrelevant.

But that was not how similar laws worked when Americans voted for the Fourteenth Amendment. We know so for three reasons.

First, as we've already detailed, the "legal traditions" and "practices" of American courts, *Glucksberg*, 521 U.S. at 710, were "to inquire fully into the matter" of custody, *Dumain*, 92 Mass. (10 Allen) at 275. Parents had the "opportunity to be heard, and to show the real facts," *Van Heck*, 4 N.E. at 179, including that they were "competent and fit to have the care of [their] child; and that the welfare of the child will permit of her removal from her present custody," *Farnham*, 141 Mass. at 205; *Kilvington*, 45 S.W. at 435.

Prior shortcomings, even convictions, did not "necessarily stamp [a parent] as an unfit person to bring up her child," especially "in the face of proof showing that the child [wa]s being well taken care of." *Jensen*, 170 N.W. at 736; *see, e.g.*, *Dumain*, 92 Mass. (10 Allen) at 272–75; *Striplin*, 36 Ala. at 91; *Lovell*, 9 Wash. at 423. Simply put, "[a] parent who has neglected his child may become competent, and may desire to furnish a better home and parental care and influences to his child . . . , and the good of the child may require that it should be restored to its parent." *In re Kelley*, 152 Mass. at

435. So "the Courts [were] always open to [parents] for a renewed application" to demonstrate their custody would be in the best interest of their children. *Verser*, 37 Ark. at 32.

Second, to the extent Reconstruction Era legislatures involved themselves in family law, their statutes often conformed to these principles, requiring individualized review based on the totality of the circumstances. Based on the historical record that Alabama presented and which our research has uncovered, legislatures primarily removed children from unfit parents through institutionalization and reformatory statutes. *See, e.g., Ex Parte Crouse*, 4 Whart. at 9. But even then, they enabled parents to retain or regain custody of their children by showing that they were in fact fit to love and care for them. *See, e.g., Milwaukee Indus. Sch.*, 40 Wis. at 339; *Van Walters*, 32 N.E. at 569. Or at the very least, courts construed the statutes to avoid such constitutional roadblocks should the statutes appear to run into them. *See, e.g., Farnham*, 141 Mass. at 205; *In re Kelley*, 152 Mass. at 436; *Sturtevant*, 19 N.W. at 618. In this way, the procedural rules codified in the reformatory statutes that the states employed evince "the historical tradition that delimits the outer bounds of the right" of parents to live with their child. *Bruen*, 597 U.S. at 19.

Third, if statutes regulating parental rights exceeded the usual rules for permanently separating a parent from their child, courts "rejected [them] on constitutional grounds." *Bruen*, 597 U.S. at 27. Indeed, just two years after the adoption of the Fourteenth Amendment, the Illinois Supreme Court struck down the State's

reformatory statute as violative of parents' "right to the care, custody and assistance of his child," in part, because of the "ease with which" it "disrupted" parents' rights—it "required" only "slight evidence" and an "informal mode of procedure"—and in part because it foreclosed parents from filing the writ of habeas corpus to regain custody over their children. *Turner*, 55 Ill. at 284–86, 288. Americans recognized that the "constitution clothe[d] the judiciary with ample authority to correct any abuses that may arise" from state interference of parent's rights. *Humphreys*, 104 Ill. at 384. So the general rule was that courts could fully inquire into the matter of custody, "even though a statute should expressly prohibit such inquiry." HOCHHEIMER, *supra*, at 105 (discussing the writ of habeas corpus); *see id.* at 105–06 (also noting the courts of chancery could employ their equitable power to remove a child from the institution to which the child has been committed).

In short, although the state could separate parents from children to whom they posed a danger, courts guaranteed substantive and procedural protections that Section 15-20A-11(d)(4) doesn't—namely, the chance to prove current fitness based on relevant and present facts. And nearly every court has recognized those guarantees as fundamental to parents' rights. For these reasons, Section 15-20A-11(d)(4) is not analogous in "how" it regulates the right of parents to live with their children. And it departs from our history and tradition of regulating family cohabitation and parent's rights to raise their children.

*       *       *

As applied to Henry, Section 15-20A-11(d)(4) violates the Fourteenth Amendment's Due Process Clause. That provision guarantees parents the right to live with their children. Yet the Section automatically precludes precisely that conduct for parents who fall within its scope. To be sure, Alabama enacted its law to advance a compelling state interest. That fact cannot be stated enough: Section 15-20A-11(d)(4) seeks to protect minors from horrific abuse. But it does not do so through constitutional means.

The statute just does not target its strong medicine narrowly to advance the State's compelling interest. Nor does it comport with our Nation's history and tradition of regulating parental rights. Both strict scrutiny and our traditions require a more precise approach.[14] As a result, Alabama may not constitutionally enforce the statute, at least in some circumstances, including as to Henry and other similarly situated parents.

---

[14] We don't address whether Alabama must in all instances provide the opportunity for individualized review. Perhaps Supreme Court precedent or our Nation's regulatory tradition may lead to that conclusion in the future. Perhaps not. But to resolve this case, we don't need to hold that individualized fact-finding is necessary in every case that a state severely burdens parental rights. *See supra* note 10. So we don't so hold.

B. *The district court abused its discretion in facially enjoining Section 15-20A-11(d)(4) because it is not unconstitutional in all its applications.*

Even if a court concludes that a statute violates the Constitution at least in some applications, as we just did, it can't "erase a duly enacted law from the statute books." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (citation omitted). "Our power is more limited: we may enjoin executive officials from taking steps to enforce" the unconstitutional law. *Id.* (cleaned up). And in entering such injunctions, we must be specific about their terms and the acts that we are restraining or requiring. *See* FED. R. CIV. P. 65(d). In other words, we need to make clear in an injunction the cases in which an executive official can (or cannot) enforce the putatively unconstitutional law.

Sometimes, the injunction is easy to craft: we can simply state that the defendant may not enforce the unconstitutional law or provision at all. Those are called facial injunctions. But we may facially enjoin enforcement of a statute only if a challenger establishes "that no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or that the law lacks a "plainly legitimate sweep," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (cleaned up).

That's a demanding standard, and for good reason. "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (cleaned up). "And facial challenges threaten to

short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (cleaned up). Wary of these concerns, the Supreme Court has "made facial challenges hard to win," *id.*, and has directed courts to consider "the circumstances in which" the challenged statute is "most likely to be constitutional," *Rahimi*, 602 U.S. at 701.

Of course, we can always enjoin enforcement of a statute on a case-by-case basis. We routinely grant narrow injunctions when plaintiffs bring an as-applied challenge. *See Moody*, 603 U.S. at 723 (noting "courts usually handle constitutional claims case by case"). But in this case, Henry brought both as-applied and facial challenges to Section 15-20A-11(d)(4). And the district court decided to facially enjoin the statute. So we must consider whether Henry has met our demanding standard for facially enjoining a statute's operation.

Alabama argues that Henry has not done so. It asserts that in some cases, it can apply Section 15-20A-11(d)(4) constitutionally. Specifically, Alabama contends that it can apply the law constitutionally to the most dangerous people who fall within its ambit and to non-parental relatives who don't enjoy the same constitutional rights as Henry does. Henry responds that the district court properly entered a facial injunction because Section 15-20A-11(d)(4) fails strict scrutiny, which modifies the traditional *Salerno* no-set-of-circumstances test. We think both parties are partially correct. But ultimately, we must conclude that the district court abused its discretion in entering a facial injunction.

We begin with Alabama's argument that Section 15-20A-11(d)(4) is facially constitutional because it will prevent at least some truly dangerous people from harming their children. As to this argument, Henry's response rings true. We've held that "the question that *Salerno* requires us to answer is whether the statute fails the relevant constitutional test." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). In other words, "*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Id.* (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012)).

*Johnson v. United States* offers an example. 576 U.S. 591 (2015). The Supreme Court declared void for vagueness a federal criminal statute that punished individuals for possessing a firearm if they were previously convicted of three crimes that presented "a serious potential risk of physical injury to another." 576 U.S. at 593–94 (emphasis omitted) (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). The dissent argued that the statute was facially constitutional because it was not vague in all its applications; that is, the statute covered "some clearly risky crimes." *See id.* at 603. But the Court rejected that proposition. As it explained, the "supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)." *Id.*

That's the case here. The relevant constitutional test is strict scrutiny. And as we've explained, Section 15-20A-11(d)(4) fails strict scrutiny because, by being overinclusive, underinclusive, and more restrictive than other effective alternatives, it is not narrowly tailored to advance the government's compelling interest. So the tautology holds: because "we hold a statute to [not] be [narrowly tailored], it is [not narrowly tailored] in all its applications." *Id.* So both Supreme Court and our precedent reject Alabama's argument that the statute's constitutional application to particularly dangerous offenders makes a facial injunction inappropriate.

For good reason. The "larger problem" with the State's approach is that it would allow defendants to "consistently sidestep facial challenges" and continue to abridge individuals' fundamental rights so long as they "crafted some instance" where the statute advances a state's compelling interest or comports with our Nation's history and tradition. *Club Madonna*, 42 F.4th at 1256. That "can't be right," especially when fundamental rights are at stake. *Id.*

*Salerno* is so demanding because we presume democratically enacted laws are constitutional. *See Moody*, 603 U.S. at 723. But after we conclude that a statute abridges a fundamental right, the presumption of constitutionality flips and the burden shifts to the state to justify the infringement. *See Zablocki*, 434 U.S. at 390 (holding "a statutory classification" that burdens a fundamental right "cannot be upheld" unless it satisfies strict scrutiny); *Ent. Merchs. Ass'n*, 564 U.S. at 799 (explaining an act that restricts protected speech "is invalid unless California can demonstrate that it passes

strict scrutiny"); *Playboy Ent. Grp.*, 529 U.S. at 813 ("Since § 505 is a content-based speech restriction, it can stand only if it satisfies strict scrutiny."). Alabama can't shirk that burden by positing "the existence of some clearly risky" individuals to whom its law may apply. *Johnson*, 576 U.S. at 603.

By contrast, the State's second argument—that the law isn't facially unconstitutional because it applies to non-parental relatives—has merit because it highlights cases where the statute may not infringe any fundamental rights. As we've noted, Section 15-20A-11(d)(4) also applies to any "grandparent, stepparent, sibling, or stepsibling," ALA. CODE §15-20A-11(d), who is an "adult sex offender" "convicted of any sex offense involving a child," *id*. § 15-20A-11(d)(4). At least some of those relatives may not have as strong a constitutional interest in living with a child relative as Henry does in living with his own son. And if that's the case, and if Alabama enforced its law against those individuals, strict scrutiny may not apply—instead, our rational-basis test might. And there's certainly a rational basis for Section 15-20A-11(d)(4).

True, as Henry points out, the Supreme Court has explained that the right to live with family is "by no means" limited to "members of the nuclear family"; the "tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." *Moore*, 431 U.S. at 504. But at the same time, the Court has cautioned that "the mere existence of a biological link does not merit equivalent constitutional

protection." *Lehr*, 463 U.S. at 261. So if family members have not shown the necessary interest in establishing a familial relationship, "the Federal Constitution will not automatically compel a state to listen." *Id.* at 262.

Because the state regulates contact with non-immediate family members, we can't so easily assume "the emotional attachments that derive from the intimacy of daily association," *Smith*, 431 U.S. at 844, which our Constitution secures in the case of parents. Whether an offender "has a right to familial association with respect to an extended family member" may be "a fact-intensive inquiry that requires the party claiming associational rights to demonstrate the nature of that relationship." *Salah v. People*, 550 P.3d 698, 709–10 (Colo. 2024). So states may constitutionally draw certain lines on the assumption that the "emotional attachments" necessary to establish a liberty interest under the Fourteenth Amendment have not yet "ripen[ed]" to the point of "requiring procedural protection and/or judicial inquiry." *Smith*, 431 U.S. at 853–54 (upholding a statute requiring a proceeding into the propriety of continuing foster care only for those "foster children who have been in foster care for 18 months or more").

In short, good arguments exist on both sides of the constitutional debate. The parties have ably identified authorities in support of their respective positions. But they have not briefed this complex constitutional question in detail, especially as it relates to the scope of injunctive relief. And we need not resolve those hard questions here to fulfill our constitutional duty of awarding relief

to Henry, the only plaintiff. *See Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) ("Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties."); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring) (explaining courts do "not anticipate a question of constitutional law in advance of the necessity of deciding it" and do "not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied" (cleaned up)).

A facial injunction would require us to speculate "about the law's coverage and its future enforcement" and wade into complex constitutional issues when the facts of this case do not require it. *Moody*, 603 U.S. at 723. Given these considerations, we conclude that Henry has not met his lofty burden of showing that Section 15-20A-11(d)(4) is unconstitutional in all its applications.

For this reason, we vacate the district court's injunction.

*C. Because we vacate the district court's injunction, we do not address the argument that the district court inappropriately entered a universal injunction.*

Finally, Alabama argues that the district court abused its discretion in entering a universal injunction. A universal injunction, or a nationwide (in this case, a statewide) injunction, is the now-common name for an injunction that prevents a state or the federal government from enforcing a law against both parties and non-parties.

We've held that "a federal district court may issue a nation-wide, or 'universal,' injunction in appropriate circumstances." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281 (11th Cir. 2021) (cleaned up); *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022). Those "appropriate circumstances are rare," but they may arise when a universal injunction "is necessary to provide complete relief to the plaintiffs, to protect similarly situated nonparties," "to avoid the chaos and confusion of a patchwork of injunctions," to guard plaintiffs "dispersed throughout the United States," or "when certain types of unconstitutionality are found." *Florida*, 19 F.4th at 1282 (cleaned up).

These are just a few examples. Our list of appropriate circumstances is not exhaustive, but it is also not "a checklist." *Georgia*, 46 F.4th at 1306. The "scope of injunctive relief is dictated by the extent of the violation established," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and any appropriate circumstances we've discussed must be understood with reference to that principle, *Georgia*, 46 F.4th at 1306.

Because we vacate the district court's order, we do not need to address whether this case presents an appropriate circumstance for a universal injunction. On remand, Henry may opt for one of the many "procedural devices [that] allow nonparties with similar interests to seek the protection of injunctive relief." *Id.* And if he does so, the question becomes moot. Alternatively, Henry may be happy just to win his as-applied challenge. And in that case, too, the question of a universal injunction becomes moot.

## IV.    CONCLUSION

We conclude that Section 15-20A-11(d)(4) violates Henry's fundamental right to live with his child and, as a parent, to the care and custody of his child because his conviction alone does not prove that he is a danger to his child.  But we conclude the district court abused its discretion in facially enjoining Section 15-20A-11(d)(4) because Henry has not met his burden of showing that the law is unconstitutional in all its applications.  For these reasons, we affirm in part and reverse in part the district court's grant of summary judgment to Henry, vacate the district court's injunction, and remand the case for further proceedings consistent with this opinion.

**AFFIRMED IN PART AND REVERSED IN PART; VACATED AND REMANDED IN PART**.