No. 24-10139

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

BRUCE HENRY,
*Plaintiff-Appellee,*

v.

RON ABERNATHY, et al.,
*Defendants-Appellants.*

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:21-cv-797

## EN BANC BRIEF OF APPELLANTS
## ATTORNEY GENERAL STEVE MARSHALL
## AND DISTRICT ATTORNEY HAYS WEBB

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
Robert M. Overing
  *Deputy Solicitor General*
Dylan Mauldin
George Muirhead
  *Ass't Solicitors General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

October 8, 2025

*Bruce Henry v. Attorney General of Alabama, et al.*, No. 24-10139

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1(a)(3) to 26.1-2(b), the undersigned counsel certifies that that the following persons and parties may have an interest in the outcome of this case:

1. Abernathy, Ron (Defendant-Appellant, Sheriff, Tuscaloosa County);

2. Adams, Magistrate Judge Jerusha T. (U. S. District Court, Middle District of Alabama);

3. Agricola, Jr., Algert S. (Attorney for Henry);

4. Agricola, Barbara H. (Attorney for Henry);

5. Agricola Law LLC (Attorneys for Henry);

6. Albea, Stuart D. (Attorney for Abernathy);

7. Davis, James W. (Attorney for Hayes and Marshall);

8. Dolan, Krista (Attorney for Amicus Curiae);

9. Dubbeling, Paul M. (Attorney for Henry);

10. Harris, Andrew Reid (Former Attorney for Hayes and Marshall; terminated in lower court 7/27/2023);

11. Henry, Bruce (Plaintiff-Appellee);

12. Huffaker, Jr., Hon. Judge R. Austin (U. S. District Court, Middle District of Alabama);

13. Juvenile Law Center (Amicus Curiae);

14. LaCour Jr., Edmund G. (Attorney for Hayes and Marshall);

15. Levick, Marsha L. (Attorney for Amicus Curiae);

16. Marshall, Steve (Defendant-Appellant, Alabama Attorney General);

17. Mauldin, Dylan (Attorney for Hayes and Marshall);

*Bruce Henry v. Attorney General of Alabama, et al.*, No. 24-10139

18. McKay, Charles A. (Attorney for Hayes and Marshall);

19. Mink, Richard D. (Attorney for Hayes and Marshall);

20. Muirhead, George, (Attorney for Hayes and Marshall);

21. Overing, Robert M. (Attorney for Hayes and Marshall);

22. P.M. Dubbeling, PLLC (Attorney for Henry);

23. Seiss, Benjamin M. (Attorney for Hayes and Marshall);

24. Southern Poverty Law Center (Amicus Curiae);

25. Webb, Hayes (Defendant-Appellant).

Undersigned counsel further certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour, Jr.
*Solicitor General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Appellants Attorney General Marshall and District Attorney Webb*

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

In its September 8, 2025 en banc briefing notice, the Court stated that oral argument will be held the week of February 9, 2026. CA11.Doc.63-1 at 2.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES..............................................................................1

STATEMENT OF THE CASE..................................................................................2

      A.   Alabama Regulates Sex Offenders. ..........................................................2

      B.   Known Sex Offenders Pose a Unique Threat to Child Safety.................4

      C.   Bruce Henry Committed a Child Pornography Offense Involving
           Children and Later Had a Child.................................................................6

      D.   Henry Sues and Is Denied a Preliminary Injunction. .............................7

      E.   No Reliable Method Can Identify Child Sex Offenders Who Can
           Safely Reside With Specific Children. ....................................................8

      F.   District    Court    Declares    §15-20A-11(d)(4)    Facially
           Unconstitutional. ......................................................................................9

SUMMARY OF ARGUMENT ...............................................................................11

STANDARD OF REVIEW .....................................................................................12

ARGUMENT ...........................................................................................................12

      I.   Section 11(d)(4) Does Not Violate Henry's Constitutional Rights.......12

A.    Henry's claim demands an extension of parental-rights precedent. ...........................................................................15

B.    The fact of Henry's conviction for a sex offense against a child must be included in a careful description of his liberty interest. ........19

C.    The right of a sex offender to live with his child is not deeply rooted in history and tradition or implicit in the concept of ordered liberty. ..................................................................30

   1.  Historically, a parent's interest in custody was not inalienable and could be forfeited by gross misconduct, especially toward children...............................................32

   2.  Conviction for a child sex offense is the kind of gross misconduct that could extinguish the parent's interest in custody. ...........................................................36

   3.  There is no substantive due process right for convicted child sex offenders "to petition courts for relief." ........................41

D.    Section 11(d)(4) satisfies any level of scrutiny because sex offenders who target children cannot safely reside with children. ..................................................................45

II.   Henry Is Not Entitled to Facial Relief. ...................................48

CONCLUSION...................................................................52

CERTIFICATE OF COMPLIANCE........................................54

CERTIFICATE OF SERVICE ...............................................55

iii

## TABLE OF AUTHORITIES

### Cases

*Alley v. U.S. Dep't of Health & Hum. Servs.*,
   590 F.3d 1195 (11th Cir. 2009) .......................................................51

*Am. Fed'n of State, Cnty. & Mun. Emp. Council 79 v. Scott*,
   717 F.3d 851 (11th Cir. 2013) ........................................................49

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,
   522 F.3d 1200 (11th Cir. 2008) ......................................................12

*Baird v. Baird*,
   21 N.J. Eq. 384 (N.J. 1869) ...........................................................42

*Bakran v. Sec'y, U.S. Dep't of Homeland Sec.*,
   894 F.3d 557 (3d Cir. 2018) ...........................................................29

*Bendiburg v. Dempsey*,
   909 F.2d 463 (11th Cir. 1990) ........................................................15

*Boggs v. Boggs*,
   49 Iowa 190 (1878) ........................................................................35

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ...........................................................................48

*Cagle v. Bruner*,
   112 F.3d 1510 (11th Cir. 1997) ......................................................12

*Chapsky v. Wood*,
   26 Kan. 650 (1881) ................................................................. 34, 35

*Cocke v. Hannum*,
   10 George 423 (Miss. 1860) ...........................................................35

*Collins v. Harker Heights*,
   503 U.S. 115 (1992) .......................................................................13

*Compassion in Dying v. Washington*,
   85 F.3d 1440 (9th Cir. 1996) ...............................................................25

*DA Mortg., Inc. v. City of Miami Beach*,
   486 F.3d 1254 (11th Cir. 2007) ..........................................................49

*Demott v. Commonwealth*,
   64 Pa. 302 (1870) ........................................................................ 35, 36

*Dep't of State v. Munoz*,
   602 U.S. 899 (2024)............................................... 24, 27, 29, 37

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022)..................................................1, 12-14, 22, 25-27, 30, 37

*Doe v. Moore*,
   410 F.3d 1337 (11th Cir. 2005) ........................................... 14, 19, 45

*Doe v. Rausch*,
   648 F. Supp. 3d 925 (W.D. Tenn. 2023) ...........................................49

*Dumain v. Gwynne*,
   10 Allen 270 (Mass. 1865) ...............................................................36

*Echols v. Lawton*,
   913 F.3d 1313 (11th Cir. 2019) ................................................. 12, 13

*Eknes-Tucker v. Gov. of Ala.*,
   114 F.4th 1241 (11th Cir. 2024) ............................................... 13, 23

*Eknes-Tucker v. Gov. of Ala.*,
   80 F.4th 1205 (11th Cir. 2023) ................................................. 21, 45

*Ex parte Bronstein*,
   434 So. 2d 780 (Ala. 1983).................................................................49

*Ex parte Crouse*,
   4 Whart. 9 (Penn. 1839)..............................................................34, 42

*Farnham v. Pierce*,
    6 N.E. 830 (Mass. 1886) ........................................................................42

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) ............................................................51

*Gill v. Whitford,*
    585 U.S. 48 (2018) ................................................................................51

*Griswold v. Connecticut*,
    381 U.S. 479 (1965) ..............................................................................25

*Harmelin v. Michigan*,
    501 U.S. 957 (1991) ..............................................................................40

*Heller v. Doe by Doe*,
    509 U.S. 312 (1993) ..............................................................................45

*Henry v. Sheriff of Tuscaloosa Cnty*,
    135 F.4th 1271 (11th Cir. 2025) .................................. 10, 17, 18, 22, 23, 26-31,
    .................................................................................. 34, 39, 41, 43-48, 50

*Hutchins v. District of Columbia*,
    188 F.3d 531 (D.C. Cir. 1999) ..............................................................29

*In re C.R.C.*,
    450 P.3d 1169 (Utah Ct. App. 2019) ...................................................45

*In re Cuneen*,
    17 How. Pr. 516 (N.Y. 1859) ...............................................................35

*In re Welfare of Child of M.Z.*,
    No. 27-JV-17-5407, 2019 WL 2167826 (Minn. Ct. App. 2019) ........45

*Jensen v. Jensen*,
    170 N.W. 735 (Wis. 1919) ............................................................36, 38, 43

*Johnson v. Bredesen*,
    624 F.3d 742 (6th Cir. 2010) ................................................................28

vi

*Jones v. Gov. of Fla.*,
  975 F.3d 1016 (11th Cir. 2020) ..........................................................28

*Jones v. Helms*,
  452 U.S. 412 (1981)............................................................................29

*K.C. v. Indiv. Mems. of Med. Licensing Bd. of Ind.*,
  121 F.4th 604 (7th Cir. 2024) ............................................................20

*K.E.W. v. T.W.E.*,
  990 So.2d 375 (Ala. Civ. App. 2007) ................................................31

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ..............................................................23

*Kerry v. Din*,
  576 U.S. 86 (2015)................................................................ 20, 24, 37

*King v. Delaval*,
  97 Eng. Rep. 913 (K.B. 1763) ............................................................37

*L. W. by & through Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ................................................. 13, 21, 22

*Lawrence v. Texas*,
  539 U.S. 558 (2003)............................................................................40

*Lehman v. Lycoming Cnty. Children's Servs. Agency*,
  458 U.S. 502 (1982)............................................................................37

*Lehr v. Robertson*,
  463 U.S. 248 (1983)............................................................... 16-17, 49

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
  358 F.3d 804 (11th Cir. 2004) .............................................. 12, 14, 21

*Lovell v. House of the Good Shepherd*,
  9 Wash. 419 (1894).............................................................................36

vii

*Marks v. United States,*
    430 U.S. 188 (1997).........................................................................17

*Massachusetts v. Roosnell,*
    8 N.E. 747 (1886) ..........................................................................40

*Matter of Pima Cnty., Juvenile Action Nos. S-826 and J-59015,*
    643 P.2d 736 (Ariz. Ct. App. 1982).......................................................44

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010).........................................................................23

*McKune v. Lile,*
    536 U.S. 24 (2002).....................................................................4, 39

*Medina v. Whitaker,*
    913 F.3d 152 (D.C. Cir. 2019) .................................................... 28, 41

*Mercein v. People ex rel. Barry,*
    25 Wend. 64 (N.Y. 1840) .................................................... 19, 34, 36

*Michael H. v. Gerald D.,*
    491 U.S. 110 (1989)........................................... 16-19, 24, 31, 43, 49

*Moe v. Dinkins,*
    669 F.2d 67 (2d Cir. 1982) .......................................................... 26, 29

*Moore v. City of E. Cleveland,*
    431 U.S. 494 (1977).........................................................................13

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022)..................................................................... 23, 24, 31

*Nat'l Rifle Ass'n v. Bondi,*
    133 F.4th 1108 (11th Cir. 2025) .........................................................47

*New York v. Ferber,*
    458 U.S. 747 (1982).........................................................................38

*Noel v. Noel*,
   24 N.J. Eq. 137 (Ch. 1873) ...............................................................38

*Obergefell v. Hodges*,
   576 U.S. 664 (2015).................................................................... 26, 27

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ..........................................................45

*Packingham v. North Carolina*,
   582 U.S. 98 (2017).............................................................................4

*People v. Chegaray*,
   18 Wend. 637 (N.Y. Sup. Ct. 1836) .................................................34

*People v. Turner*,
   55 Ill. 280 (1870) ....................................................................... 35, 43

*Prince v. Massachusetts*,
   321 U.S. 158 (1944)..........................................................................15

*Raich v. Gonzales*,
   500 F.3d 850 (9th Cir. 2007) ...................................................... 21, 22

*Reno v. Flores*,
   507 U.S. 292 (1993)............................................................ 14, 20, 21

*Richardson v. Ramirez*,
   418 U.S. 24 (1974)............................................................................27

*Roe v. Wade*,
   410 U.S. 179 (1973)..........................................................................13

*Sosa v. Martin County*,
   57 F.4th 1297 (11th Cir. 2023) .........................................................13

*Stanley v. Illinois*,
   405 U.S. 645 (1972)..................................................................... 15-18

*State v. Paine,*
  23 Tenn. 523 (1843)...........................................................43

*State v. Richardson,*
  40 N.H. 272 (1860) ..................................................... 36, 43

*Striplin v. Ware,*
  36 Ala. 87 (1860) ...........................................................31

*T.D. v. Patton,*
  868 F.3d 1209 (10th Cir. 2017) ..........................................44

*Trawick v. Trawick,*
  173 So. 2d 341 (La. Ct. App. 1965)...................................36

*Trop v. Dulles,*
  356 U.S. 86 (1958)..........................................................29

*Troxel v. Granville,*
  530 U.S. 57 (2000)............................................... 15, 18, 47

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025).................................................. 51, 52

*United States v. Duarte,*
  137 F.4th 743 (9th Cir. 2025) ................................ 28, 37, 41

*United States v. Dubois,*
  139 F.4th 887 (11th Cir. 2025) ...................... 24, 28, 38, 46

*United States v. Epps,*
  707 F.3d 773 (D.C. Cir. 2013).........................................17

*United States v. Goldberg,*
  491 F.3d 668 (7th Cir. 2007) ...........................................38

*United States v. Irey,*
  612 F.3d 1160 (11th Cir. 2010) ....................................4, 38

*United States v. Jiminez-Shilon*,
   34 F.4th 1042 (11th Cir. 2022) ..........................................................23

*United States v. Myers*,
   426 F.3d 117 (2d Cir. 2005) ...............................................................49

*United States v. Rahimi*,
   602 U.S. 680 (2024)....................................................................... 24, 31

*United States v. Williams*,
   553 U.S. 285 (2008)...........................................................................39

*Waldman v. Conway*,
   871 F.3d 1283 (11th Cir. 2017) ........................................................20

*Washington v. Glucksberg*,
   521 U.S. 702 (1997)...........................................2, 14, 20, 22, 23, 25, 27, 40-42

*Wesley v. Collins*,
   791 F.2d 1255 (6th Cir. 1986) ..........................................................28

*Williams v. Att'y Gen. of Ala.*,
   378 F.3d 1232 (11th Cir. 2004) ............................................... 14, 21, 25

*Williams v. Taylor*,
   677 F.2d 510 (5th Cir. 1982) ............................................................28

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015)...........................................................................47

**Statutes**

Act of October 1646, 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL
   THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE
   YEAR 1619 (W. W. Hening ed. 1823)....................................................33

Adam Walsh Child Protection and Safety Act of 2006,
   Pub. L. No. 109-248, 120 Stat. 587 .............................................. 38-39

18 U.S.C. §2251.................................................................................39

18 U.S.C. §2252A(a)(5)(B) ...................................................................6, 38

28 U.S.C. §1291 .................................................................................................1

28 U.S.C. §1331 .................................................................................................1

42 U.S.C. §1983 ...............................................................................................1

ALA. CODE §13A-12-190(2) .............................................................................4

ALA. CODE §13A-12-191 *et seq* .......................................................................3

ALA. CODE §15-20A-2 .......................................................................................2

ALA. CODE §15-20A-4(2) ..................................................................................3

ALA. CODE §15-20A-4(14) ................................................................................4

ALA. CODE §15-20A-4(20) ................................................................................4

ALA. CODE §15-20A-4(27) .............................................................................3, 50

ALA. CODE §15-20A-11(d) .............................................................................1, 3

ALA. CODE §15-20A-11(d)(4)................................................. 1, 2, 7, 9-12, 15, 18, 22,
.................................................................................26, 27, 31, 37, 45-48, 50-52

ALA. CODE §15-20A-23 ....................................................................................3

IND. CODE §31-35-3-4 (1997) .........................................................................44

MISS. CODE §93-15-121(h)(i) (2017) ..............................................................44

MO. ANN. STAT. §210.117(1) (2017) ..............................................................45

WIS. STAT. §48.415(9m)(a)-(am) (2018) ........................................................45

WIS. STAT. §948.051 (2018) ............................................................................45

**Constitutional Provisions**

U.S. Const. amend. II ................................................................... 23, 24, 28

U.S. Const. amend. XIV, §1 ................................................. 7, 14, 29, 30

U.S. Const. amend. XIV, §2 ................................................................27

**Other Authorities**

A. E. SMITH, COLONISTS IN BONDAGE: WHITE SERVITUDE AND CONVICT LABOR IN
   AMERICA, 1607-1776 (1971) ...............................................................33

B. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT (2016) ...............................17

E. S. MORGAN, THE PURITAN FAMILY: RELIGION AND DOMESTIC RELATIONS IN
   SEVENTEENTH-CENTURY NEW ENGLAND (1966) .................................33

H. Brewer, *Apprenticeship Policy in Virginia: From Patriarchal to Republican
   Policies of Social Welfare*, *in* CHILDREN BOUND TO LABOR: THE PAUPER
   APPRENTICE SYSTEM IN EARLY AMERICA (Herndon & Murray, eds. 2009).......33

J. E.B. Myers, *A Short History of Child Protection in America*,
   42 FAM. L. Q. 449 (2008)..................................................................42

J. LOCKE, TWO TREATISES OF GOVERNMENT (1690)................................................32

J. SCHOULER, A TREATISE ON THE LAW OF THE DOMESTIC RELATIONS
   (Boston, Little, Brown & Co. 1882) ........................................... 30, 34

J. W. FROST, THE QUAKER FAMILY IN COLONIAL AMERICA (1973) .......................41

L. Ulrich, *John Winthrop's City of Women*,
   3 MASS. HIST. REV. 19 (2001) ..........................................................40

M. Adin, *'I Shall Beat You, So That the Devil Shall Laugh at It': Children,
   Violence, and the Courts in New Amsterdam*, *in* CHILDREN IN COLONIAL
   AMERICA (Marten ed., 2007) .............................................................41

M. Bourque, *Bound Out from the Almshouse: Community Networks in Chester County, Pennsylvania: 1800–1860*, *in* CHILDREN BOUND TO LABOR: THE PAUPER APPRENTICE SYSTEM IN EARLY AMERICA (Herndon & Murray, eds. 2009) ...................................................................................................33

P. M. Genty, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis*, 30 J. FAM. L. 757 (1991) ...................................................................................44

R. H. TYLER, COMMENTARIES ON THE LAW OF INFANCY (1882) ............................35

THE COLONIAL LAWS OF MASSACHUSETTS (Whitmore, ed. 1889) ............ 32, 33, 40

U.S. Sentencing Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* (2021), www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf...47

W. C. TIFFANY, HANDBOOK ON THE LAW OF PERSONS DOMESTIC RELATIONS (1896).......................................................................................... 31, 35

## STATEMENT OF JURISDICTION

Appellee Bruce Henry sued Appellants under 42 U.S.C. §1983. DE1. The district court exercised jurisdiction under 28 U.S.C. §1331, DE62:2, and granted Henry summary judgment on January 10, 2024, DE150; DE151. Appellants timely appealed. DE152. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

Sex offenses against children are devastating and often difficult to detect. Like all other States, Alabama heavily regulates convicted sex offenders. As part of that framework, Alabama Code §15-20A-11(d) generally forbids sex offenders from residing or conducting an overnight visit with children. An exception allows sex offenders to live with their own children, stepchildren, grandchildren, siblings, and stepsiblings, but it does not apply to someone convicted of a sex offense involving a child under the age of twelve or a child pornography offense. *Id.* §15-20A-11(d)(4). Alabama thus bars people convicted of sex crimes against children or child-pornography offenses from living or staying overnight with minors.

The district court declared the law facially unconstitutional on the ground that it violates the substantive due process right to care, custody, and control of one's child. But under the "established method of substantive-due-process analysis," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 260 (2022), the Supreme Court has "required" a more "careful description" of the asserted liberty interest

1

before determining whether it is "objectively, 'deeply rooted in this Nation's history and tradition,'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). The Court thus asked the parties to address whether "the fact of [Henry's] conviction [should] be included in the description of his liberty interest." CA11.Doc.63.

The first issue is whether the enforcement of Section 11(d)(4) violates Henry's carefully described substantive due process rights.

The second issue is whether the district court abused its discretion by entering a facial injunction.

## STATEMENT OF THE CASE

### A. Alabama Regulates Sex Offenders.

Alabama enacted the Alabama Sex Offender Registration and Community Notification Act (ASORCNA) to regulate sex offenders and implement federal law. The Legislature found that "the increasing numbers [of sex offenders] coupled with the danger of recidivism place society at risk." Ala. Code §15-20A-2. "Employment and residence restrictions, together with monitoring and tracking" were necessary to advance the State's "primary governmental interest of protecting vulnerable populations, particularly children." *Id.*

Under ASORCNA, a registered adult sex offender may "reside" or conduct "overnight visits" with a minor only if the offender is "the parent, grandparent,

stepparent, sibling, or stepsibling of the minor." Ala. Code §15-20A-11(d).[1] There

are, however, five circumstances in which an adult sex offender cannot live with any

minor, no matter their relation:

> (1) Parental rights of the adult sex offender have been or are in the process of being terminated as provided by law.
>
> (2) The adult sex offender has been convicted of any sex offense in which any of the minor children, grandchildren, stepchildren, siblings, or stepsiblings of the adult sex offender was the victim.
>
> (3) The adult sex offender has been convicted of any sex offense in which a minor was the victim and the minor resided or lived with the adult sex offender at the time of the offense.
>
> (4) The adult sex offender has been convicted of any sex offense involving a child, regardless of whether the adult sex offender was related to or shared a residence with the child victim.
>
> (5) The adult sex offender has been convicted of any sex offense involving forcible compulsion in which the victim was a minor.

*Id*.

A "sex offense involving a child" refers to either a sexual crime against a child

under 12 years old or an "offense involving child pornography." *Id*. §15-20A-4(27);

*see id*. §15-20A-4(2) (defining "child" as a person not yet 12 years old). An offense

involving child pornography includes disseminating or possessing child sexual

abuse material, *id.* §§13A-12-191 *et seq.*, which is a "visual depiction of an

---

[1] ASORCNA allows for case-by-case exceptions for certain disabled or terminally ill sex offenders. *See id.* §15-20A-23.

individual under 18 years of age engaged in any act of sexually explicit conduct, including a virtually indistinguishable depiction," *id.* §13A-12-190(2). In this case, the State has not disputed that ASORCNA's residency restriction applies to someone convicted of possessing child sexual abuse material depicting a minor between the ages of 12 and 18. *See* CA11.Doc.63-1 (en banc briefing notice).

A sex offender's residence is "determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place." Ala. Code §15-20A-4(20). An "overnight visit" is "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m." *Id*. §15-20A-4(14).

### B. Known Sex Offenders Pose a Unique Threat to Child Safety.

"Sex offenders are a serious threat." *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality). "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Id*. at 33. Their victims "are most often juveniles." *Id*. at 32. Given "the grave harm that sexual abuse of children inflicts on its victims," *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc), "it is legitimate and entirely reasonable for States to try to stop abuse from occurring before it happens," *Packingham v. North Carolina*, 582 U.S. 98, 113 (2017) (Alito, J., concurring).

Sexual abuse of children often evades detection. *See* DE86-11:22. It is more "sensitive, intrusive, and intimate" than other crimes. *Id*. Victims experience

4

emotions "spanning embarrassment, guilt, shame, anger, depression, and self-derogation," which "inhibit the likelihood of reporting the victimization." *Id*. Because of undetected sexual crime, official statistics (re-arrest and re-conviction rates) do not reflect the true incidence of recidivism. *Id*. at 20-24. Depending on the inputs used to account for undetected recidivism, estimates can be between two and ten times greater than official reconviction rates. *Id*. at 19. Sex offenders often abuse children they know, DE86-18:151-52, and at least a fifth of them will abuse relatives and non-relatives, DE86-11:25.

In the 1990s, child pornography crimes multiplied, creating a new domain of victimization. DE86-18:85. Overall, "there is not a lot of research" on child pornography offenders. DE86-17:283. We know that an exceptionally small percentage of the general population exhibits a sexual interest in children, DE86-11:13-14, that possession of child pornography is a valid and reliable indicator of pedophilia, *id*. at 6, and that someone with a sexual interest in children is more likely to abuse a child sexually, DE86-8:8. Child pornography consumption is also associated with the sexual abuse of children. DE86-11:14-15. "Access to children is a significant predictor of child pornography offenders perpetrating contact sexual offenses against children." *Id*. at 15.

Even according to Henry's expert, one "can assume that roughly half [of child pornography offenders] have committed a contact sex offense against a child."

5

DE86-8:20. Other research indicates that "[t]he majority of child porn offenders have undetected contact victims, undetected sex crime offenses, and continue to offend with use of child porn/child erotica even while in sex offender treatment." DE86-11:25.

### C. Bruce Henry Committed a Child Pornography Offense Involving Children and Later Had a Child.

In 2011, Henry was arrested for possessing two videos and 348 images of child sexual exploitation material. DE86-19:6. In one video, an adult male received oral sex from a prepubescent girl and then digitally raped her. *Id*. The other video shows a prepubescent child engaging in sex acts with a dog. *Id*. The images depicted sexual, sometimes sadomasochistic, abuse of prepubescent and adolescent girls. *Id*. Henry focused on girls between the "ages of six and ten." *Id*. He saved this material because, in his words, it was "incredibly difficult to come by." DE86-2:49-50, 55.

In 2013, Henry pled guilty to one count of possession of child pornography under 18 U.S.C. §2252A(a)(5)(B). DE86-20. In 2018, he was released from prison, beginning his term of supervised release. DE86-21. As a condition of release, Henry was prohibited from accessing the internet without prior approval from his probation officer. *Id*. at 4. A year after release, Henry admitted to violating the terms of his release by accessing online pornography. *Id*. at 3. Based on the video "titles," he had searched for pornography involving "young or teenage females." *Id*. Around a

month later, Henry admitted to "seeking out" pictures of "teen girls" and "children in sexual positions." *Id.*

Henry and his wife married in November 2019. DE86-3:67. The next month, he accessed pornography using his wife's phone while she took a shower. DE86-2:76-78 As a result of Henry's repeated noncompliance, a federal judge extended Henry's supervised release from 60 to 96 months. DE86-22. Henry has also used a computer in the house to view pornography in violation of his internet usage agreement with Probation. DE86-2:42-44. In 2021, Henry's wife gave birth to their son. DE86-3:13.

### D. Henry Sues and Is Denied a Preliminary Injunction.

Later in 2021, Henry brought three claims against Sheriff Abernathy, District Attorney Webb, and Attorney General Marshall ("Appellants"). DE1¶¶12-23. He alleged that Alabama Code §15-20A-11(d)(4) ("Section 11(d)(4)") violated his intimate association rights under the First Amendment and his equal protection and substantive due process rights under the Fourteenth Amendment by preventing him from residing or conducting overnight visits with his child. DE1¶¶76-78, 90-92, 110-112. He sought a declaratory judgment that the statute is "overbroad … on its face and as applied to Mr. Henry" and "denies to persons convicted of 'an offense involving child pornography' and to Mr. Henry individually the equal protection of the laws." DE1:20.

7

Henry later moved for a preliminary injunction, and the district court held a hearing. Henry offered three experts to opine on the risks posed by sex offenders, child pornography offenders, and Henry. *See* DE30-1; DE30-2; DE30-3. In their reports, the clinical psychologists opined that "evidence-based risk assessments" allow professionals to determine "to a reasonable degree of scientific certainty" whether a given sex offender can safely reside with a given child. DE86-4:10; *see* DE86-9:9 ("[A] professional can estimate an offender's risk to a child and describe what circumstances, if any, the offender might safely be allowed to have contact with the child."). A licensed counselor offered his "professional opinion" "based on the individualized risk assessment and testing [he] conducted on [Henry]," that Henry consumed child pornography as the result of his addictive personality, not pedophilia, and "does not represent a meaningful risk of committing future acts of harm against minors," DE86-7:3, 7-9. Defendants offered an expert criminologist to rebut testimony about the risks posed by Henry and other sex offenders.

The district court denied Henry's motion for a preliminary injunction because Henry might be "a risk to his child." DE62:29.

### E. No Reliable Method Can Identify Child Sex Offenders Who Can Safely Reside With Specific Children.

After the preliminary hearing, Defendants retained an additional expert in actuarial risk assessment tools, and Henry retained a rebuttal witness. The six experts, Bruce Henry, and his wife were deposed. The State presented evidence that

the three tests used by Henry's experts to assess recidivism risk lack empirical support and predictive validity for child pornography offenders like Henry. DE86-12:6-11; DE86-8:24, 28. In the counselor's risk assessment, he attributed Henry's consumption of child pornography to a traumatic event that never occurred. DE86-16:89-90 *but cf.* DE86-19:10. And he administered one assessment indicating that Henry—after his release from prison—had a sexual interest in children. DE86-16:102-04. He dismissed the results of that test as irrelevant to Henry's present risk. *Id*. at 85-86, 285.

### F. District Court Declares §15-20A-11(d)(4) Facially Unconstitutional.

Defendants and Henry filed cross-motions for summary judgment. DE94, DE100, DE102. The court granted Henry's motion with respect to his facial substantive due process challenge, denying Henry's First Amendment and Equal Protection claims as moot. DE150:18. The court described the right burdened by Section 11(d)(4) as Henry's right to "care, custody and control" of his child. *Id.* at 7-8. Reasoning from general conceptions of parental rights, the court concluded that §11(d)(4) "burdens" the "fundamental right[s]" of Henry and every "other parent" covered. *Id.* at 8-11. On this view, §11(d)(4) would require strict scrutiny in every application. *Id.* at 11.

As to tailoring, the court took issue with §11(d)(4)'s breadth. *Id.* at 13. For some offenders, the court agreed that "the facts resulting in a conviction" "merit the

statute's lifetime restriction." *Id.* But §11(d)(4) relies on the "conviction" alone despite "varying elements" of included crimes. *Id.* Recognizing that §11(d)(4) applies to the "worst of the worst offenders," like child traffickers and rapists, the court was disturbed that the statute would also cover conduct by a 19-year-old in a relationship with a 16-year-old. *Id.* Without "some mechanism" for "relief" from the ban, §11(d)(4) failed strict scrutiny. *Id.* at 15. The court thus declared §11(d)(4) facially unconstitutional and permanently enjoined the State from enforcing it. *Id.* at 18. Section 11(d)(4)—despite applying not only to parents, but also grandparents, stepparents, siblings, and stepsiblings—was "stricken as unconstitutional and severed from" ASORCNA. *Id.* at 2.

Appellants timely noticed their appeal and moved to stay the injunction pending appeal. DE156:9. The district court granted the stay. DE164.

A three-judge panel of this Court affirmed in part and reversed in part. The panel held that §11(d)(4) violated Henry's parental rights, but it vacated the district court's "facial injunction" because Henry failed to meet "his lofty burden of showing that Section 15-20A-11(d)(4) is unconstitutional in all its applications." *Henry v. Sheriff of Tuscaloosa Cnty*, 135 F.4th 1271, 1328 (11th Cir. 2025).

The Court ordered rehearing en banc and asked the parties to address Henry's as-applied challenge and whether "the fact of [Henry's] conviction [should] be included in the description of his liberty interest." CA11.Doc.63.

## SUMMARY OF ARGUMENT

**I.A.** Section 11(d)(4) does not violate Henry's constitutional rights because the interest he asserts is not objectively, deeply rooted in our history and tradition and implicit in the concept of ordered liberty. The Supreme Court has rejected the premise that all parents have the same substantive due process rights. But no case answers the question here directly, so Henry's claim requires breaking new ground.

**I.B.** When asked to expand a substantive due process right or to identify a new one, the Court must carefully describe the asserted liberty interest. The Supreme Court and this Court have rejected many attempts to cast novel rights at the most abstract level, instead defining the scope of the claimed right by reference to the burden imposed by the challenged statute. So described, Henry asserts the right of a man convicted of a sex offense involving a child to reside with his child.

**I.C.** Henry's asserted interest finds little support in history and tradition. Our common law tradition discloses instead that a father's right to custody was forfeitable by his misconduct, especially toward children. Conviction for a child sex offense is the kind of gross immorality that past generations would deem disqualifying. Alabama has codified a long-recognized principle.

**I.D.** The statute survives rational-basis review or, in the alternative, strict scrutiny, for its restriction is limited and targeted to those proven to be unfit.

**II.** The panel correctly held that facial relief was improper.

11

## STANDARD OF REVIEW

Summary judgment is proper "only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Cagle v. Bruner*, 112 F.3d 1510, 1514 (11th Cir. 1997). An order denying or granting summary judgment is reviewed de novo, *id.*, and "the scope of [an] injunction" is reviewed "for abuse of discretion," *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).

## ARGUMENT

## I.    Section 11(d)(4) Does Not Violate Henry's Constitutional Rights.

"Although the text of the Constitution contains no reference to familial or parental rights, Supreme Court precedent" has extended to parents a general right to make certain "decisions concerning the care, custody, and control of their children." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 812 (11th Cir. 2004). This right is "untethered from the text," for "on its face," ""the Due Process Clause guarantees *no* substantive rights, but only (as it says) process.'" *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019).

When dealing with rights "not mentioned anywhere in the Constitution," courts "must guard against the natural human tendency to confuse" what the law protects with their views about what it should protect. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237, 239 (2022). Substantive due process is a

"treacherous field." *Moore v. City of E. Cleveland*, 431 U.S. 494, 502 (1977). "Before starting down this road, it is well to remember that the most deeply rooted tradition in this country is that we look to democracy to answer pioneering public-policy questions, meaning that federal courts must resist the temptation to invoke an unenumerated guarantee to 'substitute' their views for those of legislatures." *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 472-73 (6th Cir. 2023). The risk that courts "usurp authority that the Constitution entrusts" to the People is at its apex. *Dobbs*, 597 U.S. at 239-40.

For these reasons, both the Supreme Court and this Court have "been reluctant to expand the concept of substantive due process," *Echols*, 913 F.3d at 1326, or "to recognize [new] rights," *Dobbs*, 597 U.S. at 239. Such caution is necessary to prevent the "exercise of raw judicial power." *Roe v. Wade*, 410 U.S. 179, 222 (1973) (White, J., dissenting). *Accord Eknes-Tucker v. Gov. of Ala.*, 114 F.4th 1241, 1245 (11th Cir. 2024) (Pryor, C.J., respecting denial of rehearing en banc) ("Unconstrained power tempts usurpation."); *Sosa v. Martin County*, 57 F.4th 1297, 1306-07 (11th Cir. 2023) (Newsom, J., concurring).

These background tenets about the nature of substantive due process are not rhetorical; from them flow important features of the doctrine. First, where the "guideposts" were once "scarce and open-ended," *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992), we now know it is "history and tradition that map the essential

components of our Nation's concept of ordered liberty," *Dobbs*, 597 U.S. at 240. After all, the question is "what the *Fourteenth Amendment* means by the term 'liberty.'" *Id.* Second, when "asked to break new ground," *i.e.*, "recognition of a new fundamental right, or extension of an existing one," the Court "'must begin with a careful description of the asserted right.'" *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1239 (11th Cir. 2004) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)); *accord Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005); *Lofton*, 358 F.3d at 816-17. Only "a careful description of the fundamental interest at issue" will "narrowly frame the specific facts" so that courts "do not stray into broader constitutional vistas than are called for by the facts of the case at hand." *Doe*, 410 F.3d at 1344. Third, once the putative right has been carefully defined, courts can analyze whether it is "(1) 'objectively, deeply rooted in this Nation's history and tradition' and (2) 'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed.'" *Williams*, 378 F.3d at 1242 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

Here, it is not enough for Henry to rest on the general history and tradition of childrearing any more than the challengers in *Dobbs* could prevail on a "right to privacy" theory. 597 U.S. at 235. Construed at a most abstract level, parental rights certainly find support in history and tradition. But parents have never had full "autonomy" to make "decisions [that] jeopardize the health or safety of a child,"

*Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990), and not everyone who calls himself a parent enjoys the full panoply of rights. Rather, the government has always had some power to "intercede on the child's behalf," *id.*, and the "rights of parenthood" have always been subject to "regulation in the public interest" or in matters "affecting the child's welfare," *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944). Carefully described, Henry's asserted right is that of a convicted child sex offender to live with his child. That right is not deeply rooted in history and tradition and implicit in the concept of ordered liberty. Henry has not carried his burden under this framework, and Section 11(d)(4) survives rational-basis review.

### A. Henry's claim demands an extension of parental-rights precedent.

**1.** The parental-rights "principle exists [] in broad formulation; yet courts must use considerable restraint" as "the precise facts of particular cases … give further and more precise definition to the right." *Troxel v. Granville*, 530 U.S. 57, 95-96 (2000) (Kennedy, J., dissenting). Thus, the Court's abstract recognition in *Stanley* that a man has an "interest … in the children he has sired and raised" must be understood in context and in light of later precedent. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). That case protected the right of an unwed father who competently raised his children from birth to seek custody after the mother's death. *Id.* at 647.

But the Court clarified in *Lehr* that "the mere existence of a biological link" is not enough to extend "substantial protection" under the Constitution. *Lehr v.*

*Robertson*, 463 U.S. 248, 261 (1983). So another unwed father who lacked "any significant custodial, personal, or financial relationship" with his daughter had no "constitutional right to prior notice and an opportunity to be heard" before she could be adopted by the mother's new husband. *Id.* at 255, 262.

A plurality of the Supreme Court further clarified that even "biological fatherhood plus an established parental relationship" may not suffice for full parental rights. *Michael H. v. Gerald D.*, 491 U.S. 110, 123 (1989). Notwithstanding some of *Stanley*'s broad language, *Michael H.* held that California could deny to the father of "a child born to the wife of another man" "[a]ll parental rights, including visitation, [] automatically." *Id.* at 113, 119. The plurality refused to consider the "liberty interest in isolation from its effect upon other people" in the "case at hand." *Id.* at 124 n.4. Not only would a more abstract approach "distort[] the rationale" of *Stanley* and its progeny; it would license "the conclusion that if Michael had begotten Victoria by rape, that fact would in no way affect his … liberty interest." *Id.* at 123, 124 n.4. Instead, legal protection for "the situation of Michael and Victoria" had to be found in "the historic practices of our society" and its "traditions." *Id.* at 124.

In sum, not all parents have the same constitutional rights, and the existence or scope of parental rights can depend on the conduct of the parents.

**2.** The panel drew a different conclusion—that all the parents in these cases had constitutional rights "to the care, custody, and control of their child" that could

16

not be deprived "unless and until the state afforded them due process." 135 F.4th at 1303. The panel held that "broad, statutory classifications abrogating parental rights are presumptively improper," *id.* at 1303, which means subjecting them to strict scrutiny, *id.* at 1286. But that rule is incompatible with *Michael H.*, which did not apply strict scrutiny but instead—even on the panel's telling—denied "that the Constitution grants natural fathers parental rights at the expense of marital fathers." *Id.* at 1302.[2] And in *Stanley*, the Court rejected a State's conclusive presumption that all unwed fathers are unfit; it held that "Stanley," not *every* parent in *every* circumstance, was "entitled to a hearing on his fitness" because the Constitution protects "family relationships unlegitimized" by marriage. 405 U.S. at 649, 651-52. The "single fact" of *marital status*, *id.* at 646, could not lead to "the automatic destruction of the custodial relationship," *Lehr*, 463 U.S. at 259.

---

[2] The panel "accept[ed] the plurality opinion's logic as controlling." *Id.* at 1302 n.9. But it also asserted that "at its narrowest—where it is firmly binding, *see Marks v. United States*, 430 U.S. 188, 193 (1997)—*Michael H.* is a narrow-tailoring case" because Justice Stevens voted to affirm on the ground that "California afforded Michael a sufficient [process]." *Id.* But it is not obvious that the concurring opinion offered "the narrowest grounds," *i.e.*, "those that, when applied to other cases, would consistently produce results that a majority of the Justices supporting the result in [*Michael H.*] would have reached." B. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 200 (2016). Four of five Justices would *not* scrutinize a State's procedures in another case like *Michael H.* Second, Justice Stevens's analysis is not a "logical subset" of the plurality's because the two "do not share common reasoning." *See, e.g.*, *United States v. Epps*, 707 F.3d 773, 350 (D.C. Cir. 2013). Third, the Supreme Court has never treated Justice Stevens's opinion as controlling, whereas the plurality opinion has been cited many times.

17

Whether the "single fact" of conviction for a child sex offense can preclude the right to reside with one's child is a different question entirely. Unlike a law based on marital status, Alabama's §11(d)(4) does not turn on what the Supreme Court viewed as merely "formal[]" distinctions among parents. *Stanley*, 405 U.S. at 657. What the panel called the "mere[]" "fact of conviction," 135 F.4th at 1303, is a finding beyond reasonable doubt that the parent committed a sex crime with an innocent child as the victim. A mother's decision not to marry the father may not say much about her fitness; conviction for a sex offense against a child does.

Were there any doubt that *Stanley* cannot be mechanically applied to sex offenders, *Michael H*. erased it. An unmarried father with children born into another marriage has no "constitutionally protected liberty interest in [a] relationship with [his child]" because "traditionally … such a father" was denied parental rights. *Id.* at 121, 127. Just as history distinguished the father in *Michael H.* from the father in *Stanley*, the history distinguishes Henry too. *Infra* §I.C. While American society has been organized around a "natural presumption" that a parent will take care of his child, wrongdoing can "remove[]" that presumption and "deprive [the parent] of custody." 2 J. STORY, COMMENTARIES ON EQUITY JURISPRUDENCE AS ADMINISTERED IN ENGLAND AND AMERICA §§1341-42 (2d ed. 1839). The father in *Stanley* failing to marry did not render him unfit, and the wishes of the mother in *Troxel* could not be

ignored when her judgment was not in question. But the dynamic is completely different for Henry, who committed a sex crime against a child.

To resolve this case, therefore, the Court cannot look to "natural fathers in general," for there is a "more specific tradition" on point, *Michael H.*, 491 U.S. at 127 n.6 (opinion of Scalia, J.): namely, the tradition that parental rights "may be forfeited by misconduct," *see, e.g.*, *Mercein v. People*, 25 Wend. 64, 73 (N.Y. 1840). Because Henry seeks to create or extend precedent protecting the substantive due process rights of parents, the Court "must begin with a careful description of the asserted right." *Williams*, 378 F. 3d at 1239.

### B. The fact of Henry's conviction for a sex offense against a child must be included in a careful description of his liberty interest.

Henry is not like other parents, he would not have been treated like every other parent at the Framing, and his conviction for a child sex offense cannot be omitted from a careful description of the right he asserts.

**1.** *Doe v. Moore* answered the question whether the fact of conviction must be included in a careful description of the liberty interest. 410 F.3d at 1343-44. There, the Court heard a challenge to Florida's sex offender registration and notification scheme. *Id.* at 1339-40. The plaintiffs framed their rights broadly: the "rights to family association, to be free of threats to their persons and members of their immediate families, to be free of interference with their religious practices, to find and/or keep any housing, and to a fundamental right to find and/or keep any

19

employment." *Id.* at 1343. But the Court rejected those descriptions, instead "us[ing] the Sex Offender Act itself to define the scope of the claimed fundamental right." *Id.* at 1344. The correct and careful description was the right of a person "convicted of 'sexual offenses,' to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website." *Id.*; *accord Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) (confirming that *Moore* involved "the right of a sex offender to refuse subsequent registration of his or her personal information … and prevent [its] publication").

*Doe v. Moore* is an exemplar of a disciplined and objective approach to the careful-description requirement, seeking to "hew[] as closely as possible to the statute or the complaint." *K.C. v. Indiv. Mems. of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 623-25 (7th Cir. 2024) (citations omitted). The Supreme Court has repeatedly recast the question presented in terms of what the challenged statute prohibits, rather than whatever abstract philosophical principle the challenger invokes. So *Glucksberg* analyzed the asserted "right to commit suicide with another's assistance," *not* "a general tradition of 'self-sovereignty'" or "personal autonomy." 521 U.S. at 724; *see also Kerry v. Din*, 576 U.S. 86, 95 (2015) (confirming that "*Glucksberg* rejected" those broad formulations). Likewise, *Reno v. Flores* was not about "'freedom from physical restraint'" but the "right of a child

who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution," 507 U.S. at 302.

And this Court has followed suit. Thus, the issue in *Williams* was "an individual's liberty to use sexual devices when engaging in lawful, private, sexual activity," *not* "privacy" or "sexual privacy." 378 F.3d at 1239. In *Lofton*, it was the "right to adopt for homosexual persons" or protection for "long-term foster care arrangements and guardianships," and neither could be extrapolated from "parental and familial rights" without "break[ing] new ground." 358 F.3d at 813, 817. More recently in *Eknes-Tucker v. Governor of Alabama*, the Court would not apply "a high level of generality" to derive a "right to treat one's children with puberty blockers and cross-sex hormone therapy." 80 F.4th 1205, 1224 (11th Cir. 2023). Absent "historical analysis specifically tied to the [regulated] medications," the plaintiffs were not likely to succeed. *Id.*; *accord, e.g.*, *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007) (considering "right … to use medical marijuana," rather than "autonomy" or "bodily integrity").

The Court should continue to focus on the statutorily prohibited conduct to define the asserted right. "Level of generality is everything in constitutional law," *Skrmetti*, 83 F.4th at 475, but if plaintiffs can "climb[] up the ladder of generality to

21

a perch," *id.*, they can easily "justify … fundamental rights to illicit drug use, prostitution, and the like," which have no "claim to being deeply rooted in history," *Dobbs*, 597 U.S. at 257. The careful-description requirement can help avoid absurd and anti-democratic readings of the Due Process Clause, *see Skrmetti*, 83 F.4th at 475, but not without clear rules to limit judicial discretion.

Under this Court's approach, §15-20A-11(d)(4) defines the interest at stake. Henry must assert "something distinct" and "more" than a father's interest in living with his children because Alabama does not prohibit fathers from living with their children. *Contra* 135 F.4th at 1299. Something is "[c]onspicuously missing" (*Gonzalez*, 500 F.3d at 864) from the panel's description of the right. Carefully described, Henry asserts the right *of a man convicted of a sex offense against a child* to live with his child. He must prove that right is deeply rooted in history and tradition, and his failure to do so should end the case in the State's favor.

**2.** The panel jettisoned Henry's historical burden by asserting the irrelevance of his "status as a sex offender" and his "status as a felon." 135 F. 4th at 1296, 1299. But that premise just begs *Glucksberg*'s question; whether Henry's status is material to his asserted liberty interest cannot be decided *ex ante* but only *after* a careful description and inquiry into the relevant history and tradition (if any). Claiming support in text and precedent, the panel held that "Henry's conviction bears on the

22

state's justification for restricting his constitutional rights, not on the existence or definition of [them] in the first place." *Id.* at 1289.

The panel first erred by attempting to discern the scope of an unenumerated substantive due process right from the constitutional text. "[T]he Supreme Court has declared—unanimously—that the 'language' of the Due Process Clauses does not 'suggest[ ],' let alone support, the 'substantive content' that courts often have poured into them." *Eknes-Tucker*, 114 F.4th at 1244 (Pryor, C.J., respecting denial of rehearing). The asserted right is not in the text, and reliance on the constitutional phrase "any person" is unenlightening. *See* 135 F.4th at 1296-97; Red.Br.17. Parental rights plainly do not inhere in "any person"—only parents, and even then, not all parents and not in every circumstance. *Supra* §I.A. Again, the Court must decide *which parents* have which rights, a question the text does not answer.

Analogies to enumerated rights will not do. *See* 135 F.4th at 1295-98 (citing *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *United States v. Jiminez-Shilon*, 34 F.4th 1042 (11th Cir. 2022); *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)). In enumerated-rights cases, the Constitution's text puts certain matters outside of legislative reach. For example, *Bruen* explained "that when the Second Amendment's plain text covers" the challenged action, it is "presumptively" protected. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). Respect for the language approved by the People requires that when a law falls within the

23

Amendment's "unqualified command," nothing short of "consisten[cy] with the Nation's historical tradition of firearm regulation" will save it. *Id.*

Thus, when restricting who can exercise "the right of the people," the State bears the burden to establish the original meaning and scope of the text. U.S. Const. amend. II. If the State can prove a historical analogue, entire "groups" and "categories" like felons and dangerous criminals (who are still "people") can be disarmed. *See, e.g.*, *United States v. Dubois*, 139 F.4th 887, 895, 897, 900 (11th Cir. 2025) (Pryor, C.J., concurring); *United States v. Rahimi*, 602 U.S. 680, 699-701 (2024). Shifting the burden is appropriate because regulation risks violating a right that the People plainly enacted. *Bruen*, 597 U.S. at 33-34. Put another way, the State must prove an "exception[] to the right to bear arms." *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring).

But *Bruen* is not the test for substantive due process. There is no plain text that can establish *prima facie* coverage. The constitutional default is self-governance, and it is the plaintiff who seeks an exception to the rule. Accordingly, in every substantive due process case, the plaintiffs bear the historical burden, not the government. *See, e.g.*, *Dep't of State v. Munoz*, 602 U.S. 899, 903 (2024) ("[The plaintiff] must show that the asserted right is deeply rooted in this Nation's history and tradition. She cannot make that showing." (cleaned up; citation omitted)); *Din*, 576 U.S. at 95-96; *Michael H.*, 491 U.S. at 125 (plurality) ("Since it is Michael's

24

burden to establish that such a power … is so deeply embedded within our traditions as to be a fundamental right, the lack of evidence alone might defeat his case.").

If it were otherwise, then any burden on what can be loosely described as parental rights would be subjected to strict scrutiny. That cannot be correct. We do not say that an abstract right to make "intimate and personal choices," for example, *prima facie* covers "polygamy, consensual duels, prostitution," or "illicit drugs," such that their restriction must satisfy strict scrutiny. *Compassion in Dying v. Washington*, 85 F.3d 1440, 1444 (9th Cir. 1996) (O'Scannlain, J., dissenting from denial of rehearing). Nor does anyone think that those activities—or, say, the right of a serial child rapist to live with children—are necessary for liberty and justice to "exist." *Glucksberg*, 521 U.S. at 721.

The way to avoid forcing the State to disprove rights obviously unfounded in history is to require plaintiffs to define and prove them at a more granular level. *See supra* §I.B.1. Hence, the Supreme Court has more carefully described substantive due process rights like the "right of married persons to obtain contraceptives," *Dobbs*, 597 U.S. at 273, rather than older formulations like the "zone of privacy," *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965). Otherwise, as this Court explained in *Williams*, the right might "encompass[] a great universe of sexual activities, including many that historically have been, and continue to be, prohibited," such as "pederasty and adult incest." 378 F.3d at 1239-40. The three-

25

judge panel here had to embrace these loose descriptions that have since fallen out of favor. *Compare, e.g.*, 135 F.4th at 1298 ("*Loving* did not ask about a 'right to interracial marriage'" (quoting *Obergefell v. Hodges*, 576 U.S. 664, 671 (2015))) *with Dobbs*, 597 U.S. at 256 ("[*Loving*] involv[ed] the right to marry a person of a different race[.]"); *id.* at 273 ("*Loving*, 388 U.S. 1 (right to marry a person of a different race)"). On the panel's formulation, it is hard to see why a man who wants to marry a child, for instance, would need to prove something "more" than the right to marry. 135 F.4th at 1299. Rather than subject a ban on child marriage to strict scrutiny, the court could simply deny "the right of minors to marry … as a fundamental right," *Moe v. Dinkins*, 669 F.2d 67, 68 (2d Cir. 1982), which is both more straightforward and consonant with contemporary jurisprudence.

By subjecting §11(d)(4) to strict scrutiny based on Henry's assertion of the right to live with and raise a child, without more, the panel made irrelevant not just Henry's status as a child sex offender but all "historical tradition of relevantly similar regulation." 135 F.4th at 1314. Indeed, the bulk of the panel's historical analysis— the crux of the constitutional dispute—came *after* its conclusion that "the law fails strict scrutiny" and proceeded from the "*assum[ption]*" that the history of restriction matters. *Id.* (emphasis added). In the panel's view, historical restrictions on who could exercise a right do not affect its "fundamental character," *id.* at 1296, and all laws that "burden" "fundamental rights" must survive "strict scrutiny," *id.* at 1286.

Under the Supreme Court's substantive due process framework, the panel was wrong to assert that "rights are not 'defined by *who* exercised them in the past.'" 135 F. 4th at 1298 (citing *Obergefell*, 576 U.S. at 671). It is true that *Obergefell* famously declined to apply *Glucksberg* so that "new groups could [] invoke rights once denied" in the context of "the right to marry and the rights of gays and lesbians." 576 U.S. at 671. But this Court is not free to ignore *Glucksberg* because it remains the "established method of substantive due-process-analysis." *Dobbs*, 597 U.S. at 260; *see also, e.g.*, *Munoz*, 602 U.S. 909-16 (applying *Glucksberg*).[3]

The panel's view that a person's "status" cannot bear on "the existence or definition" of his rights (135 F.4th at 1297-98) is incompatible with many other areas of constitutional law in which the scope of a right includes some and excludes others. "Felon voting rights are a good example" for the State. *Contra id.* It is well established that criminals may forfeit their rights to vote. U.S. Const. amend. XIV, §2; *Richardson v. Ramirez*, 418 U.S. 24 (1974). A person can "be in one day and out the next," 135 F.4th at 1297, according to decades of decisions that "the right of felons to vote is not fundamental." *Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir.

---

[3] In one sentence, the panel wrote that whether Henry's conviction disqualifies him from parental rights is "a question of tailoring *or history*." 135 F.4th at 1298 (citation omitted; emphasis added). But that remark cannot be squared with the panel's view that the State may not infringe Henry's purported interest "*at all* … unless the infringement is narrowly tailored." *Id.*; *see also id.* at 1285 ("11(d)(4) automatically deprives him of that right. So the law must pass strict scrutiny.").

1986); *accord Jones v. Gov. of Fla.*, 975 F.3d 1016, 1029 (11th Cir. 2020) ("If the right of felons to vote were fundamental, every law [in the area] … would be subject to 'exacting judicial scrutiny.'"); *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) ("Having lost their voting rights, Plaintiffs lack any fundamental interest to assert."); *Williams v. Taylor*, 677 F.2d 510, 514 (5th Cir. 1982) ("[A felon's] interest … is constitutionally distinguishable from the 'right to vote' claims of individuals who are not felons.").

"So too with the right to keep and bear arms." *Contra* 135 F.4th at 1297. Historical evidence does not suggest that felons had inalienable rights such that restrictions should face strict scrutiny. Rather, "the Founders did not consider felons *within* the common law right to arms" at all. *Dubois*, 139 F.4th at 899 (W. Pryor, C.J., concurring) (citation modified). Nor did they "intend[] to confer any such right upon them." *Id.* Thus, the right can "depend on one's law-abiding status." *Id.*; *accord, e.g.*, *United States v. Duarte*, 137 F.4th 743, 756-59 (9th Cir. 2025) (en banc) ("[A]s a matter of constitutional authority, legislatures" could "permanently extinguish[] the rights of felons."); *Medina v. Whitaker*, 913 F.3d 152, 158-60 (D.C. Cir. 2019) (Sentelle, J.) ("[A] felony conviction removes one from the scope of the Second Amendment[.]").

Other examples of rights tied to one's status abound. Children lack a fundamental right "to be on the streets at night without adult supervision," *Hutchins*

28

*v. District of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999) (en banc) (opinion of Silberman, J.), and they lack the fundamental right to marry, *Moe*, 669 F.2d at 68. Noncitizens lack "the privileges or immunities of citizens," U.S. Const. amend. XIV, §1, and they can be excluded or removed from the country, *Munoz*, 602 U.S. at 908, 911-12. Citizens can relinquish their citizenship and the rights that come with it. *Trop v. Dulles*, 356 U.S. 86, 92 (1958) (plurality).

In these and many other contexts, the "fundamental character" of the right can depend on who asserts it and what that person has done. *Contra* 135 F.4th at 1296. It is not "unusual" that certain "*people* fall outside the … scope" of a given right. *Id.* at 1297. As the felony examples demonstrate, it would be especially unsurprising if Henry's "own misconduct … qualified his right[s]." *Jones v. Helms*, 452 U.S. 412, 420 (1981). "Limiting the rights of convicted felons has historical roots." *Bakran v. Sec'y, U.S. Dep't of Homeland Sec.*, 894 F.3d 557, 565 (3d Cir. 2018) (collecting examples).[4] But under the panel's approach, these traditions are easily cast aside in favor of strict scrutiny. If substantive due process is about maintaining old traditions rather crafting new ones, the panel must be wrong.

---

[4] The panel's list of some rights retained by prisoners, 135 F.4th at 1299, does not move the needle. The State's argument is not that every convict loses every constitutional right upon conviction. Rather, as a matter of history and tradition, some convicts lose some rights. If one's "status as a felon" can be "material" to whether some rights exist "in the first place," *id.*, then it's hard to see why the panel thought the same result would be so anomalous here.

* * *

Who asserts the right may not matter for every constitutional guarantee. But whether the "who" matters in a given case is answered by history and tradition, not by the Fourteenth Amendment's reference to "any person," 135 F.4th at 1296-97, not by what strikes a court as "perverse" or "unusual," *id.* at 1297, and certainly not by a court's (unfounded) fear that if *this* claim is reviewed for a rational basis then Alabama would have "a regulatory blank check," *id.*, which sounds a lot like "freewheeling judicial policymaking," *Dobbs*, 597 U.S. at 240. Henry must prove that he, a man convicted of a child sex offense, falls within the class of parents whose rights were protected as a matter of objectively, deeply rooted history and tradition.

### C. The right of a sex offender to live with his child is not deeply rooted in history and tradition or implicit in the concept of ordered liberty.

Henry has not proven that the right he seeks to vindicate—accurately and carefully described—is deeply rooted in history and tradition and implicit in the concept of ordered liberty. His failure to carry that burden should resolve this case. Not only is there no historical evidence in his favor; the record suggests the opposite: At the time of the Framing, a father's otherwise "paramount" interest in custody of his children could "be forfeited by his misconduct," J. SCHOULER, A TREATISE ON THE LAW OF THE DOMESTIC RELATIONS 342 (Boston, Little, Brown & Co. 1882), including being "a drunkard, or a criminal, or cruel, or shiftless, or otherwise unfit,"

W. C. TIFFANY, HANDBOOK ON THE LAW OF PERSONS AND DOMESTIC RELATIONS 249 (1896) (footnotes omitted).

As the panel recognized, the government (then as now) would not "wait for mistreatment to occur; courts could act if it 'appear[ed]' that the child would be exposed to cruelty." 135 F.4th at 1318. But the panel missed that Henry did not adduce "a single case" (or statute) deciding that someone *like him*—a man with a (1) *felony* conviction (2) for a *sex* crime (3) against *children*—was ever "award[ed]" custody, much less prove an objectively rooted tradition that would entitle him to the full parental right. *Michael H.*, 491 U.S. at 127. "This is not the stuff of which fundamental rights qualifying as liberty interests are made." *Id.*

Alabama's determination that sexual abuse of children qualifies as "gross misconduct," *Striplin v. Ware*, 36 Ala. 87, 90 (1860), conclusively establishing a parent's unfitness for physical custody, *K.E.W. v. T.W.E.*, 990 So.2d 375, 381 (Ala. Civ. App. 2007), falls well within the tradition of denying custody to fathers who have demonstrated gross immorality or criminal misconduct, especially toward children. Although the State has no historical burden, proof of a "specific tradition" that "denies protection to such a parent" is enough to sustain Section 11(d)(4). *Michael H.*, 491 U.S. at 127 n.6 (opinion of Scalia, J.); *Bruen*, 597 U.S. at 30 (requiring for an enumerated right, proof that the State's restriction has a "well-established and representative historical analogue"); *Rahimi*, 602 U.S. at 698-700.

31

### 1. Historically, a parent's interest in custody was not inalienable and could be forfeited by gross misconduct, especially toward children.

According to Blackstone, a parent's protective instinct works "so strongly as to need rather a check than a spur," so the common law reflects "indulgence" to "the workings of parental affection." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 438 (1769). Nonetheless, that deference and indulgence is not unlimited, for the father also has a "natural duty" to protect his children. *Id.* "The power, then, that parents have over their children, *arises from that duty*, which is incumbent on them, to take care of their offspring during the imperfect state of childhood." J. LOCKE, TWO TREATISES OF GOVERNMENT §58 (1690) (emphasis added). Thus, even before child protective services took their modern form, parental authority was never inalienable in the English and early American traditions.

The very first legal code of the Massachusetts Bay Colony, for example, announced the liberties of children, including the right to redress against parents for severe mistreatment. THE COLONIAL LAWS OF MASSACHUSETTS 50-51, 137 (Whitmore, ed. 1889). Embracing the duties that must attend the parental right, the Colony listed a variety of statutory obligations, such as teaching children the faith, the laws, the English language, and honest work. *Id.* at 136. If the parents were "negligent of their duty," "two Magistrates … shall take such children … from them, and place them with some masters for years, (boy[]s till they come to twenty one, &

girls eighteen years of age []) which will more strictly look unto, & force them to submit unto government[.]" *Id.*; *see also id.* at 260.[5]

Similarly, the Colony of Virginia enacted a law giving sole discretion to judges "to bind children into apprenticeships … for the good of the children and society."[6] While apprenticeships were primarily a solution to poverty, they *also* aimed at "the better educating of youth" and avoiding the vices of sloth and idleness, "wherewith such young children are easily corrupted."[7] Through the Founding, local governments in Delaware, Maryland, and Pennsylvania could remove a child from a "family setting [] injurious to the child's character or moral and physical development" "with or without the consent of the[] parents."[8]

---

[5] "Under the terms of this law the state compelled some parents to do what others did voluntarily." E. S. MORGAN, THE PURITAN FAMILY: RELIGION AND DOMESTIC RELATIONS IN SEVENTEENTH-CENTURY NEW ENGLAND 78 (1966) (citing colonial laws of Massachusetts and Connecticut).

[6] H. Brewer, *Apprenticeship Policy in Virginia: From Patriarchal to Republican Policies of Social Welfare*, *in* CHILDREN BOUND TO LABOR: THE PAUPER APPRENTICE SYSTEM IN EARLY AMERICA 188-89 (Herndon & Murray, eds. 2009) ("Parental consent to the binding of children … was irrelevant" and "routinely dismissed during the 1750s. … Parental preferences about their children's labor were secondary to the needs of society as parents."); *see also* A. E. SMITH, COLONISTS IN BONDAGE: WHITE SERVITUDE AND CONVICT LABOR IN AMERICA, 1607-1776, at 147-51 (1971) (describing mass transport of children from London to Virginia in the early 1600s).

[7] Act of October 1646, 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 336-37 (W. W. Hening ed. 1823).

[8] M. Bourque, *Bound Out from the Almshouse: Community Networks in Chester County, Pennsylvania: 1800–1860*, *in* CHILDREN BOUND TO LABOR, *supra* at 73.

While some early authorities described the father's right as "paramount," "absolute," or "supreme," 135 F.4th at 1316, it is evident from the history that whatever the common law default, the right was never inviolate. The parent's interest was "not like the right of property," which "may be asserted by any man, no matter how bad, immoral, or unworthy he may be." *Chapsky v. Wood*, 26 Kan. 650, 653 (1881). *Accord* 135 F.4th at 1316 (describing an English "tradition of judicial involvement in child custody" dating back at least to the 1720s, which "softened" "the unassailable version of paternal rights").[9]

Much "like other rights," the interest in custody could "be forfeited by misconduct." *People v. Chegaray*, 18 Wend. 637, 643 (N.Y. Sup. Ct. 1836); *accord* Schouler, *supra* at 342; *Ex parte Crouse*, 4 Whart. 9, 11 (Penn. 1839) ("The right of parental control is a natural, but not an unalienable one."). At common law, and particularly in America, a father could lose custody if he "had abused the right, or there [were] an apprehension of cruelty, or some exhibition of profligacy, or want of ability to provide for his children." Kent, *supra* at 228. Among many grounds for extinguishing the "*prima facie*" interest in custody, one treatise listed "personal ill-

---

[9] On some accounts, the idea of the father's "paramount right" gained steam in the late 18th century but began to embarrass the English courts, leading to a statutory overhaul in 1839. *Mercein*, 25 Wend. at 104-05. In America too, the father's claim (especially over older children) was "superior" to that of the mother, but not if "it appear[ed] that the child would be exposed to cruelty or gross corruption." J. Kent, Commentaries on American Law 203 (10th ed. 1860).

usage to the child," failure to "educate the child," "delinquen[cy]," "injustice," "endanger[ing] the [child's] bodily or moral welfare," or other "considerations affecting the welfare of the children." R. H. TYLER, COMMENTARIES ON THE LAW OF INFANCY 277-79 (1882) (first ed. published 1868) (collecting cases); *accord* TIFFANY, *supra* at 249 (being "a drunkard, or a criminal, or cruel, or shiftless, or otherwise unfit") (footnotes omitted).

In some cases, the disqualifying fault was the parent's "vulgarity and obscenity," which risked moral "contamination" of the children. *Cocke v. Hannum*, 10 George 423, 441-42 (Miss. 1860); *see Chapsky*, 26 Kan. at 653 (finding "no case … in which the courts have given [custody] to the father who was a drunkard and a man of gross immoralities"); *In re Cuneen*, 17 How. Pr. 516, 516-17 (N.Y. Sup. Ct. 1859) (citing father's bad "temper" and lack of fatherly "affection"); *but see Demott v. Commonwealth*, 64 Pa. 302, 305 n.1 (1870) (mother not *so* "habitually profane and vulgar" or "vicious by disposition" as to require removing the child). In other cases, the father lost custody of his children because of the risk of repeated physical abuse. *See Boggs v. Boggs*, 49 Iowa 190, 192 (1878) (having whipped his children and struck his daughter with a hoe, father was "an unsuitable person to be intrusted [*sic*] with the government of children").

At a minimum, the historical record supports a rule that "gross misconduct," *People v. Turner*, 55 Ill. 280, 284-85 (1870), or "grossly immoral conduct" could

make a father "plainly disqualified for the proper discharge of parental duties," *Mercein*, 25 Wend. at 73; *State v. Richardson*, 40 N.H. 272, 274-75 (1860) (requiring "positive disqualification of the father," such as "clear and satisfactory proofs" of "grossly immoral conduct … or other cause").

For some courts, gross misconduct meant not just vulgarity or intemperance, but the kind of "wrong [that would] meet the condemnation of all decent and law-abiding people." *Lovell v. House of the Good Shepherd*, 9 Wash. 419, 422 (1894). Thus, a mother's unlawful second marriage did not "necessarily demonstrate depravity of heart or moral unfitness." *Jensen v. Jensen*, 170 N.W. 735, 736 (Wis. 1919). Likewise, a father who seemed guilty of "desertion and neglect" could no longer "stand on his mere legal rights as a father," but his temporary neglect was not conclusive. *Demott*, 64 Pa. at 305 n.1. Another court reserved judgment as to whether a father's "forfeiture" upon conviction for burglary "would under all circumstances be permanent." *Dumain v. Gwynne*, 10 Allen 270, 272-73 (Mass. 1865). Notwithstanding various outcomes in these cases, common-law courts seemed to agree that "conviction of certain felonies presumably do indicate moral unfitness of a parent." *Trawick v. Trawick*, 173 So. 2d 341, 343 (La. Ct. App. 1965).

**2.    Conviction for a child sex offense is the kind of gross misconduct that could extinguish the parent's interest in custody.**

As an initial matter, the Court need not reach whether a sex offense against a child would have been universally considered grossly immoral. It is enough to

36

recognize that common-law courts "exercised broad discretion" in custody disputes, *Lehman v. Lycoming Cnty. Children's Servs. Agency*, 458 U.S. 502, 517 (1982) (Blackmun, J., dissenting), and "judge[d] upon the circumstances of the particular case," *id.* at 517 n.1 (quoting *King v. Delaval*, 97 Eng. Rep. 913, 914 (K.B. 1763)). While the panel made this the touchstone of its historical analysis, even identifying a parent's "right to petition," *see infra* §I.C.3, the exercise of such broad discretion cuts *against* an objectively, deeply rooted right in cases of parental misconduct. Henry seems to posit a strange kind of right that "can be taken away so long as procedural due process is observed," a category the Supreme Court has never said "exists." *Munoz*, 602 U.S. at 911 (citing *Din*, 576 U.S. at 99 (plurality)).

Henry must prove more—*viz.*, that a man in his shoes would not just receive a hearing but that he would *win*. He has not identified one such case. The fact that courts *could* grant a father custody, despite his misconduct, "does not mean that anyone thought the States lacked the authority" to deny it. *Cf. Dobbs*, 597 U.S. at 253. The "history need not show that *every* felony" or *every* act of gross misconduct resulted in "forfeiture" in order for it to be true that "as a matter of constitutional authority," the government had the "power to regulate." *Duarte*, F.4th at 758.

If the Court seeks a historical analogue for Section 11(d)(4), it should find one in the gross-misconduct standard. A man convicted of a sex offense against children falls within the set of parents who historically could lose their parental rights. Such

offenses establish a rare proclivity and willingness to violate children for one's "own perverse pleasure." *Irey*, 612 F.3d at 1199. Children entrusted to such parents "would be exposed to cruelty or gross corruption" of the most vile sort. KENT, *supra* at 203. In centuries past, a father's "indulgence" of "lusts," exhibiting the "impurity and pollution of his mind," could make him unfit even "if they do not prove the licentiousness of his conduct." *Noel v. Noel*, 24 N.J. Eq. 137, 140-42 (Ch. 1873) (discussing "obscene pictures and books … of the worst conceivable kind, such as the law prohibits, and such as a mind of ordinary intelligence and virtue must instinctively recoil"). Unlike other violations of law, sex crimes, especially against children, *do* "stamp" a parent "as an unfit person to bring up her child." *Jensen*, 170 N.W. at 736. In other words, this "categor[y] of persons … present[s] a special danger of misuse" of the right to custody. *Dubois*, 139 F.4th at 892.

The danger is present for an offender convicted of "knowingly possess[ing], or knowingly access[ing] with intent to view … material that contains an image of child pornography" transported in interstate commerce. 18 U.S.C. §2252A(a)(5)(B). Child pornography  "is intrinsically related to the sexual abuse of children." *New York v. Ferber*, 458 U.S. 747, 759 (1982). For Henry to consume child pornography, "[y]oung children were raped in order to enable [its] production." *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007). "Every instance of viewing images of child pornography represents … a repetition of their abuse." Adam Walsh Child

Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. §2251 note). "Child pornography harms and debases the most defenseless of our citizens." *United States v. Williams*, 553 U.S. 285, 307 (2008). Participation in this abuse is gross misconduct and exhibits a perverse appetite to victimize children. *See* DE86-11:6; DE86-8:7.

To downplay the risk by describing a criminal like Henry as a "hands-off offender … reflects considerable naivete about the amount of deviance (including hands-on abuse) that goes undetected" and ignores that those arrested for child pornography have "substantially" the same motive as "those arrested for hands-on abuse." U.S. Dep't of Justice, *Offender Psychology* at 7 (2023), justice.gov/d9/2023-06/offender_psychology_2.pdf; *see id.* at 20 ("[B]etween 55% and 85% of CSAM offenders have committed undetected hands-on offenses[.]"); DE86-15:51. "No one collects, distributes, or repeatedly views" child pornography because of "curiosity"; they do it to satisfy a "sexual drive[]." Offender Psychology at 6, 19.

The "risk of recidivism" is "frightening and high." *McKune v. Lile*, 536 U.S. 24, 33-34 (2002). Within five years of release, between "9.2% to 46% of child-pornography offenders will commit another sex offense," 135 F.4th at 1308. *See* DE86-11 at 18-19. 93% of recorded sexual abuse is committed by someone who knew the victim; 60% occurs in the victim's home or the home of someone the victim

knows; and 20% of convicted sex offenders abuse biologically related and non-related victims. DE86-18:151; DE86-11:24.

Would the Founders have recognized that such a father has a "fundamental" right so "deeply rooted" in history and tradition that it is "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist" if he could not live with his children? *Glucksberg*, 521 U.S. at 720-21. It's doubtful. From the start of the Colonial Era through Reconstruction, sexual crimes were met with diverse and severe punishments. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 975 (1991) (rape, statutory rape, and sodomy were punishable by death). "Puritan jurisprudence … h[el]d men accountable for sexual transgression" even against "the lowliest members of society." L. Ulrich, *John Winthrop's City of Women*, 3 MASS. HIST. REV. 19, 38 (2001); *see id.* at 41 (describing execution for soliciting adultery).

Because a sex crime *against a child* is even "more inhuman and unnatural in itself," *Massachusetts v. Roosnell*, 8 N.E. 747, 750 (1886), Massachusetts capitally punished "fornication" with a girl under ten years of age, THE COLONIAL LAWS OF MASSACHUSETTS, *supra* at 22; *accord* 4 W. BLACKSTONE COMMENTARIES ON THE LAWS OF ENGLAND 212 (1769) ("abominable wickedness"); *see also Lawrence v. Texas*, 539 U.S. 558, 569 (2003) (19th-century sodomy prosecutions often targeted

"relations between men and minor[s]")[10] It is "difficult to conclude that the public, in 1791 [or in 1868], would have understood someone facing death … to be within the scope" of a fundamental constitutional right to raise and live with his child. *C.f. Medina*, 913 F.3d at 158; *Duarte*, 137 F.4th at 756 ("Certainly, if the greater punishment of death … was permissible to punish felons, then the lesser restriction of permanent disarmament is also permissible.").

### 3. There is no substantive due process right for convicted child sex offenders "to petition courts for relief."

Henry argued at the panel stage that "[t]he right at issue in this case is the right of *parents* to the 'care, custody, and control' of their children," Red.Br.16, and the panel agreed and applied strict scrutiny as a result of that framing. But in rejecting Alabama's *Glucksberg* argument, the panel canvassed much of the history and drew from it "the following principle: government can remove children from parents who pose a danger to them, but parents enjoy the right to petition courts for relief, to prove that they are no longer a danger to their children, and to show that returning the children to their custody is in the children's best interest." 135 F.4th at 1322.

---

[10] In New Amsterdam, sodomizing a boy was punished with death, and statutory rape with "flogging and banishment." M. Adin, *'I Shall Beat You, So That the Devil Shall Laugh at It': Children, Violence, and the Courts in New Amsterdam*, *in* CHILDREN IN COLONIAL AMERICA 97, 99 (Marten ed., 2007). In Pennsylvania, a married man could be castrated and divorced for sodomy or bestiality; a single man guilty of the same "could be confined to prison for life and whipped every three months." J. W. FROST, THE QUAKER FAMILY IN COLONIAL AMERICA 185-86 (1973).

However attractive an individualized judicial process might be as a policy, it cannot satisfy the *Glucksberg* test. There is no substantive due process right to certain procedures for a convicted child sex offender to regain custody of his child.

First, there's no precedent supporting a substantive right to individualized judicial review, which would break new ground and require its own *Glucksberg* analysis. While it is true that common-law courts adjudicated custody case-by-case, that is far from demonstrating a historic and traditional right to petition. The "right of parental control" was never "excepted" from "the subjects of ordinary legislation; and it consequently remain[ed] subject to the ordinary legislative power." *Ex parte Crouse*, 4 Whart. at 11. Even in the absence of codified rules, courts endeavored "as far as practicable, to be regulated by settled rules and admitted principles." *Baird v. Baird*, 21 N.J. Eq. 384, 388 (N.J. 1869). Alabama's codification of one particular principle is not different in kind.

To take just one early statute, Massachusetts in 1866 authorized officials to intervene due to "neglect, crime, drunkenness, or other vice of parents," which threatened to lead a child to an "idle and dissolute li[fe]."[11] That law's successor was upheld as constitutional two decades later. *See Farnham v. Pierce*, 6 N.E. 830, 831 (Mass. 1886). Of course, in many cases, the fact of the father's misconduct would

---

[11] J. E.B. Myers, *A Short History of Child Protection in America*, 42 Fam. L. Q. 449, 450 (2008).

be adjudicated in the custody proceeding. Some courts would say the "gross misconduct" must be "clearly proved." *People v. Turner*, 55 Ill. 280, 284-85 (1870); *see, e.g.*, *State v. Paine*, 23 Tenn. 523, 530-31 (1843) (father complaining that "although misconduct is imputed to [him], there is nothing proved against him"); *id.* at 537 (court agreeing that he was "not shown to be disqualified, either morally or physically"). But Henry is not like those merely accused in a civil custody dispute; we already have "clear and satisfactory proofs" of his "grossly immoral conduct," *Richardson*, 40 N.H. at 274-75, for he has been convicted of a felony sex offense involving a child. Alabama has codified a rule that applies *only* to those who have already had an opportunity to be heard on the key fact and *only* to those whose acts "demonstrate depravity of heart [and] moral unfitness," *Jensen*, 168 N.W. at 736. Henry has not shown a deeply rooted right to more than that.

Moreover, there is nothing unusual about the Legislature codifying its judgment that conviction of a child sex offense is disqualifying. Legislatures regularly make predictive judgments based on the "mere fact of conviction," 135 F.4th at 1313, such as mandatory sentences or the attachment of life-long consequences for the right to vote or the right to bear arms. Courts may assess "the adequacy of the 'fit' between the classification and the policy that the classification serves," *Michael H.*, 491 U.S. at 121 (plurality), but substantive due process does not demand that these questions always be placed in the hands of judges or an

administrative board. There is no constitutional or historical reason to believe that a judge's prediction in a given case will necessarily be superior to that of the Legislature. *See, e.g.*, *T.D. v. Patton*, 868 F.3d 1209, 1217 (10th Cir. 2017) (describing therapist recommendation to court that child be placed with father who then sexually abused child).

Accordingly, many States have developed caselaw or statutory law supporting termination of parental rights proper upon "convict[ion] of particularly serious offenses." P. M. Genty, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis*, 30 J. FAM. L. 757, 782 (1991). By their "nature," certain "crimes such as child molestation," "rape and armed robbery," and "the murder of one's own child" "support a rational inference of parental unfitness." *Matter of Pima Cnty., Juvenile Action Nos. S-826 and J-59015*, 643 P.2d 736, 738 (Ariz. Ct. App. 1982) (collecting cases from Arizona, California, and Illinois). By the late 20th century, at least "Illinois, Indiana, Iowa, Louisiana, Maine, New York, Oklahoma, and Tennessee all ha[d] statutes that permit[ted] termination of rights on the basis of crimes in which a child was the victim." Genty, *supra* at 782-86 (footnotes omitted); *see also* IND. CODE §31-35-3-4 (1997) (certain crimes are grounds to move for termination of parental rights); MISS. CODE §93-15-121(h)(i) (2017) (certain crimes against children may be grounds for termination). Though other States may adopt other procedures, *see* 135

44

F.4th at 1312-14, they continue to recognize that crimes against children raise serious concerns about a parent's fitness. *See, e.g.*, *In re C.R.C.*, 450 P.3d 1169, 1176 (Utah Ct. App. 2019) ("possessing child pornography is prima facie evidence of unfitness"); *In re Welfare of Child of M.Z.*, No. 27-JV-17-5407, 2019 WL 2167826 *4 (Minn. Ct. App. 2019) (possession of child pornography "satisfies a statutory basis for termination"); *see also* WIS. STAT. §48.415(9m)(a)-(am) (2018); *id.* §948.051 (2018); MO. ANN. STAT. §210.117(1) (2017).

### D. Section 11(d)(4) satisfies any level of scrutiny because sex offenders who target children cannot safely reside with children.

**1.** The residency restriction has a rational basis. "A statute is considered constitutional under the rational basis test when there is any reasonably conceivable state of facts that could provide a rational basis for it." *Moore*, 410 F.3d at 1346 (citation modified). Preventing known child sex offenders from living with children rationally advances the State's "primary governmental interest of protecting … children." Ala. Code §15-20A-2(5). "It is well established that states have a compelling interest in 'safeguarding the physical and psychological wellbeing of … minor[s].'" *Eknes-Tucker*, 80 F.4th at 1225 (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020)). Henry has not overcome the "'strong presumption of validity.'" *Id.* at 1224 (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993)).

**2.** The law also satisfies strict scrutiny. The law does not classify parents based on a factor the Supreme Court has deemed arbitrary—like marital status or mere

biology. Nor does it rely on just any criminal history. Rather, the law targets precisely "those who have already proven themselves" to be threats to *child* safety. *Cf. Dubois*, 139 F.4th at 902 (Abudu, J., concurring).

While the panel never seriously disputed that Alabama's interests are advanced by §11(d)(4)'s application to child rapists or traffickers, it was doubtful about its application to child pornography offenders. That was a mistake. Possession of child pornography indicates pedophilia, which is a robust risk factor for sexual abuse of children. *See* Statement §B. While anonymous clinical surveys reveal that only 0.6% of the population ever indicates a sexual interest in children, DE86-11:13-14, *every* child pornography offender has victimized children to satiate that deviant desire. An estimated range of "up to 85%" of child pornography offenders have committed contact offenses, DE86-15:51, and as many as half of them will commit another sex crime within five years of release. A review of 47 studies involving 35,572 sex offenders established that one in five sex offenders abuse both related and non-related victims. DE86-11:24-25.

A State cannot be confident that an offender is no longer attracted to children, that it even knows how many children he has victimized, or that he would not harm his own children. *Cf.* DE86-14:33-36. If a man sexually abuses his child once, the child will be harmed forever. Alabama should not be required to predict recidivism perfectly or else leave the safety of children to a "coin flip." 135 F.4th at 1308.

The district court's hypothetical about a 19-year-old convicted for possessing photographs of his 16-year-old girlfriend is not a real concern. DE150:13. "Over half (52.2%) of non-production child pornography offenses in fiscal year 2019 included images or videos of infants or toddlers, and nearly every offense (99.4%) included prepubescent victims."[12] Moreover, the "median amount" of "illegal images" in a child pornographer's possession is over 4,000—far from a few images of a girlfriend. 135 F.4th at 1280 n.1. The statute should not be deemed overinclusive based on extreme possibilities.

Nor is §11(d)(4) meaningfully underinclusive. Though Alabama does not bar offenders from all access to minors, day-time visitation can be controlled by the other (presumptively fit) parent. *Troxel*, 530 U.S. at 68. Moreover, a "State need not address all aspects of a problem in one fell swoop," but can focus on areas where "the State's compelling interest is implicated most directly." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449-50 (2015).

If the Court applies strict scrutiny, it should not "make it nearly impossible to sustain common-sense regulations" when the "actual … safety" of children is at stake. *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1162 (11th Cir. 2025) (Wilson, J., concurring). But that would be the tandem effect of the panel's over- and under-

---

[12] U.S. Sentencing Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* at 4 (2021), www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

inclusiveness analysis. The panel criticized the law as underinclusive for allowing theoretically "unsupervised" visitation for "four hours" on "two consecutive days and nine aggregate days per month." 135 F.4th at 1309. But can there be any doubt that if the State had reduced that access even further, the charge would be overinclusiveness instead? Likewise, if the law afforded only "some individualized determinations" to "child-pornography-only offenders," *id.* at 1308, 1311, would that be overinclusive (for excluding some others) or underinclusive for conceivably letting some "who are in fact a danger" to slip through? *Id.* at 1309.

Because no one can predict precisely who will re-offend, any law, even one involving the state judiciary, must use certain information as a "proxy," and nothing close to "perfect tailoring" is possible. 135 F.4th at 1307-08. Section 11(d)(4) broadly bars convicted child sex offenders from *living* with children but permits a father some daytime *visitation* "as an attempt to balance the competing interests at stake in this difficult area of family law." *Id.* at 1311. Should the Court find a burden on Henry's constitutional rights, it should sustain the legislature's balancing act because "the weighty interests served … are sufficient to justify the limited effect." *Cf. Buckley v. Valeo*, 424 U.S. 1, 29 (1976).

## II.    Henry Is Not Entitled to Facial Relief.

To procure a facial injunction, Henry had "the burden of proving that the law could never be applied in a constitutional manner." *DA Mortg., Inc. v. City of Miami*

*Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007). "[T]he strict 'no set of circumstances' test is the proper standard for evaluating a facial challenge." *Am. Fed'n of State, Cnty. & Mun. Emp. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013). The panel correctly held that Henry fell short of his "lofty burden." 135 F. 4th at 1328.

First, "the law isn't facially unconstitutional because it applies to non-parental relatives," including any "grandparent, stepparent, sibling, or stepsibling," who "may not have [the same] constitutional interest in living with a child relative as Henry does." *Id.* at 1327. Not everyone with "a biological link" to the child has the same liberty interests or rights. *Id.* (quoting *Lehr*, 463 U.S. at 261). "Under common law principles, grandparents lacked any legal right to visitation and communication with their grandchildren if such visitation was forbidden by the parents." *Ex parte Bronstein*, 434 So. 2d 780, 782 (Ala. 1983); *see also, e.g.*, *Doe v. Rausch*, 648 F. Supp. 3d 925, 950-51 (W.D. Tenn. 2023) (rejecting substantive due process challenge to law preventing sex offenders from living with their stepchildren).

Not every parent has a "significant" or "developed" relationship with the child, *Lehr*, 463 U.S. at 261-62, and not every "established parental relationship" is worthy of the same legal protection, *Michael H.*, 491 U.S. at 123. *Accord United States v. Myers*, 426 F.3d 117, 128 (2d Cir. 2005) (remanding to determine whether sex offender's "relationship with his son [was] sufficiently established to merit constitutional protection"). Surely the father has no cognizable interest in a

relationship with a child he conceived through rape. *See* DE131:3-6 (listing statutes that terminate rights in that scenario).

Because §15-20A-11(d)(4) may be constitutionally applied to numerous sex offenders with various biological and nonbiological family connections to minors, it is facially constitutional. If the Court should decide that Henry is entitled to summary judgment on his claim, the resulting injunctive relief "should be limited in scope to the extent necessary to protect [his] interests." 135 F.4th at 1327-28. "A facial injunction would require [the Court] to speculate 'about the law's coverage and its future enforcement' and wade into complex constitutional issues when the facts of this case do not require it." *Id.* at 1328.

Second, if Henry succeeds on the ground that his conviction suggests no "more than a coin flip" that he will commit a contact offense, 135 F.4th at 1308, or some other rationale that applies to child pornography offenders in particular, the law should be sustained against facial attack because it applies to contact offenders *known* to be violent to children. Under ASORCNA, a "sex offense involving a child" includes any sex offense against a child under 12 years old *or* any offense "involving child pornography." Ala. Code §15-20A-4(27). When assessing the facial constitutionality of §11(d)(4), the court must assess the rights of offender parents "who trafficked and raped children," not simply the hypothetical 19-year-old and his 16-year-old girlfriend. DE150:13. The district court reduced the valid sweep of the

50

law to nil, despite conceding that "some sex offenses involving a minor, such as the child sex trafficker or serial offender, merit the statute's lifetime restriction." *Id.* If the court agreed that enforcement in those circumstances would be constitutional, its injunction should not have enjoined all enforcement.

Third, the district court abused its discretion when it entered an injunction "unnecessarily broad in scope." *Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1205 (11th Cir. 2009). "[F]ederal courts lack authority to issue" "universal injunctions." *Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025). A court's "remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford,* 585 U.S. 48, 73 (2018), and should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022). "[A]ny remedial benefit extended to others is typically collateral." *Id.* at 1304.

The district court violated these principles. Henry's injuries stem from his inability to live with his son. An injunction prohibiting Defendants from enforcing §15-20A-11(d)(4) against him—and him alone—would "redress" that "particular injury," *Gill*, 585 U.S. at 73, making a remedy for anyone else "[un]necessary" for "complete relief." *Georgia*, 46 F.4th at 1303 (citation modified). "Here, prohibiting enforcement of [§11(d)(4)] against [Henry] will give [him] complete relief:" he would be able to live with his son. *Trump*, 606 U.S. at 852-53. "Extending the

51

injunction to cover all other similarly situated individuals would not render h[is] relief any more complete." *Id.* at 853. The district court was wrong to declare Alabama Code §15-20A-11(d)(4) "stricken" in its entirety. DE150:2.

## CONCLUSION

The Court should reverse the grant of summary judgment in favor of Henry and remand with direction to enter summary judgment in favor of Appellants on Henry's facial and as-applied challenges. At a minimum, this Court should remand and direct the district court to limit its injunction to Henry alone.

Respectfully submitted,

Steve Marshall
  *Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*

Robert M. Overing
  *Deputy Solicitor General*

Dylan Mauldin
George Muirhead
  *Assistant Solicitors General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300

*Counsel for Appellants Attorney General*
*Marshall and District Attorney Webb*

53

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) as it contains 12,970 words, excluding those parts exempted by FED. R. APP. P. 32(f).

I further certify that this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and the type style requirements of FED. R. APP. P. 32(a)(6), as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

> _s/_ Edmund G. LaCour Jr.
> Edmund G. LaCour Jr.
>   *Solicitor General*
>
> STATE OF ALABAMA
> OFFICE OF THE ATTORNEY GENERAL
> 501 Washington Avenue
> Montgomery, Alabama 36130-0152
> (334) 242-7300
> Edmund.LaCour@AlabamaAG.gov
>
> *Counsel for Appellants Attorney General*
> *Marshall and District Attorney Webb*

54

## CERTIFICATE OF SERVICE

I certify that, on October 8, 2025, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.

*Counsel for Appellants Attorney General Marshall and District Attorney Webb*