No. 24-10139

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

BRUCE HENRY,

*Plaintiff-Appellee,*

v.

RON ABERNATHY, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:21-cv-797

---

## EN BANC BRIEF OF APPELLEE BRUCE HENRY

---

Paul M. Dubbeling
P.M. Dubbeling, PLLC
210 North Columbia Street
Chapel Hill, NC 27514
(919) 635-6005
Paul.Dubbeling@pmdubbeling.com

Algert S. Agricola, Jr.
Barbara H. Agricola
Agricola Law, LLC
127 South 8th Street
Opelika, AL 36801
(334) 759-7558
al@agricolalaw.com
barbara@agricolalaw.com

Elaine J. Goldenberg
Jeremy S. Kreisberg
Nicole R. Allicock
Munger, Tolles & Olson LLP
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Elaine.Goldenberg@mto.com
Jeremy.Kreisberg@mto.com
Nicole.Allicock@mto.com

*Counsel for Appellee Bruce Henry*

*Bruce Henry v. Attorney General of Alabama, et al.*, No. 24-10139

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3, the undersigned counsel certifies that the following persons and entities may have an interest in the outcome of this case:

1. Abernathy, Rob (Defendant-Appellant; Sheriff, Tuscaloosa County)

2. Adams, Magistrate Judge Jerusha T. (U.S. District Court, Middle District of Alabama)

3. Agricola, Jr., Algert S. (Attorney for Henry)

4. Agricola, Babara H. (Attorney for Henry)

5. Agricola Law LLC (Attorneys for Henry)

6. Albea, Stuart D. (Attorney for Abernathy)

7. Allicock, Nicole (Attorney for Henry)

8. American Civil Liberties Union of Alabama (Amicus Curiae)

9. American Civil Liberties Union of Georgia (Amicus Curiae)

10. Children's Rights (Amicus Curiae)

11. Davis, James W. (Attorney for Webb and Marshall)

12. Dolan, Krista (Attorney for Amicus Curiae)

13. Dubbeling, Paul M. (Attorney for Henry)

14. Goldenberg, Elaine J. (Attorney for Henry)

15. Harris, Andrew Reid (Former Attorney for Webb and Marshall)

16. Henry, Bruce (Plaintiff-Appellee)

17. Huffaker, Jr., Hon. Judge R. Austin (U.S. District Court, Middle District of Alabama)

*Bruce Henry v. Attorney General of Alabama, et al.*, No. 24-10139

18.     Juvenile Law Center (Amicus Curiae)

19.     Kreisberg, Jeremy S. (Attorney for Henry)

20.     LaCour, Jr., Edmund G. (Former Attorney for Webb and Marshall)

21.     Levick, Marsha L. (Attorney for Amicus Curiae)

22.     Marshall, Steve (Defendant-Appellant; Alabama Attorney General)

23.     Mauldin, Dylan (Attorney for Webb and Marshall)

24.     McDuffie, Eliza J. (Attorney for Amici Curiae)

25.     McKay, Charles A. (Attorney for Webb and Marshall)

26.     Mink, Richard D. (Attorney for Webb and Marshall)

27.     Muirhead, George (Attorney for Webb and Marshall)

28.     Munger, Tolles & Olson LLP (Attorneys for Henry)

29.     National Center for LGBTQ Rights (Amicus Curiae)

30.     Overing, Robert M. (Attorney for Webb and Marshall)

31.     Parental Rights Foundation (Amicus Curiae)

32.     P.M. Dubbeling, PLLC (Attorneys for Henry)

33.     Seiss, Benjamin M. (Attorney for Webb and Marshall)

34.     Southern Poverty Law Center (Amicus Curiae)

35.     The Gault Center (Amicus Curiae)

36.     United Family Advocates (Amicus Curiae)

37.     Webb, Hays (Defendant-Appellant)

38.     Youth MOVE National (Amicus Curiae)

Undersigned counsel further certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

*Bruce Henry v. Attorney General of Alabama, et al.*, No. **24-10139**

Date: November 7, 2025

Respectfully submitted,

*s/ Jeremy S. Kreisberg*
Jeremy S. Kreisberg
Munger, Tolles & Olson LLP
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Jeremy.Kreisberg@mto.com

*Counsel for Appellee Bruce Henry*

## STATEMENT REGARDING ORAL ARGUMENT

In its en banc briefing notice of September 8, 2025, this Court stated that oral argument will be held during the week of February 9, 2026.  CA11.Doc.63-1 at 2.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ...........................................iv

INTRODUCTION ..........................................................................................1

STATEMENT OF THE ISSUE.........................................................................3

STATEMENT OF THE CASE...........................................................................3

    A.    Legal and Factual Background....................................................3

    B.    Procedural History...................................................................7

STANDARD OF REVIEW ............................................................................12

SUMMARY OF ARGUMENT .......................................................................12

ARGUMENT ..............................................................................................14

I.    HENRY HAS A FUNDAMENTAL RIGHT TO RESIDE WITH HIS SON. ...............................................................................................14

    A.    Henry's Fundamental Right to Reside with His Son Is Firmly Established in Binding Supreme Court Precedent. ...........................15

    B.    This Court Should Reject Alabama's Effort to Redefine the Protection of Parental Rights...............................................................19

II.    ALABAMA'S CATEGORICAL DENIAL OF HENRY'S RIGHT TO RESIDE WITH HIS SON IS SUBJECT TO STRICT SCRUTINY. ...........30

    A.    Supreme Court Precedent Demands Strict Scrutiny for Categorical Denials of Parental Rights. ...............................................31

    B.    History and Tradition Do Not Support Section 11(d)(4). ...................35

III.    THE ALABAMA RESIDENCY RESTRICTION FAILS STRICT SCRUTINY. ......................................................................................47

    A.    Section 11(d)(4) Is Not Narrowly Tailored to Dangerous Offenders. ..................................................................................48

    B.    Less Restrictive Alternatives Can Achieve the State's Compelling Interest. .........................................................................52

CONCLUSION ...........................................................................................54

v

# TABLE OF CONTENTS
## (Continued)

**Page**

CERTIFICATE OF COMPLIANCE.........................................................................55

CERTIFICATE OF SERVICE ...............................................................................56

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*Arnold v. Board of Education*,
880 F.2d 305 (11th Cir. 1989) ..................................................24, 26

*Catholic Charities Bureau v. Wisconsin Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025)...................................................................47

*Department of State v. Munoz*,
602 U.S. 899 (2024)......................................................14, 15, 47, 52

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022)................................... 18, 22, 25, 26, 29, 35, 39, 47

*Doe v. Miller*,
405 F.3d 700 (8th Cir. 2005) .................................................28

*Doe v. Moore*,
410 F.3d 1337 (11th Cir. 2005) ...............................................27, 28

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)...............................................................17, 18

*Eknes-Tucker v. Governor of Alabama*,
80 F.4th 1205 (11th Cir. 2023) ...........................................16, 23, 31

*Elliott v. City of Athens*,
960 F.2d 975 (11th Cir. 1992) ................................................18

*Foote v. Ludlow School Committee*,
128 F.4th 336 (1st Cir. 2025)..................................................24

*Hillcrest Prop., LLP v. Pasco Cnty*,
915 F.3d 1292 (11th Cir. 2019) ..............................................25

*Jones v. Governor of Florida*,
975 F.3d 1016 (11th Cir. 2020) ...............................................23

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ...............................................23

*Lehr v. Robertson*,
    463 U.S. 248 (1983).........................................................................................20

*Littlejohn v. Sch. Bd. of Leon Cnty.*,
    132 F.4th 1232 (11th Cir. 2025) ....................................................................25

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
    358 F.3d 804 (11th Cir. 2004) .......................................................................47

*Lyng v. Castillo*,
    477 U.S. 635 (1986).......................................................................................30

*McGuire v. Marshall*,
    512 F. Supp. 3d 1189 (M.D. Ala. 2021) ..........................................................4

*McKune v. Lile*,
    536 U.S. 24 (2002).........................................................................................51

*Meyer v. Nebraska*,
    262 U.S. 390 (1923).................................................................................15, 17

*Michael H. v. Gerald D.*,
    491 U.S. 110 (1989).........................................................................20, 21, 33

*Moore v. City of East Cleveland*,
    431 U.S. 494 (1977).......................................................................16, 17, 18, 22

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022).................................................................30, 35, 36, 42, 44

*Obergefell v. Hodges*,
    576 U.S. 644 (2015).......................................................................................24

*Parham v. J.R.*,
    442 U.S. 584 (1979).................................................................3, 26, 27, 29

*Parks v. City of Warner Robins*,
    43 F.3d 609 (11th Cir. 1995) .........................................................................18

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925).................................................................15, 26, 39

*Prince v. Massachusetts*,
321 U.S. 158 (1944) ....................................................................... 15

*Quilloin v. Walcott*,
434 U.S. 246 (1978) ................................................................... 22, 33

*Richardson v. Ramirez*,
418 U.S. 24 (1974) ........................................................................ 23

*Richmond v. Badia*,
47 F.4th 1172 (11th Cir. 2022) ....................................................... 12

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984) ....................................................................... 17

*Santosky v. Kramer*,
455 U.S. 745 (1982) ................................................................ 3, 33, 34

*Skinner v. Oklahoma ex rel. Williamson*,
316 U.S. 535 (1942) ....................................................................... 46

*Smith v. Organization of Foster Families*,
431 U.S. 816 (1977) ....................................................................... 18

*Stanley v. Illinois*,
405 U.S. 645 (1972) ...................................... 13, 15, 23, 24, 31, 32, 33, 52, 53

*Troxel v. Granville*,
530 U.S. 57 (2000) ................................................................ 3, 16, 22, 26

*Turner v. Safley*,
482 U.S. 78 (1987) ......................................................................... 46

*United States v. Bear*,
769 F.3d 1221 (10th Cir. 2014) ....................................................... 27

*United States v. Caniff*,
916 F.3d 929 (11th Cir. 2019) ......................................................... 30

*United States v. Duarte*,
137 F.4th 743 (9th Cir. 2025) ......................................................... 47

*United States v. Dubois*,
  139 F.4th 887 (11th Cir. 2025) ........................................................46

*United States v. Jimenez-Shilon*,
  34 F.4th 1042 (11th Cir. 2022) .......................................................23

*United States v. Kebodeaux*,
  570 U.S. 387 (2013).........................................................................51

*Washington v. Glucksberg*,
  521 U.S. 702 (1997).................................................................15, 16

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972).................................................................16, 39

STATE CASES

*A.H. v. State*,
  949 So. 2d 234 (Fla. Dist. Ct. App. 2007) ......................................49

*Matter of A.J.*,
  2023 WL 4056326 (Ind. Ct. App. 2023) .........................................44

*In re Addison R.*,
  989 N.E.2d 224 (Ill. Ct. App. 2013) ...............................................44

*Matter of Adoption of Z.M.J. v. C.J.*,
  365 So. 3d 273 (Miss. Ct. App. 2020).............................................45

*In re Amanda D.*,
  811 N.E.2d 1237 (Ill. App. Ct. 2004), *aff'd sub nom. In re D.W.*,
  827 N.E.2d 466 (Ill. 2005)..............................................................34

*Baird v. Baird*,
  21 N.J. Eq. 384 (1869)....................................................................36

*Boggs v. Boggs*,
  49 Iowa 190 (1878).........................................................................40

*Chapsky v. Wood*,
  26 Kan. 650 (1881).........................................................................40

*In re Christopher J.*,
2017 WL 5992359 (Tenn. Ct. App. Dec. 4, 2017) ..............................................44

*Cincinnati House of Refuge v. Ryan*,
37 Ohio St. 197 (1881) ........................................................43

*Cochran v. State*,
111 So. 3d 148 (Ala. Crim. App. 2012)..............................................49

*Cocke v. Hannum*,
10 George 423 (Miss. 1860) ........................................................39, 40

*Commonwealth v. Briggs*,
33 Mass. 203 (1834) ........................................................36

*Cook v. Cook*,
1 Barb. Ch. 639 (N.Y. Ch. 1846)..............................................38

*In re Cuneen*,
17 How. Pr. 516 (N.Y. Sup. Ct. 1859)..............................................40

*In re D.P.D.*,
144 P.3d 202 (Okla. Civ. App. 2006) ........................................................44, 45

*Demott v. Commonwealth*,
64 Pa. 302 (1870)..............................................38

*Dumain v. Gwynne*,
92 Mass. 270 (1865) ..............................................45

*In re Ellie R.R.*,
2012 WL 3205577 (Wis. App. Aug. 9, 2012) ..............................................45

*In re Evelyn A.*,
169 A.3d 914 (Me. 2017)..............................................44

*Ex parte Sharp*,
96 P. 563 (Idaho 1908) ..............................................43

*Farnham v. Pierce*,
6 N.E. 830 (Mass. 1886) ..............................................43

*In re Gach*,
    889 N.W.2d 707 (Mich. 2016)............................................................34

*Gishwiler v. Dodez*,
    4 Ohio St. 615 (1855) ......................................................................37

*In re Goodenough*,
    19 Wis. 274 (1865) ..........................................................................38

*Herring v. State*,
    100 So. 3d 616 (Ala. Crim. App. 2011)............................................35

*In Int. of Q.G.*,
    911 N.W.2d 761 (Iowa 2018) ..........................................................44

*Int. of E.G.*,
    683 S.W.3d 261 (Mo. 2024) ............................................................44

*Jensen v. Jensen*,
    170 N.W. 735 (Wis. 1919)...............................................................38

*Matter of Juv. No. J-2255*,
    613 P.2d 304 (Ariz. Ct. App. 1980)..................................................44

*In re Kelley*,
    25 N.E. 615 (Mass. 1890) ................................................................37

*Kelsey v. Green*,
    37 A. 679 (Conn. 1897) ...................................................................37

*Kent K. v. Bobby M.*,
    110 P.3d 1013 (Ariz. 2005) .............................................................45

*In re Knowack*,
    53 N.E. 676 (N.Y. 1899)............................................................38, 42

*In re Kyle M.*,
    2002 WL 1414286 (N.Y. Fam. Ct. June 7, 2002) ............................44

*Lovell v. House of the Good Shepherd*,
    37 P. 660 (Wash. 1894) ...................................................................37

*Mercein v. People ex rel. Barry*,
   25 Wend. 64 (N.Y. 1840) ...................................................................40

*Mill v. Brown*,
   88 P. 609 (Utah 1907)...............................................................43, 47

*Milwaukee Indus. Sch. v. Milwaukee Cnty. Supervisors*,
   40 Wis. 328 (1876) ...................................................................43

*Noel v. Noel*,
   24 N.J. Eq. 137 (Ch. 1873) ...................................................41

*People ex rel. O'Connell v. Turner*,
   55 Ill. 280 (1870) ...........................................................24, 43

*People v. Hollins*,
   2012 IL 112754.........................................................................49

*Prescott v. State*,
   19 Ohio St. 184 (1869) ...........................................................43

*S.M.O. v. Dep't of Child. & Fams.*,
   357 So. 3d 773 (Fla. Dist. Ct. App. 2023) .........................34

*State ex rel. A.C.M.*,
   221 P.3d 185 (Utah 2009)......................................................44

*State ex rel. Bethell v. Kilvington*,
   45 S.W. 433 (Tenn. 1898).......................................................43

*State ex rel. Herrick v. Richardson*,
   40 N.H. 272 (1860) ...........................................................40, 41

*State ex rel. Sharpe v. Banks*,
   25 Ind. 495 (1865) ...................................................................36

*State In Int. of J.S.*,
   238 So. 3d 600 (La. App. 4 Cir. 2018) ...............................44

*Striplin v. Ware*,
   36 Ala. 87 (1860) ...........................................................38, 42

*Sturtevant v. State*,
19 N.W. 617 (Neb. 1884) .............................................................36, 37

*T.D.K. v. L.A.W.*,
78 So. 3d 1006 (Ala. Civ. App. 2011) ................................................35

*In re Terry E.*,
225 Cal. Rptr. 803 (Cal. Ct. App. 1986)............................................44

*Trawick v. Trawick*,
173 So. 2d 341 (La. Ct. App. 1965)...................................................45

*Verser v. Ford*,
37 Ark. 27 (1881)...............................................................................36

*Weir v. Marley*,
12 S.W. 798 (Mo. 1890) ....................................................................40

*Matter of Welfare of Child of S.B.G.*,
981 N.W.2d 224 (Minn. Ct. App. 2022), *aff'd*, 991 N.W.2d 874
(Minn. 2023) ......................................................................................44

STATE STATUTES

Ala. Code § 13A-12-190(2) .................................................................5

Ala. Code § 13A-12-192(b) .................................................................5

Ala. Code § 15-20A-4(20) .................................................................49

Ala. Code § 15-20A-4(27) ...................................................................5

Ala. Code § 15-20A-11(d) ...........................................................3, 4, 5

Ala. Code § 26-1-6(b) ........................................................................35

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ........................................................23, 28

U.S. Const. amend. XIV, § 2 ..............................................................23

xiv

## OTHER AUTHORITIES

Brief of Amici Curiae State of Montana, *Foote v. Ludlow Sch. Comm.*, No. 25-77 (U.S. Aug. 21, 2025) ........................................................25

Holly Brewer, *Apprenticeship Policy in Virginia: From Patriarchal to Republican Policies of Social Welfare*, *in* Children Bound to Labor (2009) ...........................................................................................39

43 C.J.S. Infants § 28 .....................................................................4

43 C.J.S. Infants § 31 .....................................................................4

Peggy Cooper Davis, *Neglected Stories: The Constitution and Family Values* (1997) ...............................................................................19

Phillip Genty, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis*, 30 J. Fam. L. 757 (1991) ...........................................44

Chris Gottlieb, *The Enduring Vitality of* Meyer *and* Pierce *Post-*Dobbs, 100 Notre Dame L. Rev. 101 (forthcoming 2025)....................19, 36, 37

James Schouler, A Treatise on the Law of Domestic Relations (2d. ed. 1874) ...............................................................................37

**INTRODUCTION**

Fourteen years ago, Bruce Henry was arrested for possession of child pornography. He pled guilty and served his time in prison. Upon reentering the community, Henry built a productive life. He received counseling, he found stable employment, and he became a volunteer at his church. He also started a family. Henry married Jennifer and they had a baby boy. Henry's son is now four years old. Since the day his son was born, Henry has been a loving and devoted father.

But Henry is barred by law from living in the same home as his son. In Alabama, any adult convicted of a child-pornography offense may never reside with his own minor child. The law contains no exceptions or avenues for relief. It is categorical and permanent. And it applies regardless of the nature of the offense or any other mitigating factor. Even a college freshman who is convicted for receiving explicit images from his high-school girlfriend would be barred for life from living with his future child. Alabama is the only state in the country with a law of that kind.

Soon after his son was born, Henry filed this lawsuit. He argued that the Alabama law violates the Due Process Clause because it infringes his fundamental right as a parent to live with his child. The district court agreed and enjoined Alabama from enforcing its law. A three-judge panel of this Court unanimously affirmed the injunction as applied to Henry.

1

Alabama now asks the en banc court to hold otherwise. In the State's view, sex offenders cannot invoke the fundamental rights of parents because historically in certain circumstances courts used a parent's "misconduct" (including vulgarity and shiftlessness) as a factor in deciding custody disputes between spouses. To the State, it does not matter that every qualified expert in this case has determined that Henry poses no risk to his son. It is enough that Henry committed a child-pornography offense in the past. That fact, according to the State, places him outside the Constitution's protections of parental rights and leaves him vulnerable to all manner of state regulation. He could be forced to send his son to state-selected schools, or to submit his son to state-selected medical care, or to permanently leave his son's home, and he would have no constitutional recourse.

This Court should reject that shocking contention. The Supreme Court has made clear, repeatedly and recently, that *parents* have a fundamental right to live with their children. That right is deeply rooted in this Nation's history and tradition; indeed, the drafters of the Fourteenth Amendment were determined to protect it. Alabama's novel decision to categorically deprive all child-pornography offenders of that longstanding right is an extreme historical anomaly. Alabama has not identified any law in the period surrounding the Fourteenth Amendment that comes close to resembling the law at issue here. To the contrary, the historical record shows that courts in the nineteenth century insisted on reviewing all of the circumstances

2

of a case when adjudicating parental rights. Alabama's law thus cannot stand unless it survives strict scrutiny—and it cannot. The law is egregiously overbroad and fails to use an obvious, less restrictive alternative: the system of individualized review used by every other state.

If Henry lived anywhere else in the country, he would be free to return home to his wife and son. The Constitution does not permit Alabama to decide otherwise.

## STATEMENT OF THE ISSUE

The issue is whether Ala. Code § 15-20A-11(d)(4) is constitutional under the Due Process Clause as applied to Bruce Henry.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

1. "[T]he interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized" by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). That interest is based not only on parents' "freedom of personal choice in matters of family life," *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), but also on the law's "historical[] … recogni[tion] that natural bonds of affection lead parents to act in the best interests of their children," *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

States have thus struck a careful "balance" between the rights of parents and the compelling interest in protecting children. *Santosky*, 455 U.S. at 769. They

allow courts to terminate parental rights, but only after a finding that the parent is "unfit" to care for the child and that termination of parental rights is in "the best interests of the child," 43 C.J.S. Infants § 31, taking into account "a wide range of facts and evidence," *id.* § 28. States do not categorically ban certain groups of parents—whether sex offenders or otherwise—from living with their children. Indeed, with only one exception, every "state in the country gives [sex] offenders the chance to prove that they do not pose a danger to their child or that it is in the child's best interest to live with them." Panel.Op. 73.

Alabama is the lone exception. The Alabama Sex Offender Registration and Community Notification Act (ASORCNA) is "the most comprehensive and debilitating sex-offender scheme in the nation." *McGuire v. Marshall*, 512 F. Supp. 3d 1189, 1198 (M.D. Ala. 2021). In addition to residence restrictions that mirror other state laws, ASORCNA prohibits adult sex offenders from residing with *their own minor child* in statutorily defined circumstances. Ala. Code § 15-20A-11(d)(1)-(5). As Alabama has acknowledged, "[a]side from ASORCNA, it does not appear that Alabama has ever statutorily limited parents' contact or ability to live with their own children based on the fact of a conviction or another single fact." DE131:1. Nor is Alabama "[]aware of any statute enacted by another state substantially similar" to ASORCNA. DE150:6.

4

ASORCNA lists five circumstances in which a parent who committed a sex offense may not live with their minor child. Four of them are not at issue here. Those are where the offender's parental rights "have been or are in the process of being terminated"; the offender was convicted of a sex offense against a minor relative; the offender was convicted of a sex offense against a minor with whom he or she resided; or the offender was convicted of a sex offense against a minor involving "forcible compulsion." Ala. Code § 15-20A-11(d)(1), (2), (3), (5).

The fifth circumstance, which is at issue here, is set forth in Section 11(d)(4)—a catchall covering all *other* situations in which an "adult sex offender has been convicted of any sex offense involving a child." *Id.* § 15-20A-11(d)(4). Alabama law defines a "sex offense involving a child" to include "any offense involving child pornography." *Id.* § 15-20A-4(27).

Section 11(d)(4) casts a wide net. It covers *all* child pornography offenders— even an 18-year-old who receives intimate images from his 17-year-old girlfriend. *See* Ala. Code § 13A-12-192(b) (pornography offense to possess "child sexual abuse material"); *id.* § 13A-12-190(2) ("child sexual abuse material" includes sexual images of persons "under 18 years of age"). It applies regardless of any individual risk assessment. And it applies for life, with no mechanism to petition for relief.

2. Bruce Henry is among those covered by Section 11(d)(4); it prohibits him from living with his four-year-old son. Fourteen years ago, Henry was arrested for

5

possessing videos and photographs of young girls that he downloaded from the Internet. DE86-2:13. He pled guilty to one count of possessing child pornography and served a five-year sentence. DE150:3. Henry has never been arrested or convicted of any other crime, sexual or otherwise, and he has had no sexual contact with a minor in his adult life. DE62:16 (polygraph); DE86-2:13, 28 (testimony).

Henry was released in 2018 to begin a 60-month term of supervised release. DE150:3. That term was extended by 36 months due to Henry's unauthorized use of the Internet in 2019. DE86-22. While on supervised release, Henry successfully completed a qualified Sex Offender Treatment Program, DE86-11:8, he also attends weekly Sex Addicts Anonymous meetings, DE86-2:10, and has maintained the same job for more than four years, DE86-2:8.

Henry has also started a family. In 2019, Henry and his wife, Jennifer, got married. DE86-3:18. Two years later, Jennifer gave birth to their son. DE150:3. He is now four years old. Henry's conditions of supervised release expressly state that he is not barred from having "unsupervised, one-to-one contact" with his child. DE86-20:5. Nor has his family expressed any concerns about him doing so, DE86-3:27; to the contrary, Jennifer has testified that she wants "to live with Bruce in [her] home" with their son, DE86-3:6. Only ASORCNA prevents him from doing so.

### B.   Procedural History

1.   a.   Shortly after his son's birth, Henry sued Appellants (collectively, "Alabama" or "the State") in their official capacities.   DE1:6.   He claimed that Section 11(d)(4) violates the Due Process Clause, the Equal Protection Clause, and the First Amendment.   Alabama moved to dismiss and Henry moved for a preliminary injunction.   DE20, 30.   The district court denied both motions.   DE61, 62.   As to Henry's motion, the court determined that he could not carry his heavy burden to "disrupt the status quo," DE62:28, as the court had "heard no testimony from Henry, his wife, or his probation officer, which create[d] a significant evidentiary gap at this early stage of the litigation," DE62:30-31.

b.   The parties cross-moved for summary judgment based on a more comprehensive record.   In addition to testimony from Henry and his wife, Henry relied on testimony from four experts with expertise in recidivism by sex offenders and in risk-assessment tools:  Dr. Hersh, Dr. Burkhart, Mr. Wells, and Dr. Helmus.

Their testimony overwhelmingly showed that a conviction for possession of child pornography does not itself suggest any meaningful risk of committing a future offense involving physical contact with a minor.   According to Hersh, "[s]tudies of American samples indicate that between 1 and 2 percent of child pornography offenders are later charged or convicted for a contact sexual offense."   DE86-9:5. Burkhart agreed that "[o]nly a very small percentage of people convicted of a child

7

pornography offense (1%-2%) will later go on to commit a contact sexual offense." DE86-4:9. Helmus likewise found that, for offenders who have committed only child-pornography offenses, their rate of committing future contact offenses is 1.4%. DE86-8:7. Strikingly, that figure is no higher than "a reasonable estimate of arrest or conviction for sexual offending *among non-sex offenders*." DE86-8:14 (emphasis added).

The expert testimony further showed that the likelihood of recidivism depends on a variety of factors. Burkhart identified ten specific factors that are relevant to assessing risk of recidivism, including marital status, criminal history, and rehabilitation. DE86-4:8-9. Also critical is the amount of time that has passed since a person's offense. Helmus explained that "[r]isk of sexual recidivism roughly halves for every 5 years that the individual is sex-offense free in the community." DE86-8:13. The evidence further showed that, for almost all sex offenders, after ten years of living offense-free in the community the risk of sexual recidivism is *indistinguishable* from the risk of a sexual crime by a *non-sex offender*. DE101-14.

The experts also assessed Henry's individual risk profile. Wells explained that "Henry does not represent a risk of harm to his minor child if allowed to live with him." DE86-6:3; *see* DE86-7:3 ("zero risk"). Henry received low scores on risk assessment measures and presents "even a lower risk than those scores" because he completed a sex-offender treatment program, participates in counseling, has

stable employment, and is in a committed relationship.  DE86-6:3-4.  Burkhart

likewise determined that "Henry has none of the[] known risk increasing factors,"

DE86-4:9, and that Henry's ultimate risk of committing a contact offense is "less

than one percent," DE86-15:46.  He added that Henry's likelihood of "developing

[a] sexual interest in his own child is practically nil," considering that Henry's child

is male.  DE86-4:9.  Helmus added that "it is reasonable to conclude that the risk of

a contact sexual offense posed by Mr. Henry may not be appreciably different from

the general population of men, or of nonsex offenders."  DE86-8:32.

The State, for its part, relied almost solely on the testimony of Dr. DeLisi, a

researcher in criminology.  In a prior case, DeLisi testified that he is "not a sex

offender researcher per se."  DE62:23.  The district court thus determined that DeLisi

could testify about "risk factors for crime" at a "high level of generality," but was

"not qualified to assess or perform psychological evaluations of individuals or to

opine about Henry individually."  DE62:23-24.  Perhaps owing to his lack of

expertise, much of DeLisi's testimony was irrelevant or wrong.  For instance, DeLisi

testified that the "dark figure of sexual crime is substantial meaning that most

offenders without official criminal history or prior convictions for contact sexual

offen[ses] nevertheless have perpetrated such acts."  DE86-11:22.  But DeLisi relied

on self-reporting of pre-conviction conduct for all sex offenders to arrive at that

conclusion.  DE86-11:20-24.  He therefore ultimately conceded that his "dark

figure" testimony was "not about recidivism." DE86-13:5. By contrast, as DeLisi was forced to acknowledge, a study he relied on recognizes that child-pornography-only offenders have a low rate of contact sexual offenses, which "remains true even based on confidential self-reporting in a relationship of trust." DE86-13:41.

Even taking DeLisi's testimony at face value, he largely agreed with Henry's experts. For instance, DeLisi acknowledged that it is extremely unlikely that a child-pornography-only offender will recidivate with a sexual contact offense. *See* DE86-11:18 (specifying a 3% recidivism rate); DE86-13:39 (acknowledging the Bureau of Prisons classifies *zero* child-pornography-only offenders as "high risk" and only 3% as "moderate risk"). DeLisi agreed that a wide range of factors are relevant to an individual's risk of recidivism—including criminal history, marital status, and employment—and that he would need "a full criminal file" to do a "valid risk assessment." DE86-13:8-9, 35-36, 40. DeLisi did not dispute that the risk of recidivism decreases substantially over time and ultimately becomes indistinguishable from that of the general population. DE86-13:30-33. And neither he nor any other State expert provided a qualified, individualized assessment of Henry to rebut the findings of Burkhart, Helmus, and Wells that Henry does not pose a risk to his son.[1]

---

[1] The only other expert put forward by the State was Dr. Scurich, who criticized some (though not all) of the risk assessment tools used by Henry's experts. The

c.  The district court granted Henry's motion for summary judgment on his due process claim, dismissed his other claims as moot, and denied the State's motion for summary judgment.  DE150:18.  The court concluded that Section 11(d)(4) is subject to strict scrutiny because it substantially burdens Henry's fundamental right to reside with his son.  DE150:11.  Applying that scrutiny, the court concluded that the law is not narrowly tailored—indeed, its "overbreadth" is "breathtaking."  DE150:13.  The court therefore held that Section 11(d)(4) is facially unconstitutional and enjoined Alabama from enforcing it.  DE150:18.

d.  A three-judge panel of this Court unanimously affirmed as applied to Henry.  Like the district court, the panel held that Henry has a fundamental right to reside with his son and that Section 11(d)(4) substantially burdens that right.  The panel reviewed our history and found that Section 11(d)(4) is a historical "outlier."  Panel.Op. 81.  It determined that Section 11(d)(4) could not survive strict scrutiny because it is overinclusive, underinclusive, and not the least restrictive alternative because Alabama could allow individualized review, as "every other state in the country" does.  Panel.Op. 73.  The panel last held that the district court was wrong

---

State introduced that testimony after it became clear that DeLisi had previously endorsed one of the risk assessment tools used by Henry's experts.  DE86-13:38. Even still, Scurich acknowledged the validity of risk assessments using clinical judgment.  DE86-14:10-11.

to facially enjoin Section 11(d)(4) because the analysis may be different as applied to "non-parental relatives." Panel.Op. 107.

This Court ordered rehearing en banc.

## STANDARD OF REVIEW

This Court reviews a "grant of summary judgment *de novo*, viewing all the evidence, and drawing all reasonable factual inferences, in favor of the nonmoving party." *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022) (citation omitted).

## SUMMARY OF ARGUMENT

Section 11(d)(4) is unconstitutional as applied to Bruce Henry—a parent who is barred from living with his four-year-old son despite undisputed record evidence that he presents no danger to him whatsoever.

I.  Henry has a fundamental right to reside with his son.  For more than a century, the Supreme Court has recognized that parents have a fundamental right, protected by the Due Process Clause, to establish a home and raise children.  That includes the right of parents to reside with their children.  The Supreme Court has repeatedly recognized that right as fundamental.  And it is firmly grounded in this Nation's history and tradition, including because the framers of the Fourteenth Amendment were determined to end the horrors of family separations that enslaved persons had suffered.

12

The State contends that Henry is seeking an extension of Supreme Court precedent, and that the right he actually asserts is one of *sex offenders* to reside with their children. Neither argument is correct. The State's cited cases are clear that *parents* may invoke parental rights, and there is no dispute that Henry qualifies as a parent under the law. Likewise, a proper description of Henry's asserted right is the one the Supreme Court has already articulated: the right of a *parent* to reside with his child. Alabama's contrary argument contravenes established precedent, is inconsistent with Alabama's arguments in other parental-rights cases, and would invite courts to engage in judicial policymaking by adopting broad rights definitions when they like an asserted right and narrow rights definitions when they do not.

II. Strict scrutiny applies because Section 11(d)(4) directly and substantially infringes Henry's right to reside with his son. The application of strict scrutiny follows directly from *Stanley v. Illinois*, 405 U.S. 645 (1972), which holds that overbroad, categorical infringements on parental rights cannot be sustained when a state could further its interest in protecting children in a less restrictive manner—including through a procedure for individualized review. The State appeals to history and tradition, but Section 11(d)(4) finds no support in this Nation's history of regulating parental rights. Around the time of the Fourteenth Amendment, courts insisted upon particularized review of present parental fitness and the child's best interest, including in circumstances in which the parent had engaged in misconduct

or otherwise violated a criminal law.  The State identifies no law from that time period that even remotely resembles Section 11(d)(4).

III.  Section 11(d)(4) fails strict scrutiny as applied to Henry.  The law is not narrowly tailored.  It applies to all child-pornography offenders, regardless of the nature of the offense.  It applies categorically, despite consensus record evidence establishing that child-pornography-only offenders commit future contact sex crimes at a rate of 3% or less.  And it ignores the many factors that all experts in this case acknowledge are critical to assessing risk—including criminal history, time living offense-free in the community, and stability at home.  Alabama could further its compelling interest in protecting children through the less restrictive means used by every other state—an individualized assessment of parental fitness and the best interests of the child.  Alabama need not choose between keeping families together and keeping children safe.  Individualized assessments do both.[2]

## ARGUMENT

## I.    HENRY HAS A FUNDAMENTAL RIGHT TO RESIDE WITH HIS SON.

The Due Process Clause "provides heightened protection against government interference with certain fundamental rights."  *Department of State v. Munoz*, 602

---

[2] Consistent with this Court's en banc briefing notice, this brief focuses on Henry's as-applied due process challenge.  It does not ask this Court to revisit the panel's determination related to facial relief.

U.S. 899, 910 (2024) (citation omitted).  The Supreme Court has cautioned that the "utmost care" must be exercised before "'break[ing] new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed" into judicial "policy preferences." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citation omitted).  But this case breaks no new ground.  It rests on unequivocal, longstanding Supreme Court precedent recognizing that parents have a fundamental right to reside with their children.

### A. Henry's Fundamental Right to Reside with His Son Is Firmly Established in Binding Supreme Court Precedent.

1. The Supreme Court has consistently recognized that the right of parents to control the care and custody of their children is fundamental.  More than a century ago, the Court held that the Fourteenth Amendment protects the right to "establish a home and bring up children"—a right "long recognized at common law as essential to the orderly pursuit of happiness." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534 (1925).  The Court reaffirmed that protection time and again throughout the twentieth century.  *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (right to "raise one's children" is even "more precious" than "property rights" (citations omitted)).

15

The protection of parental rights has held firm even as the modern Court has applied a more demanding standard for Fourteenth Amendment protections. In *Washington v. Glucksberg*, 521 U.S. 702 (1997), the Court recognized that "the 'liberty' specially protected by the Due Process Clause includes" the right to "direct" the "upbringing of one's children." *Id.* at 720 (citations omitted). Three years later, the Court classified "the interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by th[e] Court" and concluded that it "cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 65-66 (plurality); *see id.* at 80 (Thomas, J., concurring). After all, "the institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality). The "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972).

2. It is likewise beyond debate that "the general right" of parents "to 'make decisions concerning the care, custody, and control of [their] children' includes" the specific right asserted here: the right of parents to reside with their children. *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1221 (11th Cir. 2023). The early

16

parental-rights cases made that clear. They recognized the right of parents to "establish a home and bring up children." *Meyer*, 262 U.S. at 399. The Court's decision in *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), removed any doubt. That decision struck down a housing ordinance that restricted which family members could live together. The plurality understood the parental-rights cases as recognizing "the rights of parents to the custody and companionship of their own children," thereby restricting the government's ability to "intrude[] on choices concerning family living arrangements." *Id.* at 499-501. The plurality concluded that "the force and rationale of these precedents" applies to the "choice" of family members to live together, and that any other result would require "clos[ing one's] eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause." *Id.* at 501.

Since *Moore*, the Court has repeatedly reaffirmed that parents have a fundamental right to live with their children. In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Court echoed the conclusion reached by the *Moore* plurality that "cohabitation with one's relatives" receives "constitutional protection" because it "attend[s] the creation and sustenance of a family." *Id.* at 619. In *Dolan v. City of Tigard*, 512 U.S. 374 (1994), the Court read *Moore* as holding that an ordinance may violate the Due Process Clause if it "intrude[s] on choices concerning family

17

living arrangements." *Id.* at 391 n.8.  And just three years ago, the Court in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), confirmed that *Moore* recognized the "right to reside with relatives"—a right that has not been "undermine[d]" in "any way." *Id.* at 256-57.[3]

This right endures because, like the broader set of parental rights, the specific right of parents to reside with their children is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Id.* at 231 (citation omitted). *Moore* itself is clear on that point.  In recognizing the right to reside with family members, the *Moore* plurality applied and defended a history-and-tradition test—explaining that "an approach grounded in history" plays the important role of "impos[ing] limits on the judiciary." 431 U.S. at 505 n.12 (plurality).  The right to reside meets that test, according to *Moore*, "precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Id.* at 503 (plurality); *see also Smith v. Organization of Foster Families*, 431 U.S. 816, 844 (1977) (explaining that the "importance of the familial relationship" is based on the "emotional attachments that derive from the intimacy of daily association"); Panel.Op. 23-24.

---

[3] This Court has likewise recognized the right of parents to live with their children. *See, e.g.*, *Elliott v. City of Athens*, 960 F.2d 975, 981 (11th Cir. 1992); *Parks v. City of Warner Robins*, 43 F.3d 609, 614 n.3 (11th Cir. 1995).  So too have its sister circuits. *See* Panel.Op. 31-32.

The history surrounding the ratification of the Fourteenth Amendment confirms the wisdom of that conclusion. The Reconstruction Congress was "deeply affected by widely publicized accounts of parental separations" that had "result[ed] from sale or other reallocations" of enslaved people. Peggy Cooper Davis, *Neglected Stories: The Constitution and Family Values* 99, 112 (1997). Congress was "determined" that such "usurpations of family rights would not survive emancipation," and so "constitutionalized with the Fourteenth Amendment" the "rights of family." *Id.* at 115. Protection of the right against family separation was "directly linked to the abolition of slavery," as it was seen as an element of true citizenship. Chris Gottlieb, *The Enduring Vitality of* Meyer *and* Pierce *Post*-Dobbs, 100 Notre Dame L. Rev. 101, 138 (forthcoming 2025). Accordingly, to those who ratified the Fourteenth Amendment, the rights of a family to remain together were "understood" as "liberty and property interests." Davis, *supra*, at 116-17.

### B.  This Court Should Reject Alabama's Effort to Redefine the Protection of Parental Rights.

Despite the overwhelming authority recognizing a right of parents to reside with their children, Alabama insists that Henry has no such right. In the State's view, Henry's case "demands an extension of parental-rights precedent," Br.15, thus requiring this Court to begin anew with a careful description of Henry's asserted right, Br. 14. And that description, in Alabama's view, must include the "fact of

Henry's conviction for a sex offense." Br.19. Each step in the State's analysis is wrong.

1. Henry's case does not "break new ground," Br.14; it demands only the straightforward application of binding Supreme Court precedent. Alabama's argument to the contrary (Br. 15-19) rests on two cases that have nothing to do with this one.

The first, *Lehr v. Robertson*, 463 U.S. 248 (1983), wrestles with who qualifies as a "parent" for constitutional purposes. *Lehr* addresses a parental-rights claim by the "putative father" of a child who was not married to the child's mother at the time of birth. *Id.* at 250. The Court denied the putative father's claim because he "never had any significant custodial, personal, or financial relationship" with the child and had failed to avail himself of a "special statutory scheme to protect [an] unmarried father's interest." *Id.* at 262-63. That is far afield from this case. Henry was married to his wife when she gave birth to their son, and he has been fighting in court for the right to reside with his son since he was fifteen weeks old.

The second case, *Michael H. v. Gerald D.*, 491 U.S. 110 (1989), only underscores the Constitution's protection of a "marital family" like Henry's. *Id.* at 124 (plurality). Like *Lehr*, *Michael H.* concerns a parental-rights claim by an unmarried, putative father—only this time the child's mother was married to a different man at the time of birth. The Court was thus forced to confront competing

20

claims of parental rights: "to *provide* protection" to the putative father would "*deny* protection" to the marital father. *Id.* at 130. In that circumstance, the Court refused to constitutionalize the interests of the putative father because doing so would intrude on the "historic respect … traditionally accorded to the relationships that develop within the unitary family." *Id.* at 123. The Court explained that "our traditions have protected the marital family"—the married couple and "the child they acknowledge to be theirs"—without according any such "special protection" to the relationship urged by the putative father. *Id.* at 124. The Court's resolution of the dispute in *Michael H.* precisely aligns with Henry's claim. Henry is not only the undisputed, sole father of his son, but his claim seeks to protect the ability of his "marital family" to live as one.

Alabama nevertheless tries to draw a broader lesson from these cases—that "not all parents" have parent-based constitutional rights, Br.16, and so Henry necessarily seeks to "extend precedent" to establish *his* parental rights, Br.19. But Alabama draws the wrong lesson. Those cases make clear that, before a person may invoke the fundamental rights of *parents*, that person must qualify *as a parent* under the law. In *Lehr*, the putative father had not taken the basic steps needed to so qualify, and in *Michael H.*, the putative father could not so qualify because the law recognized another man as the child's father. *See Michael H.*, 491 U.S. at 118 (refusing to allow "dual fatherhood"). Those individuals lacked constitutional

21

protection not because of their "conduct" as parents, Br.16, but because they were not parents at all for constitutional purposes.

Alabama thus receives no assistance from *Lehr* and *Michael H*. Those cases address a question (who is a parent?) antecedent to the question here: whether Henry, as the *undisputed* father of his son, has a fundamental right to reside with him. Binding caselaw dictates the answer to that question; it need not be "exten[ded]" (Br.14) to decide this case.

2. In all events, the State is wrong that the "fact of Henry's conviction" must be included in a careful description of Henry's liberty interest. Br.19. Such a description must, instead, carefully follow Supreme Court precedent. The Court has already decided who can invoke the fundamental rights of parents. The answer is "parents." *Troxel*, 530 U.S. at 65-66 (plurality); *id.* at 80 (Thomas, J., concurring); *see Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("[T]he relationship between parent and child is constitutionally protected."). The Court has also addressed what the general rights of parents specifically include. They include, as relevant here, the "right to reside" with one's children. *Dobbs*, 597 U.S. at 256 (citing *Moore*, 431 U.S. 494). The law is thus clear that parents have a fundamental right to reside with

22

their children.  Henry's claim rests on the precise description of his liberty interest already captured in binding precedent.[4]

a. Abiding by that description is consistent with both law and logic.  It accords with the text of the Due Process Clause, which protects "person[s]"—without any exception for those who have committed certain crimes.  U.S. Const. amend. XIV, § 1; *cf. United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) ("dangerous felons" are "indisputably part of 'the people'" protected by the Second Amendment).[5]  It avoids conflating whether a person has a right with whether a state may permissibly place limits on it.  *See Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting) (it would be "unusual" for a person's rights to be "in one day and out the next").  It is consistent with parental-rights cases from both the Supreme Court and this Court.  *See, e.g.*, *Stanley*, 405 U.S. at 650 (protecting the

---

[4] This case is thus the opposite of *Eknes-Tucker*, where this Court rejected a parental-rights claim because "there is no binding authority that indicates that the general right to 'make decisions concerning the care, custody, and control of [one's] children' includes the right to give one's children puberty blockers and cross-sex hormone treatment."  80 F.4th at 1221 (citation omitted).  Here, binding authority is clear that the general right of parents concerning care and custody includes the specific right to reside with their children.

[5] The text of the Due Process Clause distinguishes this case from Fourteenth Amendment claims challenging felon disenfranchisement laws.  *Contra* Br. 27-28.  The text of the Fourteenth Amendment specifically recognizes that states may "abridge[]" the right to vote of those who "participat[ed] in rebellion" or committed "other crime[s]."  *Richardson v. Ramirez*, 418 U.S. 24, 41-43 (1974) (quoting U.S. Const. amend. XIV, § 2); *accord Jones v. Governor of Florida*, 975 F.3d 1016, 1029 (11th Cir. 2020).  Nothing of that sort appears in the Due Process Clause.

rights of a "parent," not an unwed father); *Arnold v. Board of Education*, 880 F.2d 305, 312 (11th Cir. 1989) (protecting the rights of a "parent," not a parent with a pregnant child). And it is consistent with other fundamental-rights precedent, which makes clear that fundamental rights should not be "defined by who exercised them in the past." *Obergefell v. Hodges*, 576 U.S. 644, 671 (2015); *see id.* ("*Loving* did not ask about a 'right to interracial marriage'; *Turner* did not ask about a 'right of inmates to marry'; and *Zablocki* did not ask about a 'right of fathers with unpaid child support duties to marry.'").

The First Circuit applied similar logic in another parental-rights case earlier this year. In *Foote v. Ludlow School Committee*, 128 F.4th 336 (1st Cir. 2025), parents challenged a school policy that required staff to use a student's requested name and gender pronouns without notifying the parents. As here, the court confronted the appropriate level of generality for describing the parents' rights. The court carefully reviewed rights descriptions in "the Supreme Court's parental rights cases" and decided to define parental rights precisely as the Supreme Court had, rather than "to define the right at issue with microscopic granularity." *Id.* at 348.

Strikingly, in that case (and others like it), Alabama has agreed that parental rights should *not* be defined more narrowly than the Supreme Court has described them. At the certiorari stage of *Foote*, Alabama expressly warned against "narrowly defin[ing] the asserted right not as the long-recognized and fundamental parental

24

right to make decisions concerning the care, custody, and control of their children but as the unduly specific right to 'consent prior to [a school] recognizing and referring to [a child's] preferred gender.'"  Brief of Amici Curiae State of Montana et al. at 20, *Foote v. Ludlow Sch. Comm.*, No. 25-77 (U.S. Aug. 21, 2025).  That is irreconcilable with Alabama's argument here—that the Court must "focus on the statutorily prohibited conduct to define the asserted right."  Br.21.

The State's shifting positions reveal the danger of its approach.  When Alabama likes a proffered parental right, it urges a broad definition.  When Alabama dislikes a proffered parental right, it urges a granular definition.  Playing with rights definitions in this way risks the very problems with substantive due process that some members of this Court have feared:  it invites a court to "simply read into the Constitution its own view of good government."  *Hillcrest Prop., LLP v. Pasco Cnty*, 915 F.3d 1292, 1306 (11th Cir. 2019) (Newsom, J. concurring in the judgment). After all, rights definitions are "infinitely malleable—and thus manipulable," *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1280 (11th Cir. 2025) (Newsom, J., concurring), so if a court is inclined to think a right *should* exist it can define it broadly, and vice versa.  The only principled approach that avoids the risk of "freewheeling judicial policymaking," *Dobbs*, 597 U.S. at 240, is one that strictly abides by the rights definitions the Court has already articulated —rather than one that "recast[s]" the asserted right in each case, Br.20.

25

Even were the State consistent in its definitional approach, it would still be wrong.  Under the State's approach, essentially every parental-rights case would founder at the fundamental-rights stage—despite the Court's statement in *Dobbs* that parental-rights cases remain good law.  For instance, parents could not challenge government policies that coerce their children into receiving certain medical treatments or concealing information about those treatments, absent a history and tradition specific to parents in that particular situation.  *Contra Arnold*, 880 F.2d at 312 ("a parent's constitutional right to direct the upbringing of a minor is violated when the minor is coerced to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion").  Still closer to this case, if a state determined that any group of criminal offenders could no longer reside with their children, the targeted parents would have no recourse.  *See* Br. 31 (faulting Henry for not showing a history specific to "someone *like him*").  A state could even make *non-criminal* conduct a basis for separating families.

In fact, if targeted groups of parents could not show a history and tradition specific to them, they could not assert *any* parental rights.  States could force those parents to send their children to state-selected schools, *contra Pierce*, 268 U.S. at 534-35, or to permit visitation by state-selected officials, *contra Troxel*, 530 U.S. at 67-75, or to submit their children to state-selected medical care, *contra Parham*, 442

26

U.S. at 603. All of that has been unthinkable since the Founding. All of it has been barred by the Supreme Court. Yet all of it would be licensed by the State's approach.

This Court's sister circuits have avoided that outcome by consistently holding that sex offenders (like any other group of parents) have fundamental parental rights. *See, e.g.*, *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. 2014) (scrutinizing restrictions on sex offender's "contact with his own children" in light of a father's "fundamental liberty interest in maintaining his familial relationship with his [children]" (citation omitted)); Panel.Op. 47 (more citations). Rather than thrust itself into a one-against-many split, this Court should align itself with the prevailing and correct view of the law.

   b. The State's arguments do not come close to justifying its approach.

The State's lead argument (Br.19-20) is that its approach is required by this Court's decision in *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005). That decision addresses a substantive-due-process challenge to Florida's Sex Offender Act, which requires publication of certain personal information about sex offenders. In that context, this Court described the right at issue as "the right of a person, convicted of 'sexual offenses,' to refuse" such publication. *Id.* at 1344.

That rights description in no way dictates the proper description here. *Doe* is not a parental-rights case governed by binding precedent, so (unlike here) this Court needed to craft a new description of the liberty interest it would examine. And in

27

doing so, this Court had no choice but to include the plaintiffs' sex-offender status in the description, because the plaintiffs were seeking to avoid a publication that would brand them *as sex offenders*. That logic has no application here. Nothing about Henry's argument turns on the fact that he was convicted of a sex offense, and so it is straightforward to describe his right without any mention of that fact. Henry is seeking the same right to reside with his son as *any* parent would have.

The remainder of *Doe* confirms that it is consistent with Henry's argument. *Doe* dismisses concerns that the Florida law would indirectly burden the plaintiffs' "family relationships," *not* because sex offenders lack family-based constitutional rights, but because the law "did 'not restrict plaintiffs' freedom of action with respect to their families.'" *Id.* at 1345 (citation omitted). The Court likewise cited with approval (*see id.* at 1344 n.5) the Eighth Circuit's decision in *Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005). That case held that prohibiting sex offenders from residing within 2,000 feet of sensitive locations does not infringe their right to reside with family, but critically it did so *not* because sex offenders lack such a right (as the State urges here), but instead because—unlike here—"nothing in the statute limits who may live with the [plaintiffs] in their residences." *Id.* at 710.[6]

---

[6] This case is also different from the State's other purported examples of rights that have been described by reference to "one's status." Br. 28. Those examples show that some rights are limited to U.S. citizens under the Constitution, *see, e.g.*, U.S. Const. amend. XIV, §1, while others are limited to adults due to the commonsense

The State next warns that its approach is necessary to avoid "abstract philosophical" rights descriptions that would encompass non-fundamental rights. Br.20. It is true that fundamental rights cannot be defined at such a "high level of generality" that they would encompass rights without "any claim to being deeply rooted in history." *Dobbs*, 597 U.S. at 257; *see id.* (rejecting "right to autonomy" because it would sweep in "illicit drug use" and "prostitution"). But this case presents no such problem. Henry's claim is based not only on parental rights that have long been recognized by the Supreme Court, but on an even more specific "right to reside" with one's family that the Court has repeatedly and recently reaffirmed. *Id.* at 256; *contra* Br.26 (asserting that panel embraced a "loose description[] that [has] since fallen out of favor"). The right to reside with one's children does not sweep in a set of non-fundamental rights. It is described at the precise level of generality that captures no more than is at stake in this case, and no less than history and tradition demand.

The State last insists that Henry's approach would make "irrelevant" any "historical tradition of relevantly similar regulation." Br. 26 (citation omitted). That is false. Alabama is free to defend Section 11(d)(4) by attempting to "demonstrate"

---

notion that children may lack "maturity, experience, and capacity for judgment," *Parham*, 442 U.S. at 602. Those examples provide no support for the State's position here.

that it is "consistent with this Nation's historical tradition of [residence] regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). The problem for Alabama is not that its historical argument is irrelevant, but that it is contrary to precedent and wrong. *See* Part II, *infra*.

*    *    *

There is good reason to be cautious in extending substantive due process to encompass new rights. But no such extension is necessary to conclude that the Due Process Clause protects the fundamental right of parents to reside with their children. A raft of binding precedent says just that. This Court's job is "take the law as [it] find[s] it." *United States v. Caniff*, 916 F.3d 929, 941 (11th Cir. 2019) (Newsom, J., concurring in part and dissenting in part). This Court should thus reaffirm that Henry has a fundamental right to reside with his son.[7]

## II.  ALABAMA'S CATEGORICAL DENIAL OF HENRY'S RIGHT TO RESIDE WITH HIS SON IS SUBJECT TO STRICT SCRUTINY.

Alabama does not dispute that, to the extent Henry has a fundamental right to reside with his children, Section 11(d)(4) "directly and substantially" infringes that right. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (citation omitted). And for good reason: the law permanently bars Henry from residing with his son, on pain of

---

[7] If the Court reaches a different outcome on the fundamental-rights question, the appropriate course is to vacate and remand for further proceedings so that Henry can press his remaining claims, which the district court has not yet resolved.

criminal punishment. *See* Panel.Op. 33-38. Typically that would mean strict scrutiny applies. *See Eknes-Tucker*, 80 F.4th at 1220. Alabama nevertheless argues that its law should not be held to that standard. The State claims, based on purported adherence to history and tradition, that it may declare certain parents unfit to live with their children, categorically and permanently, subject only to rational-basis review. *See* Br.30-45. That argument fails for two reasons. First, it is contrary to precedent requiring heightened review of categorical withdrawals of parental rights. Second, it gets the history backwards; in reality, Section 11(d)(4) is an extreme historical outlier without support in the traditions of this Nation.

## A.    Supreme Court Precedent Demands Strict Scrutiny for Categorical Denials of Parental Rights.

The State invites this Court to find a history and tradition supporting broad regulatory discretion over parental rights, but this Court is not writing on a blank slate; the Supreme Court has already determined that categorical denials of parental rights are subject to strict scrutiny. The lead case is *Stanley v. Illinois*, 405 U.S. 645 (1972). Peter and Joan Stanley had three children but did not marry. Upon Joan's death, Peter lost custody of his children under an Illinois law that made "the children of unwed fathers become wards of the State upon the death of the mother." *Id.* at 646. Peter brought a due process challenge, and the Supreme Court agreed the law could not stand. The Court recognized that the state sought to protect the "welfare"

31

and "safety" of children by ensuring they not remain with "unfit" parents. *Id.* at 652. The Court nevertheless held the law unconstitutional because it applied categorically, "without a hearing designed to determine whether the father is unfit in a particular disputed case." *Id.*

The Court's decision was clear that strict scrutiny applies to such categorical denials of parental rights. The Court acknowledged the possibility, urged by the state, that "most unmarried fathers are unsuitable and neglectful parents" and that Peter may even be "such a parent." *Id.* at 654. But the Court recognized that "all unmarried fathers are not in this category; some are wholly suited to have custody of their children." *Id.* The state could thus "further[]" its "statutory policy" in a less restrictive manner: by giving Peter the "opportunity to make his case." *Id.* at 655; *see id.* at 657 (state's approach "foreclose[d] the determinative issues of competence and care" and "needlessly risk[ed] running roughshod over the important interests of both parent and child"). Under the Due Process Clause, the Court held, the state could not "presum[e], rather than prov[e]," Peter's unfitness, "when the issue at stake is the dismemberment of his family." *Id.* at 658.

That reasoning is squarely applicable here—and conclusively demands strict scrutiny. Here, as in *Stanley*, the state has adopted a law that separates a category of parents from their children for the stated purpose of protecting the "safety" of children. *Id.* at 652. Here, as in *Stanley*, the category is undeniably overbroad—

32

even if "most" persons covered by the law are "unsuitable" parents, not "all" are. *Id.* at 654. And so here, as in *Stanley*, the State must show that there are no less restrictive alternatives—including giving parents an "opportunity to make [their] case." *Id.* at 655. In other words, the State must satisfy strict scrutiny before it can force the "dismemberment" of families based on "presum[ptions], rather than pro[of]." *Id.* at 658.[8]

The Court's post-*Stanley* cases confirm that categorical denials of parental rights, like the Alabama law here, are subject to strict scrutiny. In *Quillon v. Walcott*, 434 U.S. 246 (1978), the Court characterized *Stanley* as requiring a "particularized" finding of unfitness. *Id.* at 247-48. The Court added that it had "little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Id.* at 255 (citation omitted). Likewise, in *Santosky v. Kramer*, 455 U.S. 745 (1982), the Court held unlawful a New York law that allowed termination of parental rights based on a "fair

---

[8] The State briefly suggests that Henry's argument sounds in procedural rather than substantive due process. Br.37. *Michael H.* says otherwise. It explains that the Court's cases "str[iking] down as illegitimate certain 'irrebuttable presumptions,'" including *Stanley*, "did not … rest upon *procedural* due process," but instead warrant *substantive* review of "the adequacy of the 'fit' between the classification and the policy that the classification serves." 491 U.S. at 120-21.

preponderance of the evidence" showing that the child is "permanently neglected." *Id.* at 747. The Court concluded that the State must "*prove*[] parental unfitness" through "clear and convincing evidence" before it can "terminat[e]" the "natural relationship" of a "child and his parents." *Id.* at 760 (emphasis added).

State courts have received the message loud and clear. For instance, the Michigan Court of Appeals applied strict scrutiny to strike down an irrebuttable presumption of parental unfitness because the law did not allow parents the opportunity to show that they had "remed[ied] the earlier abuse or neglect." *In re Gach*, 889 N.W.2d 707, 716 (Mich. 2016). Illinois courts have applied strict scrutiny to strike down an irrebuttable presumption of unfitness based on certain convictions. *See In re Amanda D.*, 811 N.E.2d 1237, 1241-44 (Ill. App. Ct. 2004), *aff'd sub nom. In re D.W.*, 827 N.E.2d 466 (Ill. 2005). Florida courts have upheld under strict scrutiny an irrebuttable presumption applicable to parents who had harmed any of their children through egregious acts of abuse. *See S.M.O. v. Dep't of Child. & Fams.*, 357 So. 3d 773, 778-79 (Fla. Dist. Ct. App. 2023).

Alabama law is no different. Despite the State's protests in this case, its courts have held that "[p]arents and their children share a fundamental right to family integrity that does not dissolve simply because the parents have not been model parents. That due-process right requires states to use the most narrowly tailored means of achieving the state's goal of protecting children from parental harm."

34

*T.D.K. v. L.A.W.*, 78 So. 3d 1006, 1011 (Ala. Civ. App. 2011) (citations omitted).  In fact, Alabama courts even applied strict scrutiny to the predecessor version of the residency restriction *in this case*.  *See Herring v. State*, 100 So. 3d 616, 625 (Ala. Crim. App. 2011) (the law "directly infringe[s]" the offender's "fundamental right as a parent," thus requiring application of "strict-scrutiny").   The Alabama legislature has added its agreement—enacting House Bill 6 in 2023 to prohibit any "burden" on parents' fundamental rights unless the government can satisfy strict scrutiny.  Ala. Code § 26-1-6(b).

Alabama's contrary argument here is not modest.  The State effectively urges this Court to break with a longstanding judicial consensus that is founded on unequivocal Supreme Court precedent.  This Court should reject such a seismic and unwarranted shift in the law.

### B.    History and Tradition Do Not Support Section 11(d)(4).

In any event, Section 11(d)(4) is not "consistent with this Nation's historical tradition" of "regulation."  *Bruen*, 597 U.S. at 17.  In fact, the relevant history—from the time period "when the Fourteenth Amendment was adopted," *Dobbs*, 597 U.S. at 272—makes strikingly clear that Section 11(d)(4) is a historical anomaly.  A family-law scholar recently did "a broad search of state court decisions between July 1848 and July 1868" and found that courts uniformly recognized parental rights "either by: (1) vindicating that right to hold for the parent or (2) explaining the right

35

was being overcome by *particular circumstances in the record of the case*." Gottlieb, 100 Notre Dame L. Rev. at 131-32 (emphasis added). Section 11(d)(4), in stark contrast, categorically and permanently separates parents from their children without any individualized consideration of parental fitness or the best interests of the child. It renders completely irrelevant Henry's present circumstances, including his rehabilitation and his wife's expressed desire that he come home. Alabama's extended review of the relevant history (Br.30-45) did not yield a single comparable law—let alone an "American tradition justifying" its forced family separation. *Bruen*, 597 U.S. at 70.

1. The historical record lends no support to Section 11(d)(4)'s categorical and permanent denial of Henry's right to live with his son. It instead shows a consistent track record of individualized review in the period surrounding the Fourteenth Amendment. Courts at that time required that "all" relevant "circumstances" be "taken into consideration" before separating a parent from his child. *Commonwealth v. Briggs*, 33 Mass. 203, 205 (1834); *see also Baird v. Baird*, 21 N.J. Eq. 384, 388 (1869); *State ex rel. Sharpe v. Banks*, 25 Ind. 495, 500 (1865). They warned against "rigid rules" that would prevent them from exercising "judgment upon the peculiar circumstances of the case." *Verser v. Ford*, 37 Ark. 27, 29 (1881). They disregarded rules that impeded such individualized review. *See Sturtevant v. State*, 19 N.W. 617, 618 (Neb. 1884) (disregarding an "inflexible" statute that would "override every

36

consideration" of children's "welfare"); *Gishwiler v. Dodez*, 4 Ohio St. 615, 618 (1855). And they were "at pains" to "emphasize" that any denial of parental custody was based on "sufficient grounds in the record." Gottlieb, 100 Notre Dame L. Rev. at 134 (collecting cases). In short, the "American rule" was not "one of fixed and determined principles," but instead one that demanded consideration of the "peculiar surroundings of each case." James Schouler, A Treatise on the Law of Domestic Relations *339-40 (2d. ed. 1874).

The law's historical demand for individualized review served the important purpose of ensuring that parental fitness was judged based on present circumstances rather than past actions. Nineteenth-century courts expressly recognized that their role was to evaluate a parent's *present* fitness. *See Lovell v. House of the Good Shepherd*, 37 P. 660, 662 (Wash. 1894) (even if "three years ago" the mother was not "competent," "the necessity of separating the mother and child has ceased to exist"); *Kelsey v. Green*, 37 A. 679, 682 (Conn. 1897) (where a father lost custody by "his fault" but then "reinstated" his ability to care through "reformation," court will exercise "discretion" to advance "the welfare of the child" based on "all the circumstances"); *In re Kelley*, 25 N.E. 615, 615 (Mass. 1890). It would have been "a most startling doctrine" to those who adopted the Fourteenth Amendment that a parent who was once "totally unfit to discharge the duties of a parent towards his

37

children" "cannot be restored to parental care and control, where conditions have changed." *In re Knowack*, 53 N.E. 676, 677-78 (N.Y. 1899).

That demand for individualized review did not abate when courts confronted parents who had committed criminal misconduct. "A husband and father who has been so culpable or so unfortunate as to bring his wife and infant child to the poor house, *and himself to the felon's cell*," was still able to "make some explanation to entitle himself to the favor of the court." *In re Goodenough*, 19 Wis. 274, 279 (1865) (emphasis added). Such a parent was allowed to "show a change of circumstances, and that he is morally and pecuniarily fitted to have the care and education of his child." *Id.* at 279. Courts likewise held that the then-crime of adultery was not "sufficient of itself" to permanently deprive a parent of custody. *Cook v. Cook*, 1 Barb. Ch. 639, 644 (N.Y. Ch. 1846); *see also Striplin v. Ware*, 36 Ala. 87, 91 (1860); *Jensen v. Jensen*, 170 N.W. 735, 736 (Wis. 1919). Similarly, there was "nothing in the conviction and sentence" for desertion and neglect that prevented a parent from making a "proper case" for custody restoration. *Demott v. Commonwealth*, 64 Pa. 302, 305 n.a1 (1870). Any other result "would separate families beyond recall, and instead of a future gilded by hope, would make it dark and rayless for ever." *Id.*

2. Alabama's historical account shows nothing to the contrary.

a. Colonial-era laws that allowed magistrates to force children into apprenticeships as a "solution to poverty," Br.33, do nothing to assist the State. The

State's own sources note "the declining use of apprenticeship in the early nineteenth century" because, in "[t]he years after the Revolutionary War," there was "a new emphasis" on "parental custody."  Holly Brewer, *Apprenticeship Policy in Virginia: From Patriarchal to Republican Policies of Social Welfare*, *in* Children Bound to Labor 183, 184 (2009).  A practice that "was abandoned in the 19th century" is "of little importance for present purposes."  *Dobbs*, 597 U.S. at 247.

The State nevertheless portrays a history where "[p]arental preferences" about their children "were secondary to the needs of society."  Br.33 n.6.  But the Supreme Court sees things differently.  It long ago rejected the idea that children are "the mere creature of the [S]tate," *Pierce*, 268 U.S. at 535, instead finding an "enduring American tradition" where "parents" have the "primary role" in the "upbringing of their children."  *Yoder*, 406 U.S. at 232.

b.  The State next pivots to an alternative argument—that even if parents generally had rights, those who engaged in "misconduct" did not.  Br.34-39.  The State's cases do not support its position.

Alabama relies primarily on a series of decisions in which courts consider one parent's misconduct in determining whether to award custody to another parent.  *See* Br.34-35.  But those cases are clear that—counter to the State's narrative—past misconduct was *not* dispositive in determining current fitness.  *See Cocke v. Hannum*, 10 George 423, 442 (Miss. 1860) ("whatever objections may once have

39

existed" to mother's "fitness," "no ground for objection now exists against her"). Instead, even in the face of past misconduct, courts conducted an individualized review to place custody "for the benefit of the children." *In re Cuneen*, 17 How. Pr. 516, 517 (N.Y. Sup. Ct. 1859); *see Chapsky v. Wood*, 26 Kan. 650, 654 (1881); *Boggs v. Boggs*, 49 Iowa 190, 192-93 (1878). Misconduct thus did not result in "forfeiture" of parental rights (*contra* Br.34) absent findings that the parent could no longer "discharge properly his duty towards his child" and that forfeiture was in the child's "interest." *Weir v. Marley*, 12 S.W. 798, 800 (Mo. 1890).

The State insists that "[a]t a minimum" "gross misconduct" or "grossly immoral conduct" could "disqualif[y]" a parent. Br.35-36. But even the State's hand-picked cases do not support that proposition. In *Mercein v. People ex rel. Barry*, 25 Wend. 64 (N.Y. 1840) (cited Br.34-35), the court was clear that "gross misconduct" was *not* alone sufficient to terminate parental rights. Instead, the court would need to consider if the misconduct was "such" that it "shows" the parent to be "plainly disqualified for the proper discharge of parental duties." *Id.* at 73. Indeed, the court explained that even if one spouse showed that the other committed "grossly immoral acts," it would "*not necessarily follow*" that the first spouse was "entitled to the custody of the child" because "the welfare of the children" would remain "the controlling consideration." *Id.* at 75 (emphasis added). Similarly, in *State ex rel. Herrick v. Richardson*, 40 N.H. 272 (1860) (cited Br.36), the court

40

emphasized that it would "take into consideration" several factors including "the right of the father, his ability and inclination to perform faithfully the trust imposed upon him, the present condition of the child, and, if of years of discretion, its wishes upon the subject." *Id.* at 274. The State cites no case to support the notion that "gross misconduct" was historically an on/off switch for parental rights.[9]

Having failed to identify a historical analogue for its law, the State seeks to move the goalposts; it insists that Henry not only must show that historically "a man in his shoes would … receive a hearing"; he must also show, in the State's view, "that he would *win*." Br.37. That argument fails for multiple reasons. As an initial matter, the State's (wrong) contention that Henry would lose in a hearing is based on cases resolving custody disputes. Those cases provide no support for Section 11(d)(4)—a law that prohibits Henry from living with his son *even though his wife wants him home*. Indeed, nineteenth-century courts distinguished between spouse-against-spouse disputes, where courts necessarily had to pick sides, and state-against-parent disputes, where "the superior claim of the parent" could not be

---

[9] The State cites only one case—*Noel v. Noel*, 24 N.J. Eq. 137 (Ch. 1873)—to suggest that Henry's offense would have even been considered "gross misconduct." Br.38. But that case, like the others, shows that Henry's offense was *not* considered sufficient on its own to terminate parental rights. The court extensively discussed the father's alleged conduct, including "drunkenness and debauchery" and "the crime of adultery with one or more of the prostitutes." *Id.* at 141. His possession of "obscene pictures and books" was relevant only in that, "connected with the [other] proofs," it tended to show the mother's allegations were true. *Id.* at 140-42.

"disturbed, unless it plainly appear[ed] that the interests of the child require it."
*Striplin*, 36 Ala. at 90; *see In re Knowack*, 53 N.E. at 677.  If any "misconduct" that warranted discretion in custody disputes provided a basis for laws like Section 11(d)(4), then states today could categorically force family separations whenever parents used "vulgarity" or were "shiftless."  Br.35.  That is not the tradition of this Nation.

In any event, the State's argument wrongly flips the burden.  It is the *State*'s obligation to "demonstrate" that Section 11(d)(4) is "consistent with this Nation's historical tradition" of "regulation."  *Bruen*, 597 U.S. at 17; *see id.* at 24 (placing burden on the state because that "accords with how we protect other constitutional rights").  It is thus not enough for Alabama to hypothesize that some judge at some time might have ruled against Henry after considering the circumstances of his case.  The State must instead show a "historical tradition" supporting Section 11(d)(4)—a law that categorically and permanently deprives parents of the right to live with their children.  The State has not come close to making that showing.

c.  Alabama ultimately acknowledges that "common-law courts adjudicated custody case-by-case," Br.42, but it seeks to avoid the obvious import of that concession by pointing to legislatures that regulated parental rights too, Br.42-45.  The State's examples, however, only underscore the lack of historical support for Section 11(d)(4).

42

The State initially cites a Massachusetts law that allowed officials to commit neglected children to juvenile institutions. Br.42. But courts upheld that law and others like it only because they "sufficiently guarded" the "right of the parent" by permitting habeas proceedings that allowed for custody to be "restored upon a proper showing" of competence. *State ex rel. Bethell v. Kilvington*, 45 S.W. 433, 435 (Tenn. 1898); *see Farnham v. Pierce*, 6 N.E. 830, 832 (Mass. 1886) (holding Massachusetts law constitutional because official's action was "not binding upon the father as an adjudication upon his rights," which could "be protected … by this court," where he could "show that the cause stated for the commitment does not now exist").[10] Courts concluded that a law that did not permit such proceedings would constitute impermissible "tyranny and oppression." *People ex rel. O'Connell v. Turner*, 55 Ill. 280, 286 (1870); *see Prescott v. State*, 19 Ohio St. 184, 189 (1869). Far from showing a history of categorical, legislative judgments, then, the State's example shows (again) a demand for particularized review of parental rights.

Alabama next seeks refuge in twentieth- and twenty-first-century laws allowing courts to consider a parent's past convictions in assessing whether to terminate parental rights. Br.44-45. But those laws do not assist Alabama for several

---

[10] *See also Milwaukee Indus. Sch. v. Milwaukee Cnty. Supervisors*, 40 Wis. 328, 339 (1876); *Cincinnati House of Refuge v. Ryan*, 37 Ohio St. 197, 204 (1881); *Mill v. Brown*, 88 P. 609, 614 (Utah 1907); *Ex parte Sharp*, 96 P. 563, 565 (Idaho 1908).

reasons. To begin, laws allowing termination of parental rights based on a prior conviction did not arise in the time around the Fourteenth Amendment and are still far from the norm. *See* Phillip Genty, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis*, 30 J. Fam. L. 757, 782 (1991); *see Bruen*, 597 U.S. at 70 (discounting the weight of "a few late-in-time outliers"). And even if those laws were relevant, none *requires* a court to terminate parental rights based on a criminal offense. Many of the State's cited jurisdictions allow "[t]he parent [to] rebut" any "assessment of unfitness" that stems from the criminal conviction "by showing actual fitness at the time of the hearing." *Matter of Juv. No. J-2255*, 613 P.2d 304, 307 (Ariz. Ct. App. 1980).[11] And even where the conviction alone meets "the statutory basis for termination," in all of the cited jurisdictions a "court may not order the termination of parental rights without determining that the termination is in the child's best interests." *Matter of Welfare of Child of S.B.G.*, 981 N.W.2d 224, 231-32 (Minn. Ct. App. 2022), *aff'd*, 991 N.W.2d 874 (Minn. 2023).[12] Section 11(d)(4) does not

---

[11] *See State ex rel. A.C.M.*, 221 P.3d 185, 193 (Utah 2009); *Matter of A.J.*, 2023 WL 4056326, at *3 (Ind. Ct. App. 2023); *In re Addison R.*, 989 N.E.2d 224, 229 (Ill. Ct. App. 2013); *In re Terry E.*, 225 Cal. Rptr. 803, 815 (Cal. Ct. App. 1986); *In re Evelyn A.*, 169 A.3d 914, 923 (Me. 2017).

[12] *See, e.g.*, *In Int. of Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018); *State In Int. of J.S.*, 238 So. 3d 600, 603 (La. App. 4 Cir. 2018); *In re Kyle M.*, 2002 WL 1414286, at *9 (N.Y. Fam. Ct. June 7, 2002); *Int. of E.G.*, 683 S.W.3d 261, 267 (Mo. 2024); *In re Christopher J.*, 2017 WL 5992359, at *4 (Tenn. Ct. App. Dec. 4, 2017); *In re D.P.D.*,

remotely resemble those statutory schemes, which demand individualized, present-day review—not categorical family separations based on convictions alone.

d.  Last, Alabama seeks to justify its law by pointing to the history of felons' loss of rights (Br.27-29, 36, 40).  But that effort fails too.

The State cites *Trawick v. Trawick*, 173 So. 2d 341, 343 (La. Ct. App. 1965), for the proposition that "common-law courts seemed to agree that 'conviction of certain felonies presumably do indicate moral unfitness of a parent.'"  Br.36.  But *Trawick* is outside of the relevant time period.  And even if it were relevant, it does not support the State, because it does not endorse categorical judgments.  *Trawick* expressly states that "it is more important" for a court "to determine" if the offender's action "will be of such a handicap as to so seriously jeopardize the future of the child as to warrant the court in separating" the child and parent.  173 So. 2d. at 343.  That a court in 1965 was *still* unwilling to rely solely on a felony conviction to separate a family undermines, rather than supports, the State's position.  *See Dumain v. Gwynne*, 92 Mass. 270, 273-74 (1865) (declining to "hold[] that the rights of either parent in respect to the children are absolutely lost" or "would under all circumstances be permanent" despite the father's burglary conviction).

144 P.3d 202, 203 (Okla. Civ. App. 2006); *In re Ellie R.R.*, 2012 WL 3205577, ¶ 7 (Wis. App. Aug. 9, 2012); *Matter of Adoption of Z.M.J. v. C.J.*, 365 So. 3d 273, 286 (Miss. Ct. App. 2020); *Kent K. v. Bobby M.*, 110 P.3d 1013, 1018 (Ariz. 2005).

The State tries to draw support from this Court's decisions upholding felon-in-possession laws—but those decisions also do not help the State's cause. Felon-in-possession laws are based on a "long tradition of legislatures categorically disarming certain groups of people thought to present a special danger of misuse." *United States v. Dubois*, 139 F.4th 887, 895 (11th Cir. 2025) (Pryor, C.J., concurring) (citation omitted). Under that tradition, "there was no historical requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* at 898 (citation modified). But the history of parental rights is far different. As shown above, and as the State fails to rebut, the history of parental rights is one that abhors categorical rules and demands individualized assessment.

The State thus slips into a broader argument—that because many felonies were punishable by death at the founding, any consequence short of death (like stripping parental rights) is justified. Br.40-41. That argument must be rejected. As an initial matter, it cannot be squared with Supreme Court precedent. The Court has held that the Constitution does not permit states to forcibly sterilize "habitual criminal[s]," *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 537 (1942), and it protects the "marital relationship" even "in the prison context," *Turner v. Safley*, 482 U.S. 78, 96 (1987). If the State's argument were correct, those cases would have come out differently.

46

Even if the State's argument were not foreclosed, it would still be wrong. It has no limiting principle, seemingly justifying all manner of felon restrictions that are blatantly unconstitutional. *See United States v. Duarte*, 137 F.4th 743, 772 n.11 (9th Cir. 2025) (Collins, J., concurring in the judgment) ("[s]tripping convicted felons of their First Amendment rights is also less severe a consequence than death"). And in any event, a founding-era practice says nothing about "what the *Fourteenth Amendment* means by the term 'liberty.'" *Dobbs*, 597 U.S. at 240.

## III.  THE ALABAMA RESIDENCY RESTRICTION FAILS STRICT SCRUTINY.

"Laws that burden the exercise of a fundamental right require strict scrutiny and are sustained only if narrowly tailored to further a compelling government interest." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004). The State here has "failed to carry its burden" to show that Section 11(d)(4) is narrowly tailored. *Catholic Charities Bureau v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 254 (2025). Section 11(d)(4) is "seriously overinclusive" and "underinclusive," *Brown*, 564 U.S. at 805, and is not "the least restrictive means of serving" the State's interest, *Munoz*, 602 U.S. at 919. The State ignores uncontested record evidence and fails to explain why the scheme of individualized review used in all other states would not suffice.

47

### A.    Section 11(d)(4) Is Not Narrowly Tailored to Dangerous Offenders.

Section 11(d)(4) is vastly overinclusive.  It covers *all* child-pornography offenders with *no* exceptions, irrespective of the myriad factors that all experts here acknowledge are critical to determining the risk of recidivism.  It applies, for instance, regardless of the nature of the offense, *see* DE86-15:36-37 (explaining that Henry poses no risk to his male son), the offender's criminal history, *see* DE86-8:14 (child-pornography offenders with no history of contact offenses ultimately pose a similar risk of committing contact offenses as the general population); DE86-11:18 (State's expert citing a similar rate of contact recidivism), or the offender's life upon reentering the community, *see* DE86-13:35-36 (State's expert agreeing that marriage and employment reduce risk).  It leaves room for no individualized analysis, despite testimony from the State's expert that he needs a "full criminal file" to do a "valid risk assessment."  DE86-13:8-9.  And it applies permanently, despite the expert consensus that the risk of recidivism ultimately decreases for sex offenders who live offense-free in the community to a level indistinguishable from the general population.  *See* DE86-13:30-33 (State's expert acknowledging this fact).

The problem with Section 11(d)(4) is vividly demonstrated by the State's answer to this Court's question about its breadth.  In its en banc briefing notice, this Court asked whether Section 11(d)(4) applies only to child-pornography depicting children under 12, or instead reaches "any violation of the Alabama Child

Pornography Act." CA11.Doc.63-1. The State's brief acknowledges (as it must, *see* p. 5, *supra*) that the latter is true: the law applies to depictions of minors who are 16 or 17 years old. Br.3-4. That means that if a "college freshman" were "convicted of downloading sexually explicit content that their 16-year-old high-school sweetheart sent them," the freshman would be barred *for life* from ever residing with *their own child*. Panel.Op. 61.[13] A law with such startling overbreadth is not narrowly tailored.

That Section 11(d)(4) covers so many non-dangerous individuals may explain why the law is underinclusive too. At the same time that it bars child-pornography offenders from residing with their children, it poses no obstacle to those offenders having *unsupervised* daytime visits with their children, subject only to the limit that those visits cannot last more than four hours on three consecutive days or ten aggregate days in one month. *See* Ala. Code § 15-20A-4(20). Allowing such interactions belies any suggestion that the State has narrowly tailored its law to only those parents who pose a risk of abusing their children.

---

[13] The State dismisses that consequence as "not a real concern." Br.47. But the Alabama judiciary has held that the State's child pornography laws validly apply to consensual depictions of minors above the age of consent. *See Cochran v. State*, 111 So. 3d 148, 156-58 (Ala. Crim. App. 2012). And prosecutions against persons who possess consensual depictions of their boyfriend or girlfriend are not hypothetical. *See, e.g.*, *People v. Hollins*, 2012 IL 112754; *A.H. v. State*, 949 So. 2d 234, 235 (Fla. Dist. Ct. App. 2007).

The State nevertheless insists that possession of child pornography necessarily indicates a "robust risk factor for sexual abuse of children." Br.46. But the evidence in the record is directly to the contrary. Dr. Hersh, Dr. Burkhart, and Dr. Helmus all found that child-pornography offenders, without other criminal history, commit future contact offenses at a rate between *1-2%*. DE86-9:5; DE86-4:9; DE86-8:7. That recidivism rate is no higher than the likelihood of a *non-sex offender* committing a sexual contact offense. DE86-8:14. The State's expert hardly disagreed; his own preferred study finds that child-pornography-only offenders commit future contact sex offenses at a rate of 3%. DE86-11:18. Far from narrowly tailored, Section 11(d)(4) is not even rational.

The State briefly protests that "9.2% to 46% of child-pornography offenders will commit another sex offense." Br.39. As an initial matter, those figures pertain to the (purported) recidivism rate for sex offenses generally—not the *contact* sex offenses that motivate Section 11(d)(4). And even if those figures were relevant, they are wrong. The State arrives at those figures by "multiplying" the "recidivism rate for child-pornography offenders (4.6%)" by "two to ten times," on the theory that sex offenses are undercounted by that amount. Panel.Op. 62-63. But the State's own expert acknowledged that the undercounting studies on which he relied are "not about recidivism." DE86-13:5. They address undercounted offenses that occurred *prior to conviction*. *Id.* There is nothing in the record to substantiate the idea that

*future* sex offenses by child-pornography offenders are significantly undercounted. *See* DE86-18:26; DE86-8:19-20.   In fact, the record supports only the opposite conclusion.   The State's expert acknowledged that a key study on which he relied found that the "low rates of contact sexual offenses" by child-pornography offenders "remain[] true even based on confidential self-reporting."   DE86-13:41.   Henry's expert, Dr. Helmus, agreed.   DE86-8:32.   And Dr. Burkhart explained that the rate of unreported sex offenses post-conviction is "low" due to the "intense scrutiny" imposed by the criminal justice system after a sex offender's conviction.   DE86-15:48-49.[14]

Finally, even if the State's arguments had some merit, they do not remotely show narrow tailoring.   The State never disputes that a wide range of factors are critical in determining any individual offender's risk of recidivism, including the amount of time that has passed since the offense—yet Section 11(d)(4) does not permit consideration of any of those factors.   And even if there were somehow such a risk in 46% of cases, that still means that most parents covered by the law are

---

[14] The State also relies on dictum from *McKune v. Lile*, 536 U.S. 24 (2002), stating that the "risk of recidivism" by sex offenders is "frightening and high."   Br.39.   That statement was based on questionable data, and the Supreme Court has more recently acknowledged that there is "conflicting evidence" on sex-offender recidivism risk. *United States v. Kebodeaux*, 570 U.S. 387. 396 (2013).   In any event, the statement in *McKune* does not concern the specific risk addressed in the record here:  the risk of contact-offense recidivism by child-pornography offenders.

"wholly suited" to reside with their children.  *Stanley*, 405 U.S. at 654.  In that circumstance, the State cannot rely on "presum[ptions], rather than pro[of]," to force the "dismemberment" of families.  *Id.* at 658.

### B.     Less Restrictive Alternatives Can Achieve the State's Compelling Interest.

The State also fails to "demonstrate" that Section 11(d)(4) is the "least restrictive means of serving" the State's compelling interest.  *Munoz*, 602 U.S. at 919.  Henry has proffered several such alternatives during this litigation, *see* Panel.Op. 68 & n.10, none of which the State has meaningfully addressed.  The most obvious is a system of individualized review—the same alternative endorsed in *Stanley*, used by "every other state in the country" for sex offenders, Panel.Op. 73, and used by *Alabama itself* for other criminal offenders.  That system can account for the many factors, credited by the State's experts, that indicate whether a particular offender actually poses a risk to his or her children.

The State hardly tries to explain why a system of individualized review would not suffice, except to say that "no one can predict precisely who will re-offend." Br.48.  But the State provides no reason to conclude that individualized review will be ineffective in identifying risky individuals.  To the contrary, the State's experts never disputed that it is possible, through individualized review, to assess an individual's risk of committing a future sex offense. *See* DE86-13:8-9; DE86-14:10-

11. The State also ignores the cost of its overbroad approach.  Having refused to try to separate the dangerous from the not dangerous, the State inevitably will deprive children of the care and companionship of perfectly suitable parents.  Alabama "spites its own articulated goals" by needlessly separating children from parents who will properly care for them.  *Stanley*, 405 U.S. at 652-53.

At a minimum, that is true as to Henry, considering that every qualified expert in this case has assessed his risk profile as minimal or non-existent.  The State has not proffered any reason why Henry himself should not be able to live with his son.  That should be enough to resolve Henry's as-applied challenge.

## CONCLUSION

This Court should affirm as to Henry's as-applied challenge.

Date: November 7, 2025

Respectfully submitted,

*s/ Jeremy S. Kreisberg*

Paul M. Dubbeling
P.M. Dubbeling, PLLC
210 North Columbia Street
Chapel Hill, NC 27514
(919) 635-6005
Paul.Dubbeling@pmdubbeling.com

Algert S. Agricola, Jr.
Barbara H. Agricola
Agricola Law, LLC
127 South 8th Street
Opelika, AL 36801
(334) 759-7558
al@agricolalaw.com
barbara@agricolalaw.com

Elaine J. Goldenberg
Jeremy S. Kreisberg
Nicole R. Allicock
Munger, Tolles & Olson LLP
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Elaine.Goldenberg@mto.com
Jeremy.Kreisberg@mto.com
Nicole.Allicock@mto.com

*Counsel for Appellee Bruce Henry*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,997 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

Date: November 7, 2025                *s/ Jeremy S. Kreisberg*

                                     Jeremy S. Kreisberg

55

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. All participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


Date: November 7, 2025                    *s/ Jeremy S. Kreisberg*

                                           Jeremy S. Kreisberg

56