**FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-10139
_____

BRUCE HENRY,

*Plaintiff-Appellee,*

*versus*

SHERIFF OF TUSCALOOSA COUNTY, ALABAMA,
in his official capacity,
DISTRICT ATTORNEY OF TUSCALOOSA COUNTY,
ALABAMA,
in his official capacity,
ATTORNEY GENERAL OF THE STATE OF ALABAMA,
in his official capacity,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:21-cv-00797-RAH-JTA

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, ABUDU, KIDD, and WILSON,[*] Circuit Judges.

ROSENBAUM, Circuit Judge, delivered the opinion of the Court in which JORDAN, JILL PRYOR, GRANT, BRASHER, ABUDU, KIDD, and WILSON, Circuit Judges, joined.

ROSENBAUM, Circuit Judge, filed a concurring opinion.

WILLIAM PRYOR, Chief Judge, filed a dissenting opinion in which NEWSOM, BRANCH, and LAGOA, Circuit Judges, joined, and in which LUCK, Circuit Judge, joined as to Parts I and II.A.

ROSENBAUM, Circuit Judge:

This case is about the fundamental right of parents to live with their children—a right that the Supreme Court has described as "perhaps the oldest of the fundamental liberty interests" that the Fourteenth Amendment secures. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion). So it doesn't require us to ponder fundamental rights generally or define a new right.

The State of Alabama says not all parents enjoy this right. It argues instead that entire classes of parents have no fundamental rights at all because they committed state-defined "misconduct" years before their children were even born. But the Supreme Court and our history and tradition have spoken unambiguously:

---

[*] Senior Circuit Judge Wilson elected to participate in this decision. *See* 28 U.S.C. § 46(c).

parents—even those who have committed state-defined "misconduct"—enjoy the fundamental right to live with their children.

So Bruce Henry, who was convicted of possessing images of child pornography and has since served his sentence and had a child with his wife, has a fundamental right to live with his son. That does not mean that Alabama can't regulate or even abrogate that right. But to do so, Alabama must show that its legislation is narrowly tailored to further its compelling interest in the safety of children.

We explain why Supreme Court precedent, our history and tradition, and the fundamental nature of the right of the parent to live with their children all require us to conclude that Henry enjoys a fundamental right to live with his children. Then we remand to the panel to take further actions consistent with this opinion.

## I. BACKGROUND

We summarize the background of this appeal in three parts. First, we discuss Henry's background. Second, we explain the aspects of the Alabama Sex Offender Registration and Community Notification Act ("Act") that govern this appeal and permanently prevent Henry from living with his son. And third, we review Henry's legal efforts in the district court to overcome the Act's prohibition.

### A. Henry's Background

In 2013, Bruce Henry pled guilty to "knowingly possess[ing] . . . any book, magazine, periodical, film, videotape, computer disk,

or any other material that contains an image of child pornography."   18 U.S.C. § 2252A(a)(5)(B).   When officers arrested him, Henry had two videos and 348 photos of prepubescent and adolescent girls, all of which he had downloaded from the internet.   Before his arrest, Henry had no history of sexual offenses.

The district court sentenced Henry to 70 months in prison and 60 months of supervised release with special conditions.   He served five years of his sentence before his release in March 2018.   After release, Henry completed a qualified Sex Offender Treatment Program, as well as individual and group counseling.   Henry continues to attend weekly Sex Addicts Anonymous meetings.   He also maintains a steady job, attends church, and volunteers.

We note two special conditions of Henry's supervised release.   First, Henry must participate in the United States Probation Office's computer restriction-and-monitoring program.   That program prohibits Henry from possessing or using certain electronic devices that may communicate with other electronic devices without the Probation Office's prior approval.   And second, Henry may not have "any unsupervised, one-to-one contact with any children under the age of 18 *other than his own children*."

Despite these restrictions, while on supervised release, Henry in two instances accessed pornography.   In July 2019, Henry admitted during a polygraphed interview that he used an Amazon Firestick to view pornography.   A forensic examination revealed no saved images, but Henry had viewed images with "titles indicating that they were of young or teenage females."   And Henry admitted

in a follow-up polygraph test that he actively sought out images of teen girls and children posed in sexual positions.

Also, in December 2019, Henry used his wife's unlocked phone to search for pornographic images. He disclosed the incident to his sexual-offender-treatment provider but failed to inform his probation officer during the officer's home visit in January 2020. Instead, the probation officer learned about the incident from Henry's supervision report for that month.

Citing these violations, Henry's probation officer filed a petition to revoke Henry's supervised release. A federal district court declined. Instead, the court extended Henry's term of supervised release from 60 to 96 months (through March 2026). Since his December 2019 incident, Henry has not violated his supervised release.

In August 2021, Henry and his wife had a son. But because of the Act, Henry cannot live or reside overnight with him (and by extension, his wife).

## B. The Act

Alabama enacted the Alabama Sex Offender Registration and Community Notification Act in 2011. The Alabama Legislature identified the Act's purpose as "not to punish sex offenders but to protect the public and, most importantly, promote child safety." ALA. CODE § 15-20A-2(5).

The Act prohibits any sex offender from, among other things, "resid[ing] or conduct[ing] an overnight visit with a minor"

unless the sex offender "is the parent, grandparent, stepparent, sibling, or stepsibling of the minor." ALA. CODE § 15-20A-11(d). Those exemptions, though, are substantially less inclusive than they appear at first glance. That's so because Section 15-20A-11(d)'s exception itself has five exceptions.

As relevant here, a sex offender may not "reside or conduct an overnight visit with a minor," even if they are the minor's parent, if "[t]he adult sex offender has been convicted of any sex offense involving a child, regardless of whether the adult sex offender was related to or shared a residence with the child victim."[1] *Id.* § 15-20A-11(d)(4). This subsection applies to Henry because a "sex offense involving a child" includes "offense[s] involving child pornography." *Id.* § 15-20A-4(27). And under Alabama law, child pornography includes "[a]ny visual depiction of an individual under 18 years of age engaged in any act of sexually explicit conduct, including a virtually indistinguishable depiction." *Id.* § 13A-12-190(2).

The Act's definitions of "reside" and "conduct an overnight visit" prevent Henry from living with his son.

Under Alabama law, a sex offender "reside[s]" at a place if they are "habitually or systematically present at" it. *Id.* § 15-20A-

---

[1] None of the Act's other four exceptions apply to Henry. Alabama has not terminated (and is not currently terminating) Henry's parental rights, ALA. CODE § 15-20A-11(d)(1); Henry hasn't been convicted of a sexual offense involving his child or a minor with whom he resided, *id.* § 15-20A-11(d)(2), (3); and he has not been convicted of a sexual offense involving the forcible compulsion of a minor, *id.* § 15-20A-11(d)(5).

4(20). Courts determine whether a person meets that threshold, in turn, "by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place." *Id.* As a baseline, an offender "reside[s]" at a place if they "spend[] more than four hours a day" there "on three or more consecutive days" or "more than four hours a day" there "on 10 or more aggregate days during a calendar month." *Id.*

As for an "overnight visit," that occurs whenever an offender is in the same place as a minor for any part of the period "between the hours of 10:30 p.m. and 6:00 a.m." *Id.* § 15-20A-4(14) (explaining "[a]ny presence" causes an overnight visit).

So to sum up, Section 15-20A-11(d) prevents Henry from being present in the same home as his son (1) at any time between the hours of 10:30 p.m. and 6:00 a.m.; (2) for more than four hours a day on three consecutive days; (3) for more than four hours a day on ten or more days during a calendar month; or (4) in any other circumstance where he is habitually and systematically present at his son's home.

These restrictions are permanent. Alabama law affords no offramp to Henry or anyone else: the Act contains no mechanism for offenders to challenge its prohibitions on residing or staying overnight with their own children. And that restriction persists for the rest of the offender's life. So even if the offender lives a law-abiding life for decades after their conviction and later has a child,

they cannot live with that minor child. *See id.* § 15-20A-4(13). Nor can they seek or obtain relief from the prohibition.

### C. *Procedural History*

After Henry and his wife had their son, Henry sued the Sheriff and District Attorney of Tuscaloosa County and the Attorney General of Alabama. He sought to enjoin enforcement of the Act's prohibition against residing with his son. *See* 42 U.S.C. § 1983. When Henry and the Defendants moved for summary judgment, the district court granted Henry's motion. The court declared the Act's prohibition against a parent living with their children facially unconstitutional and universally enjoined its enforcement.

A panel of this Court affirmed in part, reversed in part, and vacated and remanded in part. *Henry v. Sheriff of Tuscaloosa Cnty.*, 135 F.4th 1271, 1329 (11th Cir.), *reh'g en banc granted, opinion vacated*, *Henry v. Sheriff of Tuscaloosa Cnty.*, 150 F.4th 1370 (11th Cir. 2025). It ruled that the prohibition against a parent residing with their own children, as applied, burdened Henry's "fundamental right to live with and raise [his] child." *Id.* at 1293. The panel also held that the prohibition didn't satisfy strict scrutiny. *Id.* at 1314. As to the district court's determination that the prohibition was facially unconstitutional and the corresponding universal injunction, the panel concluded that the district court erred, so the panel vacated the injunction. *Id.* at 1325, 1328.

We vacated the panel opinion and ordered rehearing en banc on the following issue: "Would applying Alabama Code section 15-20A-11(d) to bar Bruce Henry from residing or conducting

overnight visits with his minor child violate his right to substantive due process?"

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment, construing all evidence in the light most favorable to the non-moving party. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). An issue of fact is genuine if a reasonable trier of fact could return judgment for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law" and is not "irrelevant or unnecessary." *Id.*

## III. DISCUSSION

We divide our discussion into four parts. First, we review the framework for evaluating substantive-due-process claims. Second, we analyze the precedents establishing that parents—all parents—enjoy a fundamental right to live with their children. Third, we explain that Supreme Court precedent, history and tradition, and the nature of fundamental rights all show that Alabama and the Dissent's proposed exception to the fundamental right of parents to live with their children—for parents the state deems to have engaged in "misconduct"—is wrong. And fourth, we recognize that the fact that all parents have a fundamental right to live with their children does not resolve this appeal because Alabama has

articulated a compelling reason for its law: the safety of children. So we remand this case to the panel to consider the best way to proceed, given our determination that Henry, like all parents, enjoys a fundamental right to live with his children.

A.      *The Substantive-due-process Framework*

The Due Process Clause of the Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Its guarantee is both procedural and substantive. *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). When, as here, a plaintiff asserts a violation of his substantive-due-process rights caused by legislation, we generally use a two-step framework to resolve the claim. That framework employs two tracks.[2]

The first step of the framework dictates which track the analysis takes. That step requires us to determine whether a right is "fundamental." *Id.* at 710. Rights are fundamental if they are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 721 (cleaned up). Rights that don't satisfy this test are non-fundamental.

---

[2] When a plaintiff contends that executive action violates his substantive-due-process rights, the question is whether the challenged conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846–48 (1998).

At the second step, we apply the correct level of scrutiny to the challenged government action. The level of scrutiny depends on whether we are on the fundamental-rights track or the non-fundamental-rights track.

On the fundamental-rights track, we closely scrutinize the government action. That's so because the deeply rooted and historically important nature of fundamental rights entitles them to more protection from the government than non-fundamental rights. If the right is fundamental, the government action that encumbers the right is presumptively wrongful, and the government bears the burden to show that its action is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). We call this level of review strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004). Although strict scrutiny allows the government to regulate and even abrogate fundamental rights, it ensures that, when the government does so, it must act in a way that fundamental rights receive the respect and protection they are due.

In contrast, on the non-fundamental rights track, we only lightly review the challenged government action. We presume the government has acted lawfully, and we reject the plaintiff's claim so long as the government action is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. This is rational-basis review. Under it, we sustain the government's action if "there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Commcn's, Inc.*, 508 U.S. 307, 313

(1993); *see Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488 (1955).

So to be clear, even if a right is fundamental, that is not the end of the inquiry. A right's fundamental status does not mean the government can't regulate it. Indeed, the government can and does constitutionally burden fundamental rights when it invokes a compelling interest and narrowly tailors its law to further that interest.

B. *The Supreme Court has always recognized the fundamental right of all parents to live with their children.*

With this framework in mind, we consider whether the right Henry invokes is a fundamental one. To do that, we must start with a "'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (quoting *Flores*, 507 U.S. at 302).

Supreme Court precedent leaves no room for question about what that "careful description" is in a case like this one. The right to "establish a home and bring up children," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), is among the first fundamental rights the Supreme Court ever acknowledged. Even when the Court expressly identified the right for the first time, it described the right as a "privilege[]" [that] has "long [been] recognized at common law as essential to the orderly pursuit of happiness by free men." *Id.* Indeed, the right is "perhaps the oldest of the fundamental liberty interests" that the Fourteenth Amendment secures. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *see Obergefell*, 576 U.S. at 667–68 (explaining that the rights to marry, establish a

home, and bring up children make up a "unified whole" that is a "central part of the liberty protected by the Due Process Clause" (citation omitted)).

The Supreme Court has repeatedly recognized the constitutional right to establish a home and bring up children, and all the fundamental rights that right necessarily includes. *Cf. Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922) ("If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it."). And since *Meyer*, the Court has continuously reaffirmed, "and further defined the contours of, parents' liberty interest to control the upbringing of their children." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1222 (11th Cir. 2023).[3]

---

[3] *See, e.g., Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925) (holding Oregon's statute requiring parents to send their children to public school "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Prince v. Massachusetts*, 321 U.S. 158 (1944) (upholding a child-labor law against a challenge that it violated parents' rights to raise their children); *Stanley v. Illinois*, 405 U.S. 645, 646–59 (1972) (holding unconstitutional a law that designated children of unwed parents as wards of the state upon a mother's death because fathers have protected "interest[s] in retaining custody of [their] children"); *Wisconsin v. Yoder*, 406 U.S. 205, 213–234 (1972) (striking down a Wisconsin law that compelled school attendance beyond the eighth grade because it interfered with "the traditional interest of parents with respect to the religious upbringing of their children"); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (explaining the Constitution "permit[s] the parents to retain a substantial, if not the dominant, role in [their children's medical] decision[s], absent a finding of neglect or abuse"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (requiring the state to prove by clear and convincing evidence that parental rights should be

Indeed, just this year, the Supreme Court reaffirmed that fundamental right again in *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026). In *Mirabelli*, parents took issue with a California law, which, in the absence of student consent, did not allow schools to disclose to parents if their child was gender-transitioning at school. *Id.* The Court held that California's "policies likely violate *parents' rights to direct the upbringing and education of their children.*" *Id.* (emphasis added). *See also id.* at 499 (Barrett, J., concurring) ("[T]he doctrine of substantive due process has long embraced a parent's right to raise her child, which includes the right to participate in significant decisions about her child's mental health.").

Relying on the *Meyer* line of precedent, and other cases establishing the "private realm of family life," *Prince*, 321 U.S. at 166, the Supreme Court in *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (plurality opinion), reaffirmed that family members have the fundamental right to live with one another. In *Moore*, the plaintiffs challenged East Cleveland's housing ordinance that limited occupancy of a dwelling to members of a single family. *Id.* at 495–96.

---

terminated); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (declining to require the state to appoint counsel for parents at a termination proceeding, although explaining that "[a] parent's interest in the accuracy and injustice of the decision to terminate his or her parental status is . . . a commanding one"); *Troxel*, 530 U.S. at 60–75 (declaring unconstitutional a visitation statute because the law interfered with parents' fundamental right "to make decisions concerning the care, custody, and control of their children" and instructed courts to disregard "the traditional presumption that a fit parent will act in the best interest of his or her child").

The Supreme Court invalidated the ordinance as an unjustified in-trusion into family life. *Id*. at 506.

As *Moore* explained, "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition," for "[i]t is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Id*. at 503–04. In fact, the Court recognized, the right of "parents and children" to "shar[e] a household" lies at the core of the American family. *Id*. at 504. And the Court based its conclusion not only on its understand-ing of Americans' "practice[]" of living with their families (alt-hough that would have been sufficient), *see Glucksberg*, 521 U.S. at 710 (citing *Moore*, 431 U.S. at 503), but also on its firmly rooted prec-edent establishing the rights of parents to raise their children.

Since *Moore*, the Supreme Court has repeatedly reaffirmed the right of parents to live with their children.[4] In *Roberts v. United States Jaycees*, for instance, the Court did so when it explained why the Jaycees' personal-affiliation choices did not share the same type of constitutional protection as family relationships. 468 U.S. 609,

---

[4] The Court has entertained many challenges to statutes on the ground that they "intrude on choices concerning family living arrangements." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (cleaned up). In cases where it rejected the challenges, a statutory classification did not "'directly and substantially' inter-fere with family living arrangements." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 386–87 & n.12); *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers*, 485 U.S. 360, 365 (1988); *Bowen*, 483 U.S. at 601–02.

618–20 (1984). As the Court noted, the Bill of Rights affords "certain kinds of highly personal relationships [(like family relationships)] a substantial measure of sanctuary from unjustified interference by the State." *Id.* at 618. After all, the Court observed, family involves "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.* at 620. So, the Court confirmed, the Constitution secures parents' rights to "rais[e] and educat[e]" their children and to "cohabitat[e]" with them. *Id.* at 619.

The Court has consistently emphasized this point since *Moore*. Take *Dolan v. City of Tigard*, 512 U.S. 374 (1994). There, the Court described *Moore* as holding that an ordinance may violate the Due Process Clause if it "intrude[s] on choices concerning family living arrangements, an area in which the usual deference to the legislature was found to be inappropriate." *Id.* at 391 n.8. And just three years ago, the Court in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), once again confirmed that *Moore* recognized the "right to reside with relatives"—a right that has not been "undermine[d] . . . in any way." *Id.* at 256-57.

We too have consistently acknowledged family members' fundamental right to live together, which includes parents' right to live with their children.[5]  And so have our sister circuits.[6]

---

[5] *See, e.g.*, *Picou v. Gillum*, 874 F.2d 1519, 1521 (11th Cir. 1989) (recognizing that the Constitution protects "the structure of the family unit"); *Elliott v. City of Athens*, 960 F.2d 975, 981 (11th Cir. 1992) ("*Moore* and *Belle Terre*, read together, indicate that a feasible method of controlling density is to place occupancy limitations on unrelated persons but not on related persons."), *abrogated on other grounds by City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995); *Parks v. City of Warner Robins*, 43 F.3d 609, 614 n.3 (11th Cir. 1995) (citing case law establishing that government may not "directly and substantially interfere with family living arrangements" (cleaned up)); *Ross v. Clayton County*, 173 F.3d 1305, 1311 (11th Cir. 1999) (explaining "that the First Amendment right of free association encompasses 'cohabitation with one's relatives'" (quoting *U.S. Jaycees*, 468 U.S. at 619)); *Eknes-Tucker*, 80 F.4th at 1221–22 (recognizing "that the 'liberty' guaranteed by the Due Process Clause includes the right "to . . . *establish a home and bring up children*" (quoting *Meyer*, 262 U.S. at 399) (emphasis in original)); *cf. Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1285 (11th Cir. 2001) (rejecting a claim that a zero-tolerance policy for federal housing directly and substantially interfered with family living arrangements); *Konikov v. Orange County*, 410 F.3d 1317, 1326 n.11 (11th Cir. 2005) (acknowledging "the fundamental right to freedom of personal choice in marriage and family life" (citing *Moore*, 431 U.S. at 499)); *Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir. 1984) ("A state violates the fourteenth amendment when it seeks to interfere with the social relationship of two or more people.").

[6] *See, e.g.*, *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982) ("A fundamental right is even more clearly involved here because the rental policy infringes the choice of parents to live with their children rather than the choice of more distant relations."); *Franz v. United States*, 707 F.2d 582, 595 (D.C. Cir. 1983) (explaining the Fourteenth Amendment protects "cohabitation with members of one's extended family"); *Doe v. City of Butler*, 892 F.2d 315, 321 (3d Cir. 1989) ("Zoning restrictions cannot be applied to hinder those in a familial relationship from living together."); *Hameetman v. City of Chicago*, 776 F.2d 636,

In sum, it's beyond debate that the Supreme Court has recognized a parent's right to live with their children as a fundamental one under this Nation's history and traditions.

C.    *The law does not support an exception to the fundamental right of parents to live with their children for parents the state deems to have engaged in "misconduct."*

Despite the Supreme Court's clear and repeated pronouncements that parents enjoy a fundamental right to live with their children, Alabama and the Dissent argue that Henry doesn't. In their view, a parent who has engaged in "misconduct," however the state defines it, forever loses their fundamental right to live with their current and future children. We respectfully disagree. Precedent, history and tradition, and the nature of fundamental rights all show why Alabama and the Dissent are mistaken.

1.    No court has held that any class of parents lacks the fundamental right to live with their children.

Faced with a wall of Supreme Court precedent guarding parents' fundamental right to live with their children, Alabama and the Dissent seek to burrow through. It invokes *Michael H. v. Gerald D.*,

---

642 (7th Cir. 1985) ("A state or city that forces a man to live apart from his family deprives him of a form of liberty protected by the due process clause, and therefore violates the Fourteenth Amendment if due process is denied."); *cf. Johnson v. City of Cincinnati*, 310 F.3d 484, 501, 506 (6th Cir. 2002) (striking down a Cincinnati ordinance that limited a grandparent's access to the neighborhood where her grandchild lived as violative of the "fundamental right to participate in child-rearing," including the "right to 'establish a home and bring up children'" (quoting *Meyer*, 262 U.S. at 398)).

491 U.S. 110 (1989), and *Lehr v. Robertson*, 463 U.S. 248 (1983), as well as Circuit precedent, to argue that only some parents have the fundamental right of parents to live with their children. Henry, Alabama and the Dissent say, is not one of those parents who enjoy fundamental rights.

But Supreme Court precedent is unanimous the other way: the right the Court has always recognized is the fundamental right of parents to live with their children. There is no Supreme Court or Circuit precedent that has framed the right as Alabama and the Dissent propose: the right of a parent who has engaged in "misconduct" as the state defines the term—or of a parent who has been convicted of a child-sex offense, as Alabama more specifically suggests—to live with their children.

We start with *Michale H.*, *Quilloin*, and *Lehr*. To explain why these opinions don't help Alabama and the Dissent, we must consider them alongside another Supreme Court precedent: *Stanley v. Illinois*, 405 U.S. 645 (1972).

*Stanley*, the oldest of the four, lays down the baseline. There, Joan and Peter Stanley lived together on and off for 18 years and had three children together. *Id.* at 646. Upon Joan's death and without a showing that Peter was an unfit parent, Illinois law made the children wards of the state because Joan and Peter were unmarried. *Id.* Peter challenged the statute. *Id.*

While resolving Peter's equal-protection claim, the Court first considered whether the right Peter asserted—"that of a man in the children he has sired and raised," *id.* at 651—was of a

fundamental nature, *see id.* at 651–52. As the Court explained, "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment." *Id.* at 651. Not only that, the Court continued, but "the law [has not] refused to recognize those family relationships unlegitimized by a marriage ceremony." *Id.* In sum, the Court concluded, "it [is] clear that, at the least, [Peter's] interest in retaining custody of his children is cognizable and substantial." *Id.*

The Court noted Illinois's law "imposed a statutory presumption that the best interests of a particular group of children necessitate[d] some governmental supervision in certain clearly defined situations." *Id.* at 653 n.5. As the Court reasoned, "it may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including [Peter's]." *Id.* at 656. After all, the Court said, "[p]rocedure by presumption is always cheaper and easier than individualized determination." *Id.* at 656–57.

But the Court struck down Illinois's presumption. *See id.* at 657. The Court explained, "when . . . the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child." *Id.* "The State's interest in caring for [Peter's] children is de minimis if [Peter] is shown to be a fit father," the Court continued. *Id.* at 657–58. And, the Court reasoned, the advantage of the convenience of a presumption "is insufficient to justify

refusing a father a hearing when the issue at stake is the dismemberment of his family." *Id.* at 658. So the Court concluded that "*all* Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody." *Id.* (emphasis added).

Like the many precedents we cited earlier, *Stanley* once again reaffirms the fundamental nature of the right of a parent—even an unwed one—to live with their children. And it shows that the right at stake is that of a father to live with his children, not that of an *unwed* father to live with his children. It's also worth noting that *Stanley* disavows the use of irrebuttable presumptions when it comes to "dismember[ing]" a parent's family. *Id.* at 658. Rather, *Stanley* emphasizes the importance of considering a parent's present abilities to parent, as opposed to the parent's past state-defined "misconduct"—in *Stanley*, being unwed with children.

We consider *Michael H.*, *Quilloin*, and *Lehr*, the three Supreme Court precedents that Alabama and the Dissent rely on, against the *Stanley* background. Unlike *Stanley*, these cases involving the right of a parent to live with their children required the Court to determine what to do when two putative parents' rights to live with their children clashed. Because two putative parents' rights competed, the Court had to identify an exception to the rule that parents have a fundamental right to live with their children, to determine which putative parent's right won out.

Consider *Michael H.* There, Michael had an affair with Carole, his married neighbor. 491 U.S. at 113 (plurality opinion).

When Victoria was born while that affair went on, her birth certificate listed Gerald, Carole's husband, as the father. *Id.* Gerald held Victoria out as his daughter, though Michael spent time with Victoria. *Id.* at 113–14 (plurality opinion). But when Victoria was three years old, Gerald invoked California's law that presumed that a child born to a wife who lives with husband and who is not impotent or sterile was a "child of the marriage." *Id.* at 115 (plurality opinion). California's law permitted rebuttal of the presumption, but only within the first two years of the child's life. *Id.* As relevant here, Michael challenged the California law as a violation of his substantive-due-process rights as a parent to spend time with his child. *See id.* at 116, 118 (plurality opinion).

The plurality opinion noted that it could not consider Michael's relationship with Victoria without addressing its effect on Gerald's parental rights as they pertained to Victoria. *See id.* at 127 n.6. (plurality opinion). As Justice Scalia described the Court's focus, it was "upon the societal tradition regarding the natural father's rights vis-à-vis a child whose mother is married to another man." *Id.* Justice Scalia continued, "to *provide* protection to an adulterous natural father is to *deny* protection to a marital father, and vice versa." *Id.* at 130 (plurality opinion).

To resolve this conflict between Michael's and Gerald's rights, Justice Scalia looked "to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified." *Id.* at 127 n.6 (plurality opinion). So, Justice Scalia explained, "[i]f . . . there were no societal tradition, either

way, regarding the rights of the natural father of a child adulterously conceived, we would have to consult, and (if possible) reason from, the traditions regarding natural fathers in general." *Id.*[7]

But a relevant tradition turned out to exist. And when the plurality opinion considered it, the Court found "not . . . a single case, old or new," that "award[ed] substantive parental rights to the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child." *Id.* at 127 (plurality opinion). In other words, in a contest between both putative fathers' rights to raise the child, tradition showed that the marital father's rights won out over those of the "natural father."

*Quilloin* and *Lehr* reflect the same thing. In *Quilloin v. Walcott*, 434 U.S. 246 (1978), an unmarried man and woman had a child. The child lived with his mother. *Id.* at 247. When the child was two years old, the mother married a different man. *Id.* For more than eight years, the three lived together as a family. *Id.* At that point, the husband sought to adopt the child as his own, and the birth father sought to block the adoption and obtain visitation rights. *Id.* When the state court granted the adoption to the husband over the birth father's objection, the birth father challenged that decision, as relevant here, as a violation of his substantive-due-process rights. *Id.* at 254.

The Court found no violation. *See id.* at 255. It explained, "[T]his is not a case in which the unwed father at any time had, or

---

[7] Only Chief Justice Rehnquist joined this aspect of Justice Scalia's opinion.

sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence." *Id.* Put simply, the Court found that the marital father's right to live with his children triumphed over the birth father's under the circumstances.

The same is true of *Lehr*. As in *Quilloin*, in *Lehr*, an unmarried man and woman had a child. *Id.* at 250. Eight months later, the woman married a different man. *Id.* When the child was two years old, the husband sought and obtained an order to adopt the child. *Id.* The birth father challenged the adoption order as invalid because he didn't receive notice of the adoption proceeding. *Id.* Under the New York laws, to receive notice, he had to register as the child's father within two years of the birth (which he didn't do) or satisfy one of the other enumerated categories (which he didn't). *Id.* at 250–52.

The Court considered "whether the New York statutes are unconstitutional because they inadequately protect the natural relationship between parent and child." *Id.* at 255 n.10. Once again, the Court saw a clash between the parental rights of the two putative fathers. *Id.* at 256–58. After reviewing the relevant traditions, the Court discerned that "state laws almost universally express an appropriate preference for the formal family." *Id.* at 257. But because the New York laws gave the birth father the opportunity to develop a relationship with the child, the Court found no

constitutional violation when the husband adopted the child without notice. Rather, once again, the Court considered competing parental interests in living with one's children and chose the marital father's over the birth father's.

Here's the bottom line: when no competing parental right to reside with one's child is at stake, *Stanley* establishes that we define the asserted right as the parent's right to reside with their child. We don't qualify that right by a father's "misconduct," like being "unwed." And *Michael H.*, *Quilloin*, and *Lehr* teach that only when two putative fathers' rights to live with their children clash do we recognize an exception to the rule that all parents have a fundamental right to live with their children. But even then, we look to history and tradition to discern the right at stake.

In Henry's case, no other putative father has claimed a competing right to live with Henry's child. Not only that, but Henry is married, the child he wants to live with was born to that union, and Henry seeks to live with that family unit. Plus, as we explain in the next section, *see infra* at Part III.C.2, we don't have a societal tradition of automatically and forever revoking a parent's fundamental right to live with their current and future children if the parent has engaged in "misconduct," however a state may describe that term. Because "there [is] no societal tradition, either way, regarding the rights of the natural father [who has engaged in "misconduct" as the state defines the term] of a child . . . , we . . . have to consult, and (if possible) reason from, the traditions regarding natural fathers in general." *See Michael H.*, 491 U.S. at 127 n.6. Under *Stanley*,

*Michael H.*, *Quilloin*, and *Lehr*, then, Henry's asserted right is the right of a parent to live with his child. And as we've noted, there's no question that right is a fundamental one.

Alabama and the Dissent's argument fares no better under Circuit precedent. They assert that *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005), supports an exception to the rule that all parents enjoy the fundamental right to live with their children. Not so.

In describing the *Doe* plaintiffs' asserted right, *Doe* refers to the fact of the plaintiffs' convictions there because the plaintiffs sought to avoid publication of the information the statutes they challenged required. And it would have been impossible to determine whether the plaintiffs had a fundamental right not to have the information published without considering what the information was—in that case, the plaintiffs' sex-offense conviction status.

In *Doe*, a class of individuals who Florida's sex-offender law required to register as sex offenders challenged the statutory scheme. 410 F.3d at 1339. We described the asserted right as "the right of a person, convicted of 'sexual offenses,' to refuse subsequent registration of [their] personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website."[8] *Id.* at 1344. Then we

---

[8] The *Doe* plaintiffs also claimed that the Florida statute imposed on their right to direct the education and upbringing of their children. *See Doe*, 410 F.3d at 1343. They were concerned that, by publishing the fact of their convictions, Florida made it difficult for them to live in certain neighborhoods. *See id.* But the fundamental right of parents to live with their children does not protect against that type of indirect effect. *See id.* at 1344–45 (citing *Paul P. v. Verniero*,

noted that the Supreme Court had "refused to extend substantive due process protection to the publication of official acts like arrest records." *Id.* at 1345 (citing *Paul v. Davis*, 424 U.S. 693, 713 (1976)). Given that history, we said that "a state's publication of truthful information that is already available to the public does not infringe the fundamental constitutional rights of liberty and property." *Id.*

But not all personal information "is already available to the public." So contrary to the Dissent's contention, *see* Dissent at 14, including the fact that the personal information the petitioners sought to shield from publication was their sex-offense-conviction status was critical to describing the right at stake.

The fundamental right of a parent to live with their child, in contrast, is very different from a right against publication of information relating to a conviction. As we've noted, whether a tradition exists against publication depends on what is being published—in *Doe*, the fact of a conviction. Yet tradition shows that the Supreme Court has never recognized an exception to the fundamental right of a parent to live with their children, because the parent previously engaged in state-defined "misconduct," including a conviction. So *Doe* is irrelevant here.

---

170 F.3d 396 (3d Cir. 1999), for the proposition that "indirect effects of members of the public on the offender's relationship with his family did not rise to the infringement of a fundamental right by the state"). By contrast, the Alabama Act does directly infringe parents' fundamental right to live with their children by removing it automatically and permanently with respect to a parent's current and future children.

Alabama and the Dissent also cite *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023). *See* Dissent at 6–7. But *Eknes-Tucker* offers them no more assistance than *Doe*. In *Eknes-Tucker*, we rejected a parental-rights claim because we said that there was "no binding authority that indicates that the general right to 'make decisions concerning the care, custody, and control of [one's] children' includes the right to give one's children puberty blockers and cross-sex hormone treatment." *Id.* at 1221 (citation omitted). But here, Supreme Court precedent unambiguously and repeatedly holds that the general right of a parent concerning the care and custody includes the specific right to reside with their children. So this case presents the opposite of the situation we faced in *Eknes-Tucker*. For that reason, *Eknes-Tucker* is not instructive here.

Finally, we note that, despite Alabama's position here, even Alabama courts have recognized that parents like Henry have the fundamental right to live with their children. *Herring v. State*, 100 So. 3d 616 (Ala. Ct. Crim. App. 2011). In *Herring*, the Alabama Court of Criminal Appeals considered the Act's precursor, which was first enacted in 1975. *See id.* Herring argued, among other things, that the precursor violated his substantive-due-process rights. *Id.* at 619.

In evaluating Herring's claim, the Alabama court recognized that "[a] substantive due process analysis must begin with a careful description of the asserted right." *Id.* at 622 (cleaned up). Then, relying in part on *Stanley*, the court characterized Herring's

asserted right as the right "[of a parent] to reside with his children." *Id.* at 624. The court did not, as Alabama and the Dissent urge us to do, create an exception for parents who had engaged in state-defined "misconduct." *See also id.* at 623 ("There is no doubt that parental rights are fundamental.").

In short, no precedent endorses Alabama and the Dissent's argument that only some parents have the fundamental right to live with their children.

> ### 2. Our history and tradition do not support an exception to the rule that all parents enjoy the fundamental right to live with their children.

But that's not all. In this part, first, we show how even the history and tradition Alabama and the Dissent rely on prove the opposite of their point. That is, our history and tradition reflect that all parents enjoy a fundamental right to live with their children, not that parents who have engaged in "misconduct" as the state defines it don't.[9] And second, we explain the errors in Alabama's argument that depriving a person who has engaged in state-defined "misconduct" (including a sex offense against a child) of the fundamental status of their right to live with their children is

---

[9] As we have explained, precedent firmly establishes Henry's fundamental right to reside with his child; Henry doesn't ask us to "break new ground in this field." *See Glucksberg*, 521 U.S. at 720 (citation omitted). That's enough to conclude that the Act is subject to strict scrutiny. We conduct the history-and-tradition analysis here only to show that Alabama's arguments are misguided.

permissible because the common law and early American law could punish such offenses with death.

> *a.    The common law and nineteenth-century American case law do not support a "misconduct" exception to a parent's fundamental rights.*

Review of the common law and nineteenth-century American case law reveals an essential rule: the right of a parent to live with their children is a fundamental one. And courts declined to allow a parent to live with their child only if, after individualized consideration of the facts of the specific case, it appeared likely from the totality of the circumstances that harm to the child would follow from the parent's custody at that time. That is, even if a parent had previously engaged in state-defined "misconduct," that did not automatically disqualify a parent from having custody of their children. Rather, the court considered the parent's character and abilities at the time they sought custody.

Our history and tradition establish that common-law courts recognized the right of the parent to live with their child, not the right of a parent who hadn't engaged in state-defined "misconduct" to live with their child. Otherwise, courts would have automatically and forever removed a parent's custody rights if a parent had engaged in "misconduct." But courts didn't define the fundamental parental right to live with one's children by a parent's past. Rather, courts evaluated what the welfare of the child required by looking to a parent's present parenting abilities.

The panel opinion here reviews the common-law and nine-teenth-century American history in some depth. *See Henry*, 135 F.4th at 1315–19. So we focus here on only the sources that Alabama and the Dissent cite. After all, they too show the rule that courts removed children from their parents only after individualized consideration of the particular facts led them to conclude that the children would likely face harm if not removed from the parents at that time.

Indeed, the historical record shows the opposite of what Alabama and the Dissent claim. The cases are unanimous. They show a history and tradition of treating parents' rights of custody and cohabitation with their children as fundamental. And that's true even for parents who engaged in "misconduct," like past sex offenses. In every example that Alabama and the Dissent invoke, the state burdened parental rights with only a careful individualized totality-of-the-circumstances determination that reflected the parent's abilities at the time of the inquiry, not based on past "misconduct."[10]

---

[10] The Dissent incorrectly suggests that our recognition that, historically, courts have removed custody from parents only after a totality-of-the-circumstances inquiry into what the child's welfare demanded at that time means that we've turned this into a procedural-due-process matter. *See* Dissent at 22. Not so. The Dissent misses the point. As we've explained, that courts did not automatically find a parent ineligible for the custody of their children based on the simple fact of conviction, but rather consistently conducted totality-of-the-circumstances inquiries into what the child's welfare demanded at that time shows that courts treated the right of parents to live with their children as fundamental. *Cf. United States v. Hemani*, 608 U.S. ___, ___ S. Ct. ___, 2026

To show how Alabama and the Dissent flip the record upside-down, we describe several of the cases they rely on.

To start, they invoke nineteenth-century treatises. For instance, Alabama quotes James Schouler's *A Treatise on the Law of the Domestic Relations* for the proposition that parents have the "paramount" right of custody in their children, but this right "could 'be forfeited by his misconduct.'" (Quoting JAMES SCHOULER, A TREATISE ON THE LAW OF THE DOMESTIC RELATIONS *338–39 (Bos., Little, Brown & Co. 2d ed. 1874)); *see also* Dissent at 16.

On the same page as the quotation Alabama and the Dissent rely on, though, Schouler also says that "the circumstances will be fully considered by the court, and decision rendered on general principles of justice." SCHOULER, *supra* p. 339. As Schouler explains, "[t]he cardinal principle relative to such matters is to regard the benefit of this infant; to make the welfare of the children

---

WL 1751710, *10 (June 18, 2026) ("Even when a law regulates arms-bearing for a permissible reason, we have said, it may not be compatible with the Second Amendment if it does so to an extent beyond what was done at the founding. . . . The historical laws the government identifies usually provided some form of process before an individual lost any of his liberties, even temporarily. . . . None of that holds true for § 922(g)(3)." (cleaned up)). That tradition continues even today. Indeed, as far as we can tell, no state other than Alabama (in its Act) blanketly and forever abrogates the right of parents to live with their current and future children if they engage in state-defined "misconduct." *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 228 (2022) (citing as evidence of the lack of a fundamental right to an abortion the fact that 30 of 50 states at the time the Court issued *Roe v. Wade*, 410 U.S. 113 (1973), outlawed abortion entirely).

paramount to the claims of either parent." *Id.* Schouler reflects that courts conducted individualized totality-of-the-circumstances inquiries to determine what, in a particular case, the children's welfare required at that time.

The cases these treatises rely on, as well as those Alabama and the Dissent point to, bear that out. Take *Mercein v. People ex rel. Barry*, 25 Wend. 64, 73 (N.Y. Ct. for the Correction of Errors 1840). Alabama cites *Mercein* for the proposition that there is a "tradition that parental rights 'may be forfeited by misconduct.'" And *Mercein* does in fact say that "[t]he right of the father may be forfeited by misconduct, or lost by misfortune." *Id.* But *Mercein* uses the word "may" deliberately. The opinion would take on a different meaning if the court had instead used "must." *Mercein* doesn't support the notion that parents who engaged in "misconduct" were conclusively and forever divested of their custodial rights.

*Mercein* was a divorce custody case. *See id.* The wife alleged that the husband had engaged in "grossly immoral acts," so she should receive custody of the children. *Id.* at 75. But the court found the evidence lacking and awarded the husband custody.[11] *Id.*

---

[11] The common law indulged an unfortunate presumption that, "in these unhappy controversies between husband and wife, the former, if he chooses to assert his right, has the better title to the custody of their minor children." *Mercein*, 25 Wend. at 72. But in conducting a substantive-due-process analysis, we must take the relevant historical tradition as we find it, warts and all. So readers should not take the ubiquitousness of the unequal treatment that runs through these types of cases as some type of endorsement or legitimization of

Even so, the court explained, "Had [the wife] been able to charge her husband with some of those grossly immoral acts which authorize a divorce, either absolute or limited, *it would not necessarily follow* that she was entitled to the custody of the child." *Id.* (emphasis added). Rather, the court continued, despite his conduct, "still it may be quite clear that the welfare of the children, which is the controlling consideration, will be best promoted by committing them to the custody of the father." *Id.*

*Mercein* shows that (1) the only role "misconduct" played in the inquiry concerned how the parent's "misconduct"—whatever it may have been—affected "the welfare of the children, which [was] the controlling consideration," at the time of the inquiry, *id.* at 75, and (2) the court conducted an individualized inquiry considering all the circumstances to determine whether a parent's "misconduct" warranted a determination that the parent may not have custody of his children, *see generally id.* But the fact that a parent had engaged in what the law considered to be "misconduct" did not conclusively deprive the parent of their child. So Alabama's argument that people subject to its Act have been convicted after a trial provides no answer to the fact that even a conviction did not conclusively and forever mean a parent would not be permitted to live with their child.

Alabama and the Dissent rely on *People ex rel. Ordronaux v. Chegaray*, 18 Wend. 637 (N.Y. Sup. Ct. 1836), for the same

---

those ideas and treatment. To be clear, we now understand them to be wrong and unconstitutional.

proposition as *Mercein*: each court mentioned that a father's right to the custody of their children *"may* be forfeited by misconduct." (emphasis added). But as we've noted, the word "may" is discretionary. Indeed, *Ex Parte Boaz*, which the Dissent invokes, *see* Dissent at 16–17, included the same statement and then further explained that the court "exercises a *discretion*, for 'the benefit and welfare of the infants.'" 31 Ala. 425, 427 (Ala. 1858) (emphasis added). In other words, courts made individualized totality-of-the-circumstances discretionary rulings; they didn't automatically and forever forfeit a parent's right to live with their children simply because that parent had previously engaged in "misconduct."

*Lovell v. House of the Good Shepard*, 37 P. 660 (Wash. 1894), which Alabama and the Dissent cite, *see* Dissent at 17, supports the same principle. There, a widowed mother left her daughter with an orphanage. *Id.* at 660. Soon after, the mother demanded the child's return, but the orphanage refused. *Id.* at 660–61. So the mother sought the return of the child through a writ of habeas corpus. *Id.* at 660.

In awarding the mother custody, the court said, "Even immorality of the mother *is not always* a sufficient reason for depriving her of the custody of the child." *Id.* at 661 (emphasis added). After all, the court continued, "even though it may appear that three years ago the mother was not a competent person to maintain control of this child, the difficulties then alleged to exist have now passed away. Hence the necessity of separating the mother and child has ceased to exist." *Id.*

As with *Mercein*, *Boaz*, and *Ordronaux*, *Lovell* shows that courts did not blanketly and forever remove children from parents for "misconduct." Rather, they conducted individualized totality-of-the-circumstances inquiries to determine how the parents would affect the welfare of the child at that time. And when circumstances changed, courts considered anew a parent's claim to the custody of their child.

*State ex rel. Herrick v. Richardson*, 40 N.H. 272, 273 (N.H. Sup. Ct. 1860), which Alabama and the Dissent rely on, *see* Dissent at 16–17, is more of the same. There, the court characterized "the question" before it as "whether the father, *under the circumstances of this case*, is entitled to the custody of his child, and if so, whether under this process that custody can be awarded to him" (emphasis added). As the court explained, it was "required to determine whether, *in the exercise of sound discretion*, the custody of the child ought, or ought not to be awarded to the father." *Id.* at 274 (emphasis added).

Then, Alabama and the Dissent rely on *Cocke v. Hannum*, 39 Miss. 423, 441 (1860), for the notion that disqualifying "misconduct" included "vulgarity and obscenity." *See* Dissent at 17. And so it did—but only *if* the court determined, based on the totality of the circumstances, that custody with the parent at that time would likely harm the child. *Cocke* provides an example.

There, the court reviewed a lower court's decision to give custody of a couple's daughters to the father over the mother. *Cocke*, 39 Miss. at 436. Both parents had engaged in "misconduct."

*See id.* at 440–41.  On appeal, the court determined that the mother should have custody.  *See id.* at 442.

In reaching its conclusion, the court considered the totality of the circumstances.  In the end, it explained, "[W]hatever objections may once have existed to the fitness of the mother by reason of the charges against her chastity and amiability[,] . . . the testimony is very clear that . . no ground for objection now exists against her."  *Id.*

Put simply, the court operated on the principle that people can be rehabilitated.  A parent's past problematic behavior did not conclusively and forever disqualify her from living with her child.  Rather, the court looked at the totality of the circumstances before it at the time of inquiry.

So Alabama and the Dissent invoke *Chapsky v. Wood*, 26 Kan. 650, 653 (1881).  Dissent at 17.  They rely on that case for the proposition that the Supreme Court of Kansas reported it could find "no case . . . in which the courts have given [custody] to the father who was a drunkard and a man of gross immoralities.'"[12]  But there's nothing remarkable about that.  After all, when a father was

---

[12] The quoted statement in *Chapsky*, by the way, is dicta.  That case did not involve a father alleged to be either a "drunkard" or a "man of gross immoralities."  *See Chapsky*, 26 Kan. at 656.  As a result, we can't point to facts in the case to shed light on these terms.  But the context of the remark shows the court intended to offer an extreme example.  So it's clear that, by "drunkard" and "man of gross immoralities," the court meant individuals who unambiguously qualify as both.

both "a drunkard and a man of gross immoralities" *at the time of the court's individualized inquiry* into custody, every court considering the totality of the circumstances would have to conclude that "such custody [would not have] promote[d] the welfare and interest of such child." *Id*. at 653.

Yet even a father who at some point was a "drunkard" and a "man of gross immoralities" may not forever be one. So as cases Alabama and the Dissent cite show, *see supra*, courts conducted individualized totality-of-the-circumstances inquiries into whether a parent's custody of a child would likely be harmful to the child *at the time of the inquiry*. Put another way, under the common law, even if a parent committed "misconduct," that did not mean that they conclusively and forever lost their fundamental right to live with their current and future children. *See Lovell*, 37 P. 660; *Cocke*, 39 Miss. 423.

*Dumain v. Gwynne*, 92 Mass. (10 Allen) 270 (1865)—another nineteenth-century case Alabama and the Dissent cite, Dissent at 17—also reflects this principle.

In *Dumain*, a husband was found guilty of burglary and sentenced to prison for three years. 10 Allen at 272–73. While the husband was in prison, the wife found herself unable to care properly for their children, so she took them to an adoption-placement home. *Id*. at 273. There, the wife signed a contract agreeing that she would not seek to obtain the children from the adoptive parents. *Id*. at 273–74. When the husband was released from prison, he returned to live with his wife. *Id*. at 274. He then

"industriously pursued his trade as a blacksmith" and "his character and conduct [were] good." *Id.* So the couple sought to obtain their children back from the adoptive placement. *Id.*

The court saw the case as a clash of the rights of the birth parents and the adoptive parents. *See id.* at 274–75. In resolving that conflict, the court explained, *"Without holding that the rights of either parent in respect to the children are absolutely lost*, we must nevertheless hold that they are subject to the rights of the other party to the contract . . . ." *Id.* (emphasis added). So *Dumain* is like *Michael H.*, *Quilloin*, and *Lehr*. In all four cases, the courts had to decide between clashing rights of putative parents.

True, the *Dumain* court did say that the husband's burglary conviction had forfeited his right to the custody of his children *while he was in prison. See id.* at 272–73. But that simply observed a reality of the situation. Of course, the husband could not continue to live with his children while he was in prison. Yet as the quotation above shows, the court left the door open for a father who had been convicted and served his time to obtain custody, post-release, in the absence of the adoptive agreement. *See id.* at 274. In other words, even imprisonment after a criminal conviction did not conclusively and forever disqualify a father from living with his children. Rather, courts considered the particular facts at the time of the inquiry.

The other treatises Alabama and the Dissent refer to rely solely on cases that show the same thing. For instance, Alabama cites Joseph Story for the proposition that "wrongdoing can

'remov[e]' th[e] ['natural] presumption'" "that a parent will take care of his child" "'and deprive [the parent] of custody'" (citing 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE AS ADMINISTERED IN ENGLAND AND AMERICA § 1341, at 562 (Bos., Isaac F. Redfield ed., Little, Brown & Co. 8th ed. 1861)). And the Dissent invokes Story for the proposition that "the Court of Chancery 'interfere[d], and deprive[d] [a father] of the custody of his children,' whenever he exhibited 'constant habits of drunkenness and blasphemy or low and gross debauchery.'" Dissent at 15–16 (citing STORY, *supra*, § 1341, at 562).

But for these propositions, Story relies solely on five cases—none of which show that courts automatically and forever removed a parent's right to live with their children because the parent had engaged in "misconduct." Rather, they provide examples reflecting that courts consistently conducted individualized totality-of-the-circumstances inquiries to determine whether the children's welfare required removal at that time.

Story cites *Anonymous*, 61 Eng. Rep. 260 (1851); *Shelley v. Westbrooke*, Jac. 266; *Wellesley v. Wellesley*, 2 Bligh N. S. 124; *In re Besant*, 11 Ch. D. 508; and *Smart v. Smart*, [1892] A. C. 425. STORY, *supra*, at 564 n.(q). But they're no different from the other cases.

We begin with *Anonymous*. There, a clergyman husband left his wife and children. 61 Eng. Rep. at 262. He was later charged with what was then considered the "unnatural and capital crime"

of engaging in sexual relations with another man.[13]   *See id.* at 263. Five years after he was acquitted on that charge, the father sought custody of his children.   *Id.* at 261.   The court reviewed in depth the affidavits of the parents, as well as those of several witnesses who, among other things, gave specific examples of how the children would be expelled from their schools and shunned by everyone they knew if the husband regained custody.  *See id.* at 261–65.

In determining how to resolve the case, the court focused not on the father's conduct but entirely on the welfare of the children.   As the court explained, it would not give custody to the father "if the father has so conducted himself that it will not be for the benefit of the infants that they should be delivered to him—or if their being with him will affect their happiness—or if they cannot associate with him without moral contamination—or if, because they associate with him, other persons will shun their society."  *Id.* at 266.   Finding the last circumstance to be the case, the court concluded that "[i]t is impossible . . . *here* not to see that contact of these children with their father implies utter exclusion of them from everyone else."  *Id.* at 269 (emphasis added).   So the court denied the father's petition.

Like every other nineteenth-century case Alabama and the Dissent raise, *Anonymous* shows that courts denied a parent custody of their children only after an individualized inquiry into the

---

[13] Same-sex sexual relations were a capital crime (punishable by death) in England until 1861.  *See supra* at note 11.

totality of the circumstances led the court to believe that the children's welfare required it.

In *Shelley*, the court considered a petition to return children to their father after their mother died. Jac. at 266. As the court found, the father had "deserted his wife, and had since unlawfully cohabited with another woman" and that "the father avowed himself an atheist, and that since his marriage he had written and published a work, in which he blasphemously derided the truth of the Christian revelation, and denied the existence of a God as creator of the universe . . . ." *Id.*

After considering everything, the court said it viewed the father's conduct as "highly immoral," and it found "nothing in evidence before [the court] sufficient to authori[z]e [it] in thinking that this gentleman has changed . . . ." *Id.* at 267. Because the court thought the father's conduct "injuriously affect[ed]" his children's interests, the court denied custody. *See id.* But in reaching that determination, the court noted its ruling was not automatic. The court explained, "[T]his case differs . . . from any case in which such principles having been called into activity, nevertheless, in the probable range and extent of their operation, did not put to hazard the happiness and welfare of [the children]." *Id.* So *Shelley* once again reflects that past "misconduct" did not necessarily mean a parent lacked a fundamental right to live with their child. Rather, it meant only that the court could consider that past "misconduct" among the totality of the circumstances in determining whether a

compelling reason to remove the children existed—that their welfare required it.

Rinse and repeat for *Wellesley*, *Besant*, and *Smart*. The court in each case conducted an individualized hearing, considering the totality of the circumstances at the time and what the children's welfare required. Each case shows, contrary to Alabama and the Dissent's argument, that past "misconduct" did not automatically and forever deprive a parent of the right to live with their children. Rather, past "misconduct," like all other relevant facts, was simply one circumstance courts considered in determining whether a child's welfare required the court to remove a child a from a parent's custody.

Alabama and the Dissent also rely on the Tiffany treatise for the proposition that a parent lost their fundamental right to live with their children if they engaged in misconduct such as "being 'a drunkard, or a criminal, or cruel, or shiftless, or otherwise unfit." (Quoting WALTER C. TIFFANY, HANDBOOK ON THE LAW OF PERSONS AND DOMESTIC RELATIONS 346–47 (Roger W. Cooley ed., 3d ed. 1921) (footnotes omitted)). But the cases Tiffany cites for that proposition don't help Alabama and the Dissent any more than the other cases they invoke.

The Tiffany cases include *Marshall v. Reams*, 14 So. 95 (Fla. 1893); *Chapsky*, 26 Kan. 630; *In re Brown*, 117 Ill. App. 332 (1904); *Plahn v. Dribred*, 83 S.W. 867 (Tex. Ct. Civ. App. 1904); *Cowls v. Cowls*, 44 Am Dec. 708 (Ill. 1846) ("[T]he case serves to show that no certain rule can be laid down for the government of the court

in all cases, except that the best interests of the child must be consulted."). We've already discussed *Chapsky*. *See supra* at 37–38. And by this point, we've reviewed so many other nineteenth-century cases that all show the same individualized totality-of-the-circumstances inquiries that we don't see the value of adding summaries of these other cited cases as well. None of them breaks the mold.

These individualized totality-of-the-circumstances inquiries defy Alabama and the Dissent's argument that a person's "misconduct" automatically and forever denied the right of a parent to live with their children. Rather, courts evaluated the particular facts at the time of the inquiry. So the common law and nineteenth-century case law show that courts understood the fundamental right of parents to live with their children to apply to all parents, not just those who hadn't engaged in state-defined "misconduct."

> b. *That the common law and early American law punished sex offenses with harsher penalties than extinguishing the offender's right to live with their children is irrelevant to the fundamental nature of the right of a person who was convicted of such a crime to live with their children.*

Next, Alabama and the Dissent argue that the common law and early American law punished certain crimes with death, so anything less can't possibly violate the fundamental rights of a person convicted of a such an offense. *See* Dissent at 18–20. Again, Alabama and the Dissent are mistaken.

"Stripping convicted felons of their First Amendment rights is also less severe a consequence than death, but no one could seriously contend that such a statute would be consistent with the First Amendment." *United States v. Dubois*, 139 F.4th 887, 898 (11th Cir. 2025) (W. Pryor, C.J., concurring) (citation omitted). That's why we must approach past, severe punishments with a "'measured understanding of the limits of these historical analogues'"—to "avoid[] 'read[ing] a principle at such a high level of generality that it waters down the right.'" *Id.* (quoting *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barrett, J., concurring)).

So we read the reach of civil-death statutes against other forms of permissible regulations with respect to the specific right at issue. *See id.* at 898–99 (W. Pryor, C.J., concurring) (explaining we must consider the traditions together); *cf. Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1133 (11th Cir. 2025) (en banc) (Rosenbaum, J., concurring) (explaining we may consider together different regulatory traditions to determine whether a legislature's new response to a new problem may pass constitutional muster). In *Dubois*, a Second Amendment case, Chief Judge Pryor found civil-death penalties informative because, in other contexts, there was, at the time of the Founding, (a) "a well-recognized (if limited) legislative power to strip specified categories of persons of their right to bear arms" and (b) "no historical requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." 139 F.4th at 898 (W. Pryor, C.J., concurring) (cleaned up).

But those factors are absent here. To be sure, the legislature played a role in regulating parental rights. States throughout the Antebellum period established reformatories for children who were in the custody of an "unfit parent," like those who committed crimes. *See Henry*, 135 F.4th at 1319.

But as we've explained *ad nauseam*, these laws did not "strip specified categories of persons of their right" to the physical custody of their children. *Dubois*, 139 F.4th at 898 (W. Pryor, C.J., concurring) (citation omitted). They were never "intended to foreclose the right of a parent, when competent, to resume the custody and care of his child." *Milwaukee Indus. Sch. v. Milwaukee Cnty. Sup'rs*, 40 Wis. 328, 339 (1876).

Nor did they remove children from parents without "an individualized determination." *Dubois*, 139 F.4th at 898 (W. Pryor, C.J., concurring) (citation omitted). Instead, "the rights of the parent" were "protected on habeas corpus by th[e] court[s]" and by the "right to show that the cause stated for the commitment does not now exist; that he is competent and fit to have the care of his child; and that the welfare of the child will permit of her removal from her present custody." *Farnham v. Pierce*, 141 Mass. 203, 205 (1886). Even *felons* had the right to judicial review and to show their continued custody of their child would be in their child's best interests. *See Dumain*, 92 Mass. at 272–76.

If the parents could "convince[]" the court that they would "treat[] the[] children with kindness," the court would award them

custody. *Striplin v. Ware*, 36 Ala. 87, 91 (1860); *see Jensen v. Jensen*, 170 N.W. 735, 736 (Wis. 1919) (declining to rescind custody from a mother "in the face of proof showing that the child is being well taken care"). So the fact that a parent's crimes could be punished by death in the early years of our country does not bear on whether parents enjoy a fundamental right to live with their children. *Cf. Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., concurring) ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society."), *abrogated on other grounds by New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

### 3. The fundamental nature of the right of parents to live with their children requires rejection of an exception for those who have engaged in state-defined "misconduct."

If we created the exception that Alabama and the Dissent urge, virtually every parental-rights case would fail at the fundamental-rights stage. Targeted groups of parents—with or without criminal convictions—would not be able to assert any parental rights. Subject only to limited rational-basis review, states could force those groups of parents to send their children to state-selected schools, *contra Pierce*, 268 U.S. at 534–35, or to permit visitation by state-selected officials, *contra Troxel*, 530 U.S. at 67–75, or to submit their children to state-selected medical care, *contra Parham*, 442 U.S.

at 603. But the Supreme Court has never accepted such an approach. And neither do we.

This scenario could arise because of how Alabama and the Dissent justify their proposed exception for parents who have engaged in state-defined "misconduct." To define "gross misconduct," Alabama and the Dissent look to nineteenth-century materials that summarize reasons why courts removed custody from parents, *after individualized totality-of-the-circumstances inquiries*. These reasons include, among others, "personal ill usage to the child," failure to "educate the child," "delinquen[cy]," "injustice," "endanger[ing] the [child's] bodily or moral welfare," "low and gross debauchery," other "considerations affecting the welfare of the children," being "a drunkard, a criminal, or cruel, or shiftless, or otherwise unfit," engaging in "vulgarity and obscenity," moral "contamination," bad "temper," and lack of fatherly "affection."

By Alabama and the Dissent's reasoning, if a state determines a person has engaged in "misconduct"—whatever the state's definition of that term—that person no longer enjoys a fundamental right to live with their children. In other words, under this reasoning, a parent's fundamental right to live with their children is only as secure as a state's decision to refrain from determining that a parent's characteristics or conduct doesn't amount to "misconduct" and then extinguishing the right of every parent it deems to have engaged in that "misconduct." Alabama and the Dissent tell us to just trust the democratic process to protect parental rights. *See* Dissent at 21–22.

That means the fundamental nature of a parent's right to live with their children depends on what the legislature determines falls into one of the categories of "misconduct" above. In other words, it can be legislated away. But if that's so, the parent's right to live with their children is not "fundamental" in any real sense at all. The whole point of rights that are "fundamental" is that the legislature can't burden them unless it has a compelling reason to do so and it narrowly tailors its legislation to further that reason.

Yet Alabama and the Dissent's analysis would take the reason for burdening a fundamental right and mistake it for a reason why the right isn't fundamental in the first place. As a result, the right would be "fundamental" only as long as the state's legislation decides it is. That would describe out of existence the fundamental nature of the longstanding fundamental right of a parent to live with their child. So a state could target groups of parents by defining them as having committed "misconduct," and they would have no recourse. Indeed, the Dissent doesn't deny that its analysis of Henry's claim would allow for such a result.

The Supreme Court and our history and tradition don't tolerate this type of exception. So we reject it.

D.    *We remand this case to the panel to consider the best way to proceed, given our determination that Henry, like all parents, enjoys a fundamental right to live with his children.*

Our determination that Henry enjoys a fundamental right to live with his children puts us on the strict-scrutiny track of substantive-due-process analysis. But that doesn't necessarily mean

that Alabama's Act violates Henry's fundamental right. After all, Alabama has articulated a compelling reason for its law: the safety of children. And laws that vindicate this interest can be constitutional if they are narrowly tailored to further it.

So we remand this case to the panel for further proceedings consistent with this opinion.

### IV. CONCLUSION

The Supreme Court has always defined the fundamental right of the parent to live with their children at that level of generality. Our history and tradition have always done the same thing. Today, we continue to protect the fundamental right of all parents to live with their children by recognizing that Henry enjoys that same right.

We remand to the panel for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REMANDED TO THE PANEL IN PART.**

ROSENBAUM, Circuit Judge, concurring:

The Court's opinion explains that Supreme Court precedent, centuries of our history and tradition, and the nature of fundamental rights require the conclusion that all parents enjoy the fundamental right to live with their children. As the Court's opinion shows, none of these sources support the Dissent's contention that a parent's state-defined "misconduct" "status," Dissent at 1, 6, 12, 15–17, 20–21, somehow creates an exception to the universality of all parents' fundamental right to live with their children. The Dissent reaches the contrary conclusion because it devises and then employs arbitrary rules for defining the asserted right. I write separately to explain why the precedent on which the Dissent relies to manufacture its proposed rules for describing the asserted right does not support the Dissent's proposed rules or proposed asserted right.

I begin by explaining how we determine the description of the asserted right. Then I show why the Dissent's proposed rules for identifying the asserted right lack a basis in precedent.

I.   **We determine the description of the asserted right by examining our Nation's history, legal traditions, and practices.**

We begin the inquiry into whether a right is fundamental with a "'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). But we don't determine the description of the asserted right in a vacuum. Rather, "[w]e

begin, as we do in all due process cases, by examining our Nation's history, legal traditions, and practices." *Id.* at 710.

The history and tradition of some fundamental rights show we've tended to recognize the right at a higher level of generality. Take the right to marry. In *Obergefell v. Hodges*, 576 U.S. 644 (2015), for instance, same-sex couples challenged state laws that denied them the right to marry. After the Court reviewed our Nation's history and traditions concerning that right, the Court described the asserted right as "the fundamental right to marry," not the "right of two individuals of the same sex to marry each other." *See id.* at 670. The Court used the higher level of generality to describe the right in *Loving v. Virginia*, 388 U.S. 1, 12 (1967), as well. There, the Court identified the asserted right as that of "the freedom to marry," not as those of a white man to marry a Black woman or of a Black woman to marry a white man. *See id.*

Or consider a right closer to the one at issue here—parents' fundamental right "with respect to 'the upbringing and education of children." *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026). In *Mirabelli*, parents took issue with a California law, which, in the absence of student consent, did not allow schools to disclose to parents if their child was gender-transitioning at school. *Id.* But the Court did not narrowly describe the asserted right as the right of the parents to know whether their children are gender-transitioning at school. Rather, just a few weeks ago, the Court described the asserted right broadly. It held that California's "policies likely violate *parents' rights to direct the upbringing and education of their children.*"

*Id.* (emphasis added). *See also id.* at 499 (Barrett, J., concurring) ("[T]he doctrine of substantive due process has long embraced a parent's right to raise her child, which includes the right to participate in significant decisions about her child's mental health.").[1]

In contrast, our history and tradition have more narrowly described some other rights. The right to die offers a good example. In *Glucksberg*, 521 U.S. at 722, the plaintiff claimed she sought that right. But the Supreme Court noted that she based that asserted right, in part, on *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990). In *Cruzan*, the Court "assumed that the Constitution granted competent persons a 'constitutionally protected right to refuse lifesaving hydration and nutrition.'" *Glucksberg*, 521 U.S. at 723 (quoting *Cruzan*, 497 U.S. at 279). And the Court made that assumption in *Cruzan*, in turn, based on "the long legal tradition protecting the decision to refuse unwanted medical treatment." *Id.* at 725.

But that tradition differed materially from our Nation's history and tradition about what the *Glucksberg* plaintiff sought: the right to commit suicide and to do so with another's assistance. *See id.* at 728. In contrast to our Nation's history and tradition on the right to refuse lifesaving treatment, the Court explained, our country's history reflects "the rejection of nearly all efforts to permit [assisted suicide]." *Id.* Because the plaintiff's claimed right and the right she in fact sought had two different histories and traditions,

---

[1] Only Chief Justice Rehnquist joined this aspect of Justice Scalia's opinion.

the Court described the asserted right narrowly and consistently with the history and tradition of the right the plaintiff actually sought.

As each right has its own unique history and tradition applicable specifically to it, descriptions the Court has employed in cases involving other, unrelated rights are not helpful in crafting the careful description of the right at issue in any given case. I explain that problem later in more detail. *See* Part II. But for now, the point is that, to craft a careful description of the asserted right at issue here, we must consider "our Nation's history, legal traditions, and practices," *id.*, as they concern "the sanctity of the family" that the Constitution protects, *Michael H. v. Gerald D.*, 491 U.S. 110, 123–24 (1989).

And here, as the Court's opinion shows, "our Nation's [relevant] history, legal traditions, and practices" reflect that Henry's asserted right is the fundamental right of parents to live with their children.

II.     **The Dissent wrongly describes the asserted right by disregarding history and tradition in favor of arbitrary rules it has devised.**

The Dissent incorrectly identifies the asserted right. It does so because, in crafting the description, the Dissent does not focus on the history and tradition of the parent's right to live with their children. Rather, the Dissent picks and chooses cases involving *other* rights that are not relevant here. And from those select cases, the Dissent purports to develop generally applicable rules for

describing the asserted right in every case. As a result, the Dissent improperly imports Alabama's interest in burdening parents' right to live with their children into the description of the right.

That's not what the Supreme Court has told us to do. Even assuming we apply Justice Scalia's *Michael H.* plurality approach,[2] that approach directs us to look "to the most specific level at which a relevant tradition protecting, or denying protection to, *the asserted right* can be identified." *Michael H.*, 491 U.S. at 127 n.6 (plurality opinion) (emphasis added). And if there's "no societal tradition" at a more specific level, we "consult, and (if possible) reason from, the traditions regarding [the more] general right." *Id.*

For good reason. As I've explained, every fundamental right has its own history and tradition that determines its breadth. So looking to cases involving other rights is not instructive. Indeed, trying to discern generally applicable rules about how narrowly to describe a right from cases involving different rights is like trying to determine the rules for scoring in wrestling by looking at how points are scored in football, hockey, and basketball. Each sport has a different history and tradition, so each sport has different rules. And knowing that a touchdown is worth six points (without the extra point), a hockey goal is worth a single point, and a slam-dunk basket is worth two points, doesn't help us to figure out that a wrestling takedown is worth three points.

---

[2] *See supra* at note 1.

Compounding its error, in consulting cases involving other rights to come up with its rules for describing the right, the Dissent doesn't even purport to account for the histories and traditions of the full universe of fundamental rights. Rather, it selectively consults some rights—the ones where the Court has more narrowly described the asserted right—and ignores others—the ones where the Court has more generally described the asserted right (like the right to marry).

The Dissent's approach to describing the asserted right creates random rules in a vacuum, divorced from the history and tradition that are supposed to "rein in the subjective elements that are necessarily present in due-process judicial review," *Glucksberg*, 521 U.S. at 722.

For instance, the Dissent asserts that "both the Supreme Court and we have described the right 'in reference to the scope of the . . . statute' being challenged." Dissent at 4 (quoting *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1241 (11th Cir. 2004)). But *Williams* addressed the constitutionality of an Alabama statute that prohibited the sale of "sex toys." 378 F.3d at 1233. And the *Williams* plaintiff claimed fundamental rights to "privacy" and "personal autonomy." *Id.* at 1235. As the court explained, "In the abstract, . . . there is no fundamental right to either." *Id.* So it made sense there to "describe the right 'in reference to the scope of the . . . statute' being challenged."[3]

---

[3] The Dissent also relies on *Glucksberg*, *Reno v. Flores*, and *Department of State v. Muñoz* to support its point. I've already explained why *Glucksberg* doesn't

Of course, that's not the case with a parent's fundamental right to live with their children. As the Court's opinion shows, our history and tradition have consistently recognized the parent's fundamental right to live with their children to apply to all parents—even those with what the Dissent calls a "status." So as Justice Scalia explained in *Michael H.*, because "there [is] no societal tradition, either way, regarding the rights of the natural father [who has

---

bolster the Dissent's description of the right here. *See supra* at 3–4. *Flores* and *Muñoz* don't help the Dissent, either.

In *Flores*, a class of juvenile noncitizens who weren't accompanied by adults were arrested and held in immigration custody pending their deportation hearings. 507 U.S. at 294. They claimed as their right "freedom from physical restraint." *Id*. at 300. But the Court effectively determined that no such history and tradition existed and were applicable to the plaintiffs because (a) they were not in "shackles, chains, or barred cells," and (b) "juveniles, unlike adults, are always in some form of custody." *Id*. at 302. In other words, unlike with the fundamental right of a parent—with or without a "status"—to live with their child, a narrower historical and traditional right applied to juveniles.

As for *Muñoz*, there, a woman claimed the right to live with her noncitizen spouse in the United States and invoked "the fundamental right of marriage." *Muñoz*, 602 U.S. at 910. The Court defined the asserted right more narrowly, to refer to the husband as a noncitizen because the government had a "fundamental sovereign attribute" that allowed it to admit and exclude foreign nationals, "largely immune from judicial control." *Id*. at 907. So Muñoz sought "something distinct" and "more than marriage." *Id*. at 910. That is, the Court described the husband as a noncitizen in the description of the asserted right because that fact implicated a history and tradition other than the fundamental right of marriage. Put differently, *Muñoz* is similar to *Michael H.*, *Quilloin*, and *Lehr*, where two "rights" clashed, so we had to consult the relevant histories and traditions to determine which "right" takes precedence. But as I've explained, that's not the case here.

a "status,"] of a child . . . , we . . . have to consult, and (if possible) reason from, the traditions regarding natural fathers in general." 491 U.S. at 127 n.6.

For its next rule, the Dissent says "[w]e have also consistently reviewed challenges to sex-offender laws by referring to the terms of those statutes." Dissent at 5. In support, the Dissent relies on two Eleventh Circuit cases: *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005), and *United States v. Ambert*, 561 F.3d 1202 (11th Cir. 2009). But as the Court's opinion explains, *see* Maj. Op. at 26–27, *Doe* referred to the terms of the statute because the plaintiffs sought to avoid publication of the information the statute required.

Similarly, *Ambert* involved the federal version of the Florida law at issue in *Doe*. *See Ambert*, 561 F.3d 1202 (11th Cir. 2009). As a result, we found *Doe*'s analysis "equally applicable" in *Ambert*. *Id*. at 1209.

As the Court's opinion explains, history and tradition made it clear that the plaintiffs' right or lack thereof to prohibit publication in both *Doe* and *Ambert* depended on the specific personal information that the state sought to publish. For that reason, our descriptions of the asserted right in *Doe* and *Ambert* had to mention the information the statutes published. But tradition shows that whether a parent has the "status" of having engaged in state-defined "misconduct" has never conclusively and forever determined the right of a parent to live with their child. So it makes no sense to incorporate the terms of the Act into the careful description of the right.

The Dissent next relies on *Jones v. Helms*, 452 U.S. 412 (1981), to support its rule that a careful description of the right must mention "criminal status." *See* Dissent at 11. But *Jones* again involved a different right—the right to travel—from the one at stake here. There, Georgia law made it a misdemeanor for a parent to "willfully and voluntarily abandon[] his or her dependent child." 452 U.S. at 413. A parent who committed that offense and then left the state was guilty of a felony. *Id.* The Court explained that the right to travel has never been "an unlimited one." *Id.* at 419 n.15. Rather, traditionally, the government has imposed absolute limits on that right for "fugitive[s] from justice" and those who might "endanger others by carrying contagion about." *Id.* For that reason, the fact that a person invoking their right to travel is a "fugitive from justice" was relevant to determining the fundamental nature of the right at stake.

Again, though, that's not the case with the fundamental right of the parent to live with their child. To be sure, courts could and did consider a parent's misconduct in determining whether to strip the parent of their custody rights. But that was not the beginning and end of the inquiry. Rather, courts looked to the totality of the circumstances at the time the parent sought to obtain or retain custody, considering the parent's reformation and what the child's welfare required.

The Dissent also asserts that *Michael H.*, *Quilloin*, and *Lehr* support consideration of the parent's state-defined "misconduct" in

the careful description of the right. *See* Dissent at 9–11. The Court's opinion explains why that is wrong. *See* Maj. Op. at 19–25.

Finally, the Dissent points to *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), to support its contention that the careful description of the right must "refer[] to the challenged state law[]." Dissent at 6. There, a group of plaintiff parents challenged an Alabama law prohibiting the use of puberty blockers and hormones for minors, and we described the right involved as the "[parental] right to treat one's children with transitioning medications subject to medically accepted standards." *Id.* at 1224.

The Court's opinion already explains why *Eknes-Tucker* is not helpful here. *See* Maj. Op. at 28. Plus, *Mirabelli* teaches that our description of the right in *Eknes-Tucker* was likely wrong. After all, in *Mirabelli*, the Court did not narrowly describe the asserted right as the right of the parents to know whether their children are gender-transitioning at school. Rather, the Court held that California's "policies likely violate *parents' rights to direct the upbringing and education of their children*." *Id.* (emphasis added). So the description of the right in *Eknes-Tucker* should have been characterized as the parental right to direct the upbringing of their children, or the most detailed description that may have worked would have been the parental right to treat one's children subject to medically accepted standards.

But even assuming that our description of the right in *Eknes-Tucker* was not wrong, it doesn't tell us anything about the tradition and history of the parent's right to live with their children,

which the Court's opinion today reviews at length. So consulting *Eknes-Tucker* to figure out how to craft the careful description of the right at issue here is like thinking knowing how to ride a bicycle means knowing how to fly a plane. They are different from each other.

In sum, the Dissent's effort to glean rules for crafting the description of the asserted right, from cherry-picked cases, disregards the one thing the Supreme Court has told us to consult in determining the careful description: the tradition and history of the asserted right. Perhaps that's why the Supreme Court has never directed us to use the "rules" the Dissent comes up with.

WILLIAM PRYOR, Chief Judge, joined by NEWSOM, BRANCH, and LAGOA, Circuit Judges, and by LUCK, Circuit Judge, as to Parts I and II.A., dissenting:

All agree that parents generally enjoy a fundamental right to "make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion). But this appeal presents a different question: whether the Due Process Clause grants child-sex convicts, not parents generally, a fundamental right to reside with their children. Of course not.

The Supreme Court requires that we review any substantive-due-process challenge to a state law by first "careful[ly] descri[bing]" the asserted right tailored to what the law forbids. *See Reno v. Flores*, 507 U.S. 292, 302 (1993). So, in his challenge to a law that governs *only* child-sex convicts, ALA. CODE § 15-20A-11(d)(4), Bruce Henry cannot invoke a general parental right: he instead asserts the right of a child-sex convict to reside with his minor child.

The majority insists that a parent's criminal status cannot be part of the careful description of his right. Yet the Supreme Court regularly considers a parent's status *before* deciding what protection his right enjoys. *See, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("unwed father" lacking custody). And both the Court and we describe a challenger's right with reference to his *criminal status. See, e.g.*, *Jones v. Helms,* 452 U.S. 412, 420 (1981); *Doe v. Moore*, 410 F.3d 1337, 1341, 1343–44 (11th Cir. 2005). Because a child-sex convict lacks a fundamental right to reside with his minor child, and the

majority declines to hold that Alabama's law satisfies strict scrutiny, I respectfully dissent.

## I. BACKGROUND

Bruce Henry is an admitted "porn addict" who has "masturbate[d] while looking at child pornography." Henry amassed a porn collection including 348 photos and two videos of prepubescent children and adolescents, particularly girls between the ages of six and ten. The videos depicted a prepubescent girl performing oral sex on an adult male and a dog.

Henry's long entanglement with the federal criminal justice system began in 2011 when officials discovered Henry's stash. He later pleaded guilty in federal court to possession of child pornography. *See* 18 U.S.C. § 2252A(a)(5)(B). After five years in prison, Henry accessed more pornography in violation of the terms of his supervised release. He viewed pornographic images with titles like "Sexy Young Teens I want to Fuck," "Amateur Teen [Cross-Dresser] Gives a Self Facial," "Younger Fetish Ladies," "Chubby Teen [Cross-Dresser] Cum," "My favorite . . . teen," "Nerdy Teen Fucks His Sissy [Cross-Dresser]," and "Schoolgirls." Henry admitted to his probation officer having searched for the titles and other "images of children posed in sexual positions and images of teen girls."

After his conviction, Henry is subject to the Alabama Sex Offender Registration and Community Notification Act. The Alabama Legislature enacted that law "not to punish sex offenders but to protect the public and, most importantly, promote child safety."

ALA. CODE § 15-20A-2(5). The Act bars "adult sex offender[s]," like Henry, from "resid[ing] or conduct[ing] an overnight visit with a minor." *Id.* § 15-20A-11(d).

The general bar against residence or overnight visits with a minor does not apply to sex offenders who reside with their minor children, grandchildren, stepchildren, siblings, or stepsiblings. *Id.* But the Act saves five categories of sex offenders from that exception. One is for any offender "convicted of any sex offense involving a child," *id.* § 15-20A-11(d)(4), which includes "any sex offense in which the victim was a child or any offense involving child pornography," *id.* § 15-20A-4(27). This child-porn exception bars Henry from residing with his prepubescent son.

## II. DISCUSSION

The majority commits two errors. It first misunderstands Henry's asserted right, and it then shirks its judicial duty to decide whether the Alabama child-porn exception is constitutional.

### A. *Henry's Substantive-Due-Process Challenge Fails.*

Henry's suit does not implicate a general parental right, but instead the right of child-sex convicts to reside with their children. *That* right is not fundamental. And the Alabama child-porn exception has a rational basis.

#### 1. Henry Asserts the Right of a Child-Sex Convict to Reside with His Minor Child.

The Due Process Clause of the Fourteenth Amendment protects "a select list of fundamental rights that are not mentioned

anywhere in the Constitution." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). One is the fundamental right of parents "to establish a home and bring up children." *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). But that is not the end of the story.

Because the doctrine of substantive due process creates a "'treacherous field,'" *id.* at 2247 (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 502 (1977) (plurality opinion)), the Supreme Court has instructed us to "exercise the utmost care whenever . . . asked to break new ground," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citation modified). *See also Eknes-Tucker v. Gov. of Ala.*, 114 F.4th 1241, 1245 (11th Cir. 2024) (Pryor, C.J., respecting the denial of rehearing en banc) (explaining "the Supreme Court has sought to discipline [the] application" of substantive due process lest "judges . . . usurp authority" that the Constitution entrusts to democracy (citation modified)). To evaluate whether Henry enjoys a fundamental right, we "must begin with a careful description" of the right Henry asserts. *Flores*, 507 U.S. at 302. We do so to avoid placing "outside the arena of public debate and legislative action" matters generally reserved to the people. *Glucksberg*, 521 U.S. at 720.

"[T]he scope of the asserted right—and thus the parameters of the inquiry—must be dictated 'by the precise facts' of the immediate case." *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1240 (11th Cir. 2004) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 (1985)). In case after case, both the Supreme Court and we have

described the right "in reference to the scope of the . . . statute" being challenged. *Id.* at 1241; *see also K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 623–25 (7th Cir. 2024) ("The Supreme Court has always defined the right at issue narrowly, hewing as closely as possible to the statute."). For example, in *Washington v. Glucksberg*, the Supreme Court refused to describe the asserted right as "a liberty interest in determining the time and manner of one's death" or "a right to die." 521 U.S. at 722, 724 (citation modified). It instead referred to the challenged statute—a prohibition of assisted suicide—and recast the asserted right as "a right to commit suicide with another's assistance." *Id.* at 724. In *Flores*, the Court likewise rejected as overbroad an alien juvenile's asserted right "to freedom from physical restraint." 507 U.S. at 294, 302 (citation modified). It restated the "right at issue" as "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* And, in *Department of State v. Muñoz*, a challenge to a law that barred an alien spouse from entering the United States, the Court carefully described the right as "the right to reside with [a] noncitizen spouse in the United States," not as the "fundamental right of marriage" invoked by the citizen spouse. 144 S. Ct. 1812, 1819, 1822 (2024) (emphasis omitted) (citation modified).

We have also consistently reviewed challenges to sex-offender laws by referring to the terms of those statutes. For example, in *Doe v. Moore*, sex offenders argued that the Florida Sex

Offender Act violated their "rights to family association, to be free of threats to their persons and . . . families, to be free of interference with their religious practices, [and] to find and/or keep any housing [and] . . . employment" by requiring them to publicly register as sex offenders and submit blood and tissue samples for Florida law enforcement to keep on file. 410 F.3d at 1340–41, 1343 (citation modified). But we "use[d] the Sex Offender Act itself to define the scope of the claimed fundamental right." *Id.* at 1344. We employed "a more careful description of the asserted right": "the right of a person, *convicted of 'sexual offenses*,' to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information." *Id.* at 1343–44 (emphasis added). Because the Act governed only sex offenders, we described the right with reference to the *status* of the person asserting it.

We took the same approach in *United States v. Ambert*, 561 F.3d 1202 (11th Cir. 2009). There, a sex offender alleged that the federal registration law violated his substantive-due-process right by "caus[ing] his name to be placed on a sex offender registry without first providing him with a hearing to assess the risk of recidivism and current dangerousness." *Id.* at 1208. But we described his asserted right as that "of a *sexual offender* to refuse to register and to prevent publication." *Id.* at 1209 (emphasis added).

And even in decisions involving parental rights generally, we have tailored the asserted rights to the challenged statute. For example, in *Eknes-Tucker v. Governor of Alabama*, we ruled that

several parents' challenge to an Alabama law prohibiting the use of puberty blockers and cross-sex hormones for minors involved only the "[parental] right to treat one's children with transitioning medications subject to medically accepted standards." *See* 80 F.4th at 1210, 1224 (citation modified). We rejected the parents' framing as a law burdening the "fundamental right to make decisions concerning the care, custody, and control of one's children." *Id.* at 1221 (citation modified). We refused to describe the right at that "high level of generality," even if "some of [the Supreme Court's] cases recognize[d]" a "fundamental right" for parents and even "appl[ied] the fundamental parental right in the context of medical decision-making." *Id.* at 1224. Those decisions, we explained, never "establish[ed] that parents have a *derivative* fundamental right to obtain a particular medical treatment for their children." *Id.* (emphasis added).

Henry's asserted right, properly framed, is the right of a child-sex convict to live with his minor child. That framing describes Henry's right "in reference to the scope of the [state] statute" being challenged, *Williams*, 378 F.3d at 1241, because the Alabama child-porn exception prohibits only child-sex convicts, like Henry, from living with their minor children. And it is consistent with *Doe*'s and *Ambert*'s "careful description" of the asserted right as that of a person "convicted of sexual offenses" to engage in particular conduct. *Doe*, 410 F.3d at 1343–44 (citation modified).

The precedents Henry and the majority invoke do not establish that he enjoys a fundamental right. Those decisions

addressed the enforcement of generally applicable laws that burdened parents *as parents*. *See Meyer*, 262 U.S. at 397, 403 (holding unconstitutional Nebraska statute mandating that "[n]o person, individually or as a teacher, shall . . . teach any subject to any person in any language other than the English language"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 530, 534–35 (1925) (holding unconstitutional an Oregon law "requir[ing] every parent . . . of a child between eight and sixteen years to send him to a public school" (citation modified)); *Moore*, 431 U.S. at 495–96, 505–06 (holding unconstitutional zoning ordinance that limited occupancy of residences to members of a single family); *Troxel*, 530 U.S. at 60, 75 (holding unconstitutional Washington statute that permitted "any person to petition a superior court for visitation rights at any time" (citation modified)); *Mirabelli v. Bonta*, 146 S. Ct. 797, 800, 803 (2026) (holding likely unconstitutional California policies "prevent[ing] schools from telling [parents] about their children's efforts to engage in gender transitioning . . . unless the children consent"). By contrast, Alabama's child-porn exception regulates only parents with child-sex convictions. To carefully describe Henry's right, we must account for the law's limited scope.

The majority never contests that when carefully describing an asserted right, the challenged statute's prohibition is relevant, but it pretends that only half of the prohibition matters. It acknowledges that the child-porn exception burdens only Henry's right "to live with [his] child[]," *see* Majority Op. at 18, yet refuses to consider that *only* his criminal *status* triggers that prohibition. In its view, "all parents enjoy the fundamental right to live with their children." *Id*.

at 29. *See* ALA. CODE § 15-20A-11(d)(4) (prohibiting those "convicted of any sex offense involving a child" from "resid[ing] or conduct[ing] an overnight visit with a minor"). But the majority's insistence that parental status is irrelevant runs headlong into a wall of precedent. The Supreme Court has reviewed challenges to laws burdening parental and other fundamental rights by carefully describing the challenger's right based on his status, including criminal status.

In *Michael H. v. Gerald D.*, the Court considered a challenge to a California statute that presumed that a child born to a married woman living with her husband is the child of the marriage. 491 U.S. 110, 113 (1989) (plurality opinion). The natural father "contend[ed] as a matter of substantive due process that, because he ha[d] established a parental relationship with [the child], protection of [the mother's] marital union [was] an insufficient state interest to support termination of that relationship." *Id.* at 121. But the Supreme Court disagreed. Its plurality opinion explained that "[w]hat [the natural father] must establish . . . is not that our society has traditionally allowed a natural father in his circumstances to establish paternity, but that it has traditionally accorded *such a father* parental rights, or at least has not traditionally denied them." *Id.* at 126 (emphasis added). With "nothing in the older sources, nor in the older cases, addressing specifically the power of the natural father to assert parental rights over a child born into a woman's existing marriage with another man," the plurality concluded that no fundamental right was at stake. *Id.* at 125, 127. Justice Brennan urged a broader inquiry into "whether parenthood is an interest

that historically has received our attention and protection." *Id.* at 139 (Brennan, J., dissenting). But the plurality adopted a careful description tied to the father's particular *status* as a father not married to the mother. *Id.* at 127 (plurality opinion).

And in two decisions upholding state laws about stepparent adoption, the Supreme Court considered whether those laws adequately protected the asserted rights of natural fathers who were unwed and uninvolved, not parents generally. In *Quilloin v. Walcott*, the Supreme Court acknowledged that "the custody, care and nurture of the child reside first in the parents." 434 U.S. at 255 (citation modified). But it carefully defined the asserted right as that of an "unwed father" who did not "ha[ve], or s[eek], actual or legal custody of his child." *Id.* The Court rejected the biological father's assertion that "he was entitled to recognition and preservation of his parental rights absent a showing of his 'unfitness'" and upheld the Georgia statute. *Id.* at 253–55. Similarly, in *Lehr v. Robertson*, the Court defined a challenger's asserted right to "form . . . a relationship" with his child as that of a natural father who had no "significant custodial, personal, or financial relationship with [the child], . . . until after [the child] was two years old." 463 U.S. 248, 262–63 (1983). It acknowledged that "an unwed father [who] demonstrates a full commitment to the responsibilities of parenthood . . . acquires substantial protection under the Due Process Clause." *Id.* at 261. But it held that "the mere existence of a biological link does not merit equivalent constitutional protection." *Id.* Finding the relationship between the uninvolved father and his child distinct from those cases where the biological father had a "developed"

relationship with the child, the Court held that the uninvolved father had no constitutional right to notice of his child's adoption. *Id.* at 250, 261–62, 265.

The Supreme Court described an otherwise fundamental right with reference to the criminal status of a challenger in *Jones v. Helms*, when it reversed a decision of our predecessor circuit. 452 U.S. at 415–17. There, a Georgia father challenged a state law that enhanced penalties for willful abandonment of a dependent when the parent left the jurisdiction after abandoning his child. *Id.* at 413. The father argued that the law burdened the "right of a United States citizen to travel from one State to another," which the Supreme Court had previously described as "fundamental." *Id.* at 417–18; *see also Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 254 (1974) ("The right of interstate travel has repeatedly been recognized as a basic constitutional freedom."). But the Court more carefully described the issue as whether "a person who has committed an offense punishable by imprisonment has an unqualified federal right to leave the jurisdiction prior to arrest or conviction." *Helms*, 452 U.S. at 420. The father's "criminal conduct . . . necessarily qualified his [otherwise fundamental] right thereafter freely to travel interstate," so the Court rejected his reliance on precedents about citizens "whose right to travel had not been qualified in any way." *Id.* at 420–21 (first citing *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1868); and then citing *Edwards v. California*, 314 U.S. 160 (1941)).

*Stanley v. Illinois*, 405 U.S. 645 (1972), does not compel us to hold Henry has a fundamental right. *See* Majority Op. at 19–21. In

*Stanley*, the Supreme Court held that Illinois violated the right to due process by removing from custody, without a hearing, the children of an unmarried father, who had raised them during his 18-year relationship with their deceased mother, based solely on the fact that the parents were never married. 405 U.S. at 646, 658. Illinois imposed a presumption of unfitness for unwed fathers without affording them an individual judicial determination. *Id.* at 650–51 (first citing *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886 (1961); and then citing *Goldberg v. Kelly*, 397 U.S. 254 (1970)). Crucially, "nothing in th[e] record indicate[d] that Stanley [was] or ha[d] been a neglectful father who ha[d] not cared for his children." *Id.* at 655. Illinois offered no proof that he had engaged in *any* form of misconduct. *Contra* Majority Op. at 21 (suggesting that Illinois deemed "being unwed with children" as "misconduct"). Here, in contrast, a federal court convicted Henry of sexual misconduct against children. If, like the father in *Stanley*, Henry contended only that Alabama owes him a hearing before curtailing his right to reside with his child following his child-sex conviction, then his asserted right would not sound in substantive due process at all. *Cf. Muñoz*, 144 S. Ct. at 1822 (explaining that a "substantive due process right that gets only procedural due process protection" would "be in a category of one" and "neither fish nor fowl").

Henry argues *Lehr* and *Michael H.* are inapplicable because they answer only "who is a parent" instead of defining a parent's rights. But neither decision purports to answer that question. Instead, they assumed the challenger's natural "fatherhood" and, in *Michael H.*, even "an established parental relationship," and then

asked which rights traditionally would flow from the *sort* of paternal relationship the challenger had with his children. 491 U.S. at 123–24 (explaining that "our traditions have protected the marital family"). The lesson of *Lehr* and *Michael H.* is that not all fathers have the same parental rights. Those precedents require us to ask whether "such a father" as Henry, convicted of a child-sex offense, has a fundamental right to live with his child. *See id.* at 126.

Henry contends that his status as a married father also distinguishes his asserted right from those described in *Lehr* and *Michael H*. But that the laws in *Lehr* and *Michael H.* disadvantaged the challengers for different reasons than the child-porn exception burdens Henry does not alter the fact that the Court "analyze[d] the particular facts of th[e] case to determine whether [the father] ha[d] a constitutionally protected liberty interest." *Lehr*, 463 U.S. at 270 (White, J., dissenting). What matters is "the relationship between persons in the situation of [the father] and [his child]" and the traditional legal protections for "such a father." *Michael H.*, 491 U.S. at 124, 126.

The majority posits that *Michael H*., *Quilloin*, and *Lehr* are "exception[s] to the rule that all parents have a fundamental right to live with their children" because the Supreme Court was forced "to determine which putative parent's right won out." *See* Majority Op. at 21, 24–25. Yet none purports to be an "exception" to a rule. In *Michael H*., the Court made the father's relation to another family part of the careful description of his substantive-due-process right. *See* 491 U.S. at 127 ("What counts is whether the States in fact

award substantive parental rights to the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child.") And nothing in *Quilloin* or *Lehr* suggests that the Court would have resolved the issue any differently if it did not involve contested rights. Indeed, if the father in *Quilloin* had "at any time had . . . or sought" custody, 434 U.S. at 255, or if the father in *Lehr* "grasp[ed] th[e] opportunity" to "develop a relationship with his offspring," 463 U.S. at 262, they would have enjoyed the general right of parents.

Finally, the majority takes issue with my reliance on *Doe* on the ground that *Doe* "*had to* mention the information the statute published" because "[w]hether a tradition exists against publication depends on what is being published." Majority Op. at 26–27 (emphasis added). But it would have been "[]possible" to define the challenger's interest without reference to his sex-offender *status*. *Contra id*. at 26. We could have held that the asserted interest was the "right to refuse registration of personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website." Indeed, our definition of the challenger's right distinguished between the personal information Florida law required to be published, on one hand, and the sex offender's status, on the other. *See Doe*, 410 F.3d at 1344. We made this distinction because the challenged Florida law required officials to publish more than the fact of the sex offender's status: it also required publication of the offender's photograph and other "identifying information." *Id*. at 1341. We included the fact the challenger was "convicted of 'sexual offenses'" because the

Florida Act applied only to those "convicted of 'sexual offenses.'" *Id*. at 1344. Similarly, the challenged law in this case applies only to those "convicted of any sex offense involving a child," ALA. CODE § 15-20A-11(d)(4), so Henry's right should be circumscribed by his conviction.

2. Child-Sex Convicts Do Not Enjoy a Fundamental Right to Reside with Their Minor Children.

Having carefully described Henry's right as that of a child-sex convict to reside with his minor child, we must determine whether he has "show[n] that the asserted right is 'deeply rooted in this Nation's history and tradition.'" *Muñoz*, 144 S. Ct. at 1818 (quoting *Glucksberg*, 521 U.S. at 720–21). Henry "cannot make that showing." *Id*. Indeed, he does not even attempt to do so—for good reason.

The historical record makes clear that parents who committed child-sex offenses traditionally had no fundamental right to reside with their children. Indeed, the common law provided that a parent's gross misconduct could extinguish custodial rights—not only the right to reside. Joseph Story reported that the Court of Chancery "interfere[d], and deprive[d] [a father] of the custody of his children," whenever he exhibited "constant habits of drunkenness and blasphemy or low and gross debauchery." 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE AS ADMINISTERED IN ENGLAND AND AMERICA § 1341, at 562 (Bos., Isaac F. Redfield ed., Little, Brown & Co. 8th ed. 1861). As one English decision reported, the chancery court would refuse to give custody to a father

if his custody threatened to "affect [his children's] happiness," cause "moral contamination," or lead "others [to] shun their society." *Anonymous*, 61 Eng. Rep. 260, 261 (1851). And if a father were "guilty of the perpetration of an unnatural crime," courts considered it their "duty . . . to remove [the children]" and refuse "to permit any sort of intercourse with his children even after he has escaped conviction." *Id.*

That rule pervaded American law. As one treatise put it, "[t]he father has, in America, the paramount right of custody . . . [b]ut this paramount right may be forfeited by his misconduct." JAMES SCHOULER, A TREATISE ON THE LAW OF THE DOMESTIC RELATIONS *338–39 (Bos., Little, Brown & Co. 2d ed. 1874). For example, the colonial law of Massachusetts provided for the placement of children whose families were "negligent of their duty" with special "masters for year[]s (boy[]s till they [be]come . . . twenty one, [and] girls eighteen years of age comple[te]) which will more strictly look unto, [and] force them to submit unto government." THE COLONIAL LAW OF MASSACHUSETTS 136 (Bos., William H. Whitmore ed., Rockwell & Churchill 1889) (1660 with Supplements to 1672). Because the "power of the father" was "a trust, confided to him by the law, upon th[is] presumption," it could be "displaced . . . and . . . conferred upon another" with evidence of "grossly immoral conduct." *State ex rel. Herrick v. Richardson*, 40 N.H. 272, 273–75 (1860). "[L]ike other rights," a father's "right to the custody of his infant children" could "be forfeited by misconduct." *People ex rel. Ordronaux v. Chegaray*, 18 Wend. 637, 643 (N.Y. Sup. Ct. 1836); *accord Ex parte Boaz*, 31 Ala. 425, 427 (1858) ("[A

father's] right to [his children's] custody may be forfeited by misconduct, or lost by misfortune."). A father found "unfit for the trust, by reason of grossly immoral conduct, harsh usage of his child, or other cause" had no right to custody. *Herrick*, 40 N.H. at 274–75. And disqualifying misconduct included "gross profligacy or immoral conduct," or "the grossest vulgarity and obscenity." *Cocke v. Hannum*, 39 Miss. 423, 441 (1860) (citation modified). The Supreme Court of Kansas reported it could find "no case . . . in which the courts have given [custody] to the father who was a drunkard and a man of gross immoralities." *Chapsky v. Wood*, 26 Kan. 650, 653 (1881).

During the Reconstruction era and afterward, state laws also provided that various kinds of misconduct extinguished the parental right to custody. For example, if "a father . . . [was] a drunkard, or a criminal, or cruel, or shiftless, or otherwise unfit," then "the interests of the child . . . outweigh[ed] his parental right of custody." WALTER C. TIFFANY, HANDBOOK ON THE LAW OF PERSONS AND DOMESTIC RELATIONS 346–47 (Roger W. Cooley ed., 3d ed. 1921) (footnotes omitted). To "be deprived of the comfort or custody of a child," the parent's conduct had to be "sufficiently extravagant and singular and wrong to meet the condemnation of all decent and law-abiding people, without regard to religious belief or social standing." *Lovell v. House of the Good Shepherd*, 37 P. 660, 661 (Wash. 1894); *see also Dumain v. Gwynne*, 92 Mass. (10 Allen) 270, 272–73 (1865) ("[The father] committed the crime of burglary, for which offence he was sentenced to the state prison for the term of

three years. His right to the custody of his children was then forfeited . . . .").

The common law and early American law punished sex offenses against children with penalties far harsher than extinguishing the offender's right to reside with his children. *See United States v. Dubois*, 139 F.4th 887, 897 (11th Cir. 2025) (Pryor, C.J., concurring) (explaining that a "long tradition" of severe punishment for certain conduct "inform[s] the constitutionality" of punishing that conduct through other penalties with historical pedigree). Blackstone explained that "the abominable wickedness of carnally knowing and abusing any . . . child under the age of ten years" was a felony "severely and impartially . . . punished with death." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *212, *215 (London, John Taylor Coleridge ed., A. Strahan 16th ed. 1825). The law recognized rape was a "most detestable crime," 1 MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN 635 (London, E. & R. Nutt & R. Gosling 1736), and "every person convicted of the crime of rape . . . suffer[ed] death as a felon," *Commonwealth v. Burke*, 105 Mass. 376, 378 (1870) (citation modified).

At the Founding, death was "the standard penalty" for child-sex offenses. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation modified). For example, Massachusetts required that "any man" convicted of having "carnal copulation with any woman child under ten years old . . . be put to death." *Burke*, 105 Mass. at 380 (citation modified). By 1680, New Hampshire provided that "any man" who "ravish[es] a Maid or woman . . . that is . . . under

Ten years of age . . . shal[l] be punished with death; or some other gr[i]evous punishment." 1 LAWS OF NEW HAMPSHIRE 9, 15 (Albert Stillman Batchellor ed. 1904). Other states uniformly punished rape with death, and the common law treated sexual abuse of a girl under the age of ten as categorically nonconsensual. 4 BLACKSTONE, *supra*, at *212; *see, e.g.*, ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 197 (New-London, Timothy Green 1784) ("[I]f any Man shall forceably, and without Consent ravish any Maid or Woman, by committing carnal Copulation with her against her Consent, he shall be put to Death."); LAWS OF THE STATE OF NEW YORK 664–65 (N.Y.C., Samuel & John Loudon 1788) ("[E]very person . . . convicted or attainted of any manner of . . . rape . . . shall suffer death for the same, and shall be hanged by the neck until he, she or they shall be dead.").

During Reconstruction and afterward, many states executed child-sex convicts or sentenced them to life imprisonment. Alabama, for example, provided that "[a]ny person" convicted of "ha[ving] carnal knowledge of" or "abus[ing]" "any female under the age of ten years . . . must," "at the discretion of the jury," be sentenced to "death," "imprisonment in the penitentiary for life," or "hard labor for the county for life." THE PENAL CODE OF ALABAMA 45 (Montgomery, Geo. W. Stone & J. W. Shepherd eds., Reid & Screws 1866); *see also Bonner v. State*, 65 Miss. 293, 294 (1887) ("Every person who shall be convicted of rape, . . . by carnally and unlawfully knowing a female child under the age of ten years, . . . shall suffer death; unless the jury shall fix the penalty at imprisonment for life." (citation modified)); H.R. REP. NO. 54-108, at 2

(1896) (report of Judiciary Committee on bill to update federal criminal penalties) ("While the crime[] of . . . rape [is] . . . punishable with death, provision is made that life imprisonment may be substituted for the penalty of death, in trials in the civil courts, whenever the jury shall qualify their verdict by adding thereto 'without capital punishment.'").

Henry insists that "gross misconduct" was not "historically an on/off switch for parental rights" but instead one factor in a totality of circumstances bearing on whether a parent could "discharge properly his duty towards his child." The majority agrees that courts did not "automatically" extinguish custody in the light of a parent's criminal conduct. *See* Majority Op. at 30. But that reasoning fails to establish that Henry's right as a child-sex convict to reside with his minor child is "deeply rooted in [our] history and tradition." *Muñoz*, 144 S. Ct. at 1818 (citation modified). The litany of sources cited by the majority that contemplate criminals losing all custodial rights makes clear that there was no such tradition. *See* Majority Op. at 30–43. At best, those sources establish that offenders had a slim chance of convincing the state court to uphold their custody rights. *Contra* Rosenbaum Concurring Op. at 5–7 (suggesting that there is "no societal tradition" burdening the right of sex offenders to live with their children (citation modified)).

Moreover, the history cited by Henry and the majority establishes that states often terminated *custodial* rights for "gross misconduct." Section 15-20A-11(d)(4), in contrast, does not extinguish Henry's custodial rights or any other traditional right of a parent,

save the right to reside with his minor child. Henry may still make all "decisions concerning the care, custody, and control" of his son, *Troxel*, 530 U.S. at 66, including for example "direct[ing] [his] upbringing and education" by "choos[ing] schools," *Pierce*, 268 U.S. at 532, 534–35, raising him in a religious tradition, *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972), and deciding with whom his son may spend time, *Troxel*, 530 U.S. at 67. Under Alabama law, Henry retains all "rights and responsibilities for major decisions concerning the child, including, but not limited to, the education of the child, health care, and religious training." ALA. CODE § 30-3-151(2).

Unlike an enforcement action of the child-porn exception, traditional custody hearings involved the question whether the parent had committed gross misconduct in the first instance. *See, e.g.*, Majority Op. at 33–34 (explaining how in one case, a court "found the evidence of [the husband's 'grossly immoral acts'] lacking and awarded the husband custody"); *Chegaray*, 18 Wend. at 644 (concluding that, after "examin[ing] the evidence which has been adduced," the "father is a man of good character"); *Herrick*, 40 N.H. at 276 (explaining that "there is no evidence of the unfitness of the father . . . but the evidence shows . . . the father . . . to be highly respectable"). The Alabama child-porn exception, in contrast, applies only *after* a felony conviction obtained through a judicial process with proof beyond a reasonable doubt, and even then, it burdens only one of several parental rights. Henry's misconduct has already been established through a judicial process.

Under the majority's logic, the Fourteenth Amendment curtails the discretion of legislatures to regulate parental rights of sex offenders though it preserves wide discretion for judges. Indeed, the majority rejects leaving the regulation of child-sex offenders' right to reside with children up to "the democratic process." *See* Majority Op. 48. But the Supreme Court has cautioned that federal courts should not "usurp authority that the Constitution entrusts to the people's elected representatives," *Dobbs*, 142 S. Ct. at 2247, "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of" the federal judiciary, *Glucksberg*, 521 U.S. at 720. Legislatures enjoy the constitutional authority to make classifications that pertain both to criminal behavior and parental rights.

The Amendment does not foreclose a legislative classification in favor of a kitchen-sink judicial inquiry. *Cf. Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 615 n.13 (1974) ("The Constitution does not impose on the States any particular plan for the distribution of governmental powers."). As explained earlier, if Henry asks only for a judicial hearing to establish his parental fitness, then his claim sounds in *procedural*, not substantive, due process. Yet a substantive-due-process claim that requires only procedural protection would be "in a category of one." *Muñoz*, 144 S. Ct. at 1822. And a tradition of regularly terminating all parental rights of sex offenders after a hearing hardly serves as evidence that those rights are fundamental. *Contra* Majority Op. at 32–33 n.10; *cf. Kerry v. Din*, 576 U.S. 86, 99 (2015) (plurality opinion) (disclaiming the existence

of "not-so-fundamental rights, which can be taken away so long as procedural due process is observed").

Keep in mind that the Act also prohibits a parent convicted of a sexual offense against his own child from residing with any of his minor children. *See* ALA. CODE § 15-20A-11(d)(2). Under the majority's reasoning, a father who raped his minor child will enjoy the fundamental right to reside with that child and other minor children absent an individual judicial determination of dangerousness. After all, the majority maintains that "[a] parent's past problematic behavior [cannot] conclusively and forever disqualify h[im] from living with h[is] child." Majority Op. at 37.

### 3. The Child-Porn Exception Has a Rational Basis.

Because Henry has no fundamental right, we must uphold the child-porn exception if it is "rationally related to [a] legitimate government interest[]." *Glucksberg*, 521 U.S. at 728. That test is not a high bar. *See, e.g.*, *Eknes-Tucker*, 80 F.4th at 1225. And the Alabama child-porn exception easily satisfies it.

The Alabama Legislature enacted the Act to "protect[] vulnerable populations, particularly children," from sexual abuse, and to "promote child safety." ALA. CODE § 15-20A-2(5). States "have a compelling interest in 'safeguarding the physical and psychological well-being of . . . minor[s].'" *Eknes-Tucker*, 80 F.4th at 1225 (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020)). And Alabama could rationally conclude that limiting a child's exposure to adults convicted of possessing child pornography will protect the safety of children.

*B. The Child-Porn Exception Satisfies Strict Scrutiny.*

The majority remands to the panel to decide whether the child-porn exception satisfies scrutiny. *See* Majority Op. at 49–50. Why? The panel already ruled that the exception "flunk[ed]" strict scrutiny. *See Henry v. Sheriff of Tuscaloosa Cnty.*, 135 F.4th 1271, 1306 (11th Cir. 2025). Indeed, the panel did not think it was a close question. *See id.* at 1308 (opining that the child-porn exception "sweeps with too broad a brush"); *id.* (suggesting the child-porn exception addresses a problem that has no "more than a coin flip" chance to occur); *id.* at 1309 (opining that the child-porn exception "allow[s] those who are in fact a danger to minors . . . unsupervised access to their next potential victims"). The majority returns the issue with neither guidance nor suggestion that the panel consider anything differently. And the panel will likely reinstate its earlier analysis—lock, stock, and barrel.

Presumably, some in the majority would prefer not to join an opinion holding that a residence restriction for child-sex convicts violates the Constitution. Yet the parties have briefed whether the child-porn exception satisfies even strict scrutiny. So we should decide whether it is constitutional. *Cf. Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.) ("Questions may occur which we would gladly avoid, but we cannot avoid them.").

The child-porn exception satisfies strict scrutiny. Enforcement against federal convicts of child-pornography possession is "narrowly tailored [to] . . . further compelling government

interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). The district court was wrong to hold otherwise.

It is "beyond the need for elaboration" that the purpose of section 15-20A-11(d), "promot[ing] child safety," ALA. CODE § 15-20A-2(5), is a compelling government interest. *See New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (explaining that the "safeguarding [of] the physical and psychological well-being of a minor" is a compelling interest (citation modified)); *see also* Majority Op. at 50 (holding that the "Alabama [officials] ha[ve] articulated a compelling reason for [the] law: the safety of children"). That interest includes "[t]he prevention of sexual exploitation and abuse of children," *Ferber*, 458 U.S. at 757, because the "sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002); *accord United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) ("[S]exual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." (citation modified)).

Child pornography is a form of sex abuse that "magnifie[s] and perpetuate[s]" the "harm to the child victims." *Irey*, 612 F.3d at 1208; *United States v. Williams*, 553 U.S. 285, 307 (2008) ("Child pornography harms and debases the most defenseless of our citizens."). After all, the "production of child pornography is exacerbated by the circulation of a permanent record of the child's participation." *United States v. Touset*, 890 F.3d 1227, 1236 (11th Cir. 2018)

(citation modified); *Ferber*, 458 U.S. at 759 ("The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children . . . ."). It begets more sexual abuse because "[i]t may incite or encourage others to sexually abuse children," *Irey*, 612 F.3d at 1208, and may be used by sex offenders "to convince children to participate in their abuse," *Touset*, 890 F.3d at 1236. Of course, "shielding children from sexual content" is a compelling government interest. *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2317 (2025). So, even more compelling is a state's interest in protecting children from exposure to child pornography.

"The way [the child-porn exception] advances those interests is intuitive." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 437, 444–45 (2015) (holding that prohibition on state judges personally soliciting campaign funds satisfied strict scrutiny). Sex offenders, a "serious threat in this Nation," are especially threatening to children because "the victims of sexual assault are most often juveniles." *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion). The Supreme Court has acknowledged that "when convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Id.* at 33. Sex offenses against children committed in a home by family members or acquaintances pose a significant risk. *See* OFF. OF JUV. JUST. & DELINQ. PREVENTION, *Child Victims of Sexual Assault by Relationship and Offender Age* (2022), https://perma.cc/QEC7-UXNZ (more than 60 percent of sexual assaults against juveniles are committed by adult family members and adult acquaintances); OFF. OF

JUV. JUST. & DELINQ. PREVENTION, CHILD PORNOGRAPHY: PATTERNS FROM NIBRS 5–6 & tbl. 2 (2004), https://perma.cc/4KJ4-FR7G (noting 83 percent of child pornography victims are abused in a residence and 89 percent are abused by family members or acquaintances); Janis Wolak et al., *Arrests for Child Pornography Production: Data at Two Time Points From a National Sample of U.S. Law Enforcement Agencies*, 16 CHILD MALTREATMENT 184, 190 (2011) (estimating based on law enforcement surveys that 71 percent of child pornography production arrests in 2006 were executed against victims' family members or face-to-face acquaintances). And "it is legitimate and entirely reasonable for States to try to stop abuse from occurring before it happens." *Packingham v. North Carolina*, 582 U.S. 98, 113 (2017) (Alito, J., concurring in the judgment).

The child-porn exception regulates only offenders with a proven sexual interest in children. It limits the time a child-sex offender can spend with a child. And it redirects the offender's visits with a child to public places where the threat of sexual abuse diminishes. The bar on overnight visits also reflects no more than a "reasonabl[e] determin[ation]" that a child-sex offender is more likely to commit an offense when others in the home are asleep and not in a position to stop him. *Cf. Williams-Yulee*, 575 U.S. at 453.

Two aspects of the child-porn exception establish that it is narrowly tailored to serve its end. First, section 15-20A-11(d)(4) limits a provision that *otherwise allows* even most sex offenders to reside with their minor children. The exception applies only to

those convicted of sex offenses against children. Second, the exception does not burden other parental rights. It diminishes the risk to child safety that a child-sex offender's private and extended physical presence presents. It limits only when and where a child-sex offender may spend time with his child. Henry otherwise retains all "rights and responsibilities for major decisions concerning the child, including, but not limited to, the education of the child, health care, and religious training." ALA. CODE § 30-3-151(2).

Contrary to Henry's framing, the child-porn exception seeks to prevent more than "contact offenses." It also advances the state's compelling interest in curbing the production, distribution, and possession of child pornography and the myriad uses of it that may harm a child. Henry's expert admits there remain "noncontact offenses" against children, such as "voyeurism" and "exhibitionism." Often, district courts subject offenders convicted of possessing child pornography to terms of supervised release that bar or limit their access to the internet. In Henry's case, for example, he could not access any internet source without the consent of his probation officer. But without internet pornography access, a child-sex offender may resort to the most vulnerable person near him to satisfy his sexual interest—the child in his own home.

As applied to federal offenders like Henry, the child-porn exception advances the state's compelling interest in *every* case because, as the state officials argue, "no one can predict precisely who will re-offend," and, as even Henry's expert agrees, "we will not know with certainty who will reoffend." The risk each child-porn

offender poses does not entirely "lend itself to proof by documentary record." *Williams-Yulee*, 575 U.S. at 447. No one can measure with precision the rate child-porn offenders commit or have committed sexual crimes. As the United States Sentencing Commission explains, "sexual offenses against children . . . often go unreported or undetected." U.S. SENT'G COMM'N, FEDERAL SENTENCING OF CHILD PORNOGRAPHY: NON-PRODUCTION OFFENSES 63 (2021), https://perma.cc/9SM5-JY8U (citing Ryan C. W. Hall & Richard C. W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 MAYO CLINIC PROC. 457, 460–61 (2007) (explaining that an "estimated 1 in 20 cases of child sexual abuse is reported or identified" and that "an arrest was made in only 29% of reported juvenile sexual assaults")); *see also* U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES 204 (2012), https://perma.cc/PYU5-57MB ("[T]he actual historical prevalence rate of [criminal sexually dangerous behavior] among child pornography offenders is higher than the known rate.").

Even the *known* rates of sexual deviance by possessors of child pornography are significant. Of federal offenders, 43.9 percent have engaged in "criminal sexually dangerous behavior," including contact and non-contact sex offenses and other child pornography offenses, either before or concurrently with their federal child pornography offense. U.S. SENT'G COMM'N, FEDERAL SENTENCING OF CHILD PORNOGRAPHY, *supra*, at 40–41. Nearly 30 percent of non-production offenders committed a contact sex offense with a minor, although only 11 percent were convicted for it.

*Id.* at 42. The Commission estimates that 94.7 percent of pre-conviction instances of illegal sexual behavior "involved victims who were minors," and the "most common type . . . was sexual molestation of a female prepubescent minor who knew the perpetrator . . . [such as] a family member or family friend." U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES, *supra*, at 204.

Of non-production federal offenders, 27.6 percent were *arrested*—i.e., caught—or had their supervised release revoked within three years of being released from prison. U.S. SENT'G COMM'N, FEDERAL SENTENCING OF CHILD PORNOGRAPHY, *supra*, at 63, 65. Of those, 4.3 percent of offenders were either arrested for a contact or non-contact sex offense, and 16.4 percent committed an administration of justice offense—including violating supervised release terms such as using pornographic materials, like Henry. *Id.* at 65. Alabama has "reasonably determined" that every child pornography possession convict is "inherently" a risk to the children closest to him. *Williams-Yulee*, 575 U.S. at 453. The risk may vary across circumstances, but Alabama's interest in preventing new sex crimes by convicted child-sex offenders remains in each case. The Constitution does not require proof that a child-sex offender is more likely than not to commit a new offense before limiting his right to reside with his minor child.

The child-porn exception is not, as Henry argues, "vastly overinclusive" as applied to those convicted under federal law for possessing child pornography. Henry gives as an example of its "startling overbreadth" a hypothetical college freshman convicted

for downloading pornographic photographs of his 16-year-old girl-friend. But the Alabama law, by its terms, is not tied to hypotheticals more suited to a law-school classroom; it is instead tailored to those convicted in a courtroom of a child-porn offense. In 2019, 99.4 percent of non-production child pornography offenders convicted in federal court possessed images or videos of prepubescent victims. U.S. SENT'G COMM'N, FEDERAL SENTENCING OF CHILD PORNOGRAPHY, *supra*, at 4. If the Commission had compiled the statistic in 2013, Henry would have been in that category. And 84 percent of the offenders received a sentencing enhancement for having images depicting abuse of an infant or toddler or depicting sadistic or masochistic conduct. *Id.* Henry was in that camp too. Far from burdening teenage sexters, the child-porn exception overwhelmingly affects only those who have possessed pornographic images of preteens and younger children—often of the most repugnant sort. Even if the remaining 0.6 percent were all teenage-sexter-turned-saints, it would establish only that the exception is not "perfectly tailored," which strict scrutiny does not require. *Burson v. Freeman*, 504 U.S. 191, 209 (1992) (plurality opinion); *see also Williams-Yulee*, 575 U.S. at 454.

Nor is the child-porn exception unconstitutionally underinclusive. According to Henry, the exception is fatally flawed because it allows child pornography possessors "*unsupervised* daytime visits with their children, subject only to the limit that those visits cannot last more than four hours on three consecutive days or ten aggregate days in one month." But the text of the exception does nothing to "reveal that [it] does not actually advance a compelling interest."

*Williams-Yulee*, 575 U.S. at 449. Alabama was not required to "address all aspects of a problem in one fell swoop." *Id.*

The child-porn exception stands as one line of defense in a comprehensive regime against child-sex crimes, *see, e.g.*, ALA. CODE §§ 13A-6-61(a)(3), (b), 13A-6-63(a)(3), (b) (making "sexual intercourse" and "sodomy" with another person "less than 12 years old" class A felonies); *id.* §§ 13A-6-62, 13A-6-64 (making "sexual intercourse" and "sodomy" with another person "12 years or older, but less than 16 years old" class B felonies); *id.* § 13A-6-65.1(a)(3), (b) (making "[p]enetrat[ion] [of] the vagina, anus, or mouth of a person who is less than 12 years old, with an inanimate object" a class A felony); *id.* § 13A-6-69.1 (making "sexual contact" with a "child less than 12 years old" a class B felony); *id.* § 13A-6-67(a)(2), (b)–(c) (making "subject[ion] [of] another person to sexual contact who is less than 16 years old, but more than 12 years old" a class A misdemeanor or a class C felony when committed by one "at least 15 years older than the victim"); *id.* § 13A-6-69 (making the "entice[ment]" of "any child under 16 years of age" to any place "for the purpose of proposing to such child" any sexual act a class C felony); *id.* § 13A-6-70(c) (explaining that a "person is deemed incapable of consent" to sexual contact when "[l]ess than 16 years old"). Moreover, in Alabama, the most serious sex offenses trigger permanent termination of parental rights. When "a parent has been convicted of rape" or "sodomy" "in the first degree" "or incest," the law requires "the juvenile court [to] make a finding that the parent is unable to properly care for a child" and "terminate the parental rights of the parent." *Id.* § 12-15-319(b). Even offenders

who do not trigger mandatory termination provisions may still suffer termination of their parental rights, as the state court must consider "[c]onviction of and imprisonment for a felony" when evaluating parental fitness. *Id.* § 12-15-319(a)(4).

By "limit[ing] contact to daytime visitation that can be controlled by the other parent," as the state officials explain, the child-porn exception reflects a careful balancing of child-sex offenders' rights against the threat that they pose. The exception is not under-inclusive simply because it "conceivably could have" terminated all one-on-one contact between child-sex offenders and their children. *Cf. Williams-Yulee*, 575 U.S. at 449.

Henry also contends that there is an "obvious" less restrictive means of serving Alabama's compelling interest: "a system of individualized review . . . used by every other state in the country for sex offenders." But I fail to understand how those systems are less restrictive. Those regimes allow the termination of all parental rights with fewer procedural protections and less proof of similar or even less culpable conduct. *See, e.g.*, MISS. CODE ANN. §§ 93-15-105, 93-15-121(g) (explaining that a chancery court may "terminat[e] . . . parental rights" if "by clear and convincing evidence" it finds that the "parent has committed . . . a series of physically, mentally, or emotionally abusive incidents . . . against [any] child"); *In re D.F.*, 777 N.E.2d 930, 933, 940 (Ill. 2002) (for parental rights to be terminable, the state need only show "by clear and convincing evidence" that a parent is "unfit" pursuant to "any one" of several factors including "[h]abitual drunkenness" and "[o]pen and

notorious adultery or fornication," 750 ILL. COMP. STAT. 50/1(D)(j)–(k), at a "fitness hearing"); *State ex rel. T.M.P.*, 126 So. 3d 741, 756 (La. Ct. App. 2013) (for parental rights to be terminable, the state "need only establish one statutory ground," including sexual abuse of any child and "gross[] negligen[ce]" toward any child, LA. CHILD. CODE ANN. art. 1015(3), "by clear and convincing evidence" at a trial court fact finding); *In re A.B.*, 815 N.W.2d 764, 769, 774 (Iowa 2012) (explaining that the state need only "establish[] a ground for termination," including "severe substance [ab]use," IOWA CODE § 232.116(1)(l)(2), by "clear and convincing evidence" at a juvenile court hearing). Indeed, in Alabama, a juvenile court may render a panoply of parental rights terminable upon "clear and convincing evidence" that the "parents . . . are unable . . . to discharge their responsibilities to and for the child." ALA. CODE §§ 12-15-311, 12-15-319(a).

By contrast, Henry was entitled to a jury trial about whether he was guilty of possessing child pornography beyond a reasonable doubt, *see Erlinger v. United States*, 144 S. Ct. 1840, 1855 (2024), with the assistance of constitutionally effective counsel, *see Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938), and the opportunity to confront and cross-examine all witnesses against him, *see Crawford v. Washington*, 541 U.S. 36, 42 (2004), before his residency right was limited. The Constitution does not oblige Alabama to use its comprehensive regime for terminating parental rights as an alternative to its modest statutory prohibition on Henry residing with his minor child after a federal court convicted him of a child-porn offense.

Because I would vacate the injunction entered by the district court and instruct it to enter judgment in favor of the state officials, I respectfully dissent.