**FOR PUBLICATION**

In the
# United States Court of Appeals
For the Eleventh Circuit

No. 24-10139

BRUCE HENRY,

*Plaintiff-Appellee,*

*versus*

SHERIFF OF TUSCALOOSA COUNTY, ALABAMA,
in his official capacity,
DISTRICT ATTORNEY OF TUSCALOOSA COUNTY, ALABAMA,
in his official capacity,
ATTORNEY GENERAL OF THE STATE OF ALABAMA,
in his official capacity,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:21-cv-00797-RAH-JTA

Before ROSENBAUM, ABUDU, and WILSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

Alabama enacted the Alabama Sex Offender Registration and Community Notification Act ("Act") in 2011. ALA. CODE § 15-20A-11. Under it, no sex offender may, among other things, "reside or conduct an overnight visit with a minor," even if they are the minor's parent, if "[t]he adult sex offender has been convicted of any sex offense involving a child, regardless of whether the adult sex offender was related to or shared a residence with the child victim." *Id.* § 15-20A-11(d)(4). This ban applies for the life of the parent and prevents them from living with their current and future children. Alabama offers no escape hatch from the Act for a person who falls within its confines.

So it prevents Plaintiff Bruce Henry, who was convicted of possessing images of child pornography and has since served his sentence and had a child with his wife, from living with his son. Henry challenged the Act as a violation of his fundamental right to live with his children. Alabama argued that, as a convicted sex offender, Henry had no such right.

As an en banc Court, we determined that Henry, like all parents, enjoys a fundamental right to live with his children. That does not mean that Alabama can't regulate or even abrogate that right. But to do so, the Act must survive strict scrutiny. That is, Alabama must show that its legislation is narrowly tailored to further its compelling interest in the safety of children. The en banc

Court remanded this case to us to determine whether the Act is narrowly tailored and survives strict scrutiny.

After careful consideration, we conclude that it does not. So we hold the Act to be unconstitutional as applied to Henry.

## I. BACKGROUND[1]

We summarize the background of this appeal in three parts. First, we discuss Henry's background. Second, we explain the aspects of the Act that govern this appeal and permanently prevent Henry from living with his son. And third, we review the procedural history of this case.

### *A. Henry's Background*

In 2013, Bruce Henry pled guilty to "knowingly possess[ing] . . . any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography." 18 U.S.C. § 2252A(a)(5)(B). When officers arrested him, Henry had two videos and 348 photos of prepubescent and adolescent girls, all of which he had downloaded from the internet. Before his arrest, Henry had no history of sexual offenses.

The district court sentenced Henry to 70 months in prison and 60 months of supervised release with special conditions. He served five years of his sentence before his release in March 2018.

[1] We take much of the background directly from our en banc opinion because not much has changed since we issued it. In the interest of convenience, we reprint the background here, with only a few updates.

After release, Henry completed a qualified Sex Offender Treatment Program, as well as individual and group counseling. Henry continues to attend weekly Sex Addicts Anonymous meetings. He also maintains a steady job, attends church, and volunteers.

We note two special conditions of Henry's supervised release. First, Henry must participate in the United States Probation Office's computer restriction-and-monitoring program. That program prohibits Henry from possessing or using certain electronic devices that may communicate with other electronic devices without the Probation Office's prior approval. And second, Henry may not have "any unsupervised, one-to-one contact with any children under the age of 18 *other than his own children*."

Despite these restrictions, while on supervised release, Henry in two instances accessed pornography. In July 2019, Henry admitted during a polygraphed interview that he used an Amazon Firestick to view pornography. A forensic examination revealed no saved images, but Henry had viewed images with "titles indicating that they were of young or teenage females." And Henry admitted in a follow-up polygraph test that he actively sought out images of teen girls and children posed in sexual positions.

Also, in December 2019, Henry used his wife's unlocked phone to search for pornographic images. He disclosed the incident to his sexual-offender-treatment provider but failed to inform his probation officer during the officer's home visit in January 2020. Instead, the probation officer learned about the incident from Henry's supervision report for that month.

Citing these violations, Henry's probation officer filed a petition to revoke Henry's supervised release. A federal district court declined. Instead, the court extended Henry's term of supervised release from 60 to 96 months (through March 2026). Since his December 2019 incident, Henry has not violated his supervised release.

In August 2021, Henry and his wife had a son. But because of the Act, Henry cannot live or reside overnight with him (and by extension, his wife).

*B. The Act*

As we've noted, Alabama enacted the Alabama Sex Offender Registration and Community Notification Act in 2011. The Alabama Legislature identified the Act's purpose as "not to punish sex offenders but to protect the public and, most importantly, promote child safety." ALA. CODE § 15-20A-2(5).

The Act prohibits any sex offender from, among other things, "resid[ing] or conduct[ing] an overnight visit with a minor" unless the sex offender "is the parent, grandparent, stepparent, sibling, or stepsibling of the minor." *Id.* § 15-20A-11(d). Those exemptions, though, are substantially less inclusive than they appear at first glance. That's so because Section 15-20A-11(d)'s exception itself has five exceptions.

As relevant here, a sex offender may not "reside or conduct an overnight visit with a minor," even if they are the minor's parent, if "[t]he adult sex offender has been convicted of any sex offense involving a child, regardless of whether the adult sex offender

was related to or shared a residence with the child victim."[2] *Id.* § 15-20A-11(d)(4). This subsection applies to Henry because a "sex offense involving a child" includes "offense[s] involving child pornography." *Id.* § 15-20A-4(27). And under Alabama law, child pornography includes "[a]ny visual depiction of an individual under 18 years of age engaged in any act of sexually explicit conduct, including a virtually indistinguishable depiction." *Id.* § 13A-12-190(2).

The Act's definitions of "reside" and "conduct an overnight visit" prevent Henry from living with his son.

Under Alabama law, a sex offender "reside[s]" at a place if they are "habitually or systematically present at" it. *Id.* § 15-20A-4(20). Courts determine whether a person meets that threshold, in turn, "by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place." *Id.* As a baseline, an offender "reside[s]" at a place if they "spend[] more than four hours a day" there "on three or more consecutive days" or "more than four hours a day" there "on 10 or more aggregate days during a calendar month." *Id.*

---

[2] None of the Act's other four exceptions apply to Henry. Alabama has not terminated (and is not currently terminating) Henry's parental rights, ALA. CODE § 15-20A-11(d)(1); Henry hasn't been convicted of a sexual offense involving his child or a minor with whom he resided, *id.* § 15-20A-11(d)(2), (3); and he has not been convicted of a sexual offense involving the forcible compulsion of a minor, *id.* § 15-20A-11(d)(5).

As for an "overnight visit," that occurs whenever an offender is in the same place as a minor for any part of the period "between the hours of 10:30 p.m. and 6:00 a.m." *Id.* § 15-20A-4(14) (explaining "[a]ny presence" is an overnight visit).

So to sum up, Section 15-20A-11(d) prevents Henry from being present in the same home as his son (1) at any time between the hours of 10:30 p.m. and 6:00 a.m.; (2) for more than four hours a day on three consecutive days; (3) for more than four hours a day on ten or more days during a calendar month; or (4) in any other circumstance where he is habitually and systematically present at his son's home.

These restrictions are permanent. Alabama law affords no offramp to Henry or anyone else: the Act contains no mechanism for offenders to challenge its prohibitions on residing or staying overnight with their own children. And that restriction persists for the rest of the offender's life. So even if the offender lives a law-abiding life for decades after their conviction and later has a child, they cannot live with that minor child. *See id.* § 15-20A-4(13). Nor can they seek or obtain relief from the prohibition.

### C. *Procedural History*

After Henry and his wife had their son, Henry sued the Sheriff and District Attorney of Tuscaloosa County and the Attorney General of Alabama. He sought to enjoin enforcement of the Act's prohibition against residing with his son. *See* 42 U.S.C. § 1983. When Henry and the Defendants moved for summary judgment, the district court granted Henry's motion. The court declared the

Act's prohibition against a parent living with their children facially unconstitutional and universally enjoined its enforcement.

A panel of this Court affirmed in part, reversed in part, and vacated and remanded in part. *Henry v. Sheriff of Tuscaloosa Cnty.*, 135 F.4th 1271, 1329 (11th Cir. 2025), *reh'g en banc granted, opinion vacated*, *Henry v. Sheriff of Tuscaloosa Cnty.*, 150 F.4th 1370 (11th Cir. 2025). It ruled that the prohibition against a parent residing with their own children, as applied, burdened Henry's "fundamental right to live with and raise [his] child." *Id.* at 1293. The panel also held that the prohibition didn't satisfy strict scrutiny. *Id.* at 1314. As to the district court's determination that the prohibition was facially unconstitutional and the corresponding universal injunction, the panel concluded that the district court erred, so the panel vacated the injunction. *Id.* at 1325, 1328.

Sitting en banc, we vacated the panel opinion and reheard the case. In those proceedings, Alabama argued that parents who engage in misconduct, including receiving a child-sex-offense conviction like Henry, lack a fundamental right to live with their children. We rejected Alabama's position. *Henry v. Sheriff of Tuscaloosa Cnty.*, 180 F.4th 1294, 1298 (11th Cir. 2026) ("*Henry II*"). Rather, we held that Henry enjoys a fundamental right to live with his children. *Id.* Because the Act deprives Henry of that right, we explained, we must apply strict scrutiny to it to determine whether, as applied to Henry, the Act is constitutional. *Id.* at 1302. As an en banc Court, we remanded the case to the panel to conduct that analysis. *Id.* at 1319. We address that issue now.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment, construing all evidence in the light most favorable to the non-moving party. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). An issue of fact is genuine if a reasonable trier of fact could return judgment for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law" and is not "irrelevant or unnecessary." *Id.*

## III. DISCUSSION

We divide our discussion into two parts. First, we review the framework for evaluating substantive-due-process claims. Second, we apply strict scrutiny to the Act as applied to Henry.

### A. *The Substantive-due-process Framework*[3]

The Due Process Clause of the Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Its guarantee is both procedural and substantive. *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). When, as here, a plaintiff

[3] As with much of the background section, we reprint much of our discussion of the substantive-due-process framework from the en banc opinion with very few updates. Again, not much has changed since then.

asserts a violation of his substantive-due-process rights caused by legislation, we generally use a two-step framework to resolve the claim. That framework employs two tracks.[4]

The first step of the framework dictates which track the analysis takes. That step requires us to determine whether a right is "fundamental." *Id.* at 710. Rights are fundamental if they are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 721 (cleaned up). Rights that don't satisfy this test are non-fundamental.

At the second step, we apply the correct level of scrutiny to the challenged government action. The level of scrutiny depends on whether we are on the fundamental-rights track or the non-fundamental-rights track.

On the fundamental-rights track, we scrutinize the government action. We do so because the deeply rooted and historically important nature of fundamental rights entitles them to more protection from the government than non-fundamental rights. If the right is fundamental, the government action that encumbers the right is presumptively wrongful, and the government bears the burden to show that its action is "narrowly tailored to serve a

---

[4] When a plaintiff contends that executive action violates his substantive-due-process rights, the question is whether the challenged conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846–48 (1998).

compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). We call this level of review strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004). Although strict scrutiny allows the government to regulate and even abrogate fundamental rights, it ensures that, when the government does so, it must act in a way that fundamental rights receive the respect and protection they are due.

In contrast, on the non-fundamental rights track, we only lightly review the challenged government action. We presume the government has acted lawfully, and we reject the plaintiff's claim so long as the government action is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. This is rational-basis review. Under it, we sustain the government's action if "there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Commcn's, Inc.*, 508 U.S. 307, 313 (1993); *see Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488 (1955).

So to be clear, that a right is fundamental does not end the inquiry. A right's fundamental status does not mean the government can't regulate it. Indeed, the government can and does constitutionally burden fundamental rights when it invokes a compelling interest and narrowly tailors its law to further that interest.

During the en banc proceedings here, we determined that Henry enjoys a fundamental right to live with his children, despite his conviction. *Henry II*, 180 F.4th at 1298. That puts us on the

fundamental-rights track. So we must apply strict scrutiny to the Act as applied to Henry.

*B. The Act fails strict scrutiny as applied to Henry.*

Because we review the Act on the strict-scrutiny track, Alabama bears the burden to show that its action is "narrowly tailored to serve a compelling state interest." *Flores*, 507 U.S. at 302.

Alabama certainly has a "compelling interest." Indeed, it "is indisputable 'that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)).

But "it is not enough for the [State] to identify a compelling interest." *Id.* "To survive strict scrutiny," Alabama "must prove" that Section 15-20A-11(d)(4) furthers "that compelling interest and" is "narrowly tailored to that end." *Id.* (cleaned up). Tailoring is especially important in cases like this one, which involve familial rights. After all, the State has no compelling interest in removing children from parents who are in fact competent to love and care for them. *See Stanley v. Illinois*, 405 U.S. 645, 652 (1972) ("[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents."); *Santosky v. Kramer*, 455 U.S. 745, 760 (1982) ("[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.").

Three factors guide our determination on whether state action is sufficiently tailored: overinclusiveness, underinclusiveness,

and the opportunity to enact less restrictive alternatives. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (explaining that compelling interests "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive"); *Dep't of State v. Muñoz*, 602 U.S. 899, 919 (2024) (acknowledging that a burden on a fundamental right "trigger[s]" the government's "obligation to demonstrate" that its action "is the least restrictive means of serving" its compelling "interest"). The Act fails on all three fronts.

**A. The Act is overinclusive.**

A law is overinclusive when it regulates too much conduct. In other words, the law applies to people for whom the government lacks a compelling interest in regulating. Overinclusive cases present the greatest constitutional concern because the government abridges constitutional rights without justification. *See Zablocki v. Redhail*, 434 U.S. 374, 390 (1978) (concluding a statute forbidding marriage without a court order was "substantially overinclusive" because it possibly prevented individuals, through marriage to wealthy spouses, from "improving their ability to satisfy" the prior familial support obligations that Wisconsin claimed to enact the statute to secure); *cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("[T]he record does not reveal any rational basis for believing that the Featherston home would pose any special threat to the city's legitimate interests.").

Narrow tailoring does not require "perfect tailoring." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015). Yet state action is not narrowly tailored if it advances the state's compelling interest

in only "some" cases. *Stanley*, 405 U.S. at 654; *Ent. Merchs. Ass'n*, 564 U.S. at 804.

And that's a problem with the Act. Alabama asserts that the Act advances its compelling interest by "not giving convicted child sex offenders a ready opportunity to offend again." But a conviction that qualifies under the Act does not alone predict with substantial precision an offender's likelihood of harming their own child. Nor does such a conviction offer, as Alabama law and our Constitution usually require, "clear and convincing evidence" that the regulated individual "is unsuited or unfit to assume the place of a [parent] in providing a safe and comfortable home . . . ." *Ex parte Sullivan*, 407 So. 2d 559, 563 (Ala. 1981) (quoting *Chandler v. Whatley*, 189 So. 751, 753 (1939)); *see Santosky*, 455 U.S. at 769 (requiring the clear-and-convincing standard of proof to terminate parental rights).

At its broadest, the Act covers some crimes that sustain little to no rational inference that a parent is likely to harm their child. For instance, the Act would bar from residing with their child a 19-year-old college freshman convicted of downloading sexually explicit content that their 16-year-old high-school sweetheart sent them. And because the Law operates forever without exception, that categorical bar would remain even if the 19-year-old college freshman later married his high-school sweetheart and fathered a child with her after living decades of a law-abiding life. Alabama offers no justification for treating that person exactly like one who just last week trafficked or raped children.

And for at least some of the core conduct the Act targets, the sole fact of a conviction is not sufficiently tailored to advance Alabama's interests in protecting children. The parties hotly contest whether a qualifying conviction, specifically a child-pornography conviction, may adequately stand in for the danger that a parent poses to a child. They do so primarily through expert testimony on the recidivism rates for sex offenders generally and child-pornography offenders specifically. *Cf. United States v. Kebodeaux*, 570 U.S. 387, 396 (2013) (acknowledging that, generally, there is "conflicting evidence" on sex offenders' recidivism rates). We briefly recount that evidentiary debate, crediting the evidence Alabama marshaled. But even applying our summary-judgment standard of review, Alabama has not shown the Act is narrowly tailored.

Alabama relies mostly on three figures to argue that child-pornography offenders recidivate at a high rate and therefore pose a continuing danger to their own children. First, Alabama suggests that within five years of release, an estimated 9.2% to 46% of child-pornography offenders will commit another sex offense. It reaches that estimate by multiplying a five-year sex-offense recidivism rate for child-pornography offenders (4.6%) by its experts' claim that actual recidivism rates are undercounted at a multiple of two to ten times the reported figures. Second, the State asserts that 50%—and up to 85%—of child-pornography offenders have previously committed a contact offense against a child (meaning an offense involving the sexual molestation of a child). And third, Alabama argues that, for those who have committed a contact offense and have recidivated, about a quarter did so even after ten years of living free

in their community. So the risk an offender poses, the State posits, does not decrease over time.

Henry disputes the relevance and the accuracy of some of these figures. He counters that Alabama fails to differentiate between child-pornography offenders who have committed a contact offense in the past and those who have not. And Henry's expert proffered that less than 2% of—that is, not even one in fifty—offenders who have only viewed or possessed child pornography, like Henry, commit a future contact offense.

Henry also contests the extrapolations the State makes from its estimates of unreported recidivism. Alabama's unreported-crime-multiplier, Henry's expert claims, relies on unreported crimes committed by those who have not yet been caught, not recidivism rates of those who have been convicted of an offense, like Henry. Henry's expert also argues that the risk of sexual recidivism halves every five years a person lives in the community as a law-abiding citizen. After around ten to fifteen years, Henry adds, most people who have committed a sex offense are no more likely to commit a new sex offense than are those with a non-sexual criminal history. And for low-risk sex offenders, Henry's expert points out that it may take only five years to pose a risk that is statistically indistinguishable from that of other non-sexual offenders.

Of course, we don't wade into these factual disputes at the summary-judgment stage. Rather, we must draw all reasonable inferences in favor of the non-movant (here, Alabama). *Marbury*,

936 F.3d at 1232. But even under the summary-judgment standard, Alabama has not carried its burden. That is so for two reasons.

First, none of the figures Alabama proffers show that Henry's qualifying conviction *necessarily* makes him and others like him, without more, a danger to their children. The Act doesn't distinguish between offenders like Henry—who haven't committed a previous contact offense and appear statistically unlikely to commit one in the future—and offenders who have committed a previous contact offense and who may be more likely to commit another. In other words, Alabama defends its Law by relying on material distinctions the law itself does not make and which do not even apply to offenders in Henry's shoes. That is a concession of overinclusiveness.

To be sure, the premise of Alabama's position is that many sexual offenses go unreported, so broad legislative categories are necessary to prevent likely *contact* offenders from recidivating with their own child. But as applied to the Act, that logic just uses a child-pornography conviction as a proxy for offenders who have previously committed a *contact* offense, even when they haven't. Then the Act uses the first proxy as a second proxy for the dispositive conclusion that the regulated offender poses a threat to their own child. *See Stanley*, 405 U.S. at 657 (holding, in parental-rights cases, "the determinative issues" are "competency and care"). But this logic—twice removed from Henry's *non-contact* situation—falls apart as soon as we look at the record, which offers no direct evidence that child-pornography-only offenders like Henry pose a

danger to their children. In this respect, Section 15-20A-11(d)(4) sweeps with too broad a brush.

Second, even if we disregard that error, the overinclusiveness problems persist. The most relevant statistic the State proffered was its first: that 9.2% to 46% of child-pornography offenders will commit another sex offense.

That figure raises several questions. For starters, it includes a substantial range because it depends on estimates of the amount of unreported recidivism. That range of uncertainty—a span of about 37 percentage points—is so large that it makes the estimate of recidivism meaningless.

Plus, even crediting the highest recidivism rate in that range, as we must in this posture, still more than half the parents the law prevents from residing with their children will not pose a danger to them. Indeed, our sister circuits have determined that a conviction for viewing child-pornography images, without more, does not establish that an offender is a danger to their own child. *See, e.g.*, *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006) (finding "plain error" where a district court barred a child-pornography offender from having unsupervised contact with his own daughter where there was "no evidence that he has abused a child"); *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. 2014) (vacating conditions limiting Bear's ability to reside with his children because, despite his prior sex offenses, the record did not show "a danger to his own three children"); *United States v. Del Valle-Cruz*, 785 F.3d 48, 64 (1st Cir. 2015) (same); *United States v. Worley*, 685 F.3d 404, 408–09

(4th Cir. 2012) (same). Of course, any new contact offense is truly a tragedy. But so is depriving a child of a caring, competent, loving parent who presents no danger to the child. And although narrow tailoring does not require "perfect tailoring," *Williams-Yulee*, 575 U.S. at 454, it demands more than a coin flip.

Other courts have held as much, declaring unconstitutional statutes that terminate parental rights based solely on the fact of a conviction, because they ignored individualized evidence relevant to a parent's fitness. *See, e.g.*, *In re Amanda D.*, 811 N.E.2d 1237, 1242 (Ill. App. Ct. 2004) ("We conclude that a conviction of aggravated battery to a child is not an adequate proxy for unfitness" because it "fails to take into account several things relevant to the ultimate fitness determination."), *aff'd sub nom. In re D.W.*, 827 N.E.2d 466 (Ill. 2005).

In short, Alabama cannot justify abridging fundamental rights by advancing its compelling state interests in "some" cases. *See Stanley*, 405 U.S. at 654 ("But all unmarried fathers are not in this category; some are wholly suited to have custody of their children."); *Ent. Merchs. Ass'n*, 564 U.S. at 804 ("[S]ome of the legislation's effect may indeed be in support of what some parents of the restricted children actually want . . . . [But] [t]his is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires."). And that's especially so when, as we discuss later, the Act doesn't even safeguard against those who are dangerous to their children. Plus, Alabama has other tools at its disposal to protect its children. The Act is fatally overinclusive.

**B. Alabama's Law is underinclusive.**

The Act is also underinclusive. A law is underinclusive if it leaves unregulated similar conduct that also threatens the compelling interest that the state action purports to advance. *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015). We assess a state action's underinclusiveness because a "woefully underinclusive" act may undermine our belief that the government truly wishes to advance its asserted interest. *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see City of Ladue v. Gilleo*, 512 U.S. 43, 52–53 (1994) (explaining underinclusiveness "diminish[es] the credibility of the government's rationale" for regulating fundamental rights).

Underinclusiveness doesn't raise the same constitutional concerns as does overinclusiveness. And some underinclusive situations may arise, as here, when no reasonable person would doubt that the government is genuine in its efforts to advance its asserted interest. Plus, the government "need not address all aspects of a problem in one fell swoop." *Williams-Yulee*, 575 U.S. at 449. But even so, the state bears the burden of identifying "good reason[s]" for "singl[ing] out" the conduct it did regulate. *TikTok Inc. v. Garland*, 604 U.S. 56, 75 (2025). And to the extent the government leaves unregulated some conduct that may undermine its asserted interest, that fact may hamper the government's ability to disprove the viability of proffered less restrictive alternatives.

The Act is puzzlingly underinclusive. The statute doesn't prohibit a covered offender from unsupervised visitation with "his or her child at the residence of the criminal sex offender where the

child does not also reside." *S.A.N. v. S.E.N.*, 995 So. 2d 175, 178 (Ala. Civ. App. 2008). That is, it "allows every qualifying adult sex offender daily unsupervised access to minors for four hours at a time in any one place on two consecutive days and nine aggregate days per month, as long as such access occurs between the hours of 6:00 a.m. and 10:30 p.m." *Henry v. Abernathy*, 711 F. Supp. 3d 1300, 1305 (M.D. Ala. Jan 10, 2024).

So while Alabama burdens many who may be fit to love and care for their children, at the same time, it may allow those who are in fact a danger to minors (for instance, those who have committed a contact offense against a child) to enjoy unsupervised access to their next potential victims. That is not the sort of narrow tailoring strict scrutiny looks favorably upon.

To be clear, we don't doubt that the Act reflects Alabama's genuine efforts to secure the safety and wellbeing of its children. We believe the State is sincere in exercising its *parens patriae* authority to the benefit of its citizenry. Maybe the legislature afforded even dangerous offenders the visitation rights we've just discussed to allow their children the benefit of a relationship with their parent, subject to a judicial determination that visitation is not in the child's best interest. *See S.A.N.*, 995 So. 2d at 178–79. But under strict scrutiny, where we must consider a law's effectiveness against less restrictive alternatives, a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on [fundamental rights], when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576

U.S. at 172 (internal quotation marks omitted) (quoting *Republican Party of Minn.*, 536 U.S. at 780).

**C. Alabama has less restrictive alternatives to the Act.**

That brings us to the next factor. State action infringing fundamental rights fails strict scrutiny "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. ACLU*, 521 U.S. 844, 874 (1997). Put simply, "the government cannot" advance a compelling interest "by means that 'broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Lynch v. Baxley*, 744 F.2d 1452, 1459 (11th Cir. 1984) (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

That doesn't mean that states must affirmatively proffer and then rebut less restrictive alternatives. *United States v. Grady*, 18 F.4th 1275, 1286 n.12 (11th Cir. 2021) (discussing least-restrictive alternatives under the Religious Freedom and Restoration Act); *see also Knight v. Thompson*, 797 F.3d 934, 946 (11th Cir. 2015) (acknowledging that, at least under the Religious Land Use and Institutionalized Persons Act, we split on this issue with the First and Third Circuits, which require that governments show they considered and rejected less restrictive alternatives). But if a plaintiff "present[s]" the government "with a plausible, less restrictive alternative," the government must "prove the alternative to be ineffective." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 823 (2000); *Grady*, 18 F.4th at 1286.

Here, Alabama could employ less restrictive alternatives to accomplish its goals. Henry suggests five different ways Alabama could more narrowly tailor its statute: by holding individualized hearings to assess a parent's fitness, by allowing residence under certain conditions (such as the presence of a qualified caregiver or ongoing supervision by the Alabama Department of Human Resources), by including fewer qualifying offenses, by time-limiting its law, or by providing criteria for reinstatement into the home (like completion of a treatment program).

Henry focuses primarily on the alternative that Alabama could offer the opportunity for judicial review and individualized relief, so we do, too. But other alternatives Henry suggests are also viable—like allowing residence with the presence of a qualified caregiver. So are more narrowly tailored alternatives Henry doesn't suggest—like a rebuttable presumption, or some combination of the other suggestions.

This case doesn't require us to decide the best alternative; it requires us to determine only whether viable more narrowly tailored alternatives exist. They do.

The Act prevents covered offenders from living with their children "regardless of the opinion of experts, lay persons, and the trial court that the registered sex offender does not pose a threat to the child." *K.E.W. v. T.W.E.*, 990 So. 2d 375, 381 (Ala. Civ. App. 2007). So if Henry filed suit to prove his fitness as a parent, the Act would foreclose the claim and forbid the judge from considering any evidence on the matter.

But Henry has developed evidence that a person's likelihood of recidivism declines substantially when we account for certain factors and that an individualized review can offer the most accurate assessment of the danger a particular person may pose to their child.[5] Plus, generally, "parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody." *Stanley*, 405 U.S. at 658; *cf. Doe v. Kearney*, 329 F.3d 1286, 1295 (11th Cir. 2003) ("[A] state may not remove a child from parental custody without judicial authorization unless there is probable cause to believe the child is threatened with imminent harm."). So Henry has proffered a plausible less restrictive alternative, *see ACLU*, 521 U.S. at 874: individualized hearings.

Alabama suggests that, by proposing an individualized hearing, Henry seeks only "procedural due process" protection. Not so. Henry doesn't contest the "constitutional adequacy of [state] procedures," *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), like

---

[5] Alabama also hasn't shown that the future dangerousness of a person convicted of a non-contact offense is the same as, or even similar to, the future dangerousness of a person who has committed a contact offense. So limiting the list of qualifying crimes to contact offenses or a sub-category of contact offenses may offer another viable more narrowly tailored alternative. Even so, Alabama would have to show that people convicted of contact offenses are forever so likely to reoffend (or are otherwise overwhelmingly dangerous to their children physically or mentally) that prohibiting them to reside with their own children is a narrowly tailored way to further the state's compelling interest in protecting children. But that information is not currently before us because we consider only Henry's as-applied challenge. And Henry's as-applied class consists of only those who have committed only non-contact offenses.

when a person challenges the acceptability of post-deprivation hearings, *id.* at 349; the applicable standard of proof, *Santosky*, 455 U.S. at 769–70; or the lack of appointed counsel, *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 31–32 (1981). Instead, Henry's claim sounds in substantive due process.

He raises the opportunity for individualized relief only to show a problem with Alabama's tailoring: there isn't an "adequa[te] . . . 'fit' between the classification and the policy that the classification serves." *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989). That the less restrictive alternative is more procedure is immaterial.

The Supreme Court has recognized that certain procedural rules may satisfy substantive due process by furthering a compelling state interest. *See, e.g.*, *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 280–85 (1990) (concluding Missouri could require clear and convincing evidence of a patient's intent before discontinuing nutrition and hydration because such a requirement permissibly furthers the state's interest in safeguarding the patient's wishes and preserving life); *United States v. Salerno*, 481 U.S. 739, 750–51 (1987) (holding the Bail Reform Act's restriction of physical liberty was justified by the "careful delineation of the circumstances" in and the procedures by which one could be detained before trial, furthering the government's interest in abating "an identified and articulable threat to an individual or the community"). At bottom, claims that a statute is unconstitutional as applied to a plaintiff—because the plaintiff "is not likely to be currently

dangerous"—"'must ultimately be analyzed' in terms of substantive, not procedural, due process," at least if, as is the case here, dangerousness is not already "relevant under the statutory scheme." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7–8 (2003) (quoting *Michael H.*, 491 U.S. at 121)*; see also Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 648–50 (1974) (explaining how an irrebuttable presumption can violate substantive-due-process rights).

Alabama disputes the viability of individualized hearings. It contends that no expert tool can establish with a reasonable degree of scientific accuracy whether an offender poses a risk to their child. In Alabama's view, individualized determinations could never advance its compelling interest as effectively as its current statutory scheme because some future offenders may slip through the cracks of any individualized process. But Alabama has failed to introduce evidence that satisfies its burden of proving that the mere availability of individualized relief will make its statutory scheme less effective. *See Playboy Ent. Grp.*, 529 U.S. at 823; *Grady*, 18 F.4th at 1286. That's so for three reasons.

First, Alabama too narrowly defines the end to which it must narrowly tailor its law. Alabama must advance "the physical and psychological well-being" of *all* its children. *Otto*, 981 F.3d at 868 (citation omitted). Yet as we've noted, "the State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley*, 405 U.S. at 652. So if Henry, or any other parent, "is a fit" one, then Alabama "spites its own articulated

goals when it needlessly separates him from his family." *Id.* at 652–53.

In turn, the most effective means of pursuing Alabama's stated goal is the one that maximizes the number of children who can remain with fit parents while minimizing the number of children who may be placed with unfit ones. On this rubric, permitting some form of individualized relief comports more effectively with advancing the State's interests than does a categorical rule. *See id.* at 655 ("Given the opportunity to make his case, Stanley may have been seen to be deserving of custody of his offspring. Had this been so, the State's statutory policy would have been furthered by leaving custody in him."). And that's especially so when, as we discuss in the second point, the Act doesn't even ensure the safety of affected children.

"[W]hen . . . the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child." *Id.* at 657. "The State's interest in caring for [Henry's] children is de minimis if [Henry] is shown to be a fit father." *See id.* at 657–58. And the advantage of the convenience of an irrebuttable presumption "is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family." *Id.* at 658.

Second, Alabama fails to show how the opportunity for individualized adjudications will make its statutory scheme less effective, given the law's underinclusiveness. As we've noted, the Act

permits even the worst covered offenders periods of unsupervised access to their children.[6] We understand those visitation rights as an attempt to balance the competing interests at stake in this difficult area of family law. But even so, Alabama has not adduced evidence that employing a scheme that permits some individualized determinations that a parent is fit to reside with their child would undermine its interests.

For starters, Alabama has not offered evidence on how likely its trial courts are to err in making individualized determinations. Nor has it shown that the number of future offenders who may slip through the cracks of an alternative scheme with individualized relief would be greater than the number of those who would harm their children under the Act's current operation. And that seems especially unlikely if the alternative scheme eliminates the Act's current underinclusivity and is narrowly tailored to cover those who either decline their opportunity for individualized relief, *see Lehr v. Robertson*, 463 U.S. 248, 264–65 (1983), or, after petitioning for relief, are adjudicated to be dangerous, *see Stanley*, 405 U.S. at 654–55.

After all, to police the statute's current underinclusiveness, the "legislature obviously relie[s] heavily on the understanding that trial courts" will "restrict the visitation rights of a parent who poses a danger of sexually abusing a child." *S.A.N.*, 995 So. 2d at 179. So

---

[6] This is a reason why another alternative—requiring the presence of a qualified caretaker at all times—is another more effective, more narrowly tailored viable alternative to the Act.

the State can't reasonably contend that individualized adjudications are so often wrong that they seriously threaten the Act's effectiveness; it already relies on them. Without more evidence, we can't conclude that a genuine dispute of material fact exists on whether Henry's proffered alternatives are less effective.

Third, and relatedly, to the best of our knowledge, every other state in the country gives offenders the chance to prove that they do not pose a danger to their child or that it is in the child's best interest to live with them. Indeed, in the district-court proceedings, both the parties and the district court were "unaware of any statute enacted by another state substantially similar to [the Law]." *Henry*, 711 F. Supp. 3d at 1305.

That fact is important to the analysis of less restrictive alternatives. If the Act is an outlier, we can more easily conclude that Henry successfully proffered a viable less restrictive alternative. *See Poe v. Ullman*, 367 U.S. 497, 554 (1961) (Harlan, J., dissenting) ("[C]onclusive, in my view, is the utter novelty of this enactment."); *cf. Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) ("It is instructive that no case or holding of this Court has approved of a statute as broad in its reach."). The Supreme Court has confirmed that other states' practices may show that a given measure has "already proven effective" in advancing the State's interests. *TikTok*, 145 S. Ct. at 71; *see McCullen v. Coakley*, 573 U.S. 464, 490–494 (2014) (concluding a state law burdened more speech than necessary where it had not considered less restrictive measures successfully adopted by other jurisdictions).

In sum, because Section 15-20A-11(d)(4) is both overinclusive and underinclusive, and because less restrictive alternatives are plausibly at least just as effective, the law as applied to Henry, a non-contact offender, fails strict scrutiny. *See In re Amanda D.*, 811 N.E.2d at 1238, 1241–48 (holding unconstitutional a statute that terminated parental rights based solely on the fact that the parent "was previously convicted of aggravated battery of a child").

## IV. Conclusion

For the foregoing reasons, we conclude that the Act fails strict scrutiny as applied to Henry. We therefore affirm the district court's ruling as applied to Henry.

**AFFIRMED AS APPLIED TO HENRY.**